UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

NATIONAL INDEMNITY COMPANY,                )
                                           )
                    Plaintiff,             )
                                           )
        vs.                                )
                                           )
STONEWALL INSURANCE COMPANY AND            )
SEATON INSURANCE COMPANY,                  )
                                           )
                    Defendants.            )
-------------------------------------------------------------x

Civil Action No. 08 Civ. 3718 (RWS)
(ECF Case)

**DECLARATION OF
JAMES McCONNELL**

I, JAMES McCONNELL, pursuant to 28 U.S.C. § 1746, state as follows:

1.      I am a member of the Bar of the United States District Court for the Southern District of New York and a partner at Hargraves McConnell & Costigan, P.C.  Along with the firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, we are attorneys for Defendants Stonewall Insurance Company ("Stonewall") and Seaton Insurance Company ("Seaton") (collectively, "Defendants").  I make this declaration in support of Defendants' motion under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and Sections 3 and 4 of the Federal Arbitration Act ("FAA") to: (i) dismiss the complaint of National Indemnity Company ("NICO"), or stay this action in favor of arbitration; and (ii) compel NICO to arbitrate.

2.      Annexed hereto as Exhibit A is a true and correct copy of the Aggregate Reinsurance Agreement between Stonewall and NICO.

3.      Annexed hereto as Exhibit B are true and correct copies of the Aggregate Retrocession of Loss Portfolio Agreements between Seaton and NICO.

4.      Annexed hereto as Exhibit C is a true and correct copy of NICO's January 4, 2006 demand for arbitration against Stonewall.

5.     Annexed hereto as Exhibit D is a true and correct copy of NICO's January 4, 2006 demand for arbitration against Seaton.

6.     Annexed hereto as Exhibit E is a true and correct copy of NICO's May 22, 2006 amended demand for arbitration against Seaton.

7.     Annexed hereto as Exhibit F is a true and correct copy of NICO's May 22, 2006 amended demand for arbitration against Stonewall.

8.     Annexed hereto as Exhibit G is a true and correct copy of Stonewall's June 22, 2006 counter-demand for arbitration against NICO.

9.     Annexed hereto as Exhibit H is a true and correct copy of Seaton's June 22, 2006 counter-demand for arbitration against NICO.

10.     Annexed hereto as Exhibit I is a true and correct copy of the May 3, 2007 stipulation between NICO and Stonewall, under cover of a letter from NICO's counsel, Michael A. Knoerzer of LeBoeuf, Lamb, Greene & MacRae LLP.

11.     Annexed hereto as Exhibit J is a true and correct copy of the May 3, 2007 stipulation between NICO and Seaton, under cover of a letter from NICO's counsel, Michael A. Knoerzer of LeBoeuf, Lamb, Greene & MacRae LLP.

12.     Annexed hereto as Exhibit K is a true and correct copy of Stonewall's March 20, 2008 demand for arbitration against NICO.

13.     Annexed hereto as Exhibit L is a true and correct copy of Seaton's March 20, 2008 demand for arbitration against NICO.

14. Annexed hereto as Exhibit M is a true and correct copy of Stonewall's proposed final award in the 2006 Arbitrations.

15.  Annexed hereto as Exhibit N is a true and correct copy of Seaton's proposed final award in the 2006 Arbitrations.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.


Dated:  New York, New York
      July 23, 2008

By: _____
      James McConnell (jdmcconnell@hm-law.com)

# EXHIBIT  A

5/04/2000 17:39 FAX 212 909 6636   DEBEVOISE & PLIMPTON   P. 02
MAY-05-2000 FRI 02:04 PM   FAX NO.

RA-1385

# AGGREGATE REINSURANCE AGREEMENT

between

## STONEWALL INSURANCE COMPANY,

Cincinnati, Ohio

and

## NATIONAL INDEMNITY COMPANY

Omaha, Nebraska

MICHAEL FRIEDMAN, CSR

NO.: 24

DATE: 3/6/07

Contract No. RA 1385

5/04/2000 17:59 FAX 212 909 6836        DEBEVOISE & PLIMPTON                    ⊠005
MAY-05-2000 FRI 02:04 PM                          FAX NO.                       P. 03

This Aggregate Reinsurance Agreement ("Reinsurance") is made between Stonewall Insurance Company, Cincinnati, Ohio (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

## ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Reinsurance shall take effect on the Effective Date. This Reinsurance shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Reinsurance ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Reinsurance shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

## ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $240,000,000.  UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $240,000,000 (TWO HUNDRED AND FORTY MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS REINSURANCE.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Reinsurance follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance.

## ARTICLE 3.  EXCLUSIONS

    A.   This Reinsurance shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

    B.   In addition to Article 3(A) above, this Reinsurance shall not cover any sums which, after application of best practice procedures for the adjustment and settlement of claims in accordance with the terms and conditions of an Insurance Policy/Reinsurance Contract, should have been paid or which should have been booked as paid in the books and records of Reinsured prior to the Effective Date. This Article 3(B) shall be capped at $4,000,000 net of applicable reinsurance (other than this Reinsurance) and shall expire two years from the date of Reinsurer's receipt of Premium under Article 6 of this Reinsurance.

    C.   This Reinsurance shall not cover any liability (a) in respect of the fraud of a

director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts not reinsured hereunder.

D.   This Reinsurance shall not cover any Unallocated Loss Adjustment Expense.

E.   This Reinsurance shall not cover any policyholder dividends, return premiums and retrospective or loss sensitive premiums (except reinstatement or adjustment premiums (1) paid in connection with reinsurance inuring to the benefit of the Reinsurer with respect to risks reinsured under this Reinsurance or (2) where the payment of such amounts benefits the Reinsurer either by way of reduction in the net present value of the liabilities of the Reinsurer with respect to risks reinsured under this Reinsurance or by increasing reinsurance recoverables or coverage available to the Reinsurer hereunder in an amount greater than the dividend or premium.

F.   This Reinsurance shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

G.   This Reinsurance shall not cover any liability incurred by the Reinsured under insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

H.   This Reinsurance shall not cover any liability with respect to occurrences or, for claims-made exposures, claims made, which are properly allocated to insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

ARTICLE 4.  DEFINITIONS

A.   Wherever used in this Reinsurance, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was issued on or prior to January 1, 1992. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under

this Reinsurance, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the scope of business covered hereunder (subject always to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured in this regard.

B.  Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean (1) that sum which is paid or payable by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured; and (2) the amounts excepted from the exclusion in Article 3(E). Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(C). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

C.  Wherever used in this Reinsurance, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

D.  Wherever used in this Reinsurance, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

E.  Whenever used in this Reinsurance, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

F.  Whenever used in this Reinsurance, the term "Claims Servicer" shall mean (1) the Reinsured; (2) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof; or (3) such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of the Reinsured.

G.  Whenever used in this Reinsurance, "Effective Date" shall mean 12:01 a.m., Eastern Standard Time on May 1, 2000.

H.  Whenever used in this Reinsurance, "Acquisition" shall mean the acquisition of the Reinsured by Dukes Place Holdings, L.P. pursuant to the Stock Purchase Agreement entered into between Great American Insurance Company and Dukes Place Holdings, L.P.

I.  Whenever used in this Reinsurance, "Closing" shall mean the closing of the Acquisition.

J.  Whenever used in this Reinsurance, "Closing Date" shall mean the date of the Closing.

## ARTICLE 5.  SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Reinsurance is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any reinsurance recoverables, salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/ Reinsurance Contracts with respect to claims paid or reimbursed by Reinsurer to Reinsured under this Reinsurance. It is understood and agreed that reinsurance recoverables, salvage and subrogation in respect of claims paid by the Reinsured prior to the Effective Date (as determined by the books and records of the Reinsured or which should have been booked as paid prior to the Effective Date) shall be the property of the Reinsured, up to the amount recorded in Reinsured's closing balance sheet delivered following the Closing in accordance with the Stock Purchase Agreement. All sums in excess of such cap shall be solely for the account of the Reinsured. The whole of any receipts for the account of the Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall take all steps reasonably necessary to collect from solvent reinsurers; including drawing down all letters of credit, withdrawing funds from trusts or charging collections against funds held to collect amounts due Reinsured.

## ARTICLE 6.  PREMIUM

As the consideration for the rights and obligations set forth in this Reinsurance, Reinsurer agrees to accept and the Reinsured agrees to pay (i) a minimum base premium of U.S. $126 million (one hundred and twenty-six million United States Dollars); plus, in addition thereto, an amount equal to 7.5% of the base premium calculated on a per annum basis from the Effective Date through the date of receipt of the full amount of the premium by Reinsurer. Payment shall be made in immediately available U.S. funds

by wire transfer to:

Norwest Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058
Account No. 1150-001-492

It is understood and agreed that the premium stated in this Reinsurance is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Reinsurance as such charges are the responsibility of the Reinsured, and further that the premium shall not be subject to any offsets or other reductions. The premium is non-refundable. The premium will be paid to the Reinsurer on or before the Closing Date, subject to a December 31, 2000 termination date.

Upon Reinsurer's receipt of the premium, Reinsurer will immediately reimburse Reinsured for Ultimate Net Loss paid by Reinsured on and after the Effective Date, for and only to the extent that reinsurance is otherwise provided hereunder, less all reinsurance recoveries, salvage and subrogation received by Reinsured arising out of the payment of such Ultimate Net Loss for the period from and including the Effective Date to and including the Closing Date.

## ARTICLE 7. CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

## ARTICLE 8. ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Reinsurance to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Reinsurance do not constitute a waiver of any rights or remedies that the party has under this Reinsurance to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Reinsurance, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the

10/04/2000 17:40 FAX 212 909 6636    DEBEVOISE & PLIMPTON                    @002
MAY-05-2000 FRI 02:06 PM                            FAX NO.                    P. 08

Reinsurer. This Reinsurance may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

## ARTICLE 9. ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer during normal business hours, all records of the Reinsured and Claims Servicer relating to this Reinsurance. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer during normal business hours, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy during normal business hours all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Reinsurance. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily change its domicile without prior written consent of the Reinsurer, which consent will not be unreasonably withheld or delayed.

In the event that, following the Effective Date, the Reinsured buys any additional reinsurance or retrocessional protection in respect of any Insurance Policy/Reinsurance Contract reinsured under this Reinsurance, this Reinsurance will automatically become excess of such additional reinsurance or retrocessional protection.

## ARTICLE 11. CONDITIONS

A.  With effect from the Effective Date, Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B.  In addition to the Reinsurer's general right to associate as set forth in A. above, and with effect from the Effective Date, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any individual gross claim settlement, quarterly account settlements or other payments in respect of the adjustment of Underlying Claims covered by this Reinsurance in excess of U.S. $150,000; (2) any insurance policy buy-back, return premium, commutation or like payment in excess of U.S. $250,000; and (3) any commutations or assignment of ceded reinsurance regardless of value. With respect to items (1) and (2) herein,

/04/2000 17:40 FAX 212 909 6836    DEBEVOISE & PLIMPTON
MAY-06-2000 FRI 02:06 PM    FAX NO.    P. 09

Reinsurer's approval shall not be unreasonably withheld or delayed.

