UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

NATIONAL INDEMNITY COMPANY,           :
                                      :        08 Civ. 3718 (RWS)
                        Plaintiff,    :        ECF Case
                                      :
            vs.                       :
                                      :
STONEWALL INSURANCE COMPANY AND       :
SEATON INSURANCE COMPANY,             :
                                      :
                        Defendants.   :
--------------------------------------------------------X


**NATIONAL INDEMNITY COMPANY'S
MEMORANDUM IN OPPOSITION TO DEFEDANTS' MOTION
TO STAY OR DISMISS AND TO COMPEL ARBITRATION**


CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue, 11th Floor
New York, New York 10174
(212) 710-3900

            -and-

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

Attorneys for Plaintiff
National Indemnity Company

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................2

I.      The Parties and the Reinsurance Agreements ........................................................2

II.     The Arbitrated Disputes between NICO and the Companies ...........................................4

III.    The Arbitration Awards and this Court's Confirmation of those Awards ...................12

IV.     Post-Arbitration Events ..............................................................................................13

V.      NICO's Complaint ........................................................................................................14

VI.     The Companies' Motion to Dismiss NICO's Complaint and Compel Arbitration .......14

ARGUMENT ..................................................................................................................15

I.      THERE IS NO BASIS TO DISMISS NICO'S COMPLAINT ...................................15

        A.      The federal policy in favor of arbitration does not extend to matters
                which the parties have not agreed to arbitrate. ...............................................15

        B.      The arbitration clauses at issue contain a limitation which expressly
                excepts from arbitration actions to enforce arbitration awards ........................17

        C.      The authorities relied upon by the Companies all considered broad
                arbitration clauses which are materially different from those at issue here .....20

        D.      The Companies have had a full and fair opportunity to arbitrate their
                their rescission claims and NICO is entitled to enforcement of the
                Awards denying those claims ........................................................................22

II.     THE COMPANIES' MOTION TO STAY THESE PROCEEDINGS AND
        TO COMPEL ARBITRATION SHOULD BE DENIED BECAUSE THE
        THE PARTIES HAVE NOT AGREED TO ARBITRATE THIS DISPUTE .............24

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.,*
    307 F.3d 24 (2d Cir. 2002)..................................................................................... 15, 20

*ATSI Comms., Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ........................................................................................ 15

*Communications Workers of America v. Verizon New York Inc.,*
    03 Civ. 1511, 2003 U.S. Dist. LEXIS 19418 (S.D.N.Y. Oct. 30, 2003) ................................. 24

*Federated Rural Elec. Ins. Exch. v. Nationwide Mut. Ins. Co.,*
    134 F. Supp. 2d 923 (S.D. Ohio 2001) ..................................................................... 16, 18, 19

*Green Tree Financial Corp. v. Bazzle,*
    539 U.S. 444 (2003)............................................................................................. 16, 20

*Hartford Acc. & Indem. Co. v. Swiss Reins. Am. Corp.,*
    246 F.3d 219 (2d Cir. 2001) ............................................................................. 16, 17, 21

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2002)......................................................................................... 15, 16, 20

*Kassner v. 2nd Ave. Delicatessen Inc.,*
    493 F.3d 87 (2d Cir. 2007) .................................................................................. 15, 21

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,*
    252 F.3d 218 (2d Cir. 2001) .................................................................................. 15, 21

*McAllister Bros., Inc. v. A&S Transp. Co.,*
    621 F.2d 519 (2d Cir. 1980)....................................................................................... 24

*McMahan Securities Co. L.P. v. Forum Capital Markets L.P.,*
    35 F.3d 82 (2d Cir. 1994)......................................................................................... 24

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983);.................................................................................................. 15

*Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.,*
    88 F.3d 129 (2d Cir. 1996)........................................................................................ 21

*North River Ins. Co. v. Allstate Ins. Co.*,
    866 F. Supp. 123 (S.D.N.Y. 1994).................................................................... 16, 21

*Stamford Holding Co. v. Clark*,
    No. 3:02 CV 1236 (CFD), 2003 WL 1597206 (D. Conn. March 25, 2003)............................ 21

*UnionAmerica Ins. Co. v. Allstate Ins. Co.*,
    302 F. Supp. 2d 865 (N.D. Ill. 2004) ............................................................... 19, 20

*United Computer Systems, Inc. v. AT&T Corp.*,
    298 F.3d 756 (9th Cir. 2002) ............................................................................ 21

Plaintiff National Indemnity Company ("NICO") respectfully submits this memorandum of law in opposition to the motion of Stonewall Insurance Company ("Stonewall") and Seaton Insurance Company ("Seaton") (together, "the Companies") to (i) dismiss the complaint of NICO ("the Complaint") or stay this action in favor of arbitration and (ii) compel NICO to arbitrate.

## PRELIMINARY STATEMENT

There is a strong federal policy to enforce arbitration clauses as written. This policy, however, does not require arbitration of matters that the parties have not agreed to arbitrate.

The reinsurance agreements between NICO and the Companies each contain an arbitration clause which requires the arbitration of disputes under the reinsurance agreements. The Complaint, however, does not seek to resolve disputes arising under the reinsurance agreements, but disputes relating to the enforcement of arbitration awards (the "Awards") that NICO successfully obtained against the Companies in 2007. The arbitration clauses themselves expressly "carve out" a proceeding to enforce an arbitration award, and refer such a proceeding to "any court having jurisdiction:"

> If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

Tellingly, the Companies' motion omits any reference to this clause, and relies on inapposite case law addressing arbitration clauses that lack similar language. The Complaint seeks to enforce the Awards and to enjoin the Companies' violations of the Awards. The Awards resolved the dispute that the Companies are now seeking to rearbitrate. Because this Court has jurisdiction to enforce the Awards under the

reinsurance agreements, the Court should deny the motion to dismiss or stay and to compel arbitration.