C.  If Reinsurer fails to approve any payment or settlement of an Underlying Claim for which Reinsurer's approval is required, and has in fact been sought, within a reasonable period of time following submission for approval to the Reinsurer, despite Reinsured's reasonable efforts to obtain such approval, during the period from the Effective Date to the Closing Date, Reinsurer agrees to indemnify and defend Reinsured from any and all losses, liabilities or reasonable expenses directly arising out of Reinsurer's failure to so approve the payment or settlement. It shall be a condition precedent of Reinsurer's obligation in this regard that Reinsured shall give Reinsurer immediate notice of any facts or circumstances likely to give rise to an indemnification or defense obligation of the Reinsurer, and Reinsurer shall furthermore have the right but not the obligation to assume direct control of negotiation, litigation, or settlement of any such loss or liability. Reinsured shall be obligated to cooperate with Reinsurer in this regard. This Article 11(C) shall survive termination hereof for any reason including the failure to consummate the Closing.

D.  No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than the Reinsured or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Reinsurance, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Reinsurance and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given,

7/04/2000 17:40 FAX 212 909 6636    DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:07 PM                        FAX NO.                              P. 10

Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Reinsurance in a manner reasonably acceptable to Reinsurer.

In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer.

If at any time after the Effective Date, Reinsurer becomes the Claims Servicer and the Run-Off Agreement is no longer in force, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expenses it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12. OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Reinsurance or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer.

## ARTICLE 13. INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this

10/04/2000 17:41 FAX 212 909 6836     DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:07 PM                          FAX NO.                          P. 11

Reinsurance shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Reinsurance shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/Reinsurance Contracts. It is agreed, that the liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14. ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Reinsurance, including its formation and validity, and whether arising during or after the period of this Reinsurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Reinsurance). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt

of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Reinsurance. The arbitration shall be conducted in the English language. This Reinsurance shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

## ARTICLE 15. NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Reinsurance upon exhaustion of the Aggregate Limit or for any other reason.

## ARTICLE 16. NO RIGHTS OF THIRD PARTIES

Nothing in this Reinsurance, express or implied, is intended, or shall be construed

10/04/2000 17:41 FAX 212 909 6836    DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:08 PM    FAX NO.    P. 13

to confer upon or give to any person, firm or corporation (other than the parties hereto and their permitted assigns or successors), any rights or remedies under or by reason of this Reinsurance.

### ARTICLE 17.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 3024 Harney Street
> Omaha, Nebraska  68131
> Attn: General Counsel
> Telecopy:  (402) 536-3266

> To the Reinsured (1) from the Effective Date to (but not including) the Closing Date, and (2) anytime if there is no Closing:

> Great American Insurance Company
> 580 Walnut Street
> Cincinnati, Ohio  45202
> Attn:  Eve Cutler Rosen, Esq.
> Telecopy:  (513) 369-3655

> To the Reinsured on and after the Closing Date:

> Stonewall Insurance Company
> c/o Eastgate, Inc.
> P.O. Box 9510
> Boston, Massachusetts  02114-9510
> (street address:  7 Bulfinch Place)
> Attn:  Bryan Klinck
> Telecopy:  (617) 725-1599

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.  Notice shall be deemed effective:

1.  If communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2. if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

## ARTICLE 18.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

## ARTICLE 19.  ENTIRE AGREEMENT

The parties hereto agree that this Reinsurance is not cancelable or voidable. This Reinsurance is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

## ARTICLE 20.  REPORTS AND REMITTANCES

Reports.  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Reinsurance within 45 days of the close of each calendar quarter (the "Quarterly Reports"). The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Reinsurance and estimating receipts and disbursements for the following month. The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Reinsurance.

Annual Statement. As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

Claims Account.  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account"). The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Reinsurance. In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Reinsurance. Interest on funds in the Claims Account shall be the property of the Reinsurer. Subject

10/04/2000 17:41 FAX 212 909 6836        DEBEVOISE & PLIMPTON                    ☒015
    MAY-05-2000 FRI 02:09 PM                            FAX NO.                        P. 15

to all other terms of this Agreement and following receipt of Premium, Reinsurer will settle
its liabilities as due no less frequently than quarterly and payments will be made in cash.

### ARTICLE 21.  RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine
the amount of its reserves on the Underlying Claims and may change those reserves from
time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the
Reinsurer shall determine the amount of its reserves on its liability hereunder and may
change those reserves from time to time as its, in its sole discretion, deems necessary
or appropriate. Notwithstanding the foregoing, Reinsurer's reserves shall be no less than
Reinsured's reserves on the Underlying Claims.

### ARTICLE 22.  CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's
consent has not been obtained under Article 10) the Reinsured is advised by an
insurance regulatory authority in which it is licensed or is an accredited reinsurer that,
during the term of this Reinsurance, it will not be able, due to the licensing status or the
lack of appropriate accreditation (or other qualification similarly required by an applicable
insurance regulatory authority in any jurisdiction within the United States of America to
assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance
recoverables hereunder (whether paid or unpaid) in its then current financial statements
required by appropriate state insurance regulatory authorities in any jurisdiction within the
United States, and the Reinsured gives the Reinsurer written notice to such effect, the
Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for
such reinsurance recoverables in such then current financial statements, which may
include any one or combination of the following: providing funds withheld, cash advances,
a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate
insurance regulatory authorities, amending this Reinsurance in form but not in substance
or such other action acceptable to Reinsurer and applicable insurance regulatory
authorities. The Reinsurer has sole discretion in which necessary steps to take, and the
Reinsurer will fully cooperate in implementing the steps so chosen, so long as the steps
the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest
and all other investment income on any funds posted as security pursuant to Article 22
shall be sole property of Reinsurer.

### ARTICLE 23.  TERRITORY

The Reinsurance shall apply to Insurance Policies/Reinsurance Contracts covering
risks wherever situated.

### ARTICLE 24.  INTERMEDIARY

10/04/2000 17:42 FAX 212 909 ~~36          DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:09 PM                            FAX NO.                              P. 18

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Reinsurance.

## ARTICLE 25.  COUNTERPARTS

This Reinsurance may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

## ARTICLE 26.  DUE DILIGENCE

Reinsurer acknowledges that it has conducted its own due diligence review of Reinsured's business and operations and that it is relying on its own independent investigation in making its decision to enter into this Agreement. Reinsurer is not relying upon any representation or warranty made on or prior to the Effective Date by Reinsured or any of its affiliates, subsidiaries or parent which is not expressly set forth in this Agreement.

1/04/2000 17:42 FAX 212 909 6836        DEBEVOISE & PLIMPTON                     ☒017

8.    2000 10:48 FAX 212 909 8863        DEBEVOISE & PLIMPTON                 ☒003/003
MAY-03-2000 WED 03:08 PM                         FAX NO.                        P. 18/26

### ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at __Cincinnati, OHIO__ on this __9th__ day of __May__, 2000.

STONEWALL INSURANCE COMPANY

By _____
      Gary J. Gruber
Title: Chairman & Vice President

and at _____, _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                DUKES PLACE HOLDINGS L.P., by
                                       its General Partner Dukes Place
                                       Holdings Ltd.

By _____            By _____
Title:                                Title:

0/04/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON    @018
MAY-05-2000 FRI 02:09 PM    FAX NO.    P. 17

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptances.

Executed at _____, _____ on this ____ day of _____, 2000,

STONEWALL INSURANCE COMPANY


By_____

Title:


and at Stafd, Conn. on this 5ᵗʰ day of May, 2000.

NATIONAL INDEMNITY COMPANY


By_____

Title: VICE PRESIDENT

Acknowledged and Accepted:

EASTGATE GROUP LIMITED

DUKES PLACE HOLDINGS L.P., by its General Partner Dukes Place Holdings Ltd.


By_____
Title:

By_____
Title:

1/04/2000 17:42 FAX 212 909 8836          DEBEVOISE & PLIMPTON                    ☒019

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Dukes Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at _____, _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                    DUKES PLACE HOLDINGS L.P., by
                                          its General Partner Dukes Place
                                          Holdings Ltd.

By _____ _L.E. Randall___          By_____
Title: _____ _Chief Executive_         Title:

'04/2000 17:42 FAX 212 908 6836    DEBEVOISE & PLIMPTON    NO. 3591    P. 020
'?5MAY. 5, 2000- 4:04PM    P  NWICH ST. CAPITAL    FAX NO.    P. 18/24
- MAY-03-2000 WED 03:48 PM

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this 5ᵗʰ day of MAY , 2000.

STONEWALL INSURANCE COMPANY

By_____

Title:

and at _____, _____ on this ____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY

By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED

By_____
Title:

DUKES PLACE HOLDINGS L.P., by its General Partner Dukes Place Holdings Ltd.

By_____
Title:

<u>Amendment No. 1</u>
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

<u>Article 11</u>

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at  Cincinnati, Ohio
on this 29 day of September, 2000.

STONEWALL INSURANCE
COMPANY


By: K. Ada Gorrell
Name:  Karen Holley Horrell
Title:  Vice President

Executed at _____,
on this ___ day of September, 2000.

NATIONAL INDEMNITY COMPANY



By: _____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited


By: _____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner


By: _____
Name:
Title:

4/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON    70  6:22AM;    022
; Chitogenics, Inc.;    973 286 3332;    Sep.-    Page 3/6

<u>Amendment No. 1</u>
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

<u>Article 11</u>

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____
on this __ day of September, 2000.

STONEWALL INSURANCE
COMPANY


By:_____
Name:
Title:

Executed at _____, _____
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY


By:_____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited


By:_____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner

By:_____
Name:
Title:

/04/2000 17:42 FAX 212 909 6836        DEBEVOISE & PLIMPTON                    @023
SEP-28-2000 THU 02:38 PM                          FAX NO.                      P. 03/03

**Amendment No. 1**
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____,                  Acknowledged and Accepted:
on this ___ day of September, 2000.
                                             Eastgate Group Limited
STONEWALL INSURANCE
COMPANY
                                             By:_____
                                             Name:
                                             Title:
By:_____
Name:                                        Dukes Place Holdings, L.P.
Title:                                       By: Dukes Place Holdings Ltd, General
                                             Partner
Executed at Stratford, Canada
on this 28 day of September, 2000.

NATIONAL INDEMNITY COMPANY                   By:_____
                                             Name:
                                             Title:
By:_____
Name: Brian Snover
Title: Vice President

i/04/2000 17:42 FAX 212 909 6836        DEBEVOISE & PLIMPTON        ☑024

7/2000 10:48 FAX        DEBEVOISE & PLIMPTON        ☑008

Amendment No. 1
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer; provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____
on this ___ day of September, 2000.

STONEWALL INSURANCE
COMPANY

By:_____
Name:
Title:

Executed at _____
on this ___ day of September, 2000.

NATIONAL INDEMNITY COMPANY

By:_____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By:_____
Name: Ke Ranvell
Title: CHIEF EXECUTIVE OFFICER

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner

By:_____
Name:
Title:

21083838v1

**EXHIBIT B**

11/20/98   14:33   ☎203



🖃002

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington

FIRST AGGREGATE EXCESS RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA - 1322

11/20/98  14:34  ☎203                                                    ☑003

This First Aggregate Excess Retrocession Loss Portfolio Agreement ("Retrocession") is made between UNIGARD SECURITY INSURANCE COMPANY, Seattle, Washington (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Retrocession shall incept on the Effective Date.  This Retrocession shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Retrocession ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Retrocession shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $15,000,000 (Sixteen Million United States Dollars).  UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $16,000,000 (SIXTEEN MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS RETROCESSION.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Retrocession follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Retrocession.