## STATEMENT OF FACTS

The Companies' motion misrepresents material facts and omits other material facts that reveal the truth. While the Court must consider facts as pled by NICO to be true for purposes of the motion to dismiss, the Court is not required to do so for purposes of the Companies' motion to compel arbitration. NICO therefore sets forth the facts accurately in the event the Court considers the motion to compel arbitration.

## I.      The Parties and the Reinsurance Agreements

The defendant Companies are two insurers, each with its principal place of business in Rhode Island. Both of the Companies are in "run-off." This means that they no longer actively write insurance policies, but they remain in operation to wind down their defense and indemnity obligations under policies they have written in the past.

Until 1999, defendant Seaton (then known as Unigard Insurance Company), was owned by John Hancock Insurance Company. (Ex. 1).[1] Hancock sought to divest itself of its run-off obligations for Unigard and consequently sought a buyer for Unigard. A buyer was found in the form of private investors doing business as Dukes Place Holdings LP ("Dukes Place"). (*Id.*). Regulatory approval from the State of Washington Office of the Insurance Commissioner (then the state of domicile for Unigard) was required before Hancock could sell Unigard to Dukes Place. (*Id.*).

Similarly, until 2000, defendant Stonewall was owned by Great American Insurance Company. (Ex. 2). Great American sought to divest itself of its run-off

---

[1] Numbered exhibits refer to those exhibits attached to the accompanying Affirmation of Michael Knoerzer, dated September 5, 2008.

obligations for Stonewall and sought a buyer. Dukes Place agreed to buy the Stonewall run-off obligations. (*Id.*). Regulatory approval from the State of Ohio Insurance Department (then the state of domicile for Stonewall) was required before Great American could sell Stonewall to Dukes Place. (*Id.*).

Plaintiff NICO, a subsidiary of Berkshire Hathaway Inc., is a commercial lines insurer and reinsurer domiciled in the State of Nebraska. Among NICO's specialties is providing reinsurance coverage to insurers and/or reinsurers that are seeking to dispose of their discontinued business and run-off operations, either by means of reinsurance or by means of sale to a third party purchaser. In some instances, a sale to a third party takes place in conjunction with a reinsurance protection to absorb adverse development on the business being sold, which typically gives comfort to regulators (whose approval is being sought for the change in control over the entity) that the assets available to meet policyholder obligations post-sale will be no less than they were pre-sale, and often much greater depending upon the reinsurance limit. (*See* accompanying Affirmation of Brian Snover, dated September 5, 2008 ("Snover Aff.") at ¶ 2).

Dukes Place's purchase of each of the Companies was conditioned upon NICO's agreement to provide retrospective reinsurance protection for the Companies' run-off obligations, up to a coverage limit considered at the time of sale to be sufficient to cover those obligations. (Ex. 1 at 2, Ex. 2 at 3). NICO issued reinsurance agreements to each of the Companies for this purpose (the "Reinsurance Agreements"). (Exs. 3 and 4). Specifically, the Reinsurance Agreements each require NICO to reinsure (subject to the terms and conditions of each Reinsurance Agreement) 100% of the liabilities and expenses of the Companies, up to a limit of $327 million for Seaton (later increased to

3

$350 million) and $240 million for Stonewall. (Ex. 3 at 2, Ex. 4 at 2). Among the key features of the Reinsurance Agreements are provisions which give NICO not only the right to approve claims above a stated amount, but also the right to act as claims servicer for the payment of the Companies' claims (as it is NICO that is actually funding the Companies' liabilities) under certain circumstances, including the sale of the Companies. (Exs. 3 and 4 at Art. 11).

Each of the Reinsurance Agreements contains an arbitration clause which calls for arbitration of disputes arising under the Reinsurance Agreements. However, the arbitration clauses also contain an explicit "arbitration carve out" which refers actions pertaining to the enforcement of an arbitration award to any court having jurisdiction:

> If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

(Exs. 3 and 4 at Art. 14).

NICO and the Companies cooperated in the handling of the Companies' claims from the time of the sale to Dukes Place (1999 for Seaton and 2000 for Stonewall) through 2005, without incident or meaningful dispute with either company. (Snover Aff. at ¶ 3).

II.    **The Arbitrated Disputes between NICO and the Companies**

In 2005, Dukes Place concluded that it wished to sell the Companies. The prospective buyer that Dukes Place found for the Companies was Enstar (US), Inc. formerly known as Castlewood Holdings (US), Inc. ("Castlewood/Enstar US"), which was in the business of servicing claims of run-off companies for a fee. (Ex. 5).

Castlewood/Enstar US's economic interest in buying the Companies involved taking over the claims servicing of the Companies and garnering fees for that service.

Given the interests of Castlewood/Enstar US, Dukes Place and Castlewood/Enstar US concluded (in writing) that NICO's contractual right to be claims servicer rendered the Companies "not in a saleable condition." (Ex. 6). Thereafter, Dukes Place and Castlewood/Enstar US (again in writing) covertly hatched a scheme in an attempt to coerce NICO into relinquishing its right under the Reinsurance Agreements to be claims servicer for the Companies. (Ex. 7). The details of this scheme are pled in a separate action commenced by NICO that is also before this Court. *National Indem. Co. v. Greenwich Street Invests. II, L.L.C.,* 08 CV 4067 (Apr. 30, 2008) (Sweet, J.). (Ex. 8).