ARTICLE 3.  RETENTION

The Reinsurer shall have no liability under this Retrocession with respect to any losses incurred by the Reinsured and otherwise covered hereunder until (1) Ultimate Net Loss actually paid by the Reinsured exceeds U.S. $327,000,000 (Three Hundred Twenty-Seven Million United States Dollars) in the aggregate (hereinafter referred to as the "Retention"); and (2) the reinsurance agreement by and between the Reinsured and the Reinsurer effective as of the Effective Date with an aggregate limit of $327,000,000 (the "Underlying Retrocession") has been fully exhausted and the Reinsurer has no further liability in respect of such Underlying Retrocession.

ARTICLE 4.  EXCLUSIONS

A.  This Retrocession shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  This Retrocession shall not cover any liability (a) in respect of the fraud of a director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts, not reinsured hereunder.

C.  This Retrocession shall not cover any Unallocated Loss Adjustment Expense.

D.  This Retrocession shall not cover any policyholder dividends or return premiums except to the extent Reinsured receives a full and final

release from the Insured in consideration of such return premium.

E.  This Retrocession shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

F.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the FASR Book which relate to an occurrence on or after January 1, 1978 or, for claims made coverage, a claim made on or after January 1, 1978. With respect to the FASR Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1977.

G.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the RA Book which relate to an occurrence on or after January 1, 1987 or, for claims made coverage, a claim made on or after January 1, 1987. With respect to the RA Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1987.

H.  This Retrocession shall not cover any liability excluded in the Insurance Policies/Reinsurance Contracts or as otherwise agreed between the Reinsured and Reinsurer.

ARTICLE 5 - DEFINITIONS

A.  Wherever used in this Retrocession, the term "Insurance Policy/Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was included in the FASR Book prior to or on December 31, 1977, or in the RA Book prior to or on December 31, 1986. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the FASR Book or the RA Book (subject to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured in this regard.

B.  Wherever used in this Retrocession, the term "FASR Book" shall mean any and all binders, policies of insurance and contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured insures or reinsures any portion of the risk written and which are included within the Facultative and Special Risks ("Allen Miller") Book.

C.  Wherever used in this Retrocession, the term "RA Book" shall mean any and all binders, contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured reinsures any portion of the risk written and which are included in the Reinsurance Assumed Book.

D. Wherever used in this Retrocession, the term "Ultimate Net Loss" shall mean that sum which has in fact been paid by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured. Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 4(B). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

E. Wherever used in this Retrocession, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurances Contracts reinsured under this Retrocession. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

F. Wherever used in this Retrocession, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

G. Whenever used in this Retrocession, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

H. Whenever used in this Retrocession, the term "Claims Servicer" shall mean Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, or such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of Reinsured.

I. Whenever used in this Retrocession, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on the later of the 1) day of the closing of the acquisition of Reinsured by Dukes Place Holdings, L.P., and 2) the day Reinsurer receives the premium due under Article 6.

ARTICLE 6.   SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Retrocession is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/Reinsurance Contracts. The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall aggressively take all steps reasonably necessary to collect from solvent reinsurers. Reinsured shall promptly draw down all letters of credit, withdraw funds from trusts or charge collections against funds held to collect promptly amounts due Reinsured.

## ARTICLE 7.  PREMIUM

As the consideration for the rights and obligations set forth in this Retrocession, Reinsurer agrees to accept and the Reinsured agrees to pay a premium of U.S. $1,000,000 (One Million United States Dollars) which is to be received by Reinsurer in five annual installments of U.S. $200,000 (Two Hundred Thousand United States Dollars).  The first U.S. $200,000 shall be received by Reinsurer no later than December 31, 1998 and each annual U.S. $200,000 payment shall be received by Reinsurer thereafter on each successive December 31. Payment shall be made in immediately available U.S. funds by wire transfer to:

        Norwest Bank Nebraska, N.A.
        Omaha, Nebraska
        ABA #104000058
        Account No. 1150-001-492

It is understood and agreed that the premium stated in this Retrocession is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Retrocession as such charges are the responsibility of the Reinsured.  The premium is non-refundable.


## ARTICLE 8.  CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.


## ARTICLE 9.  ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery.  Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Retrocession to rectify any incorrect payment or any payment which is found not to be due.  Reports submitted by one party hereto to the others in the course of the Retrocession do not constitute a waiver of any rights or remedies that the party has under this Retrocession to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Retrocession, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Retrocession shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the Reinsurer.  This Retrocession may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.


## ARTICLE 10.  ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer at all reasonable times, all records of the Reinsured and Claims Servicer relating to this Retrocession. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer at all reasonable times, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise.  The Reinsurer shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and

11/20/98   14:39   ☎203                                                                    ☒007

records to which the Reinsured may have access, relating to the business covered by this Retrocession. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Retrocession. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

ARTICLE 11. WARRANTIES

Reinsured warrants and represents that it will not voluntarily undertake any material change in corporate structure, administrative practices in respect of the Insurance Policies/Reinsured Contracts which are reinsured under this Retrocession or its domicile, without prior written consent of the Reinsurer which consent will not be unreasonably withheld or delayed.

Reinsured warrants and represents that it will not buy any additional reinsurance protection in respect of any Insurance Policy/Reinsurance Contract either above or below this Retrocession without prior written consent of the Reinsurer which will not be unreasonably withheld or delayed.

ARTICLE 12. CONDITIONS

A.    Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B.    In addition to the Reinsurer's general right to associate as set forth in A. above, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any gross claim settlements or other payments covered by this Retrocession in excess of U.S. $250,000; (2) any payments not in settlement of specific claims, including insurance policy buy-backs, return premiums or commutations of assumed reinsurance obligations, in excess of U.S. $250,000; and (3) any commutations or assignments of ceded reinsurance regardless of value. With respect to items (1) and (2) herein, Reinsurer's approval shall not be unreasonably withheld or delayed.

C.    No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Retrocession, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Retrocession and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent

6 of 12

11/20/98  14:40  ☎203                                                                ⊠008

is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given, Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Retrocession in a manner reasonably acceptable to Reinsurer.

In the event that, on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer.

In the event Reinsurer becomes the Claims Servicer, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expense it incurs as Claims Servicer.

For purposes of this Article 12, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event, Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 12, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 13.  OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party.  This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Retrocession or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer.  This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance.

## ARTICLE 14.  INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this Retrocession shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor.  Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency.  In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Retrocession shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/Reinsurance Contracts.  It is agreed, that the Liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the

☒009

Reinsured indicating the Insured, which claim would involve a possible
liability on the part of the Reinsurer within a reasonable time after such
claim is filed in the conservation or liquidation proceeding or in the
receivership, and that during the pendency of such claim, the Reinsurer may
investigate such claim and interpose, at its own expense, in the proceeding
where such claim is to be adjudicated any defense or defenses that they may
deem available to the Reinsured or its liquidator, receiver, conservator or
statutory successor. The expense thus incurred by the Reinsured shall be
chargeable, subject to the approval of the court, against the Reinsured as part
of the expense of liquidation to the extent of a pro rata share of the benefit
which may accrue to the Reinsured solely as a result of the defense undertaken
by the Reinsurer.

ARTICLE 15. ARBITRATION

   All matters in difference between the Reinsured and the Reinsurer in
relation to this Retrocession, including its formation and validity, and
whether arising during or after the period of this Retrocession, shall be
referred to an Arbitration Tribunal in the manner hereinafter set out. If a
trustee, receiver, rehabilitator, liquidator or conservator (including any
insurance regulatory agency or authority acting in such a capacity) is
appointed for either Reinsured or Reinsurer, the parties shall continue to be
obligated to resolve any claim, dispute or cause of action subject to this
Article 14 by arbitration.

   Unless the parties agree upon a single arbitrator within thirty days of
one receiving a written request from the other for arbitration, the Claimant
(the party requesting Arbitration) shall appoint his arbitrator and give
written notice thereof to the Respondent (the other party to this
Retrocession). The Respondent shall appoint his arbitrator and give written
notice thereof to the claimant. The two arbitrators shall agree upon the
selection of an Umpire.

   If the two arbitrators are unable to agree upon an umpire, each party
shall select three nominees for umpire within thirty days after receipt of a
joint notice from the arbitrators that they are unable to agree upon an umpire.
Each party shall have the right to strike two of the umpire nominees selected
by the other party within thirty days of receipt of the nominations. The
umpire shall be selected between the remaining nominee of each party by lot.

   The Claimant shall submit its initial brief within 20 days from
appointment of the Umpire. The respondent shall submit its brief within 20
days after receipt of the Claimant's brief and the Claimant shall submit a
reply brief within 10 days after receipt of the respondent's brief. The
Arbitration Tribunal shall make its decision solely as to the issue presented
in the notice of arbitration within 60 days following the termination of the
hearings. All deadlines set forth in this paragraph may be extended by the
Arbitration Tribunal in any manner that it may deem just and proper upon the
application of either party.

   Unless the parties otherwise agree, the Arbitration Tribunal shall consist
of persons who are disinterested, active or retired senior executives of
insurance or reinsurance companies.

   The Arbitration Tribunal shall have power to fix all procedural rules for
the holding of the Arbitration including discretionary power to make orders as
to any matters which it may consider proper in the circumstances of the case
with regard to pleadings, discovery, inspection of documents, examination of
witnesses and any other matter whatsoever relating to the conduct of the
Arbitration and may receive and act upon such evidence whether oral or written
strictly admissible or not as it shall in its discretion think fit.

   Each party shall bear the costs of its own arbitrator and shall share
equally in the costs of the Umpire. All other costs of the arbitration shall
be paid as directed by the Arbitration Tribunal, who shall direct to and by
whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession. The arbitration shall be conducted in the English language. This Retrocession shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

ARTICLE 16.  NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Retrocession upon exhaustion of the Aggregate Limit or for any other reason.

ARTICLE 17.  NO RIGHTS OF THIRD PARTIES

Nothing in this Retrocession, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Retrocession.

ARTICLE 18.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

National Indemnity Company
3024 Harney Street
Omaha, Nebraska  68131
Attn: General Counsel
Telecopy:   (402) 536-3265

Unigard Security Insurance Company
c/o Eastgate, Inc.
44 Wall Street
New York, NY  10005
Attn: David Wallis
Chief Executive Officer
Telecopy:  212-425-4564

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.  Notice shall be deemed effective:

1.  if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2.  if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody

☒011

of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

Article 19.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

ARTICLE 20.  ENTIRE AGREEMENT

The parties hereto agree that this Retrocession is not cancelable or voidable.  This Retrocession is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

ARTICLE 21.  REPORTS AND REMITTANCES

A. Reports.  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Retrocession within 45 days of the close of each calendar quarter (the "Quarterly Reports").  The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Retrocession and estimating receipts and disbursements for the following month. . . . The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Retrocession.

B. Annual Statement.  As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

C. Claims Account.  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account").  The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Retrocession.  In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Retrocession.  Interest on funds in the Claims Account shall be the property of the Reinsurer.

ARTICLE 22.  RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.

ARTICLE 23.  CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 11) the Reinsured firm is advised by a state insurance regulatory authority in which it is licensed or an accredited reinsurer that, during the term of this Retrocession, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable state insurance regulatory authority in the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Retrocession in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities. The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest and all other investment income on any funds posted as security pursuant to Article 23 shall be sole property of Reinsurer. In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California.

ARTICLE 24.   TERRITORY

The Retrocession shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

ARTICLE 25.   INTERMEDIARY

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Retrocession.

ARTICLE 26.   COUNTERPARTS

This Retrocession may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

ARTICLE 27.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this _____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By_____
Title:

and at _Stamford CT_, _____ on this _20ᵗʰ_ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By_____
Title: _Vice President_

Acknowledged and Accepted:

Eastgate Group Limited                      Dukes Place Holdings L.P.