Pursuant to this scheme, the Companies sought to prevent NICO from exercising its right to be claims servicer, thereby interfering with NICO's rights under the Reinsurance Agreements. As a result, NICO demanded arbitration against the Companies in January 2006. (Exs. 9 and 10). The Companies counter-demanded arbitration against NICO and, as their arguments and claims for relief expanded, they each ultimately sought rescission of the Reinsurance Agreements they had with NICO, or alternatively, relief from NICO's right to be claims servicer.

Each of the arbitration panels was comprised of two party-appointed arbitrators (who acted in both arbitrations) and a neutral arbitrator (a different neutral in each arbitration). As a result of a discovery dispute between the parties, the arbitration panels each separately directed that the parties agree on the scope of the claims presented by the Companies in the arbitration. (Exs. 11 and 12). The parties complied with the arbitration panels' directives and entered into mutually agreed stipulations regarding the claims

5

being brought in the arbitrations (the "Stipulations").  (Exs. 13 and 14).  The Stipulations

were largely identical, with each stating in part:

> There is no claim that the Reinsurance Agreements are
> ambiguous or were fraudulently induced.

> There is no claim against NICO sounding in fraud.

(*Id.*).  The Stipulations did not result in any limitation on the Companies' ability to raise

any argument or claim that they desired to make, including rescission based on fraud.

The Stonewall arbitration occurred first.  Despite the Stipulations, Stonewall's

pre-hearing brief submitted to the arbitration panel dedicated eight pages to arguing for

the remedy of rescission.  (Ex. 15 at 41-49).  Stonewall contended that rescission is

appropriate, *inter alia* "where one party to a contract has misled its counterparty during

negotiations or has misrepresented a material fact to its counterparty." (*Id.* at 41).

Stonewall's pre-hearing brief went on to allege that the Reinsurance Agreement should be

rescinded because NICO misled Stonewall regarding the nature of the contract:

- "The facts before the Panel when considered in light of these principles
  – as well as fundamental fairness – compel rescission of the Treaty;
  otherwise, NICO will benefit – profit handsomely – from having misled
  Stonewall as to the fundamental nature and character of the Treaty." (*Id.*
  at 44).

- "Under these circumstances, rescission is an appropriate remedy on
  several legal bases; most notably, misrepresentation, mistake and
  material breach." (*Id.* at 48).

- "At worst, there was deliberate misconduct by NICO in purposefully
  misleading Stonewall as to the claims role NICO would assume." (*Id.*).

Stonewall argued that NICO's alleged fraud warranted rescission of the Reinsurance

Agreements *ab initio* in its pre-hearing reply brief:

- "The only equitable thing for this Panel to do is rescind the Treaty *ab initio* and disgorge NICO's obscene and wrongfully obtained profits." (Ex. 16 at 4).

- "Provided the Panel concludes that NICO misled Stonewall as well as regulators, the Panel should not hesitate to rescind the Treaty *ab initio* and disgorge NICO of its ill-gotten and obscene gains." (*Id.* at 14).

At the commencement of the Stonewall arbitration hearing, NICO contended that Stonewall's claim of fraud and the remedy of rescission (as contained in its briefs) violated the Stipulations. NICO asked the arbitration panel to limit Stonewall's claims to the issues listed in the Stipulations.

Stonewall did not deny that its allegations of fraud and claims for rescission transcended the Stipulations, but instead argued precisely the opposite of what it has represented to the Court – that the Stipulations did not limit the scope of the Companies' claims in the arbitration: "Nothing in your order required the parties to put forth the relief they were seeking." (Ex. 17 (Transcript of Stonewall Hearing) at 65). In so arguing, Stonewall admitted that it was making claims and seeking remedies beyond those in the Stipulations:

> I have to say I reject the notion that we violated anything. Your order says simply that you wanted to be apprised of the issues to be heard. That's what the order says. It doesn't say we want an exhaustive list of every remedy you might potentially ever seek. Now, I agree the document does set forth remedies at that point in time. You know? **And the remedy we seek now is different than the remedy we sought then.** But that's clearly not a violation of any Panel order or of any agreement. And it's not asking you to hear anything different than you would have heard.

(*Id.* at 122) (emphasis added). The arbitration panel in the Stonewall arbitration denied NICO's motion and ruled that the Stipulations imposed no limit on the claims for relief that Stonewall could bring in the arbitration:

7

> The Panel, after hearing arguments by the parties, denies
> NICO's motion for entering relief as set forth this morning,
> and rules that the motion can be renewed by NICO after the
> completion of the evidentiary hearing if it so wishes.

(*Id.* at 124). As a result, Stonewall was permitted to – and did – argue for rescission, both

on grounds of fraud and on other grounds.

It was much the same in the Seaton arbitration hearing.[2] In opposing NICO's

argument that the Stipulations limited the claims that Seaton could raise at the hearing,

Seaton's counsel made the same argument they made weeks earlier in the Stonewall

hearing; Seaton's counsel denied that the Stipulations defined the relief that Seaton was

seeking: "There's nothing about telling you the relief the parties are seeking." (Ex. 18

(Transcript of Seaton Hearing) at 55). The arbitrators in the Seaton arbitration (two of

whom also served in the Stonewall arbitration) ruled that the stipulation did not limit the

claims that Seaton could bring at arbitration:

> [T]he Panel does deny the motion NICO made this morning
> to strike certain actions, with leave to renew that motion at
> the close of this hearing.

(*Id.* at 283-285).