By:_____            By:_____
Title:                                      Dukes Place Holdings Ltd.
                                            as General Partner of
                                            Dukes Place Holdings L.P.

11/20/98  14:46  ☎203                                          ☑014

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington


AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321

03/27/2000 11:21 FAX                    DEBEVOISE & PLIMPTON                    ☑002/020

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington


AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321


EXHIBIT A

This Aggregate Retrocession Loss Portfolio Agreement ("Retrocession") is made between UNIGARD SECURITY INSURANCE COMPANY, Seattle, Washington (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

ARTICLE 1.   EFFECTIVE DATE AND TERMS OF AGREEMENT

The Retrocession shall incept on the Effective Date. This Retrocession shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Retrocession ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Retrocession shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

ARTICLE 2.   AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $327,000,000 (Three Hundred Twenty-Seven Million United States Dollars).   UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $327,000,000 (THREE HUNDRED TWENTY-SEVEN MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS RETROCESSION.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Retrocession follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Retrocession.

ARTICLE 3.   EXCLUSIONS

A.   This Retrocession shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.   This Retrocession shall not cover any liability (a) in respect of the fraud of a director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts, not reinsured hereunder.

C.   This Retrocession shall not cover any Unallocated Loss Adjustment Expense.

D.   This Retrocession shall not cover any policyholder dividends or return premiums except to the extent Reinsured receives a full and final release from the Insured in consideration of such return premium.

E.   This Retrocession shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

F.   This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the FASR Book which relate to an occurrence on or after January 1, 1978 or, for claims made coverage, a claim made on or after January 1, 1978.  With respect to the FASR Book, this Retrocession excludes any

2 of 12

G.  liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1977.

G.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the RA Book which relate to an occurrence on or after January 1, 1987 or, for claims made coverage, a claim made on or after January 1, 1987.  With respect to the RA Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1987.

H.  This Retrocession shall not cover any liability excluded in the Insurance Policies/Reinsurance Contracts or as otherwise agreed between the Reinsured and Reinsurer.

ARTICLE 4.  DEFINITIONS

A.  Wherever used in this Retrocession, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was included in the FASR Book prior to or on December 31, 1977, or in the RA Book prior to or on December 31, 1986. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the FASR Book or the RA Book (subject to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured in this regard.

B.  Wherever used in this Retrocession, the term "FASR Book" shall mean any and all binders, policies of insurance and contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured insures or reinsures any portion of the risk written and which are included within the Facultative and Special Risks ("Allen Miller") Book.

C.  Wherever used in this Retrocession, the term "RA Book" shall mean any and all binders, contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured reinsures any portion of the risk written and which are included in the Reinsurance Assumed Book.

D.  Wherever used in this Retrocession, the term "Ultimate Net Loss" shall mean that sum which has in fact been paid by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured. Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(B).  Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs

incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

E. Wherever used in this Retrocession, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

F. Wherever used in this Retrocession, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

G. Whenever used in this Retrocession, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

H. Whenever used in this Retrocession, the term "Claims Servicer" shall mean Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, or such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of Reinsured.

I. Whenever used in this Retrocession, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on the later of the 1) day of the closing of the acquisition of Reinsured by Dukes Place Holdings, L.P., and 2) the day Reinsurer receives the premium due under Article 6.

## ARTICLE 5.   SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Retrocession is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/Reinsurance Contracts. The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall aggressively take all steps reasonably necessary to collect from solvent reinsurers. Reinsured shall promptly draw down all letters of credit, withdraw funds from trusts or charge collections against funds held to collect promptly amounts due Reinsured.

## ARTICLE 6.   PREMIUM

As the consideration for the rights and obligations set forth in this Retrocession, Reinsurer agrees to accept and the Reinsured agrees to pay a premium of U.S. $191,000,000 (One Hundred Ninety-One Million United States Dollars). Payment shall be made in immediately available U.S. funds by wire transfer to:

Norwest Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058

Account No. 1150-001-492

It is understood and agreed that the premium stated in this Retrocession is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Retrocession as such charges are the responsibility of the Reinsured. The premium is non-refundable.

## ARTICLE 7. CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

## ARTICLE 8. ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Retrocession to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Retrocession do not constitute a waiver of any rights or remedies that the party has under this Retrocession to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Retrocession, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Retrocession shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the Reinsurer. This Retrocession may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

## ARTICLE 9. ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer at all reasonable times, all records of the Reinsured and Claims Servicer relating to this Retrocession. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer at all reasonable times, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Retrocession. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Retrocession. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily undertake any material change in corporate structure, administrative practices in respect of the Insurance Policies/Reinsured Contracts which are reinsured under this Retrocession or its domicile, without prior written consent of the Reinsurer which consent will not be unreasonably withheld or delayed.

Reinsured warrants and represents that it will not buy any additional reinsurance protection in respect of any Insurance Policy/Reinsurance Contract either above or below this Retrocession without prior written consent of the Reinsurer which will not be unreasonably withheld or delayed.

ARTICLE 11. CONDITIONS

A. Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B. In addition to the Reinsurer's general right to associate as set forth in A. above, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any gross claim settlements or other payments covered by this Retrocession in excess of U.S. $250,000; (2) any payments not in settlement of specific claims, including insurance policy buy-backs, return premiums or commutations of assumed reinsurance obligations, in excess of U.S. $250,000; and (3) any commutations or assignments of ceded reinsurance regardless of value. With respect to items (1) and (2) herein, Reinsurer's approval shall not be unreasonably withheld or delayed.

C. No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Retrocession; (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Retrocession and shall continue to comply with such terms; and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given, Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Retrocession in a manner reasonably acceptable to Reinsurer.

In the event that, on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, then Reinsurer shall have the right to become the Claims Servicer until this

Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer.

In the event Reinsurer becomes the Claims Servicer, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expense it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12.  OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Retrocession or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer. This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance.

## ARTICLE 13.  INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this Retrocession shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Retrocession shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/ Reinsurance Contracts. It is agreed, that the Liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14.  ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Retrocession, including its formation and validity, and whether arising during or after the period of this Retrocession, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Retrocession). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession. The arbitration shall be conducted in the English language. This Retrocession shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other

may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

## ARTICLE 15. NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Retrocession upon exhaustion of the Aggregate Limit or for any other reason.

## ARTICLE 16. NO RIGHTS OF THIRD PARTIES

Nothing in this Retrocession, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Retrocession.

## ARTICLE 17. NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 3024 Harney Street
> Omaha, Nebraska 68131
> Attn: General Counsel
> Telecopy: (402) 536-3255

> Unigard Security Insurance Company
> c/o Eastgate, Inc.
> 44 Wall Street
> New York, NY 10005
> Attention: Mr. David Wallis
> Chief Executive Officer
> Telecopy: (212) 425-4564

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties. Notice shall be deemed effective:

1. if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2. if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

## Article 18. STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

ARTICLE 19.   ENTIRE AGREEMENT

The parties hereto agree that this Retrocession is not cancelable or voidable. This Retrocession is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

ARTICLE 20.   REPORTS AND REMITTANCES

A.   Reports.   The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Retrocession within 45 days of the close of each calendar quarter (the "Quarterly Reports"). The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Retrocession and estimating receipts and disbursements for the following month. The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Retrocession.

B.   Annual Statements.   As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

C.   Claims Account.   The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account"). The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Retrocession. In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Retrocession. Interest on funds in the Claims Account shall be the property of the Reinsurer.

ARTICLE 21.   RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.

ARTICLE 22.   CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by a state insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Retrocession, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable state insurance regulatory authority in the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables

hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Retrocession in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities.  The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit.  Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer.  In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California.

## ARTICLE 23.   TERRITORY

The Retrocession shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

## ARTICLE 24.   INTERMEDIARY

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Retrocession.

## ARTICLE 25.   COUNTERPARTS

This Retrocession may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

ARTICLE 26.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _BOSTON_ , _MASS_ on this _20th_ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _Thomas E Mdon_
Title:

and at _____' _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                          Dukes Place Holdings L.P.

By _____                                   By _____
Title:                                          Dukes Place Holdings Ltd,
                                                as General Partner of
                                                Dukes Place Holdings L.P.

ARTICLE 25.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this _____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____, _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                      Dukes Place Holdings L.P.

By _____         By _____
Title:                                     Dukes Place Holdings Ltd.
                                           as General Partner of
                                           Dukes Place Holdings L.P.

12 of 12

ARTICLE 25.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____. _____ on this ____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____. _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By _____
Title:

Dukes Place Holdings L.P.

By _____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

12 of 12

**ARTICLE 26.  HEADINGS**

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____ _____ on this 20th day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: _____

and at _____ _____ on this _____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title: _____

Acknowledged and Accepted:

Dukes Place Holdings L.P.

Eastgate Group Limited

By _____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

By _____
Title:

DIRECTOR

12 of 12

Amendment No. 1

Unigard Security Insurance Company
of Seattle, Washington

Aggregate Retrocession of Loss Portfolio Agreement

No. RA 1321

This Agreement is hereby amended as follows:

Article 12

The last sentence of Article 12, which states "This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance" is deleted in its entirety.

Article 13

The second sentence of Article 13, which states "Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency" is deleted in its entirety. This deletion shall not be construed to create any right to accelerate or otherwise alter the timing or amount of Reinsurer's liabilities.

Article 20

The following is added as the last sentence of Article 20(c): "Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash."

Article 21

The following is added as the last sentence of Article 21, "Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims."

Article 22

The last sentence of Article 22, which states "In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California" is deleted in its entirety.

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date set forth in the Agreement.

Page 1 of 2

Executed at _New York_ , _New York_ on this _31st_ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _[signature]_
Title: _Vice President_

and at _Stamford_ , _Connecticut_ on this _29th_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _[signature]_
Title: _Brian G. Smith_
        _Vice President_

Acknowledged and Accepted:

Eastgate Group Limited                              Dukes Place Holdings L.P.

By_____                         By_____
Title:                                              Dukes Place Holdings Ltd.
                                                    as General Partner of
                                                    Dukes Place Holdings L.P.

Page 2 of 2

08/07/2000 11:27 FAX                    DEBEVOISE & PLIMPTON                    ☑019/020

Executed at _____ on this _____ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____

Title: VICE PRESIDENT

and at _____ , _____ on this 29th day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____

Title: _____

Acknowledged and Accepted:

Eastgate Group Limited

By _____

Title: DIRECTOR

Dukes Place Holdings L.P.

By _____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

Page 2 of 2

Executed at _New York_, _New York_ on this _31st_ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: _Vice President_

and at _Stamford_, _Connecticut_ on this _29th_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: _Brian Snover_
       _Vice President_

Acknowledged and Accepted:

Eastgate Group Limited                          Dukes Place Holdings L.P.

                                                By _____
By _____.                         Dukes Place Holdings Ltd.
Title:                                          as General Partner of
                                                Dukes Place Holdings L.P.

Page 2 of 2

# EXHIBIT  C

 # National Indemnity Company

A member of the Berkshire Hathaway group of insurance companies

BY E-MAIL dross@stroock.com
January 4, 2006

**Demand for Arbitration by National Indemnity
Company against Stonewall Insurance Company**

Dear Mr. Ross:

I am in receipt of your letter today concerning the December 26, 2005 requests by National Indemnity Company ("NICO") for access to the books and records of Stonewall Insurance Company ("Stonewall") under the aggregate reinsurance agreement between NICO and Stonewall.