Unconstrained by the Stipulations, both Companies argued at length for rescission

of the Reinsurance Agreements. Counsel in the Stonewall hearing stated:

> We believe that you will conclude, after hearing that
> evidence, that there has been a clear and material breach of
> the treaty by NICO. *A breach that goes directly to the*
> *heart of the treaty and the bargain struck by Stonewall*
> *that you will conclude that the most appropriate remedy*
> *for that breach is to rescind the treaty.*

(Ex. 17 at 62-63) (emphasis added).

---

[2] Although Seaton did not raise rescission arguments in its pre-hearing briefings, it nevertheless argued for rescission during the arbitration hearing.

In the closing arguments of the Stonewall hearing, Stonewall's counsel left little

doubt that its rescission argument was based in part on NICO's alleged (but never proven)

fraud both prior to, and subsequent to, the effective date of the Reinsurance Agreements:

> *If the parties never intended to comply with the treaty that*
> *the regulators approved, I submit you absolutely have to*
> *rescind it,* that you have no choice but to rescind it.
> Because *if you do not, you are becoming post facto*
> *contributors to or sanctioners of a fraud* on the Ohio
> Insurance Department.  And frankly, that ought to be the
> end of this case.

(*Id.* at 2832) (emphasis added).  Stonewall's counsel went on to summarize multiple

examples of how NICO allegedly misrepresented and concealed, allegedly in an attempt

to hide the "true nature" of the Reinsurance Agreements:

- "It would have been real easy for Mr. Randall, as Stonewall's agent, to tell Mr. Barclay and the Stonewall board, we've entered into a collaboration agreement with NICO under which we've delegated our responsibilities to them. Here it is.  But that never happened.  They don't suggest, they don't allege that it happened.  Why not?  It would have been the easiest thing in the world for Forrest Krutter to say I am your subagent.  Forrest admitted under the collaboration agreement he's now a subagent to Stonewall.  So he owes them a duty of loyalty.  But he never told them of it."  (*Id.* at 2833-2834).

- "And not only was Mr. Barclay never told of the extent of the delegation, he was repeatedly misled about it."  (*Id.* at 2835).

- "This deal, the collaboration agreement, has been in force for six months and nobody has mentioned it to Stonewall, to the board or to Mr. Barclay, other than in that one mention where it's a deal with One Beacon."  (*Id.* at 2837).

- "Again, is this a disclosure of the subdelegation that took place in the collaboration agreement?  Ms. Hoelsken knew exactly what the terms of the subdelegation were.  Why didn't she tell the board?"  (*Id.* at 2838).

- "And again, I ask you, would you have thought otherwise.  Or would you have expected your agent sometime in the prior six months to have told you the truth, the whole truth."  (*Id.* at 2839).

9

- "These are his colleagues. His agent. He trusts them. He assumes they are fulfilling their contractual duties to him. He's not told and has no reason to believe that they have sold him out to NICO and have transferred full claims control to NICO because nobody ever told him or even hinted at that." (*Id.* at 2841).

- "Ms. Hoelsken knew what she was saying was untrue. In fact, it's hard to imagine that she didn't know she was telling Mr. DeQuatro an outright lie. But Mr. Barclay didn't know it was a lie. It accurately reflected what he thought because for the last two and half years that's what he had been told by Randall and Hoelsken." (*Id.* at 2846).

- "While you're saying to yourself how could Barclay not have asked, please also say to yourself how could Randall, Hoelsken, Krutter and Ryan not have told, two and half years after the collaboration agreement is signed and still there is nothing from anyone who knows its terms disclosing what they are to Mr. Barclay. Or to anyone else on the Stonewall board." (*Id.* at 2849).

- "Even an ounce of candor by Randall or NICO, just one e-mail disclosing the delegation that actually took place, and we wouldn't be here today. But instead of disclosure from NICO we got silence, and from Randall we got affirmative misrepresentation." (*Id.* at 2850).

The Companies' counsel repeated the same arguments during the closing of the Seaton hearing: "Let me begin by apologizing to [two of the three arbitrators] because, you know, a fair chunk of what I've got to go through, you already heard in the Stonewall case." (Ex. 18 at 1200). Seaton's counsel argued that rescission was "the most appropriate remedy" if accompanied by a return of premium with interest at 12 percent:

> And if you choose to fashion the remedy of rescission plus a return of premium at 12 percent, which is $242 million, you have the authority to do that, it would not render Seaton insolvent, and would in many ways be the most appropriate remedy to pick.

(*Id.* at 1281).

Seaton's counsel argued that the Reinsurance Agreement should be rescinded due to fraud by NICO both before and after the execution of the Reinsurance Agreement:

- "Indeed, we believe from [NICO's underwriter's] testimony that NICO never intended to honor the treaty terms to which [the underwriter] had agreed with Mr. Barclay." (*Id.* at 1230).

- "Seaton never agreed to it; never would have agreed to it." (*Id.* at 1242).

- "Now, I think we can all agree it would have been easy enough for Seaton's agent, Randall, or for its own supposed subagent NICO, to tell Mr. Barclay and the Seaton Board, We've done a deal under which we, Randall, have subdelegated to NICO all of our claims handling authority under our agreement with you. A one-sentence e-mail would have done the trick. There is none. No disclosure. Can you imagine?" (*Id.* at 1250).

- "Not only was Mr. Barclay never told the extent of the delegation of authority to NICO, he and the Seaton Board, in fact, we submit, were repeatedly misled about it." (*Id.* at 1253).

- "In all this time, before you get to the redomestication, Mr. Barclay has never been told or even hinted that the Collaboration Agreement involves a delegation of claims handling for Seaton." (*Id.* at 1260).

- "She has to know she's misleading the department. But Mr. Barclay didn't know it. It was completely consistent with what he believed and had always believed." (*Id.* at 1264).