You state in your letter that Stonewall is under no obligation to consider NICO's request. You are wrong. The reinsurance agreement between NICO and Stonewall states at Article 9 that Stonewall is obliged to provide NICO with access to its records. NICO's request includes access to books and records of Stonewall relating to reserves and other aspects of the business subject to the reinsurance agreement, all of which NICO has a legitimate and important interest at accessing. You claim that NICO has not responded to document requests made by Stonewall. Once again you are mistaken. I am unaware to date of any request by Stonewall to NICO for records. In your letter today, you assert entitlement on behalf of Stonewall to all sorts of records of NICO or its affiliated companies. What you fail to specify, as I have done, is the contract provisions under which Stonewall is making these requests of NICO.

In any case, given Stonewall's breach of the access to records provision contained in the reinsurance agreement that is confirmed in your letter, NICO hereby demands arbitration against Stonewall under Article 14 of the aggregate reinsurance agreement between NICO and Stonewall. NICO seeks in this proceeding both access to all of Stonewall's books and records that NICO has already requested and all other relief deemed fit and proper by the Panel. Unless the parties agree otherwise, NICO will name its arbitrator thirty days from the date of this letter, and demands that Stonewall do the same. All further correspondence or inquiry concerning this matter should be directed to the undersigned.

Sincerely,

Brian G. Snover
Vice President and Assistant General Counsel

EXHIBIT  D

 **National Indemnity Company**

A member of the Berkshire Hathaway group of insurance companies

BY E-MAIL dross@stroock.com
January 4, 2006

> **Demand for Arbitration by National Indemnity
> Company against Seaton Insurance Company**

Dear Mr. Ross:

I am in receipt of your letter today concerning the December 26, 2005 requests by National Indemnity Company ("NICO") for access to the books and records of Seaton Insurance Company ("Seaton") under the aggregate reinsurance agreement between NICO and Stonewall.

You state in your letter that Seaton is under no obligation to consider NICO's request. You are wrong. The reinsurance agreement between NICO and Seaton states at Article 9 that Seaton is obliged to provide NICO with access to its records. NICO's request includes access to books and records of Stonewall relating to reserves and other aspects of the business subject to the reinsurance agreement, all of which NICO has a legitimate and important interest at accessing. You claim that NICO has not responded to document requests made by Seaton. Once again you are mistaken. I am unaware to date of any request by Seaton to NICO for records. In your letter today, you assert entitlement on behalf of Seaton to all sorts of records of NICO or its affiliated companies. What you fail to specify, as I have done, is the contract provisions under which Seaton is making these requests of NICO.

In any case, given Seaton's breach of the access to records provision contained in the reinsurance agreement that is confirmed in your letter, NICO hereby demands arbitration against Seaton under Article 14 of the aggregate reinsurance agreement between NICO and Seaton. NICO seeks in this proceeding both access to all of Seaton's books and records that NICO has already requested and all other relief deemed fit and proper by the Panel. Unless the parties agree otherwise, NICO will name its arbitrator thirty days from the date of this letter, and demands that Seaton do the same. All further correspondence or inquiry concerning this matter should be directed to the undersigned.

Sincerely,

Brian G. Snover
Vice President and Assistant General Counsel

# EXHIBIT E

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

125 WEST 55TH STREET
NEW YORK, NY 10019-5389
(212) 424-8000
FACSIMILE: (212) 424-8500

E-MAIL ADDRESS: JOHN.NONNA@LLGM.COM
WRITER'S DIRECT DIAL: (212) 424-8311
WRITER'S DIRECT FAX: (212) 649-9461

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
ALMATY
BEIJING

May 22, 2006

**VIA FEDERAL EXPRESS**
Daniel A. Ross, Esq.
Stroock, Stroock & Lavan
180 Maiden Lane
New York, New York 10038-4982

Shawn L. Kelly, Esq.
Riker Danzig Scherer Hyland Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981

> Re:  Amended Demand for Arbitration between National Indemnity
> Company and Seaton Insurance Company and Castlewood, Inc.

Dear Mr. Ross and Mr. Kelly:

We are appearing as counsel for claimant National Indemnity Company ("NICO") in the above-referenced matter.  NICO hereby amends and supplements its demand for arbitration dated January 4, 2006 pursuant to the Aggregate Retrocession of Loss Portfolio Agreement between Seaton Insurance Company ("Seaton") and NICO (the "Reinsurance Agreement") to add a demand for arbitration against Seaton's agent, Castlewood, Inc. ("Castlewood") and to add additional claims against Seaton.

In addition to demands previously made in the January 4, 2006 demand for arbitration, NICO hereby further requests that the Panel make the following findings:

1. That Castlewood, as agent of Seaton and as Seaton's putative administrator of the Reinsurance Agreement, may properly be added as a respondent to this arbitration.

Daniel A. Ross, Esq.
Shawn L. Kelly, Esq.
May 22, 2006
Page 2

2. That, pursuant to section 11.C of the Reinsurance Agreement, as well as other relevant sections therein, Castlewood is not authorized to serve as Claims Servicer or otherwise manage any claims for which Seaton seeks coverage under the Reinsurance Agreement.

NICO further requests that the Panel declare that NICO is entitled to at least the following relief:

a. A Panel order that Castlewood shall cease and desist any involvement in claims servicing or management as respects (i) claims for which Seaton seeks coverage under the Reinsurance Agreement, or (ii) any third party reinsurance that inures to the benefit of NICO.

b. A Panel order that Seaton instruct Castlewood to cease and desist from any involvement in claims servicing or management as respects (i) claims for which Seaton seeks coverage under the Reinsurance Agreement, or (ii) any third party reinsurance that inures to the benefit of NICO.

c. A Panel order that, with respect to any claims for which Seaton seeks coverage under the Reinsurance Agreement, Seaton advise each and every attorney, reinsurer, or other party contacted by Castlewood that Castlewood is not authorized to service or manage any claims for Seaton and that communications should be referred to NICO.

d. A Panel order that Seaton and Castlewood reimburse NICO for its reasonable costs and expenses for servicing and managing claims and collecting reinsurance.

e. A Panel order that Seaton and Castlewood produce all communications, agreements and memoranda of understanding related to the potential sale of Seaton to any third party.

John M. Nonna
LeBoeuf, Lamb, Greene & MacRae LLP
125 W. 55th St.
New York, NY 10010
(212) 424-8000
Counsel for National Indemnity
Company

Daniel A. Ross, Esq.
Shawn L. Kelly, Esq.
May 22, 2006
Page 3

cc  Caleb Fowler
     Mark Wigmore

597632.3

**EXHIBIT  F**

# LeBoeuf, Lamb, Greene & MacRae LLP

<table>
<tr><td>NEW YORK<br>WASHINGTON, D.C.<br>ALBANY<br>BOSTON<br>CHICAGO<br>HARTFORD<br>HOUSTON<br>JACKSONVILLE<br>LOS ANGELES<br>PITTSBURGH<br>SAN FRANCISCO</td><td>125 WEST 55TH STREET<br>NEW YORK, NY 10019-5389<br>(212) 424-8000<br>FACSIMILE: (212) 424-8500<br><br>E-MAIL ADDRESS: JOHN.NONNA@LLGM.COM<br><br>WRITER'S DIRECT DIAL: (212) 424-8311<br>WRITER'S DIRECT FAX: (212) 649-9461</td><td>LONDON<br>A MULTINATIONAL<br>PARTNERSHIP<br>PARIS<br>BRUSSELS<br>JOHANNESBURG<br>(PTY) LTD.<br>MOSCOW<br>RIYADH<br>AFFILIATED OFFICE<br>ALMATY<br>BEIJING</td></tr>
</table>

May 22, 2006

**VIA FEDERAL EXPRESS**
Daniel A. Ross, Esq.
Stroock, Stroock & Lavan
180 Maiden Lane
New York, New York 10038-4982

Shawn L. Kelly, Esq.
Riker Danzig Scherer Hyland Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981

> Re:  Amended Demand for Arbitration between National Indemnity
> Company and Stonewall Insurance Company and Castlewood, Inc.

Dear Mr. Ross and Mr. Kelly:

We are appearing as counsel for claimant National Indemnity Company ("NICO") in the above-referenced matter.  NICO hereby amends and supplements its demand for arbitration dated January 4, 2006 pursuant to the Aggregate Reinsurance Agreement between Stonewall Insurance Company ("Stonewall") and NICO (the "Reinsurance Agreement") to add a demand for arbitration against Stonewall's agent, Castlewood, Inc. ("Castlewood") and to add additional claims against Stonewall.

In addition to demands previously made in the January 4, 2006 demand for arbitration, NICO hereby further requests that the Panel make the following findings:

1. That Castlewood, as agent of Stonewall and as Stonewall's putative administrator of the Reinsurance Agreement, may properly be added as a respondent to this arbitration.

Daniel A. Ross, Esq.
Shawn L. Kelly, Esq.
May 22, 2006
Page 2

2. That, pursuant to section 11.D of the Reinsurance Agreement, as well as other relevant sections therein, Castlewood is not authorized to serve as Claims Servicer or otherwise manage any claims for which Stonewall seeks coverage under the Reinsurance Agreement.

NICO further requests that the Panel declare that NICO is entitled to at least the following relief:

a. A Panel order that Castlewood shall cease and desist any involvement in claims servicing or management as respects (i) claims for which Stonewall seeks coverage under the Reinsurance Agreement, or (ii) any third party reinsurance that inures to the benefit of NICO.

b. A Panel order that Stonewall instruct Castlewood to cease and desist from any involvement in claims servicing or management as respects (i) claims for which Stonewall seeks coverage under the Reinsurance Agreement, or (ii) any third party reinsurance that inures to the benefit of NICO.

c. A Panel order that, with respect to any claims for which Stonewall seeks coverage under the Reinsurance Agreement, Stonewall advise each and every attorney, reinsurer, or other party contacted by Castlewood that Castlewood is not authorized to service or manage any claims for Stonewall and that communications should be referred to Stonewall and NICO.

d. A Panel order that Stonewall and Castlewood produce all communications, agreements and memoranda of understanding related to the potential sale of Stonewall to any third party.

John M. Nonna
LeBoeuf, Lamb, Greene & MacRae LLP
125 W. 55th St.
New York, NY 10010
(212) 424-8000
Counsel for National Indemnity
Company

Daniel A. Ross, Esq.
Shawn L. Kelly, Esq.
May 22, 2006
Page 3

cc  Caleb Fowler
    Mark Wigmore

598185.1

**EXHIBIT  G**



RIKER
DANZIG
SCHERER
HYLAND
PERRETTI LLP

ATTORNEYS AT LAW

Shawn L. Kelly
Partner

Direct:
t: 973.451.8555
f: 973.451.8670
skelly@riker.com
Reply to: Morristown

June 22, 2006

**VIA E-MAIL AND REGULAR MAIL**
John M. Nonna, Esq.
LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019-5389

Re:    Arbitration between National Indemnity Company and Stonewall
       Insurance Company and Castlewood, Inc.

Dear Mr. Nonna:

We are appearing as counsel for counter-claimant Stonewall Insurance Company
("Stonewall") and we respond to your letter dated May 22, 2006. At the outset,
we request that your firm withdraw as counsel to National Indemnity Company
("NICO") in this proceeding. Your attempted representation of NICO while
contemporaneously representing Stonewall clearly conflicts with DR 5-105, which
prohibits attorneys from undertaking a matter directly adverse to a current client
without the client's informed consent. We have addressed this issue with you by
separate letter dated June 22 which is attached hereto. Should you fail to
withdraw as counsel in this matter, we will seek appropriate relief from the
court.