- "And Mr. Barclay testified at page 1905 of the transcript that he would have never extended those agreements and continue to pay Randall millions of dollars in claims handling fees under them if he had known that Randall had delegated the claims handling to NICO and was getting reimbursed for all of the costs. It would have been insane of him to extend those agreements had he known the truth. Nothing could more effectively prove that he did not know the truth than the fact that he agreed to extend those agreements." (*Id.* at 1265).

- "But in considering that, we have to ask you to think about the deceit that had been practiced on him for all those years. Think about the fact that both Randall, as his agent, and NICO, as his subagent, pursuant to the Collaboration Agreement, owed him duties of undivided loyalty, owed him the duty to tell him what they had done and how it affected him. And they never did." (*Id.* at 1266-1267).

- "But all they had to do was tell him the truth. So, you decide who is more culpable. Those who know the exact truth, have an absolute duty to tell it and don't, or he, who didn't figure it out, even though maybe, by

11

the time of the redomestication, he could have figured it out." (*Id.* at 1270).

The 2007 arbitrations between NICO and the Companies were full-blown arbitration proceedings with extensive discovery and motion practice. The parties exchanged hundreds of thousands of pages of documents and took a total of 18 depositions. The two hearings consisted of three weeks of live testimony before the arbitration panels. By the conclusion of the hearings, more than 700 exhibits had been marked by the parties. (Snover Aff. at ¶ 4).

## III.    The Arbitration Awards and this Court's Confirmation of those Awards

On September 28, 2007, the arbitration panel in the Stonewall arbitration issued a final award which provided in part:

> The panel, having considered all of the parties' submissions, evidence, authorities and arguments, and having duly deliberated thereon, by majority hereby rules as follows for its Final Award:
>
> 1. Stonewall's demand for rescission of the Aggregate Reinsurance Agreement between Stonewall and NICO (the "Reinsurance Agreement") is denied.
>
>    *  *  *
>
> 5. Stonewall's demand that it be appointed claims servicer is denied.
>
>    *  *  *
>
> 7. NICO's request that it continue as claims servicer is granted, and, commencing from the date hereof, NICO is to be paid fees for this service according to the terms of the Reinsurance Agreement.
>
>    *  *  *
>
> 10. All other claims and requests for relief are denied.

(Complaint at Ex. A).

On September 28, 2007, the arbitration panel in the Seaton arbitration likewise

issued an award which declared in part:

> The Panel, having read the several briefs together with
> exhibits, after a hearing, and deliberations, a majority now
> rules as follows:
>
> 1.  Seaton's demands for rescission of the treaties and return
> of the premium and investment income less net losses paid
> . . . are denied.
>
> 2.  NICO's request that it continue as claims servicer is
> granted, and NICO is to be paid fees for this service
> according to the treaties.
>
> 3.  Seaton's request that it be appointed as claims servicer is
> denied.
>
> *      *      *
>
> 6.  All other claims and demands for relief by either party
> are denied.

(Complaint at Ex. B).

NICO petitioned this Court to confirm each of the Awards.  The Companies both

consented to confirmation of the Awards.  The Court issued judgments confirming the

Awards.  (Complaint at Exs. C and D).

## IV.     Post-Arbitration Events

Subsequent to confirmation of the awards, a representative for the Companies

candidly admitted that, unless NICO was prepared to purchase the Companies from

Dukes Place and Castlewood/Enstar US[3] at a premium price or otherwise comply with

the demands of the Companies' owners, Dukes Place and Castlewood/Enstar US had

---

[3] Castlewood/Enstar US recently acquired a 44% minority interest in the Companies, but has been
primarily responsible for managing the Companies since 2006.

given the instruction to counsel to continue to search for ways to pressure NICO to relent. (Snover Aff. at ¶ 5). Following this communication, the demands to re-arbitrate issues previously decided were made by the Companies. (*Id.*). On March 20, 2008, Stonewall and Seaton individually served arbitration demands on NICO, seeking "a panel order rescinding [the Reinsurance Agreements] on the ground that they were induced by fraud by NICO...." (Ex. 19 and 20).

## V.      NICO's Complaint

On April 18, 2008, NICO filed a complaint against the Companies, seeking declarations that the Companies are violating the Awards by interfering with NICO's awarded right to be claims servicer and contradicting the Awards' mandates that the Reinsurance Agreements are not rescinded.   NICO further seeks an injunction enjoining the Companies' misconduct in derogation of the arbitration awards.  Alternatively, if the Court were to decline to exercise jurisdiction to enforce its prior judgment, NICO seeks a reference back to the same arbitration panels for a determination of whether the arbitration panels decided the question of rescission based upon fraud.  (Complaint ¶ 45).

## VI.     The Companies' Motion to Dismiss NICO's Complaint and Compel Arbitration

On July 23, 2008, the Companies filed a motion to dismiss or stay NICO's complaint and compel arbitration.  The Companies' motion falsely declares: (i) that the Companies' claims for relief at arbitration were limited by stipulation; and (ii) that the Companies did not allege during those arbitrations that NICO was guilty of a fraud which justified rescission of the Reinsurance Agreements.

The Companies' motion papers (1) omit any reference to the Companies' arguments in the arbitrations to the effect that the Stipulations did not limit the claims for

relief they could bring in the arbitrations, (2) omit the arbitration panels' rulings relieving

the Companies of the restrictions in the Stipulations, (3) omit any mention of the

Companies' fraud claims against NICO made to the arbitration panels, and (4) do not

candidly address the arbitration panels' express rejection of the Companies' rescission

claims in the Awards.