Additionally, please be advised that Stonewall objects to your attempt to name
Castlewood, Inc. ("Castlewood") as a respondent in this arbitration. As you
know, Castlewood is not a party to the Aggregate Reinsurance Agreement
("Reinsurance Agreement") and has never agreed to arbitrate any claims arising
under the Reinsurance Agreement with NICO. Accordingly, should NICO fail to
withdraw its amended and supplemental demand for arbitration ("Amended
Demand") as to Castlewood, we will seek appropriate relief from the court.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, Suite 4920, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
www.riker.com

John M. Nonna, Esq.
June 22, 2006
Page 2

While reserving all of our rights to seek your firm's disqualification from this proceeding and to enjoin NICO's improper attempt to arbitrate with Castlewood, we also take this opportunity on behalf of Stonewall to counter-demand arbitration against NICO. Stonewall hereby requests that the Panel declare Stonewall is entitled to the following relief:

1. A Panel order confirming that Stonewall is its own Claim Servicer pursuant to Section 4.F and 11.D of the Reinsurance Agreement;

2. A Panel order directing NICO, and its agent Cavell USA, Inc. ("Cavell"), to cease and desist any involvement in claims handling for Stonewall policies;

3. A Panel order confirming that Stonewall has the inherent right to negotiate the settlement of claims and communicate directly with policyholders and that NICO shall reimburse Stonewall for any settlements;

4. A panel order directing NICO and Cavell to cease and desist any involvement in the collection of any third-party reinsurance ceded by Stonewall; and

5. A panel order requiring NICO to produce all communications with Cavell relating to the management or servicing of claims that potentially implicate coverage under the Reinsurance Agreement.

In addition, Stonewall requests that the Panel find that NICO has breached its duty of utmost good faith and intentionally interfered with Stonewall's business relations during the course of the Reinsurance Agreement over the past five years, causing Stonewall damages, by, *inter alia*:

1. Entering into the Collaboration Agreement with Cavell to the detriment of Stonewall;

2. Directing the appointment of legal counsel on Stonewall's behalf that were beholden to the interests of Commercial Union Insurance Company ("Commercial Union") or other companies in the Berkshire Hathaway family;

3. Directing a disproportionate allocation of counsel fees and expenses to Stonewall, to the benefit of NICO, Commercial Union and/or other companies in the Berkshire Hathaway family;

John M. Nonna, Esq.
June 22, 2006
Page 3

4.  Directing Cavell not to raise certain coverage defenses favorable to Stonewall's interests, but unfavorable to the interests of Commercial Union and/or other companies in the Berkshire Hathaway family, thereby increasing Stonewall's ultimate exposure;

5.  Intentionally interfering with Stonewall's communications with coverage counsel;

6.  Directing Cavell to abstain from settling claims under terms beneficial to Stonewall, thereby causing Stonewall to (i) subsidize the legal fees of Commercial Union and/or other companies in the Berkshire Hathaway family, and (ii) suffer a reduction in the ultimate cover provided by the Reinsurance Agreement;

7.  Directing Cavell to enter into loss settlements contrary to the interests of Stonewall, but beneficial to the interests of NICO, Commercial Union and/or other companies in the Berkshire Hathaway family, thereby further reducing the ultimate cover provided by the Reinsurance Agreement;

8.  Offsetting claims management fees from reinsurance payments due Stonewall without the consent of Stonewall, thereby effecting a conversion of Stonewall funds; and

9.  Appointing Cavell as NICO's agent for the management of claims, despite Stonewall's prior termination of Cavell as "Claims Servicer."

Stonewall further requests that the Panel declare that Stonewall is entitled to at least the following relief:

a.  A Panel order requiring NICO to reimburse Stonewall for NICO's unauthorized conversion of Stonewall funds;

b.  A Panel order requiring NICO to pay Stonewall compensatory damages, based upon NICO's actions as described hereinabove, in an amount to be determined after a hearing;

c.  A Panel order requiring NICO to pay Stonewall's costs, expenses and attorneys' fees associated with this arbitration;

John M. Nonna, Esq.
June 22, 2006
Page 4

      d.     A panel order directing NICO to provide discovery which refers or relates to the above issues, including discovery from other Berkshire-Hathaway entities involved in these claims and/or transactions; and

      e.     A Panel order awarding Stonewall such other further relief that the Panel deems proper and equitable.

Stonewall reserves the right to seek other or further relief in this arbitration based on subsequently discovered information.

Stonewall hereby appoints Caleb Fowler, Esq. as its arbitrator in regards to the within counter-demand for arbitration.

Very truly yours,

Shawn L. Kelly

Enclosure

cc:    Robert B. Green, Esq.
       Caleb L. Fowler, Esq.
       W. Mark Wigmore, Esq.

3863499.1

# EXHIBIT H



**RIKER**
**DANZIG**
**SCHERER**
**HYLAND**
**PERRETTI**LLP

ATTORNEYS AT LAW

Shawn L. Kelly
Partner

Direct:
t: 973.451.8555
f: 973.451.8670
skelly@riker.com
Reply to: Morristown

June 22, 2006

**VIA E-MAIL AND REGULAR MAIL**
John M. Nonna, Esq.
LeBoeuf, Lamb, Greene & MacRae LLP
125 West 55th Street
New York, NY 10019-5389

Re:  Arbitration between National Indemnity Company and Seaton
     Insurance Company and Castlewood, Inc.

Dear Mr. Nonna:

We are appearing as counsel for counter-claimant Seaton Insurance Company
("Seaton") and we respond to your letter dated May 22, 2006. At the outset, we
request that your firm withdraw as counsel to National Indemnity Company
("NICO") in this proceeding. Your attempted representation of NICO while
contemporaneously representing Seaton clearly conflicts with DR 5-105, which
prohibits attorneys from undertaking a matter directly adverse to a current client
without the client's informed consent. We have addressed this issue with you by
separate letter dated June 22 which is attached hereto. Should you fail to
withdraw as counsel in this matter, we will seek appropriate relief from the
court.

Additionally, please be advised that Seaton objects to your attempt to name
Castlewood, Inc. ("Castlewood") as a respondent in this arbitration. As you
know, Castlewood is not a party to the Aggregate Retrocession of Loss Portfolio
Agreement ("Retrocession Agreement") and has never agreed to arbitrate any
claims arising under the Retrocession Agreement with NICO. Accordingly,
should NICO fail to withdraw its amended and supplemental demand for
arbitration ("Amended Demand") as to Castlewood, we will seek appropriate
relief from the court.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, Suite 4920, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
www.riker.com

John M. Nonna, Esq.
June 22, 2006
Page 2

While reserving all of our rights to seek your firm's disqualification from this proceeding and to enjoin NICO's improper attempt to arbitrate with Castlewood, we also take this opportunity on behalf of Seaton to counter-demand arbitration against NICO. Seaton hereby requests that the Panel make the following findings:

1.    That NICO, as a result of the activities detrimental to Seaton, has forfeited its right to be Claims Servicer pursuant to Article 11.C of the Retrocession Agreement.

Seaton further requests that the Panel declare Seaton is entitled to the following relief:

    a.    A Panel order appointing Seaton its own Claim Servicer pursuant to Article 11.C of the Retrocession Agreement;

    b.    A Panel order directing NICO, and its agent Cavell USA, Inc. ("Cavell"), to cease and desist any involvement in claims handling for Seaton policies;

    c.    A Panel order confirming that Seaton has the inherent right to negotiate the settlement of claims and communicate directly with policyholders and that NICO shall reimburse Seaton for any settlements;

    d.    A Panel order directing NICO and Cavell to cease and desist any involvement in the collection of any third-party reinsurance ceded by Seaton; and

    e.    A Panel order requiring NICO to produce all communications with Cavell relating to the management or servicing of claims that potentially implicate coverage under the Retrocession Agreement;

In addition, Seaton requests that the Panel find that NICO has breached its duty of utmost good faith and intentionally interfered with Seaton's business relations during the course of the Retrocession Agreement over the past five years, causing Seaton damages, by, *inter alia*:

1.    Entering into the Collaboration Agreement with Cavell to the detriment of Seaton;

John M. Nonna, Esq.
June 22, 2006
Page 3

2.   Directing the appointment of legal counsel on Seaton's behalf that were beholden to the interests of Commercial Union Insurance Company ("Commercial Union") or other companies in the Berkshire Hathaway family;

3.   Directing a disproportionate allocation of counsel fees and expenses to Seaton, to the benefit of NICO, Commercial Union and/or other companies in the Berkshire Hathaway family;

4.   Directing Cavell not to raise certain coverage defenses favorable to Seaton's interests, but unfavorable to the interests of Commercial Union and/or other companies in the Berkshire Hathaway family, thereby increasing Seaton's ultimate exposure;

5.   Intentionally interfering with Seaton's communications with coverage counsel;

6.   Directing Cavell to abstain from settling claims under terms beneficial to Seaton, thereby causing Seaton to (i) subsidize the legal fees of Commercial Union and/or other companies in the Berkshire Hathaway family, and (ii) suffer a reduction in the ultimate cover provided by the Retrocession Agreement;

7.   Directing Cavell to enter into loss settlements contrary to the interests of Seaton, but beneficial to the interests of NICO, Commercial Union and/or other companies in the Berkshire Hathaway family, thereby further reducing the ultimate cover provided by the Retrocession Agreement;

8.   Offsetting claims management fees from reinsurance payments due Seaton without the consent of Seaton, thereby effecting a conversion of Seaton funds; and

9.   Appointing Cavell as NICO's agent for the management of claims, despite Seaton's prior termination of Cavell as "Claims Servicer."

Seaton further requests that the Panel declare that Seaton is entitled to at least the following relief:

a.   A Panel order requiring NICO to reimburse to Seaton for NICO's unauthorized conversion of Seaton funds;

John M. Nonna, Esq.
June 22, 2006
Page 4

b.    A Panel order requiring NICO to pay Seaton compensatory damages, based upon NICO's actions as described hereinabove, in an amount to be determined after a hearing;

c.    A Panel order requiring NICO to pay Seaton's costs, expenses and attorneys' fees associated with this arbitration;

d.    A Panel order directing NICO to provide discovery which refers or relates to the above issues, including discovery from other Berkshire-Hathaway entities involved in these claims and/or transactions; and

e.    A Panel order awarding Seaton such other further relief that the Panel deems proper and equitable.

Seaton reserves the right to seek other or further relief in this arbitration based on subsequently discovered information.

Seaton hereby appoints Caleb Fowler, Esq. as its arbitrator in regards to the within counter-demand for arbitration.

Very truly yours,

Shawn L. Kelly

Enclosure

cc:    N. David Thompson, Esq.
      Caleb L. Fowler, Esq.
      W. Mark Wigmore, Esq.

3656513.4

# EXHIBIT I

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
SAN FRANCISCO

125 WEST 55TH STREET
NEW YORK, NY 10019-5389
(212) 424-8000
FACSIMILE: (212) 424-8500

E-MAIL ADDRESS: MICHAEL.KNCERZER@LLGM.COM
WRITER'S DIRECT DIAL: (212) 424-8077

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
ALMATY
BEIJING

May 3, 2007

<u>VIA E-MAIL</u>

Mr. Robert B. Green
14 North Drive
Simsbury, Connecticut 06070

Mr. W. Mark Wigmore
Avalon Consulting, LLC
10 Station Street
Simsbury, Connecticut 06070

Mr. Caleb L. Fowler
27907 Revells Neck Road
Westover, Maryland 21871

> Re:  Arbitration between National Indemnity Company
> and Stonewall Insurance Co.