## ARGUMENT

### I.     THERE IS NO BASIS TO DISMISS NICO'S COMPLAINT.

On a motion to dismiss, the court must draw all reasonable inferences in NICO's

favor and accept the facts alleged by NICO as true. *Kassner v. 2nd Ave. Delicatessen*

*Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 98 (2d Cir. 2007).

### A.     The federal policy in favor of arbitration does not extend to matters which the parties have not agreed to arbitrate.

NICO acknowledges the strong federal policy in favor of arbitration. *Moses H.*

*Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Howsam v.*

*Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

This policy does not, however, require a party to arbitrate an issue that it did not

expressly agree to arbitrate. *Howsam*, 537 U.S. at 83. "While federal policy generally

favors arbitration, the obligation to arbitrate nevertheless remains a creature of contract.

Because arbitrators' authority arises only when the parties agree in advance to that forum,

a party cannot be required to submit to arbitration any dispute which he has not agreed so

to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218,

224 (2d Cir. 2001) (internal quotation omitted); *see also ACE Capital Re Overseas Ltd. v.*

*Central United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002) ("arbitration under the Act is

a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit."). Therefore, the federal presumption in favor of arbitration does not apply if the parties' arbitration agreement does not plainly require NICO to arbitrate the dispute in question. Likewise, "[t]here is no policy favoring the re-arbitration of prior awards." *Federated Rural Elec. Ins. Exch. v. Nationwide Mut. Ins. Co.*, 134 F. Supp. 2d 923, 928 (S.D. Ohio 2001).

The Second Circuit Court of Appeals has recognized, in a reinsurance matter, that while parties may enter into broad arbitration clauses, they may also agree to "carve out" certain matters from the arbitration clause:

> Where the parties to an arbitration agreement *specifically have excepted a certain type of claim* from mandatory arbitration, it is the duty of courts to enforce not only the full breadth of the arbitration clause, but its limitations as well.

*Hartford Acc. & Indem. Co. v. Swiss Reins. Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (emphasis in original) (internal quotation omitted).

Whether the parties have agreed to arbitrate a particular dispute is a question for the courts. *See Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (the Court is to decide "certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy"); *Howsam,* 537 U.S. at 84 ("Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide."); *North River Ins. Co. v. Allstate Ins. Co.*, 866 F. Supp. 123, 126 (S.D.N.Y. 1994) ("As a threshold matter, a court must determine 'whether

the parties agreed to arbitrate, and if so, whether the scope of that agreement

encompasses the asserted claims.'").

Thus, the strong policy in favor of arbitration does not apply where parties have

expressly excepted from arbitration particular types of disputes. In those cases, "it is the

duty of courts" to enforce the limitations contained in the arbitration clause. *Hartford*,

246 F.3d at 226.

**B.    The arbitration clauses at issue contain a limitation which expressly
        excepts from arbitration actions to enforce arbitration awards.**

The arbitration clause in each of the Reinsurance Agreements contains an

"arbitration carve out" which unambiguously excepts from arbitration disputes related to

the enforcement of any award:

> If either of the parties should fail to carry out any award the
> other may apply for its enforcement to any court having
> jurisdiction thereof or having jurisdiction over the parties or
> their assets.

(Exs. 3 and 4 at Article 14).

Thus, the parties unambiguously agreed that an action to enforce the Awards is to

be heard by the Courts. NICO respectfully submits that such an enforcement action

would logically require the Court to consider (1) the issues decided by the arbitration

panels so as to determine the scope and effect of the Awards, and (2) whether the Awards

have been violated by the Companies. Although the Complaint expressly refers to the

arbitration carve out provision at paragraph 11, the Companies do not address this

provision anywhere in their motion.

In the Complaint, NICO alleges that the Companies have violated the Awards by

interfering with NICO's Award-granted right to be claims servicer and by seeking to

rescind the Reinsurance Agreements which the Awards declared were not to be
rescinded:

> 29. Despite consenting to confirmation of the Awards,
> Seaton and Stonewall have violated the directions
> contained in the Awards and Judgments of this Court
> confirming the Awards by interfering with NICO's
> exclusive right to service Seaton's and Stonewall's claims
> and also by interfering with NICO's exclusive right to
> collect amounts due from Seaton's and Stonewall's third
> party reinsurers.
>
> 30. Seaton and Stonewall violated the Awards, and the
> Judgments confirming the Awards, on March 20, 2008 by
> each serving upon NICO a written demand seeking to re-
> arbitrate its claims for rescission of its respective
> Reinsurance Agreement with NICO (the "Re-Arbitration
> Demands").

(Complaint ¶¶ 29 and 30).

These allegations (and indeed NICO's entire Complaint) merely require the Court
to consider the scope and effect of the Awards and determine whether the Companies'
actions are violating those Awards. Nowhere in the Complaint does NICO allege that the
Companies are breaching the Reinsurance Agreements. The allegations in its Complaint
are plainly within the scope of the arbitration carve out provision concerning the
enforcement of arbitration awards.

Other courts have rejected attempts by parties to re-arbitrate final and binding
arbitration awards. For example, in *Federated Rural Elec. Ins. Exch. v. Nationwide Mut.
Ins. Co.*, the court distinguished between cases seeking to give preclusive effect to a prior
award and cases seeking to prevent rearbitration of final, binding awards:

> *North River Ins. Co.* is distinguishable because the issue
> before this court is not whether the 1996 award is entitled
> to preclusive effect in subsequent, separate arbitrations.
> Instead, Federated seeks a declaration that the 1996 award

> is final and binding and that *it* cannot be re-arbitrated or, in
> effect, appealed.