Gentlemen:

This letter has been reviewed and approved by both parties, who are pleased to report that an agreement has been reached concerning Stonewall's causes of action in the above-referenced arbitration, as well as the scope of the depositions of Messrs. Jain, Krutter and Snover. The parties' agreement is reflected in the document attached to this letter.

We are working to schedule the depositions at the earliest mutually agreeable date. NICO reserves its rights to make appropriate objections or directions at the depositions in the event that NICO perceives the questions to go beyond the scope of what has been agreed. Given the spirit of the negotiations, we are optimistic that this will not be necessary. If it becomes necessary, the parties will resort to the Panel for resolution.

Finally, while the parties have agreed that the attached documents reflect Stonewall's causes of action and permitted areas of inquiry, both parties reserve the right to challenge the relevance or admissibility of any evidence at the Hearing, irrespective of the issues agreed to be subject to exploration at deposition.

Messrs. Green, Wigmore and Fowler
May 3, 2007
Page 2

        Kind regards.

                                  Sincerely,

                                  Michael A. Knoerzer

cc:   John M. Nonna, Esq.
      Shawn L. Kelly, Esq.
      John F. Finnegan, Esq.

Attachment

631535

**The Companies' Causes of Action in these Arbitrations**

Breach of Contract/Interference with Contractual Relations: NICO violated the Reinsurance Agreements (and the duties derived therefrom) and interfered with the contractual relations of Seaton and Stonewall (the "Companies") by dominating and controlling the Companies' claims and their run-off manager, Cavell, to the detriment of the Companies.

The relief being sought is:

a.   Money damages arising from the claims identified in Exhibits 22 (Stonewall) and 32 (Seaton).

and

b.   Equitable Relief in the form of a declaration that Seaton/Stonewall may act as their own Claims Servicer.

and

c.   An award of the Companies' attorneys' fees and costs in the arbitrations.

In support of these Causes of Action, the Companies seek discovery of Messrs. Jain, Krutter and Snover concerning the following topics:

1.   Their education and employment background.

2.   Their role, if any, in drafting and negotiation of the Reinsurance Agreements between NICO and Seaton/Stonewall, including in any discussions preceding the execution of the Reinsurance Agreements to purchase the Companies directly and in any modeling of payout patterns and investment returns projected under the Reinsurance Agreements.

3.   Their role generally, if any, in managing and controlling the Companies' claims, and specifically in regard to the claims set forth in Exhibits 22 and 32.

4.   Their role generally, if any, in establishing and monitoring the claims processes and procedures used by Cavell/NICO/Resolute in respect to the Companies, including without limitation, any procedures used to avoid conflicts of interest and the use of in-house law firms.

5.   Their role, if any, in monitoring and approving payments made on the Seaton and Stonewall books, and their review and use, if any, of the "run rate spreadsheet" and any other financial documents relating to the Companies.

6.   NICO's historical relationship, if any, with Ken Randall managed or owned enterprises including Eastgate and its successors.

7. NICO's role, if any, in drafting and negotiating the Administration Agreements between Eastgate and Seaton/Stonewall.

8. The drafting and negotiation of the Collaboration Agreement, and any disclosure by NICO of its terms.

9. NICO's use of bonuses and incentives based in whole or in part upon the financial performance of the Seaton and Stonewall books.

10. Fees paid by NICO or to NICO vis a vis Eastgate and its successors (including whether NICO was paying the Cavell office rent or salaries of Cavell employees).

11. The termination of Bob Burns.

12. The Berkshire Boys e-mails.

13. The Burns memo.

There is no claim that the Reinsurance Agreements are ambiguous or were fraudulently induced.

There is no claim against NICO sounding in fraud.

Each witness is being offered as a percipient witness and will testify from personal knowledge.

Each witness will be examined for no more than 7 hours total and all three depositions will take place in LLGM's N.Y. office.

# EXHIBIT  J

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

125 WEST 55TH STREET
NEW YORK, NY 10019-5389
(212) 424-8000
FACSIMILE: (212) 424-8500

E-MAIL ADDRESS: MICHAEL.KNOERZER@LLGM.COM
WRITER'S DIRECT DIAL: (212) 424-8077
WRITER'S DIRECT FACSIMILE: (212) 649-9422

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

May 3, 2007

**BY E-MAIL**

Mr. N. David Thompson
47 Kettle Creek Road
Weston, Connecticut 06883

Mr. Caleb L. Fowler
27907 Revells Neck Road
Westover, Maryland 21871

Mr. W. Mark Wigmore
12 The Glade
Simsbury, Connecticut 06070

Re:  Arbitration between NICO and Seaton

Gentlemen:

This letter has been reviewed and approved by both parties, who are pleased to report that an agreement has been reached concerning Stonewall's causes of action in the above-referenced arbitration, as well as the scope of the depositions of Messrs. Jain, Krutter and Snover. The parties' agreement is reflected in the document attached to this letter.

We are working to schedule the depositions at the earliest mutually agreeable date. NICO reserves its rights to make appropriate objections or directions at the depositions in the event that NICO perceives the questions to go beyond the scope of what has been agreed. Given the spirit of the negotiations, we are optimistic that this will not be necessary. If it becomes necessary, the parties will resort to the Panel for resolution.

Finally, while the parties have agreed that the attached documents reflect Stonewall's causes of action and permitted areas of inquiry, both parties reserve the right to challenge the relevance or admissibility of any evidence at the Hearing, irrespective of the issues agreed to be subject to exploration at deposition.

Messrs. Thompson, Wigmore and Fowler
May 3, 2007
Page 2

Kind regards.

Sincerely,

Michael A. Knoerzer

cc:   John M. Nonna, Esq.
      Shawn L. Kelly, Esq.
      John F. Finnegan, Esq.

Attachment

## The Companies' Causes of Action in these Arbitrations

Breach of Contract/Interference with Contractual Relations: NICO violated the Reinsurance Agreements (and the duties derived therefrom) and interfered with the contractual relations of Seaton and Stonewall (the "Companies") by dominating and controlling the Companies' claims and their run-off manager, Cavell, to the detriment of the Companies.

The relief being sought is:

a.   Money damages arising from the claims identified in Exhibits 22 (Stonewall) and 32 (Seaton).

and

b.   Equitable Relief in the form of a declaration that Seaton/Stonewall may act as their own Claims Servicer.

and

c.   An award of the Companies' attorneys' fees and costs in the arbitrations.

In support of these Causes of Action, the Companies seek discovery of Messrs. Jain, Krutter and Snover concerning the following topics:

1.   Their education and employment background.

2.   Their role, if any, in drafting and negotiation of the Reinsurance Agreements between NICO and Seaton/Stonewall, including in any discussions preceding the execution of the Reinsurance Agreements to purchase the Companies directly and in any modeling of payout patterns and investment returns projected under the Reinsurance Agreements.

3.   Their role generally, if any, in managing and controlling the Companies' claims, and specifically in regard to the claims set forth in Exhibits 22 and 32.

4.   Their role generally, if any, in establishing and monitoring the claims processes and procedures used by Cavell/NICO/Resolute in respect to the Companies, including without limitation, any procedures used to avoid conflicts of interest and the use of in-house law firms.

5.   Their role, if any, in monitoring and approving payments made on the Seaton and Stonewall books, and their review and use, if any, of the "run rate spreadsheet" and any other financial documents relating to the Companies.

6.   NICO's historical relationship, if any, with Ken Randall managed or owned enterprises including Eastgate and its successors.

7. NICO's role, if any, in drafting and negotiating the Administration Agreements between Eastgate and Seaton/Stonewall.

8. The drafting and negotiation of the Collaboration Agreement, and any disclosure by NICO of its terms.

9. NICO's use of bonuses and incentives based in whole or in part upon the financial performance of the Seaton and Stonewall books.

10. Fees paid by NICO or to NICO vis a vis Eastgate and its successors (including whether NICO was paying the Cavell office rent or salaries of Cavell employees).

11. The termination of Bob Burns.

12. The Berkshire Boys e-mails.

13. The Burns memo.

There is no claim that the Reinsurance Agreements are ambiguous or were fraudulently induced.

There is no claim against NICO sounding in fraud.

Each witness is being offered as a percipient witness and will testify from personal knowledge.

Each witness will be examined for no more than 7 hours total and all three depositions will take place in LLGM's N.Y. office.

NYC 631441.1 11454 00003 5/2/2007 11:46am

EXHIBIT  K



RIKER
DANZIG :
SCHERER
HYLAND
PERRETTᴸᴸᴾ

ATTORNEYS AT LAW

**Shawn L. Kelly**
Partner

Direct:
t: 973.451.8555
f: 973.451.8670
skelly@riker.com
Reply to: Morristown

March 20, 2008

<u>Via Telecopy</u> (402-536-3265)

National Indemnity Company
3024 Harney Street
Omaha, NE 68131
Attn: General Counsel

Re:   Demand for Arbitration by Stonewall Insurance Company against
National Indemnity Company

Dear Sir/Madam:

Along with Cadwalader, Wickersham & Taft LLP, this firm represents Stonewall
Insurance Company ("Stonewall"). By and through this letter, Stonewall hereby
demands arbitration against National Indemnity Company ("NICO") pursuant to
Article 14 of the Aggregate Reinsurance Agreement between NICO and
Stonewall more fully identified as Contract No. RA 1385 (the "Treaty"). In this
arbitration, Stonewall shall seek a panel order rescinding the Treaty on the
ground that it was induced by fraud by NICO, and an award of such other and
further relief that the arbitration panel deems equitable and appropriate.

Stonewall names as its arbitrator Richard L. Voelbel, whose curriculum vitae is
available on the ARIAS US web site. Stonewall demands that NICO appoint its
arbitrator within thirty (30) days of receipt of this arbitration demand, as
required by the Treaty. Should NICO fail to appoint its arbitrator within the
specified time period, Stonewall intends to appoint NICO's arbitrator.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t: +44 (0) 20.7877.3270 f: +44 (0) 20.7877.3271
www.riker.com

National Indemnity Company
March 20, 2008
Page 2

All responses to this arbitration demand should be directed to the undersigned
co-counsel for Stonewall.

Very truly yours,

*Shawn L. Kelly / JRV*

Shawn L. Kelly

CADWALADER WICKERSHAM & TAFT LLP

By: *Lawrence I. Brandes / JRV*

Lawrence I. Brandes, Esq.
Co-Counsel for Seaton

cc:  Brian G. Snover, Esq. (via E-mail)
     Richard L. Voelbel (via E-mail)

3834466.3

# EXHIBIT  L



RIKER
DANZIG
SCHERER
HYLAND
PERRETTI LLP

ATTORNEYS AT LAW

**Shawn L. Kelly**
Partner

Direct:
t: 973.451.8555
f: 973.451.8670
skelly@riker.com
Reply to: Morristown

March 20, 2008

<u>Via Telecopy</u> (402-536-3265)

National Indemnity Company
3024 Harney Street
Omaha, NE 68131
Attn: General Counsel

Re:    **Demand for Arbitration by Seaton Insurance Company against
National Indemnity Company**

Dear Sir/Madam:

Along with Cadwalader, Wickersham & Taft LLP, this firm represents Seaton
Insurance Company, formerly known as Unigard Security Insurance Company
(hereinafter, "Seaton").    By and through this letter, Seaton hereby demands
arbitration against National Indemnity Company ("NICO") pursuant to Article 14
of the Aggregate Retrocession of Loss Portfolio Agreement between Seaton and
NICO more fully identified as Contract No. RA 1321, and Article 15 of the First
Aggregate Excess Retrocession of Loss Portfolio Agreement between NICO and
Seaton more fully identified as Contract No. RA 1322.  In this arbitration, Seaton
shall seek a panel order rescinding each of the above referenced Retrocession of
Loss Portfolio Agreements (collectively, the "Treaties") on the ground that they
were induced by fraud by NICO, and an award of such other and further relief
that the arbitration panel deems equitable and appropriate.