134 F. Supp. 2d 923, 928 (S.D. Ohio 2001). The Court relied on a prior order that it had

issued, denying Nationwide's motion to dismiss and discussing the finality of the

arbitration award:

> According to Nationwide, the issue of the finality of the
> prior arbitration award should be determined in another
> arbitration proceeding. *Nationwide's argument, carried to
> its logical conclusion, would render meaningless the
> provision of an arbitration agreement which says that the
> results of the arbitration shall be final and binding.* If the
> parties can never resort to a court for enforcement of this
> provision, the only limit on the losing party's ability to
> continuously request the arbitrators to reconsider their
> award, would be its ability to conjure up new arguments as
> to why their original award was erroneous.

*Id.* The court rejected Nationwide's attempts to evade the reasoning of the prior order by

attempting re-arbitrate the award:

> Nationwide first argues that the parties must arbitrate the
> effect of the "final and binding" language because of the
> strong policy favoring arbitration. The court agrees that
> when two parties contract to submit their disputes to
> arbitration they should be compelled to arbitrate. Despite
> Nationwide's strenuous arguments to the contrary, the
> instant action does not involve a dispute subject to the
> arbitration agreements. Instead, it is Nationwide's attempt
> to re-arbitrate a previous final and binding award.

*Id.* Just as in *Federated*, NICO is not seeking to arbitrate a dispute under the Reinsurance

Agreements, but rather is seeking to enforce the final, binding Awards issued by the

arbitrators and confirmed by this Court. The Companies should not be allowed to re-

arbitrate the Awards simply by recasting NICO's Complaint as an issue preclusion

defense. In such a case, this Court should enjoin the re-arbitration. In rejecting an

attempt to rearbitrate a prior dispute, the court in *UnionAmerica Ins. Co. v. Allstate Ins.*

*Co.*, 302 F. Supp. 2d 865, 868 (N.D. Ill. 2004) enjoined the party seeking to rearbitrate

the same dispute:

> I agree with plaintiffs that Allstate's letter to the plaintiffs
> suggest that the true motive behind the new arbitration is to
> take a "second bite at the apple" in hope of a more
> favorable outcome on the same issues before a new panel.
> Those letters bespeak no confusion about the award's terms,
> but disagreement with those terms and an intention to
> disregard them.

That is exactly what is happening here, where the Companies are seeking to rearbitrate

rescission claims that were rejected in the prior arbitration Awards. (Snover Aff. at ¶ 5).

### C.   The authorities relied upon by the Companies all considered broad arbitration clauses which are materially different from those at issue here.

The Companies' motion to dismiss NICO's Complaint rests entirely upon the

inaccurate characterization of the arbitration clauses at issue in this matter as "broad

clauses" which require arbitration of all matters without exception: "These are broad

clauses." (*See* the Companies' Memorandum in Support of Motion to Stay or Dismiss

and to Compel Arbitration ("Companies' Br.") at 13). Continuing with this misleading

argument, the Companies characterize NICO's *affirmative action* to enforce the Awards,

which is not arbitrable, as a *defense* of issue preclusion, which is arbitrable.

In making this argument, the Companies completely disregard the "arbitration

carve out" provision. Likewise, none of the cases cited by the Companies address an

arbitration clause that contains a provision for ongoing Court enforcement of arbitration

awards. *Green Tree*, 539 U.S. at 448 (addressing broad arbitration clause with no carve

out language); *Howsam*, 537 U.S. at 81 (addressing broad arbitration clause with no carve

out language); *ACE Capital Re*, 307 F.3d at 33-34 (addressing broad arbitration clause

with no carve out language); *Louis Dreyfus Negoce*, 252 F.3d at 225-226 (addressing broad arbitration clause with no carve out language); *Hartford*, 246 F.3d at 223 (addressing broad arbitration clauses with no carve out language); *Nat'l Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 132 (2d Cir. 1996) (addressing broad arbitration clause with no carve out language).

The case upon which the Companies most heavily rely, *Belco,* expressly recognized that the existence of a provision excepting certain matters from arbitration would suggest a different result: "Nothing in the arbitration clause gives any indication that anyone other than the arbitrator should decide the preclusive effect of a prior arbitration." *Belco*, 88 F.3d at 135. Other cases cited by the Companies make the same point, though less explicitly. *See, e.g., Stamford Holding Co. v. Clark,* No. 3:02 CV 1236 (CFD), 2003 WL 1597206, *6 (D. Conn. March 25, 2003) (*citing North River Ins. Co. v. Allstate Ins. Co.,* 866 F. Supp. 123 (S.D.N.Y. 1994) (noting the arbitration clause's "expansive reach") *and United Computer Systems, Inc. v. AT&T Corp.,* 298 F.3d 756 (9th Cir. 2002) (noting "the broad language of the arbitration clause")).

As these cases suggest, the scope of the arbitration clause makes all the difference. Because the arbitration clauses in the Reinsurance Agreements contain an "arbitration carve out" which excludes from arbitration disputes relating to the enforcement of any arbitration award, none of the cases cited by the Companies are relevant.

For the same reasons, the Companies' characterization of the Complaint as asserting the defense of issue or claim preclusion is also irrelevant. In any litigation to enforce the Award, the Court must naturally consider the issues that were decided in

order to assess the scope and effect of the Award. This can be done on the face of the Award. That NICO's action to enforce the Award involves in part some of the same analyses that a court might consider on an issue preclusion defense does not change the fact that this dispute is not arbitrable, but is subject to litigation. Indeed, the defense of issue preclusion is typically heard by courts except in cases where the arbitration clause calls for it to be heard by arbitrators. That is not the case here. Here, the parties plainly agreed that any action to enforce the Award (without limitation upon the circumstances, including where the prior award is being attacked by subsequent arbitration) is subject to litigation. If the Companies' argument was upheld, the parties' agreement to litigate in court disputes concerning the enforcement of an arbitration award would be rendered meaningless.