Seaton names as its arbitrator Jonathan Rosen, whose curriculum vitae is available
on the ARIAS US web site.  Seaton demands that NICO appoint its arbitrator
within thirty (30) days of receipt of this arbitration demand, as required by the
Treaties.  Should NICO fail to appoint its arbitrator within the specified time
period, Seaton intends to appoint NICO's arbitrator.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t: +44 (0) 20.7877.3270 f: +44 (0) 20.7877.3271
www.riker.com

National Indemnity Company
March 20, 2008
Page 2

All responses to this arbitration demand should be directed to the undersigned co-counsel for Seaton.

Very truly yours,

Shawn L. Kelly / JKV

Shawn L. Kelly

CADWALADER WICKERSHAM & TAFT LLP

By: Lawrence I. Brandes / JKV

Lawrence I. Brandes, Esq.
Co-Counsel for Seaton

cc: Brian G. Snover, Esq. (via E-mail)
    Jonathan Rosen, Esq. (via E-mail)

3834538.3

# EXHIBIT  M

IN THE MATTER OF THE ARBITRATION

between

NATIONAL INDEMNITY COMPANY,

Petitioner,

and

STONEWALL INSURANCE COMPANY,

Respondent and Counter-
Claimant.

Before:

Robert B. Green, Esq.
Caleb L. Fowler, Esq.
W. Mark Wigmore, Esq.

## DRAFT FINAL AWARD

1.     This arbitration was commenced by means of a demand dated January 4, 2006,

(the "Demand"), served by Petitioner, National Indemnity Company ("NICO"), on Respondent,

Stonewall Insurance Company ("Stonewall"). Stonewall interposed counterclaims against NICO

by means of a counter-demand dated June 22, 2006 (the "Counter-Demand"). At an

Organizational Meeting held on June 28, 2006, the parties accepted and certified a panel

consisting of Caleb Fowler and Mark Wigmore, Arbitrators, and Robert Green, Umpire

(collectively, the "Panel"), to hear and resolve the disputes framed by the Demand, the Counter-

Demand and the parties' Position Statements, copies of which were submitted to the Panel in

advance of the Organizational Meeting. Thereafter, the Panel oversaw discovery, resolved

discovery disputes, held an interim Claims Servicing hearing on September 28, 2006, and, in

June 2007, the Panel received pre-hearing briefs from the parties, together with exhibits and

authorities. The Panel conducted an evidentiary hearing from July 9, 2007 to July 19, 2007 and,

on July 20, 2007, the Panel heard closing arguments from the parties following which the Panel

asked the parties to submit draft awards. Having considered all of the parties' submissions,

evidence, authorities and arguments and having now had an opportunity to deliberate, the Panel hereby rules, unanimously, as follows:

(a)     NICO materially breached the Aggregate Reinsurance Agreement, contract RA 1385, between it and Stonewall (the "Treaty") and tortiously interfered with the Agreement Relating to Administration of Run-Off Business between Stonewall and Eastgate, Inc.;

[Alternate 1]   (b)     The most appropriate remedy for NICO's misconduct is rescission of the Treaty, which the Panel hereby grants, requiring NICO to return to Stonewall $190 million (being premium plus investment income less net losses paid) within ten business days of the date of this Award;

[Alternate 2]   (b)     The most appropriate remedy for NICO's misconduct is an Award, which the Panel hereby enters:   (1) granting Stonewall $45 million in compensatory damages; (2) appointing Stonewall as Claims Servicer under the Treaty; (3) requiring NICO to deposit $142 million into a claims account to be administered by Stonewall in accordance with Article 20 of the Treaty; (4) requiring NICO to reimburse Stonewall dollar for dollar for all Ultimate Net Loss  (as that term is defined in the Treaty) that may be recoverable by Stonewall under the Treaty without regard to the Treaty's aggregate limit, it being the Panel's intention to transfer to NICO the risk that losses and loss adjustment expenses might exceed the Treaty's aggregate limit; (5) binding NICO unconditionally to all reasonable, good faith settlements made by Stonewall; (6) permitting Stonewall, as respects all reasonable, good faith settlements below the Article 11B thresholds, to reimburse itself from the claims account; (7) requiring NICO, as respect all reasonable, good faith settlements at or above the Article 11B thresholds, to give its consent, or it reasons for refusing to consent, within two business days of a request for consent (with any failure by NICO to act within the two day period being deemed consent);

(8) permitting Stonewall, upon receipt of NICO's consent (whether explicit or deemed) to reimburse itself out of the claims account for each approved settlement; and, in the case of any refusal by NICO to consent to a settlement, (9) directing the parties to advise this Panel within three business days of NICO's refusal. This Panel, which will retain jurisdiction to hear any and all claim disputes that might arise in the future, will hear and determine the parties' controversy concerning the settlement on an expedited basis, with a briefing and hearing schedule to be set by the Panel following consultation with counsel;

(c)    NICO is ordered to reimburse Stonewall $704,500, the amount of the TIG settlement ($600,000) and the loss adjustment expenses associated therewith ($104,500);

(d)    NICO is ordered to reimburse Stonewall for Stonewall's attorneys' fees and expenses in this arbitration; if the parties are unable to reach agreement on the amount due to Stonewall under this provision within 20 days of this Award, Stonewall shall so notify the Panel which will establish a briefing schedule;

(e)    Should NICO fail to pay all or any part of the amounts in paragraphs (b), (c) or (d) of this Award within ten business days of the date of this Award or, as applicable, agreement as to amount, NICO shall be required to pay Stonewall interest on the entire unpaid balance at the rate of 12% per annum, compounded monthly, from the date of this Award until the date full payment is made;

(f)     All other requests for relief made by either party which are not expressly addressed above are DENIED.

EXECUTED on _____, 2007:

_____

Robert B. Green, Umpire

_____

Caleb L. Fowler, Arbitrator

_____

W. Mark Wigmore, Arbitrator

# EXHIBIT  N

IN THE MATTER OF THE ARBITRATION

between

NATIONAL INDEMNITY COMPANY,

Petitioner,

and

SEATON INSURANCE COMPANY,

Respondent and Counter-
Claimant.

Before:

N. David Thompson, Esq.
Caleb L. Fowler, Esq.
W. Mark Wigmore, Esq.

## DRAFT FINAL AWARD

1.    This arbitration was commenced by means of a demand dated January 4, 2006, (the "Demand"), served by Petitioner, National Indemnity Company ("NICO"), on Respondent, Seaton Insurance Company ("Seaton").    Seaton interposed counterclaims against NICO by means of a counter-demand dated June 22, 2006 (the "Counter-Demand").   At an Organizational Meeting held on June 29, 2006, the parties accepted and certified a panel consisting of Caleb Fowler and Mark Wigmore, Arbitrators, and N. David Thompson, Umpire (collectively, the "Panel"), to hear and resolve the disputes framed by the Demand, the Counter-Demand and the parties' Position Statements, copies of which were submitted to the Panel in advance of the Organizational Meeting.    Thereafter, the Panel oversaw discovery, resolved discovery disputes, and, in July 2007, the Panel received pre-hearing briefs from the parties, together with exhibits and authorities.   The Panel conducted an evidentiary hearing which concluded on August 8, 2007.  On August 9, 2007, the Panel heard closing arguments from the parties, following which the Panel requested that the parties submit draft awards.  Having considered all of the parties'

submissions, evidence, authorities and arguments and having now had an opportunity to deliberate, the Panel hereby rules, unanimously, as follows:

(a)    NICO materially breached the Aggregate Retrocession of Loss Portfolio Agreements, between it and Seaton (the "Treaties") and tortiously interfered with the Agreement Relating to Administration of Run-Off Business between Seaton and Eastgate, Inc.;

[Alternate 1]  (b)    The most appropriate remedy for NICO's misconduct is rescission of the Treaties, which the Panel hereby grants, requiring NICO to return to Seaton $245.7 million (being premium plus estimated investment income less net losses paid) within ten business days of the date of this Award;

[Alternate 2]  (b)    The most appropriate remedy for NICO's misconduct is an Award, which the Panel hereby enters:

(1) granting Seaton $84 million in compensatory damages;

(2) enforcing the Treaties by: (i) appointing Seaton as Claims Servicer under the Treaties; (ii) requiring NICO to deposit $188 million into a claims account, representing NICO's remaining limit under the Treaties, to be administered by Seaton in accordance with Article 20C of the Treaties; (iii) directing that interest on the amount held in the claims account belongs to NICO, provided, however that all such interest shall remain in the claims account and shall be available to Seaton to pay losses and expenses in the event the Treaties' aggregate limits are exceeded, with the balance in the claims account, whether principal, interest or both, paid over to NICO only upon a commutation of the Treaties; (iv) binding NICO unconditionally to all reasonable, good faith settlements made by Seaton; (v) permitting Seaton, as respects all reasonable, good faith settlements below the Article 11B thresholds, to reimburse itself from the claims account until such account is exhausted, after which NICO shall be obligated to reimburse Seaton as provided in subparagraph 3 below; (vi) requiring NICO, as respect all reasonable, good faith settlements at or above the Article 11B thresholds, to give its consent, or its reasons for refusing to consent, within two (2) business days of a request for consent (with any failure by NICO to act within the two day period being deemed consent); (vii) permitting Seaton, upon receipt of

NICO's consent (whether explicit or deemed) to reimburse itself out of the claims account for each approved settlement, until such account is exhausted, after which NICO shall be obligated to reimburse Seaton as provided in subparagraph 3 below; and

(3) granting Seaton damages in the amount equal to all losses and expenses paid by Seaton, on covered risks, in excess of the Treaties' combined, aggregate limits, to be paid by NICO (to the extent unrecoverable from the claims account) within five (5) business days after Seaton has paid each such loss and/or expense.

In the case of any refusal by NICO to consent to a settlement or proposed settlement, Seaton shall advise this Panel within three business days of NICO's refusal. This Panel, which will retain jurisdiction to hear any and all claim disputes that might arise in the future, will hear and determine the parties' controversy concerning the settlement or proposed settlement on an expedited basis, with a briefing and hearing schedule to be set by the Panel following consultation with counsel;

(c)    NICO is ordered to pay Seaton $500,000 in connection with the Gerling commutation;

(d)    NICO is ordered to reimburse Seaton for Seaton's attorneys' fees and expenses in this arbitration; if the parties are unable to reach agreement on the amount due to Seaton under this provision within 20 days of this Award, Seaton shall so notify the Panel which will establish a briefing schedule;

(e)    Should NICO fail to pay all or any part of the amounts in paragraphs (b), (c) or (d) of this Award within ten business days of the date of this Award or, as applicable, agreement as to amount, NICO shall be required to pay Seaton interest on the entire unpaid balance at the rate of 12% per annum, compounded monthly, from the date of this Award until the date full payment is made; to the extent there are future controversies concerning the

appropriateness of a claim settlement or payment by Seaton, the Panel will award interest on all amounts later found to be owing by NICO to Seaton at a 25% compound rate;

(f)    All other requests for relief made by either party which are not expressly addressed above are DENIED.


EXECUTED on _____, 2007:

_____
N. David Thompson, Umpire

_____
Caleb L. Fowler, Arbitrator

_____
W. Mark Wigmore, Arbitrator