**D.    The Companies have had a full and fair opportunity to arbitrate their rescission claims and NICO is entitled to enforcement of the Awards denying those claims.**

The Companies contend that "[t]he Awards did not enjoin any conduct of either of the Companies going forward." (Companies' Br. at 7). The Companies seem to argue that, although the Awards denied the Companies the remedy of rescission,[4] the Awards do not enjoin the Companies from seeking the rescission remedy in the future.

This argument makes a mockery of the arbitration panels' rulings and completely undermines both the Awards and the Judgments of this Court confirming the Awards. The parties entered into the Stipulations that purported to limit the relief that the Companies could seek in the arbitrations. (Exs. 13 and 14). Indeed, the Companies

---

[4] The Companies' only acknowledgement that the arbitration panels rejected their rescission claims is in a footnote. In this footnote, the Companies inaccurately characterize rescission as simply an "alternative remedy" sought by the Companies in the prior arbitrations, rather than a claim that was heard and deliberated upon by the panels and expressly denied in each of the Awards.

profess in their moving brief that the stipulation demonstrates that "those Arbitrations involved no claim against NICO sounding in fraud." (Companies' Brief at 6) (emphasis in original). However, the Companies completely disregarded these stipulations after they were agreed, a fact which the Companies failed to disclose in their motion. In fact, when NICO applied to the arbitration panels for a ruling that would limit the Companies' claims and remedies to those identified in the Stipulations, the Companies argued that they should not be limited by the Stipulations. (*See supra* pp. 7-8). Both arbitration panels denied NICO's application and permitted the Companies to make any claims and seek any remedy on any ground, including rescission. (*Id.*). Unconstrained by the Stipulations, the Companies argued extensively for rescission of the Reinsurance Agreements, based upon fraud and on breach of contract. (*See supra* pp. 8-12). Throughout the course of the arbitration hearings,[5] the Companies argued for rescission based, at least in part, on alleged fraud by NICO both before and after the parties entered into the Reinsurance Agreements. (*Id.*). The Awards expressly state that the arbitrators considered all of the Companies' arguments and, after deliberation, expressly ruled that the Reinsurance Agreements were not to be rescinded. (Complaint Ex. A ¶ 1; Complaint Ex. B ¶ 1). The Companies' arguments misrepresent their position in the arbitrations, and their attempts to once again seek the same rescission remedy based on the same contracts and the same facts (that have existed for more than six years), render the Awards meaningless and are contemptuous of both the arbitral process and this Court's judgments confirming the Awards.

---

[5] Each of the arbitrations involved many depositions, extensive motion practice, hundreds of pages of briefing and roughly a week of hearing testimony. (Snover Aff. at ¶ 4).

## II.   THE COMPANIES' MOTION TO STAY THESE PROCEEDINGS AND TO COMPEL ARBITRATION SHOULD BE DENIED BECAUSE THE PARTIES HAVE NOT AGREED TO ARBITRATE THIS DISPUTE.

A motion to compel arbitration should be denied if there is no agreement by the parties to arbitrate the dispute at issue. *See, e.g., McAllister Bros., Inc. v. A&S Transp. Co.*, 621 F.2d 519, 522 (2d Cir. 1980) ("Hence, if the arbitration agreement cannot reasonably be construed to cover [the dispute at hand], arbitration need not be compelled."); *Communications Workers of America v. Verizon New York Inc.*, 03 Civ. 1511, 2003 U.S. Dist. LEXIS 19418, at *4 (S.D.N.Y. Oct. 30, 2003) ("Accordingly, where language in the agreement 'clearly and unambiguously' places the parties' dispute outside the scope of the arbitration clause, arbitration will not be compelled."). The Companies' motion to compel must be denied because their arbitration demands are merely challenges to the enforcement of the Awards and because the parties expressly agreed that enforcement of an existing award is the province of the courts. Accordingly, there is no arbitrable dispute and the motion to compel must be denied.

Likewise, the motion to stay should be denied. The Companies rely on *McMahan Securities Co. L.P. v. Forum Capital Markets L.P.*, 35 F.3d 82 (2d Cir. 1994) to support their argument that this case should be stayed pending arbitration. However, the language of the Court in *McMahan*, as cited by the Companies, does not support a stay of this action. As the Court noted, a court must stay an action only "if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Id.* at 85-86. The *McMahan* court also recognized the well-established rule that "the FAA does not require parties to arbitrate when they have not agreed to do so." *Id.*

24

Under the carve out provision of the Reinsurance Agreements, NICO and the Companies explicitly agreed that the present dispute, involving enforcement of the Awards, is not subject to arbitration. Therefore, because the parties have not agreed in writing to arbitrate this issue, the Court is not required to stay this action and *McMahan* does not apply.

## **CONCLUSION**

For the foregoing reasons, NICO respectfully requests that the Companies' motion to dismiss or stay this action and compel arbitration be denied, and for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        September 5, 2008

                                        Respectfully submitted,

Clyde & Co US LLP                       Dewey & LeBoeuf LLP

By: ___s/ Michael A. Knoerzer_____      By: ___s/ John M. Nonna_____
Michael A. Knoerzer                     John M. Nonna
The Chrysler Building                   1301 Avenue of the Americas
405 Lexington Avenue, 11th Floor        New York, New York 10019
New York, New York 10174                (212) 259-8000
(212) 710-3900

            *Attorneys for Plaintiff National Indemnity Company*

*54205*

25