UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | | |
|---|---|---|
| NATIONAL INDEMNITY COMPANY, | : | |
| | : | 08 Civ. 3718 (RWS) |
| Plaintiff, | : | ECF Case |
| | : | |
| vs. | : | **AFFIRMATION OF** |
| | : | **MICHAEL KNOERZER** |
| STONEWALL INSURANCE COMPANY AND | : | **IN OPPOSITION TO** |
| SEATON INSURANCE COMPANY, | : | **MOTION TO DISMISS** |
| | : | **OR STAY AND COMPEL** |
| Defendants. | : | **ARBITRATION** |

-------------------------------------------------------------X

I, MICHAEL KNOERZER, pursuant to 28 U.S.C. § 1746, state as follows:

1.      I am a member of the Bar of the United States District Court for the Southern District of New York and a member of the firm Clyde & Co US LLP.  Along with the firm Dewey & LeBoeuf LLP, I represent Plaintiff National Indemnity Company ("NICO") in the above-captioned action.  I make this affirmation in support of NICO's opposition to the Motion to Stay or Dismiss and to Compel Arbitration of Defendants Stonewall Insurance Company ("Stonewall") and Seaton Insurance Company ("Seaton") (together, the "Companies").

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Form A Statement Regarding the Acquisition of Control of Unigard Security Insurance Company submitted to the Washington Office of the Insurance Commissioner, dated November 20, 1998.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Form A Statement Regarding the Acquisition of Control or Merger of Stonewall Insurance Company submitted to the Ohio Department of Insurance, dated June 9, 2000.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Aggregate Retrocession of Loss Portfolio Agreement between Unigard Security Insurance Company and NICO, dated November 20, 1998.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Aggregate Reinsurance Agreement between Stonewall and NICO, dated May 5, 2000.

6.      Attached hereto as Exhibit 5 is a true and correct copy of an e-mail exchange between and among Dominic Silvester, Mayur Patel and Matthew Kaufman, dated March 23, 2005.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an e-mail exchange between and among Paul O'Shea, Mayur Patel, Dominic Silvester, Matthew and Kaufman, dated May 28, 2006.

8.      Attached hereto as Exhibit 7 is a true and correct copy of an e-mail exchange between and among Mayur Patel, Matthew Kaufman, Robert Barclay and Mark Shepherd, dated December 21, 2005.

9.      Attached hereto as Exhibit 8 is a true and correct copy of the Complaint filed in the matter *National Indemnity Company v. Greenwich Street Investments II, L.L.C., et al.*, 08 CV 4067 (Apr. 30, 2008) (Sweet, J.).

10.      Attached hereto as Exhibit 9 is a true and correct copy of NICO's Demand for Arbitration against Stonewall, dated January 4, 2006.

11.      Attached hereto as Exhibit 10 is a true and correct copy of NICO's Demand for Arbitration against Seaton, dated January 4, 2006.

12.      Attached hereto as Exhibit 11 is a true and correct copy of a discovery order issued by the panel in the Stonewall arbitration hearing, dated May 1, 2007.

13.    Attached hereto as Exhibit 12 is a true and correct copy of a discovery order issued by the panel in the Seaton arbitration hearing, dated May 1, 2007.

14.    Attached hereto as Exhibit 13 is a true and correct copy of a stipulation agreed to by NICO and Stonewall in the Stonewall arbitration hearing, dated May 3, 2007.

15.    Attached hereto as Exhibit 14 is a true and correct copy of a stipulation agreed to by NICO and Seaton in the Seaton arbitration hearing, dated May 3, 2007.

16.    Attached hereto as Exhibit 15 is a true and correct copy of the Pre-Hearing Memorandum submitted by Stonewall in the Stonewall arbitration hearing, dated June 22, 2007.

17.    Attached hereto as Exhibit 16 is a true and correct copy of Pre-Hearing Reply Memorandum submitted by Stonewall in the Stonewall arbitration hearing, dated July 27, 2007.

18.    Attached hereto as Exhibit 17 is a true and correct copy of excerpts of a transcript of the arbitration hearing between NICO and Stonewall, dated July 9 and 20, 2007.

19.    Attached hereto as Exhibit 18 is a true and correct copy of excerpts of a transcript of the arbitration hearing between NICO and Seaton, dated August 6 and 9, 2007.

20.    Attached hereto as Exhibit 19 is a true and correct copy of Stonewall's Demand for Arbitration against NICO, dated March 20, 2008.

21.    Attached hereto as Exhibit 20 is a true and correct copy of Seaton's Demand for Arbitration against NICO, dated March 20, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 5, 2008

_____ s/ Michael Knoerzer _____
MICHAEL KNOERZER

# EXHIBIT 1

FORM A

STATEMENT (THE "STATEMENT") REGARDING
THE ACQUISITION OF CONTROL OF

Unigard Security Insurance Company
(the "Domestic Insurer")

BY

Dukes Place Holdings, L.P.
Dukes Place Holdings, Ltd.
Dukes Place Holdings LLC
GSCP, Inc.
DP Holdings LLC
Greenwich Street Capital Partners II, L.P.
Greenwich Street Investments II, LLC
Alfred C. Eckert III
Sanjay H. Patel
and
Keith W. Abell
(collectively, the "Applicants")

Filed with the Washington Office of the Insurance Commissioner

Dated: November 20, 1998

Name, Title, Address, and Telephone Number of Individual to Whom Notices and
Correspondence Concerning this Statement Should be Addressed:

John Dembeck
Debevoise & Plimpton
875 Third Avenue
New York, New York 10022
Tel 212-909-6158
Fax 212-909-6836

20644839.08

Confidential Cavell024920

Cavell-024920

*Item 1. Insurer and Method of Acquisition.*

(a) <u>Purpose of Statement.</u> This Statement is being filed pursuant to Washington Insurance Code Section 48.31B.015 and Washington Regulations Section 284-18-360 by Dukes Place Holdings, L.P., a Bermuda limited partnership ("<u>Dukes Place LP</u>"), Dukes Place Holdings, Ltd., a Bermuda corporation ("<u>Dukes Place Ltd.</u>"), Dukes Place Holdings LLC, a Delaware limited liability company ("<u>Dukes Place LLC</u>"), GSCP, Inc., a Delaware corporation ("<u>GSCP</u>"), DP Holdings LLC, a Delaware limited liability company ("<u>DP LLC</u>"), Greenwich Street Capital Partners II, L.P., a Delaware limited partnership ("<u>Greenwich Street LP</u>"), Greenwich Street Investments II, LLC, a Delaware limited liability company ("<u>Greenwich Street LLC</u>"), Alfred C. Eckert III, Sanjay H. Patel and Keith W. Abell, in connection with the proposed acquisition (the "<u>Acquisition</u>") by Dukes Place LP of all of the capital stock of Unigard Security Insurance Company, a Washington property/casualty insurance company.

(b) <u>Name and Address of Domestic Insurer.</u> The name and address of the Domestic Insurer to which this Statement relates is:

Unigard Security Insurance Company
1215 Fourth Avenue
Suite 1001
Seattle, Washington 98161-1001

(c) <u>Shares to be Acquired.</u> As of December 31, 1997, the Domestic Insurer had 200,000 shares of common stock, par value $10.00 per share, issued and outstanding (the "<u>Common Stock</u>"), and 550,000 shares of preferred stock, par value $10.00 per share, issued and outstanding (the "<u>Preferred Stock</u>"). The Applicants understand that the Seller will purchase or redeem all or part of the Preferred Stock prior to the Closing (as defined in the Stock Purchase Agreement). *See* Item 1(e). The shares of the Domestic Insurer to be acquired at Closing will be the Common Stock and any issued and outstanding shares of Preferred Stock following the Seller's purchase or redemption (the "<u>Domestic Insurer Capital Stock</u>").

(d) <u>Description of How Control is to be Acquired.</u> Control of the Domestic Insurer is to be acquired pursuant to a Stock Purchase Agreement, dated as of November 20, 1998 (the "<u>Stock Purchase Agreement</u>"), by and between John Hancock Property and Casualty Holding Company, a Delaware corporation (the "<u>Seller</u>"), and Dukes Place LP, pursuant to which Dukes Place LP will acquire all of the Domestic Insurer Capital Stock. Under the Stock Purchase Agreement, Dukes Place LP will acquire all such Domestic Insurer Capital Stock for an aggregate purchase price of $25 million in cash, provided, among other things, that at the Closing, the Domestic Insurer has a minimum shareholders

20644838.08

Confidential Cavell/024921

Cavell-024921

equity (the "Closing Shareholders Equity"), as measured on a basis consistent with generally accepted accounting principles, of $55 million, and the Domestic Insurer has entered into the Aggregate Retrocession of Loss Portfolio Agreement and First Aggregate Excess Retrocession of Loss Portfolio Agreement described in Item 1(f). A conformed copy of the executed Stock Purchase Agreement is attached at Exhibit A.

The consummation of the Acquisition is subject to customary closing conditions.

(e) Dividend or Redemption of Preferred Stock and Dividend or Distribution on Common Stock by the Domestic Insurer. As contemplated in the Stock Purchase Agreement, if, prior to Closing, the estimated Closing Shareholders Equity is greater that $55 million, then the Seller, in its sole discretion, must cause the Domestic Insurer, prior to Closing, to declare and pay dividends and any accrued interest thereon, on the Preferred Stock, or to purchase or redeem the Preferred Stock, or to declare and pay dividends on the Common Stock or to make a distribution constituting a return of paid-in capital on the Common Stock, in the amount necessary to reduce the Closing Shareholders Equity to $55 million. Because this could result in an extraordinary dividend by the Domestic Insurer, Dukes Place LP understands from the Sellers that the Domestic Insurer will make the required filing and obtain the required consent of the Washington Commissioner of Insurance prior to declaring or making any extraordinary dividend.

(f) Aggregate Retrocession of Portfolio Loss Agreements. Integral to the Acquisition will be the purchase by the Domestic Insurer of two layers of reinsurance of the net liabilities of the Domestic Insurer, including any credit risk associated with the recoverability of amounts due from existing third party reinsurers as follows: (i) $327 million from first dollar up, and (ii) $16 million excess of the $327 million, for a total of $343 million in cover. Dukes Place LP believes that the impact of these two reinsurance agreements will be to leave the Domestic Insurer with zero net retained insurance/reinsurance liabilities. These two reinsurance agreements will not only meet the estimated liabilities of the Domestic Insurer (on an non-discounted basis) but will provide $158 million protection in excess of these estimated liabilities. These layers of reinsurance will be purchased by the Domestic Insurer from National Indemnity Company, a member of the Berkshire Hathaway group of companies. Copies of the proposed Aggregate Retrocession of Loss Portfolio Agreement and First Aggregate Excess Retrocession of Loss Portfolio Agreement are attached at Exhibit B.

*Item 2. Identity and Background of the Applicant*

(a) Name and Address of Applicants. The name and address of each of the Applicants seeking to acquire control of the Domestic Insurer are as follows:

2

20844839.08

Confidential Cavell024922

Cavell-024922

Dukes Place Holdings, L.P.
    Clarendon House
    2 Church Street
    Hamilton HM 11
    Bermuda

Dukes Place Holdings, Ltd.
    Clarendon House
    2 Church Street
    Hamilton HM 11
    Bermuda

Dukes Place Holdings LLC
    c/o Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington, Delaware 19801

GSCP, Inc.
    c/o RL&F Service Corp.
    One Rodney Square, 10th Floor
    Tenth and King Streets
    Wilmington, Delaware 19801

DP Holdings LLC
    c/o Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington, Delaware 19801

Greenwich Street Capital Partners II, L.P.
    c/o RL&F Service Corp.
    One Rodney Square, 10th Floor
    Tenth and King Streets
    Wilmington, Delaware 19801

Greenwich Street Investments II, LLC
    c/o RL&F Service Corp.
    One Rodney Square, 10th Floor
    Tenth and King Streets
    Wilmington, Delaware 19801

3

Confidential Cavell#024923

Cavell-024923

Alfred C. Eckert III
 c/o Greenwich Street Capital Partners II, L.P.
 388 Greenwich Street
 New York, New York 10013-6351

Sanjay H. Patel
 c/o Greenwich Street Capital Partners II, L.P.
 388 Greenwich Street
 New York, New York 10013-6351

Keith W. Abell
 c/o Greenwich Street Capital Partners II, L.P.
 388 Greenwich Street
 New York, New York 10013-6351

 While The Travelers Insurance Company, a wholly-owned subsidiary of CitiGroup Inc. (formerly known as Travelers Group Inc.), is a member of Greenwich Street LLC, the Applicants believe that neither CitiGroup Inc. nor The Travelers Insurance Company will control the Company because the limited liability company agreement of Greenwich Street LLC (the "LLC Agreement") will provide (pursuant to an amendment that will be executed prior to Closing) that notwithstanding anything in the LLC Agreement to the contrary, The Travelers Insurance Company shall not have the right to direct or take part in the management, policies or control of, or to transact any business or to sign documents for or otherwise bind, DP LLC, Dukes Place LP, Dukes Place LLC, or any subsidiary of any of the foregoing, including the Domestic Insurer. The LLC Agreement will also provide that these provisions can not be amended, modified or waived in any manner without the prior consent of all of the members of Greenwich Street LLC, which obviously includes entities other than The Travelers Insurance Company.

 (b) <u>Nature of Business Operations of Applicant.</u>

 <u>Dukes Place LP.</u> Dukes Place LP is a limited partnership organized under the laws of Bermuda on December 13, 1996 to invest in insurance and reinsurance companies in run-off, particularly in circumstances in which the parent organizations have made a strategic decision to withdraw from insurance or reinsurance as a whole or from the classes of business underwritten by the company in run-off. Dukes Place LP completed its acquisition of Unione Italiana (U.K.) Reinsurance Company Ltd. ("Unione") on May 21, 1998.

4

Confidential Cavell024924

Cavell-024924

**Dukes Place Ltd.** Dukes Place Ltd. is a corporation organized under the laws of Bermuda in December 1996 to act as the general partner of Dukes Place LP.

**Dukes Place LLC.** Dukes Place LLC is a limited liability company organized under the laws of Delaware on August 1, 1996 and holds 100 percent of the shares of common stock of Dukes Place Ltd.

**DP Holdings LLC.** DP Holdings LLC is a limited liability company organized under the laws of Delaware on June 23, 1998 to hold 99 percent of the interests of each of Dukes Place LP and Dukes Place LLC.

**GSCP.** GSCP is a corporation organized under the laws of Delaware on June 23, 1998 to, among other things, provide management services to certain of the portfolio companies acquired from time to time, directly or indirectly, by Greenwich Street LP. GSCP is manager for Dukes Place LLC although it holds no membership interests in Dukes Place LLC. GSCP is the surviving company to a merger of Greenwich Street Capital Partners II, LLC, a Delaware limited liability company organized in June 1998, into GSCP which became effective June 29, 1998. Greenwich Street Capital Partners II, LLC did no business prior to the merger.

**Greenwich Street LP.** Greenwich Street LP is a private investment fund organized as a limited partnership under the laws of Delaware on May 26, 1998. The principal business of Greenwich Street LP is to acquire, hold, sell and otherwise dispose of securities. Greenwich Street LP holds 92.3 percent of the interests of DP Holdings LLC and 1 percent of the interests of each of Dukes Place LP and Dukes Place LLC.

**Greenwich Street LLC.** Greenwich Street LLC is a limited liability company organized under the laws of Delaware on May 26, 1998 to act as the general partner of and invest in various investment funds, including Greenwich Street LP. Greenwich Street LLC is currently the general partner of, and holds 5 percent of the limited partnership interests of, Greenwich Street LP.

(c) **Organization Chart.** An organizational chart depicting the Applicants and all entities treated as affiliates thereof for the purpose of responding to the disclosure items of this Statement is attached as Exhibit C.

No court proceedings involving a reorganization or liquidation are pending with respect to any person identified in Exhibit C.

5

20644839.08

Confidential Cavell024925

Cavell-024925

*Item 3.  Identity and Background of Individuals Associated with the Applicant*

(a) <u>Name and business address</u>:

    (a)  <u>Name and Business Address of Directors, Executive Officers and 10%</u> <u>Owners of the Applicant.</u>

    <u>Dukes Place LP</u>.

        Robert Barclay, Managing Director
           c/o Dukes Place Holdings, LLC
           Eastgate House
           40 Dukes Place
           London EC3A 7LP
           England

    <u>Dukes Place Ltd</u>.

        Alfred C. Eckert, III, Director, President and Chief Executive Officer
           c/o Greenwich Street Capital Partners II, L.P.
           388 Greenwich Street
           New York, NY 10013

        Robert A. Hamwee, Director and Vice President
           c/o Greenwich Street Capital Partners II, L.P.
           388 Greenwich Street
           New York, NY 10013

        Keith W. Abell, Director
           c/o Greenwich Street Capital Partners II, L.P.
           388 Greenwich Street
           New York, NY 10013

        Alton F. Irby, Director
           c/o Hawkpoint Partners Limited
           4 Great Saint Helens
           London EC3A 6HA
           England

6

Confidential Cavell024926

Cavell-024926

Kenneth Randall, Director
   c/o Eastgate Group Limited
   Eastgate House
   40 Dukes Place
   London EC3A 7LP

Wayne Morgan, Secretary
   c/o Codan Services Limited
   Clarendon House
   2 Church Street
   Hamilton HM 11
   Bermuda

GSCP.

Alfred C. Eckert, III, Owner, Director, President and Chief Executive Officer
   c/o Greenwich Street Capital Partners II, L.P.
   388 Greenwich Street
   New York, NY 10013

Keith W. Abell, Owner, Director and Vice President
   c/o Greenwich Street Capital Partners II, L.P.
   388 Greenwich Street
   New York, NY 10013

Sanjay H. Patel, Owner, Director and Vice President
   c/o Greenwich Street Capital Partners II, L.P.
   388 Greenwich Street
   New York, NY 10013

Eric S. Bomze, Secretary and Treasurer
   c/o Greenwich Street Capital Partners II, L.P.
   388 Greenwich Street
   New York, NY 10013

Greenwich Street LLC.

Alfred C. Eckert, III, Owner
   c/o Greenwich Street Capital Partners II, L.P.
   388 Greenwich Street
   New York, NY 10013

7

20844839.08

Confidential Cavell024927

Cavell-024927

Keith W. Abell, Owner
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

Sanjay H. Patel, Owner
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

Robert A. Hamwee, Assistant Vice President
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

Thomas V. Ingelsby, Assistant Vice President
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

Eric S. Bomze, Assistant Vice President
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

George Roeck, Assistant Vice President
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

Christine K. Vanden Beukel, Assistant Vice President
    c/o Greenwich Street Capital Partners II, L.P.
    388 Greenwich Street
    New York, NY 10013

Dukes Place LLC, DP LLC and Greenwich Street LP are each organized as either a limited partnership or limited liability company and do not have individuals who are directors, executive officers or owners of 10% or more of their voting securities.

8

Confidential Cavell#024928

Cavell-024928

(b) Present Employment Information of Directors, Executive Officers and 10% Owners of the Applicant.

Please refer to biographical affidavits for each of the persons named in Item 3(a) included in Exhibit D.

(c) Prior Employment Information of Directors, Executive Officers and 10% Owners of the Applicant.

Please refer to biographical affidavits for each of the persons named in Item 3(a) included in Exhibit D.

(d) Prior Criminal Convictions of Directors, Executive Officers and 10% Owners of the Applicant.

None of the persons named in this Item 3 has been convicted in a criminal proceeding (excluding minor traffic violations) during the last ten (10) years.

*Item 4. Nature, Source and Amount of Consideration*

(a) The limited partners of Greenwich Street LP will fund the acquisition of control of the Domestic Insurer. The general partner of Greenwich Street LP will, pursuant to existing capital commitments of its limited partners, make a capital call for approximately $25 million in cash. This sum will then be contributed to Dukes Place LP which will use the cash to fund the Acquisition.

(b) The nature and amount of the consideration involved in the purchase of the Domestic Insurer Capital Stock were determined through arm's length negotiations between unrelated parties.

(c) Not applicable.

*Item 5. Future Plans of Insurer*

Extraordinary Dividends. As described in Item 1(e), the Domestic Insurer may, prior to the Closing of the Acquisition, pay an extraordinary dividend to its current parent in connection with the Acquisition. The Applicants have no present plans to cause the Domestic Insurer to declare any extraordinary dividend. In every event, ordinary dividends or extraordinary dividends would be paid only after notice to and/or receipt of the applicable insurance regulatory consents and with the view that the insurer's statutory

9

20844839.06

Confidential Cavell024929

Cavell-024929

capital and surplus and risk-based capital will be adequate and meet all statutory requirements following the payment of such a dividend.

Liquidation. The Applicants have no present plans to liquidate the Domestic Insurer.

Sale of Assets. The Applicants have no present plans to sell any material assets of the Domestic Insurer.

On or prior to the Closing under the Stock Purchase Agreement, the Domestic Insurer and Eastgate, Inc., a Delaware corporation incorporated on September 26, 1997, an indirect wholly-owned subsidiary of Eastgate Group Limited, intend to enter into an Asset Purchase Agreement (the "Asset Purchase Agreement") pursuant to which the Domestic Insurer will transfer to Eastgate, Inc. substantially all of the personal property (the "Applicable Assets") currently utilized by the Domestic Insurer in its operations. The Applicable Assets include general office supplies, furniture and equipment, including computer hardware and related items. The purchase price for the Applicable Assets will be equal to the book value assigned thereto on the definitive Closing Balance Sheet (currently estimated to be about $300,000) and will be paid by Eastgate, Inc. to the Domestic Insurer on a installment basis over a period exceeding one year, together with an effective interest rate of 6% per annum. The transfer of the Applicable Assets is intended principally to enable Eastgate, Inc. to more efficiently perform its obligations under the Agreement Relating to Administration of Run-Off described in this Item 5 under the heading "Material Change in Business." Because the Asset Purchase Agreement will be entered into between the Domestic Insurer and Eastgate, Inc. prior to the Closing under the Stock Purchase Agreement, we believe that the Asset Purchase Agreement would not be an affiliate transaction subject to Washington Insurance Code Section 48.31B.030.

Merger and Consolidation. No mergers or consolidations involving the Domestic Insurer are contemplated by the Applicants.

Material Change in Investment Policy. The Domestic Insurer plans to enter into an Investment Management Agreement with City Capital Counseling, Inc., a Georgia corporation incorporated on November 14, 1988. According to the March 1997 Form ADV for City Capital Counseling, Inc., the company managed securities portfolios on a discretionary basis for 153 clients with a total market value of $521 million. Clients include individuals, banks, pension and profit sharing plans, trusts and estates and corporations.

A copy of the Investment Management Agreement is attached to this Statement as Exhibit E. The Investment Management Agreement provides that the Domestic Insurer

10

20644839.08

Confidential Cavell024930

Cavell-024930

will establish an investment policy in the form attached as Schedule B to the Investment Management Agreement. The investment policy will guide the investment decisions made under the Investment Management Agreement subject to compliance with all qualitative and quantitative limitations under the Washington Insurance Code. City Capital Counseling U.K., an affiliate of City Capital Counseling, Inc., provides investment management services for Unione which was acquired by Dukes Place LP on May 21, 1998.

   **Material Change in Business.** It is the primary intention of Dukes Place LP to run-off the affairs of the Domestic Insurer in an orderly and efficient manner. However, Dukes Place LP will also consider the potential for recapitalization of the Domestic Insurer in order to recommence underwriting should an appropriate opportunity be identified and market conditions justify such a strategy. Should such an event arise, the Domestic Insurer will comply with all necessary regulatory requirements.

   Eastgate, Inc., a Delaware corporation incorporated on September 26, 1997, an indirect wholly-owned subsidiary of Eastgate Group Limited, will manage the run-off of the Domestic Insurer. Eastgate Insurance Services, Ltd., another wholly-owned subsidiary of Eastgate Group Limited, provides run-off management for Unione which was acquired by Dukes Place LP on May 21, 1998. Eastgate, Inc. will bring its specialist run-off management skills to bear on the Domestic Insurer, ensuring that the Domestic Insurer's assets are maximized to the advantage of policyholders particularly through the efficient and timely collection of reinsurance debt and through more cost-effective management and administration, combined with the reinsurance protection afforded by National Indemnity Company described in Item 1(f). Thus the balance sheet resources of the Domestic Insurer available to meet its liabilities to policyholders will be enhanced by virtue of its acquisition by Dukes Place LP by the following: (i) firmer control on liabilities supported by reinsurance cover of $343 million available to fund estimated liabilities of $185 million; and (ii) improved specialist management and controlled operating costs. The Domestic Insurer plans to enter into an Agreement Relating to Administration of Run-Off Business with Eastgate, Inc. Since Eastgate Group Limited is "controlled," within the meaning of Washington Insurance Code Section 48.31B.005, by Dukes Place LLC, a person that will control the Domestic Insurer, and Eastgate, Inc. is controlled by Eastgate Group Limited, the Agreement Relating to Administration of Run-Off Business will be an affiliate transaction subject to Washington Insurance Code Section 48.31B.030. Therefore, the Agreement Relating to Administration of Run-Off is attached to this Statement for your review as Exhibit F.

   **Material Change in Corporate Structure.** The proposed acquisition of the Domestic Insurer will replace the existing immediate parent of the Domestic Insurer (the Seller) and the existing ultimate parent of the Domestic Insurer (the John Hancock Mutual

11

20644839.06

Confidential Cavell024931

Cavell-024931

Life Insurance Company) with a new immediate parent (Dukes Place LP) and a new ultimate parents, GSCP, Alfred C. Eckert III, Sanjay H. Patel and Keith W. Abell. The Applicants have no present plans to amend the articles of incorporation of the Domestic Insurer. The Applicants plan to amend the by-laws of the Domestic Insurer to reduce the minimum number of directors to five, the minimum number required under Washington Insurance Code Section 48.06.200(5).

Material Change in Management. The Applicants will reconstitute the board of directors of the Domestic Insurer with the following persons:

Keith W. Abell
Robert Barclay
Robert A. Hamwee
Thomas V. Ingelsby
Christine K. Vanden Beukel

All these persons other than Robert Barclay are U.S. citizens.

The Applicant currently anticipates replacing several of the senior management positions of the Domestic Insurer in due course. The number of senior management positions to be replaced and the identity of the individuals who will replace the current senior managers has not yet been determined.

Biographical affidavits for each of these proposed directors are included in Exhibit D as individuals associated with the Applicants.

Projected Domestic Insurer Financial Statements. Attached hereto as Exhibit G are statutory statements of admitted assets, liabilities and capital and surplus and statutory statements of operations and changes in capital and surplus of the Domestic Insurer as at December 31, 1997 on a historical basis and as of the closing of Acquisition and as at December 31, 1999, 2000 and 2001 on a projected basis (the "Projected Financial Statements"). The Projected Financial Statements are based on assumptions and estimates that, while considered reasonable when taken as a whole, are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Domestic Insurer and the Applicants. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions on which the projections are based will not materialize or will vary significantly from actual results. Consequently, the inclusion of the Projected Financial Statements herein should not be regarded as a representation by the Domestic Insurer or the Applicants or any other person or entity of the results that will actually be achieved.

12

20644839.08

Confidential Cavell024932

Cavell-024932

*Item 6.  Voting Securities to be Acquired*

Dukes Place LP plans to acquire 200,000 shares of common stock, par value $10.00 per share, issued and outstanding of the Domestic Insurer, and all the shares of preferred stock, par value $10.00 per share, issued and outstanding of the Domestic Insurer on the Closing.  Please refer to Item 1(e) regarding an expected redemption of all or part of the Preferred Stock by the Seller prior to the Closing.  Other than Dukes Place LP, none of the Applicants, their affiliates, or any person listed in Item 3 plans to acquire any voting securities of the Domestic Insurer.

The terms of the Acquisition are set forth in the Stock Purchase Agreement described in Items 1 and 4.  Pursuant to the Stock Purchase Agreement, Dukes Place LP has agreed to acquire all of the Domestic Insurer Capital Stock on the date of the Closing for the purchase price described in Item 1, payment for which will be made from the funds described in Item 4.

*Item 7.  Ownership of Voting Securities*

Except for the right of the Applicants (through their control of Dukes Place LP) to acquire the Domestic Insurer Capital Stock pursuant to the Stock Purchase Agreement, as of the date of this Statement, none of the Applicants, their affiliates or any person listed in Item 3 (a) beneficially owns any voting security of the Domestic Insurer, or (b) has the right to acquire beneficial ownership of any voting security of the Domestic Insurer.

*Item 8.  Contracts, Arrangements, or Understandings with Respect to Voting Securities of the Insurer*

Other than the Stock Purchase Agreement described in Item 1 above, as of the date of this Statement, none of the Applicants, their affiliates or any person listed in Item 3 are involved in any contract, arrangement or understanding with respect to any voting security of the Domestic Insurer, including but not limited to, transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, or the giving or withholding of proxies.

*Item 9.  Recent Purchases of Voting Securities*

There have been no purchases of any voting securities of the Domestic Insurer by the Applicants, their affiliates or any person listed in Item 3 during the twelve (12) calendar months preceding the filing of this Statement.

13

20644839.08

Confidential Cavell024933

Cavell-024933

*Item 10.  Recent Recommendations to Purchase*

None of the Applicants, their affiliates or any person listed in Item 3 has made any written or oral recommendations to purchase any voting security of the Domestic Insurer during the twelve (12) calendar months preceding the date of this Statement.  No one, based upon interviews with or at the suggestion of the Applicants, their affiliates, or any person listed in Item 3, has made any written or oral recommendations to purchase any voting security of the Domestic Insurer during the twelve (12) calendar months preceding the date of this Statement.

*Item 11.  Agreements with Broker-Dealers*

No agreement, contract or understanding has been made by the Applicants, their affiliates or any person listed in Item 3 with any broker-dealer as to solicitation of voting securities of the Domestic Insurer for tender and no amount of fees, commissions, or other compensation have been paid by the acquiring parties, their affiliates or any person listed in Item 3 above to broker-dealers with regard to solicitation of voting securities of the Domestic Insurer for tender.

*Item 12.  Financial Statements and Exhibits*

(a)  Listing of Financial Statements.  A list of financial statements and exhibits to this Statement immediately follows the response to Item 12(c).

(b)  Description of Financial Statements Attached as Exhibits.

Dukes Place LP.  Attached as Exhibit H are audited financial statements for Dukes Place LP as of December 31, 1996 and December 31, 1997.  Please note that these financial statements were prepared prior to the acquisition of Unione by Dukes Place LP on May 21, 1998.

Dukes Place LLC.  Attached as Exhibit I are audited financial statements for Dukes Place LLC as of December 31, 1996 and December 31, 1997.

Greenwich Street LP.  Unaudited financial statements for Greenwich Street LP as of September 30, 1998 are currently being prepared and will be submitted as a supplement to this Statement.

The Applicants request that the following persons be exempt from providing financial statements in connection with this Statement:  Dukes Place Holdings, Ltd., GSCP, Inc., Greenwich Street Capital Partners II, LLC (which was merged into GSCP,

14

20644839.06

Confidential Cavell024934

Cavell-024934

Inc. effective June 29, 1998), DP Holdings LLC, Greenwich Street Investments II, LLC, Unione, Alfred C. Eckert III, Sanjay H. Patel and Keith W. Abell. None of these persons, in their capacities as Applicants, will be the source of financing for the Acquisition (*See* response to Item 4(a)) and submission of a financial statement by such persons would provide no useful information on which the merits of the application set forth in this Statement can be judged.

(c) <u>Tender Offers and Proposed Contracts</u>. There have been no tender offers for, requests, or invitations for tenders of, exchange offers for, or agreements to acquire or exchange any voting securities of the Domestic Insurer. The following proposed agreements concerning the Domestic Insurer are attached as Exhibits to this Statement: (1) Investment Management Agreement between the Domestic Insurer and City Capital Counseling, Inc., <u>Exhibit E</u>, and (2) Agreement Relating to Administration of Run-Off between the Domestic Insurer and Eastgate, Inc., <u>Exhibit E</u>. As of the date of this Statement, there are no other proposed employment, consultation, advisory or management contracts concerning the Domestic Insurer.

15

20844839.08

Confidential Cavell#024935

Cavell-024935

A complete index to the Exhibits to this Statement follows:

| Exhibit | Name of Exhibit |
| --- | --- |
| A | Stock Purchase Agreement, dated as of November 20, 1998, between John Hancock Property and Casualty Holding Company and Dukes Place Holdings, L.P. |
| B | Aggregate Retrocession of Loss Portfolio Agreement and First Aggregate Excess Retrocession of Loss Portfolio Agreement between the Domestic Insurer and National Indemnity Company |
| C | Applicants Organizational Chart |
| D | Biographical Affidavits of Persons Identified in Item 3 and Proposed Directors of the Domestic Insurer Identified in Item 5 |
| E | Investment Management Agreement between the Domestic Insurer and City Capital Counseling, Inc. |
| F | Agreement Relating to Administration of Run-Off between the Domestic Insurer and Eastgate, Inc. |
| G | Projected Financial Statements |
| H | Audited financial statements of Dukes Place LP as of December 31, 1996 and December 31, 1997 |
| I | Audited financial statements of Dukes Place LLC as of December 31, 1996 and December 31, 1997 |

.

16

Confidential Cavell024936

Cavell-024936

*Item 13. Signature and Certification* Signature and certification required as follows:

SIGNATURE

Pursuant to the requirements of section 4, chapter 462, Laws of 1993, Dukes Place Holdings, L.P. has caused this application to be duly signed on its behalf in the City of New York and State of New York on the 2<u>9th</u> day of November, 1998.

Dukes Place Holdings, L.P., a Bermuda Limited Partnership
By: Dukes Place Holdings, Ltd., a Bermuda corporation, general partner

(SEAL)

By: _____
Name:  Alfred C. Eckert, III
Title:    President and Chief Executive Officer

Attest:

_____
Name: Robert A. Hamwee
Title:  Vice President

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached application dated November <u>29</u>, 1998, for and on behalf of Dukes Place Holdings, Ltd.; that he is the President and Chief Executive Officer of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information, and belief.

By: _____
Name: Alfred C. Eckert, III

20644839.07

Confidential Cavell024937

Cavell-024937

SIGNATURE

Pursuant to the requirements of section 4, chapter 462, Laws of 1993, Dukes Place Holdings LLC has caused this application to be duly signed on its behalf in the City of New York and State of New York on the 20ᵗʰ day of November, 1998.

Duke's Place Holdings LLC, a Delaware limited liability company
By: GSCP, a Delaware corporation, manager

(SEAL)

By: _____
Name:  Alfred C. Eckert, III
Title:   President and Chief Executive Officer

Attest:

_____
Name: Sanjay H. Patel
Title:  Vice President

CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated November 20, 1998, for and on behalf of GSCP, Inc.; that he is the President and Chief Executive Officer of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information, and belief.

By: _____
Name: Alfred C. Eckert, III

20644639.07

Confidential Cavell024938

SIGNATURE

Pursuant to the requirements of section 4, chapter 462, Laws of 1993, DP Holdings LLC has caused this application to be duly signed on its behalf in the City of New York and State of New York on the 20ᵗʰ day of November, 1998.

> DP Holdings LLC, a Delaware limited liability company
> By: Greenwich Street Capital Partners II, L.P., a Delaware limited Partnership, managing member
> By: Greenwich Street Investments II, LLC, a Delaware limited liability company, general partner
> By: Alfred C. Eckert III, managing member

(SEAL)

By: _____
Name: Alfred C. Eckert III

Attest:

Name: Robert A. Hamwee
Title: Assistant Vice President

CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated November 20 , 1998, for and on behalf of Alfred C. Eckert III; that he is the managing member of Greenwich Street Investments II, LLC and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information, and belief.

By: _____
Name: Alfred C. Eckert III

20644839.06

Confidential Cavell024939

Cavell-024939

## SIGNATURE

Pursuant to the requirements of section 4, chapter 462, Laws of 1993, DP Holdings LLC has caused this application to be duly signed on its behalf in the City of New York and State of New York on the 20ᵗʰ day of November, 1998.

Sanjay H. Patel

Name: Sanjay H. Patel

## CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated November 20 , 1998, for and on behalf of himself and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information, and belief.

Name: Sanjay H. Patel

20644839.06

Confidential Cavell024940

Cavell-024940

## SIGNATURE

Pursuant to the requirements of section 4, chapter 462, Laws of 1993, DP Holdings LLC has caused this application to be duly signed on its behalf in the City of New York and State of New York on the 2e͟ᵗ͟ʰ͟ day of November, 1998.

Keith W. Abell

Name: Keith W. Abell

## CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated November 2e , 1998, for and on behalf of himself and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information, and belief.

Name: Keith W. Abell

20644839.08

Confidential Cavell024941

# EXHIBIT 2

# 2

# DEBEVOISE & PLIMPTON

| | | | |
|---|---|---|---|
| 875 THIRD AVENUE | 555 13TH STREET, N.W. | 21 AVENUE GEORGE V | TOWER 42 |
| NEW YORK, NY 10022 | WASHINGTON, D.C. 20004 | 75008 PARIS | INTERNATIONAL FINANCIAL CENTRE |
| (212) 909-6000 | TELEPHONE (202) 383-8000 | TELEPHONE (33) 1) 40 73 12 12 | OLD BROAD STREET |
| | TELECOPIER (202) 383-8118 | TELECOPIER (33) 1) 47 20 50 82 | LONDON EC2N 1HQ |
| | | | TELEPHONE (44 20) 7786 9000 |
| TELECOPIER: (212) 909-6836 | | | TELECOPIER (44 20) 7588 4180 |
| | 13/F ENTERTAINMENT BUILDING | BOLSHOI PALASHEVSKY PER. 13/2 | |
| | 30 QUEEN'S ROAD CENTRAL | MOSCOW 103104 | |
| | HONG KONG | TELEPHONE (7-503) 956 3858 | |
| | TELEPHONE (852) 2160 9800 | TELECOPIER (7-503) 956 3868 | |
| | TELECOPIER (852) 2810 9828 | | |

June 9, 2000

## BY FEDERAL EXPRESS

EXHIBIT
592
7/16/07

Ms. Sandra Ellis
Paralegal
Office of Legal Services
Ohio Department of Insurance
2100 Stella Court
Columbus, Ohio 43215-1067

Dukes Place Holdings, L.P.
Form A Application to Acquire Stonewall Insurance Company

Dear Ms. Ellis:

On May 5, 2000, Dukes Place Holdings, L.P. entered into a Stock Purchase Agreement with Great American Insurance Company to acquire control of Stonewall Insurance Company, an Ohio property/casualty insurer. Enclosed please find the following:

1. Form A Statement Regarding the Acquisition of Control or Merger of Stonewall Insurance Company by Dukes Place Holdings, L.P. (the "Statement") filed as required by Ohio Insurance Law Section 3901.321(B). One original and two copies of the Statement are enclosed as required by Ohio Administrative Code Rule 3901-3-01(G). Included in the Statement are requests for approval of a possible post-Closing Purchase Price Adjustment (Item 1(g)) and an Agreement Relating to Administration of Run-Off Business (Item 5(c)(i)).

2. Check in the amount of $2,500 in payment of the fee for filing the Statement as required by Ohio Administrative Code Rule 3901-1-57(C)(3)(a).

3. Application of Stonewall Insurance Company dated May 17, 2000 under Ohio Insurance Law Section 3901.34(C) requesting approval of an extraordinary

20979066v1

Confidential
ST-000769

Ms. Sandra Ellis                            2                            June 9, 2000

dividend in connection with the proposed acquisition. This distribution is described in Item 1(e) of the Statement.

4.   Application of Stonewall Insurance Company dated May 17, 2000 under Ohio Insurance Code Section 3925.33 requesting approval of the Aggregate Reinsurance Agreement to be entered into in connection with the proposed acquisition. The Aggregate Reinsurance Agreement is described in Item 1(f) of the Statement.

We request that the Ohio Superintendent of Insurance consider all these approval requests together since the proposed acquisition cannot go forward without obtaining each requested approval.

If you have any comments or questions, please call me at 212-909-6158.

Sincerely,

John Dembeck

cc:   BY FEDERAL EXPRESS
      (without enclosures)
      Steve Vamos, Esq.
      Staff Attorney
      Office of Legal Services
      Ohio Department of Insurance
      2100 Stella Court
      Columbus, Ohio 43215-1067

20979066v/1

Confidential
ST-000770

FORM A

STATEMENT (THE "STATEMENT") REGARDING
THE ACQUISITION OF CONTROL OR MERGER OF

Stonewall Insurance Company
(the "Domestic Insurer")

BY

Dukes Place Holdings, L.P.
Dukes Place Holdings, Ltd.
Dukes Place Holdings LLC
DP Holdings LLC
Greenwich Street Capital Partners II, L.P.
Greenwich Street Investments II, LLC
and
Robert A. Hamwee
(collectively, the "Applicants")

Filed with the Ohio Department of Insurance

Dated: June 9, 2000

Name, Title, Address, and Telephone Number of Individual to Whom Notices and
Correspondence Concerning this Statement Should be Addressed:

John Dembeck
Debevoise & Plimpton
875 Third Avenue
New York, New York 10022
Tel 212-909-6158
Fax 212-909-6836

Confidential
ST-000771

20950147v5

**Item 1.  Insurer and Method of Acquisition.**

*State the name and address of the domestic insurer to which this application relates and a brief description of how control is to be acquired.*

(a)  Purpose of Statement.  This Statement is being filed pursuant to Ohio Insurance Code Section 3901.321 and Ohio Administrative Code Rule 3901-3-01 by Dukes Place Holdings, L.P., a Bermuda limited partnership, Dukes Place Holdings, Ltd., a Bermuda corporation, Dukes Place Holdings, LLC, a Delaware limited liability company, DP Holding, LLC, a Delaware limited liability company, Greenwich Street Capital Partners II, L.P., a Delaware limited partnership, Greenwich Street Investments II, LLC, a Delaware limited liability company and Robert A. Hamwee, in connection with the proposed acquisition (the "Acquisition") by Dukes Place Holdings, L.P. of all of the capital stock of Stonewall Insurance Company, an Ohio property/casualty insurance company.

(b)  Name and Address of Domestic Insurer.  The name and address of the Domestic Insurer to which this Statement relates is:

Stonewall Insurance Company
580 Walnut Street
Cincinnati, Ohio 45202

(c)  Shares to be Acquired.  The Applicants propose to acquire all the issued and outstanding shares of the Domestic Insurer which, as of the date of this Statement, consisted of 100,000 shares of common stock, par value $20.00 per share (the "Shares").

(d)  Description of How Control is to be Acquired.  Control of the Domestic Insurer is to be acquired pursuant to a Stock Purchase Agreement, dated as of May 5, 2000 (the "Stock Purchase Agreement"), by and between Great American Insurance Company, an Ohio corporation (the "Seller"), and Dukes Place Holdings, L.P., pursuant to which Dukes Place Holdings, L.P. will acquire the Shares. Capitalized terms used in this Statement without definition shall have the meanings assigned thereto in the Stock Purchase Agreement. Under the Stock Purchase Agreement, Dukes Place Holdings, L.P. will acquire the Shares for an aggregate purchase price of $10 million in cash, provided that the Estimated Closing Total Surplus is $63,200,000. If the Estimated Closing Total Surplus of the Domestic Insurer is less than $63,200,000, the Seller is required prior to the Closing to make an additional capital contribution to the Company in the amount necessary to increase the Estimated Closing Total Surplus to $63,200,000. If the Estimated Closing Total Surplus of the Domestic Insurer exceeds $63,200,000, then, prior to Closing, the Domestic Insurer is required to declare and pay a distribution of up to $35,500,000 (referred to in Item 1(e)) to the Seller in order to reduce the Estimated Closing Total Surplus to $63,200,000. The Stock Purchase Agreement also provides for

Confidential
ST-000772

2

a post-closing Purchase Price Adjustment (Stock Purchase Agreement § 2.5) designed to ensure that the Closing Total Surplus is $63,200,000. Under these provisions, the Domestic Insurer (or Dukes Place Holdings, L.P. if applicable regulatory approvals for payment by the Domestic Insurer are denied) or the Seller, as the case may be, will be required to make a post-Closing payment to the Seller or the Domestic Insurer, respectively, to ensure that the Closing Total Surplus of the Domestic Insurer is $63,200,000. If the Purchase Price Adjustment requires a payment by the Domestic Insurer, we request approval for an extraordinary dividend as described in Item 1(g).

The Closing of the Acquisition is subject, immediately prior to the Closing, to (1) the declaration and payment by the Domestic Insurer of a distribution of up to $35,500,000 to the Seller immediately prior to the Closing described in Item 1(e) (Stock Purchase Agreement §§ 2.4(b)(ii) and 4.1(a)), and (2) the Domestic Insurer and National Indemnity Company executing and delivering the Aggregate Reinsurance Agreement (called the "Reinsurance Agreement" in the Stock Purchase Agreement) described in Item 1(f) (Stock Purchase Agreement § 2.4(b)(i)). A conformed copy of the executed Stock Purchase Agreement is attached at Exhibit A.

The consummation of the Acquisition is subject to customary closing conditions.

(e) Distribution by the Domestic Insurer. As contemplated in the Stock Purchase Agreement, the Domestic Insurer must, as a condition of Closing the Acquisition, declare and pay a distribution of up to $35,500,000 (the "Distribution") to the Seller immediately prior to the Closing (Stock Purchase Agreement §§ 2.4(b)(ii) and 4.1(a)). The purpose of the Distribution is leave a Estimated Closing Total Surplus at Closing of $63,200,000 after payment of the premium under the Aggregate Reinsurance Agreement (described in Item 1(f)) of $126 million. Because the Distribution will be an extraordinary dividend by the Domestic Insurer, Dukes Place Holdings, L.P. understands that the Domestic Insurer will make the required filing and obtain the required consent of the Ohio Superintendent of Insurance under Ohio Insurance Law Section 3901.34(C) prior to declaring or making the Distribution. We ask that this Statement be considered together with the Distribution submitted directly by the Domestic Insurer.

(f) Aggregate Reinsurance Agreement. Integral to the Acquisition is the purchase by the Domestic Insurer of reinsurance of the net liabilities of the Domestic Insurer, including any credit risk associated with the recoverability of amounts due from existing third party reinsurers, with an aggregate limit of $240 million. The premium for this reinsurance is $126 million. This Aggregate Reinsurance Agreement will become effective immediately prior to the Closing of the Acquisition and will have an inception date as of May 1, 2000. The impact of this Aggregate Reinsurance Agreement will be to leave the Domestic Insurer with zero net retained insurance/reinsurance liabilities. This reinsurance will meet not only the estimated net liabilities (including incurred but not reported liabilities) of the Domestic Insurer (on an non-discounted basis) but will provide

Confidential
ST-000773

23950147v6

approximately $83 million protection in excess of these estimated liabilities determined as of December 31, 1999. This reinsurance will be purchased by the Domestic Insurer from National Indemnity Company, a member of the Berkshire Hathaway group of companies. A conformed copy of the Aggregate Reinsurance Agreement is attached at **Exhibit B**. This Aggregate Reinsurance Agreement is subject to approval by the Ohio Superintendent of Insurance under Ohio Insurance Code Section 3925.33. Since the Aggregate Reinsurance Agreement will be made effective immediately prior to the Closing of the Acquisition, the Aggregate Reinsurance Agreement will be submitted separately for approval directly by the Domestic Insurer. We ask that this Statement be considered together with the Aggregate Reinsurance Agreement submitted directly by the Domestic Insurer.

(g) Post-Closing Purchase Price Adjustment. Following the Closing, a revised balance sheet of the Domestic Insurer is to be prepared as of the Closing Date. The Closing Total Surplus in such revised balance sheet will be the "total surplus as regards policyholders" of the Domestic Insurer. If the Closing Total Surplus is not $63,200,000, then the difference (the "Purchase Price Adjustment") will be paid, with interest at a rate of 5% per annum, by the Seller (if the Closing Total Surplus is less than $63,200,000) or the Domestic Insurer (if the Closing Total Surplus is more than $63,200,000). The Applicants believe that any Purchase Price Adjustment payment by the Domestic Insurer could be characterized as a dividend and thus be subject to Ohio Insurance Code Section 3901.34(C) governing the payment of extraordinary dividends. The Applicants request the approval of any Purchase Price Adjustment under the Stock Purchase Agreement to be made by the Domestic Insurer by the Ohio Superintendent of Insurance under Ohio Insurance Code Section 3901.34(C) and that such approval be granted contemporaneously with approval of the Acquisition requested by this Statement. By operation of the Stock Purchase Agreement, the "total surplus as regards policyholders" of the Domestic Insurer following any Purchase Price Adjustment under the Stock Purchase Agreement made by the Domestic Insurer will be $63,200,000. The Dividend/Distribution Notification Filing of the Domestic Insurer dated May 17, 2000 and accompanying the submission of this Statement is incorporated by reference. No dividends or distributions will have been made by the Domestic Insurer during the past 12 months except any dividend or distribution described in that Dividend/Distribution Notification Filing. The pro forma financial condition of the Domestic Insurer following the Acquisition is set forth in Item 1(h) and the Projected Financial Statements described in Item 5(d).

(h) Effect of Acquisition. The acquisition of control of the Domestic Insurer by Dukes Place Holdings, L.P. (described in Item 1(d)) combined with the Distribution (described in Item 1(e)) and the Aggregate Reinsurance Agreement (described in Item 1(f)) will have, in combination, the effect of increasing the assets available to the Domestic Insurer to meet its liabilities to its policyholders by covering all outstanding insurance liabilities and by providing for excess coverage of $83 million in excess of the

2098014743

Confidential
ST-000774

Domestic Insurer's outstanding insurance liabilities and leaving $63,200,000 of Closing
Total Surplus in the Domestic Insurer at Closing (after payment of the reinsurance
premium of $126 million to National Indemnity Company). This may be illustrated in
the following summary:

| | $ million | |
| --- | --- | --- |
| | Before | After |
| Gross Insurance Liabilities | 283 | 283 |
| *Assets available to meet Liabilities to Policyholders* | | |
| Third Party Reinsurance net of Provision For Doubtful Reinsurance | 126 | 126 |
| National Indemnity Company Reinsurance of Net Liabilities | 0 | 157 |
| National Indemnity Company Surplus Cover | 0 | 83 |
| Cash and Investments | 209 | 55 |
| Other net assets (net of creditors and other provisions) | (9) | 8 |
| Assets available to meet Gross Insurance Liabilities | 326 | 428 |
| Excess of Assets over Liabilities | 43 | 146 |
| Percentage increase in total assets available to meet policyholder liabilities | | 31% |
| Percentage increase in surplus of assets over liabilities | | 240% |

Note: The above excludes a deferred tax liability of $18 million which will not appear on
a statutory balance sheet of the Domestic Insurer. If included, the "Excess of Assets over
Liabilities" would decrease to $128 million.

**Item 2. Identity and Background of the Applicant.**

*(1) State the name and address of the applicant seeking to acquire control of the insurer.*

*(2) If the applicant is not an individual, state the nature of its business operations for the
past five years or for such lesser period as such person and any predecessors thereof*

Confidential
ST-000775

20950147v5

Greenwich Street Investments II, LLC
c/o GSP Partners
500 Campus Drive, Suite 2200
Florham, Park, New Jersey 07932

Robert A. Hamwee
c/o GSP Partners
500 Campus Drive, Suite 2200
Florham, Park, New Jersey 07932

As illustrated on Exhibit C (Applicants Organizational Chart), each of the
Applicants is controlled, directly or indirectly, by Greenwich Street Investments II, LLC.
Robert A. Hamwee is the only member of Greenwich Street Investments II, LLC who is
permitted under the limited liability company agreement of Greenwich Street Investments
II, LLC (the "LLC Agreement") to make any decision or take any action on behalf of
Greenwich Street Investments II, LLC, either directly or through any entity controlled by
Greenwich Street Investments II, LLC, with respect to the Domestic Insurer, including
the Acquisition (or disposition) of the Domestic Insurer and the management, policies
and control of the Domestic Insurer following the Acquisition.  None of the other
members of Greenwich Street Investments II, LLC are permitted under the LLC
Agreement to participate in any way in any decisions regarding the Domestic Insurer.

While The Travelers Insurance Company, a wholly-owned subsidiary of
CitiGroup Inc. (a successor to Travelers Group Inc.), is a member of Greenwich Street
Investments II, LLC, neither CitiGroup Inc. nor The Travelers Insurance Company
control the Company because the LLC Agreement provides that, notwithstanding
anything in the LLC Agreement to the contrary, The Travelers Insurance Company does
not have the right to direct or take part in the management, policies or control of, or to
transact any business or to sign documents for or otherwise bind, DP Holding, LLC,
Dukes Place Holdings, L.P., Dukes Place Holdings, LLC, or any subsidiary of any of the
foregoing.  The Domestic Insurer will be a direct subsidiary of Dukes Place Holdings,
L.P.  Therefore The Travelers Insurance Company is prohibited from directing or taking
part in the management, policies or control of the Domestic Insurer.

Pursuant to the limited liability company agreement of Dukes Place Holdings,
LLC, Robert A. Hamwee has been appointed the manager of Dukes Place Holdings, LLC
with respect to all matters pertaining to the Domestic Insurer.

Confidential
ST-000777

20560147v5

(b) Nature of Business Operations of the Applicants.

Dukes Place Holdings, L.P. Dukes Place Holdings, L.P. is a limited partnership organized under the laws of Bermuda on December 13, 1996 to invest in insurance and reinsurance companies in run-off, particularly in circumstances in which the parent organizations have made a strategic decision to withdraw from insurance or reinsurance as a whole or from the classes of business underwritten by the company in run-off. Dukes Place Holdings, L.P. acquired Unione Italiana (U.K.) Reinsurance Company (a United Kingdom insurer) on May 21, 1998 and Unigard Security Insurance Company (a Washington insurer, renamed Seaton Insurance Company) on March 31, 1999.

Dukes Place Holdings, Ltd. Dukes Place Holdings, Ltd. is a corporation organized under the laws of Bermuda in December 1996 to act as the general partner of Dukes Place Holdings, L.P.

Dukes Place Holdings, LLC Dukes Place Holdings, LLC is a limited liability company organized under the laws of Delaware on August 1, 1996 and holds 100 percent of the shares of common stock of Dukes Place Holdings, Ltd.

DP Holding, LLC DP Holding, LLC is a limited liability company organized under the laws of Delaware on June 23, 1998 and holds 99 percent of the interests of each of Dukes Place Holdings, L.P. and Dukes Place Holdings, LLC.

Greenwich Street Capital Partners II, L.P. Greenwich Street Capital Partners II, L.P. is a private investment fund organized as a limited partnership under the laws of Delaware on May 26, 1998. The principal business of Greenwich Street Capital Partners II, L.P. is to acquire, hold, sell and otherwise dispose of securities. Greenwich Street Capital Partners II, L.P. holds 89.34% of the interests of DP Holding, LLC and 1 percent of the interests of Dukes Place Holdings, LLC.

Greenwich Street Investments II, LLC. Greenwich Street Investments II, LLC is a limited liability company organized under the laws of Delaware on May 26, 1998 to act as the general partner of and to invest in various investment funds, including Greenwich Street Capital Partners II, L.P. Greenwich Street Investments II, LLC is currently the general partner of, and holds 5% of the limited partnership interests of, Greenwich Street Capital Partners II, L.P.

(c) Organization Chart. An organizational chart depicting the Applicants and all entities treated as affiliates thereof for the purpose of responding to the disclosure items of this Statement is attached as Exhibit C.

Confidential
ST-000778

No court proceedings involving a reorganization or liquidation are pending with respect to any person identified in <u>Exhibit C</u>.

**Item 3. Identity and Background of Individuals Associated with the Applicant.**

*(1) Identify the applicant if (s)he is an individual or, if the applicant is not an individual, all persons who are directors, executive officers or owners of ten percent or more of the voting securities of the applicant.*

*(2) Each individual applicant or all persons who are directors, executive officers or owners of ten percent or more of the voting securities of the applicant shall complete a biographical affidavit and authority for release of information, Appendices 1 and 2 respectively.*

(a)  <u>Name and Business Address of Directors, Executive Officers and 10% Owners of the Applicant</u>.

<u>Dukes Place Holdings, L.P.</u>

Robert Barclay, Managing Director
    c/o Dukes Place Holdings, LLC
    Eastgate House
    40 Dukes Place
    London EC3A 7LP
    United Kingdom

<u>Dukes Place Holdings, Ltd.</u>

Alfred C. Eckert, III, Director, President and Chief Executive Officer
    c/o GSP Partners
    500 Campus Drive, Suite 2200
    Florham, Park, New Jersey 07932

Robert A. Hamwee, Director and Vice President
    c/o GSP Partners
    500 Campus Drive, Suite 2200
    Florham, Park, New Jersey 07932

Keith W. Abell, Director
    c/o GSP Partners
    500 Campus Drive, Suite 2200
    Florham, Park, New Jersey 07932

20950147v5

Confidential
ST-000779

Alton F. Irby, Director
  c/o Hawkpoint Partners Limited
  4 Great Saint Helens
  London EC3A 6HA
  United Kingdom

Kenneth Randall, Director
  c/o Eastgate Group Limited
  Eastgate House
  40 Dukes Place
  London EC3A 7LP
  United Kingdom

Wayne Morgan, Secretary
  c/o Codan Services Limited
  Clarendon House
  2 Church Street
  Hamilton HM 11
  Bermuda

<u>Greenwich Street Investments II, LLC</u>

Robert A. Hamwee, Member
  (in charge of Stonewall Insurance Company)
  c/o GSP Partners
  500 Campus Drive, Suite 2200
  Florham, Park, New Jersey 07932

Alfred C. Eckert, III, Managing Member
  c/o GSP Partners
  500 Campus Drive, Suite 2200
  Florham, Park, New Jersey 07932

Keith W. Abell, Managing Member
  c/o GSP Partners
  500 Campus Drive, Suite 2200
  Florham, Park, New Jersey 07932

Sanjay H. Patel, Managing Member
  c/o GSP Partners
  500 Campus Drive, Suite 2200
  Florham, Park, New Jersey 07932

20950147v6

Confidential
ST-000780

Thomas V. Ingelsby, Assistant Vice President
c/o GSP Partners
500 Campus Drive, Suite 2200
Florham, Park, New Jersey 07932

Eric S. Bomze, Assistant Vice President
c/o GSP Partners
500 Campus Drive, Suite 2200
Florham, Park, New Jersey 07932

George Roeck, Assistant Vice President
c/o GSP Partners
500 Campus Drive, Suite 2200
Florham, Park, New Jersey 07932

Christine K. Vanden Beukel, Assistant Vice President
c/o GSP Partners
500 Campus Drive, Suite 2200
Florham, Park, New Jersey 07932

Dukes Place Holdings, LLC, DP Holding, LLC and Greenwich Street Capital Partners II, L.P. are each organized as either a limited partnership or limited liability company and do not have individuals who are directors or executive officers.

(b) Biographical Affidavits and Authority for Release of Information.

Biographical affidavits and authority for release of information forms for each of the persons name in Item 3(a) are included in Exhibit D.

**Item 4.  Nature, Source and Amount of Consideration.**

*(1) Describe the nature, source and amount of funds or other consideration used or to be used in effecting the proposed transaction.  If any part of the consideration is or is to be borrowed or otherwise obtained for the purpose of acquiring, holding or trading securities, furnish a description of the transaction, the names of the parties thereto, the relationship, if any (whether direct or indirect), between the borrower and the lender, the amounts borrowed or to be borrowed, and copies of all agreements, understandings, promissory notes and security arrangements relating thereto.  If the stock or any asset of the domestic insurer is to be pledged or hypothecated in any way, so describe and provide a copy of the agreement or arrangement.*

*(2) Explain the criteria used in determining the nature and amount of such consideration.*

20650147v5

Confidential
ST-000781

(a) <u>Nature, Source and Amount of Consideration.</u> The general partner of Greenwich Street Capital Partners II, L.P., Greenwich Street Investments II, L.L.C., will, pursuant to existing capital commitments of its limited partners, make a capital call on such limited partners, and use other sources of funds, to fund the Acquisition. This sum will then be contributed to Dukes Place Holdings, L.P. which will, in turn, use the cash to fund the Acquisition. None of the consideration will be borrowed. As part of the Acquisition, neither the stock nor any asset of the Domestic Insurer will be pledged or hypothecated in any way.

(b) <u>Criteria.</u> The nature and amount of the consideration involved in the purchase of the Shares were determined through arm's length negotiations between unrelated parties.

**Item 5. Future Plans of Insurer.**

*(1) Describe any contemplated or actual plans or proposals which the applicant may have to: cause the insurer to declare dividends, liquidate or dissolve the insurer, sell any asset of the insurer, enter into any rental, leasing or financial arrangements with the insurer, or merge the insurer with any person or persons.*

*(2) Provide a plan of operation for the domestic insurer for three years following consummation of the proposed transaction including: type of business to be written, amount of anticipated premiums, investment policy, marketing plans, relocation of home office or of corporate records and changes in reinsurance or reinsurers.*

*(3) Describe all changes planned to be made after consummation of the proposed transaction concerning the board of directors or executive officers of the domestic insurer or those of the organization which will succeed the latter as a result of the proposed transaction. Describe the nature, extent and amount of any commitments to or agreements or understandings with the present officers and directors of the domestic insurers. Attach copies of all contemplated or actual contracts, commitments, agreements or understandings for: employment, consultation, advice, management or services.*

*(4) Provide pro forma balance sheets and income statements of the insurer prepared in accordance with statutory accounting principles, for three years following consummation of the proposed transaction. If any part of the consideration for the proposed transaction involves borrowed funds, describe debt service in detail. If any part of the consideration is to be obtained from or financed by an affiliate of the applicant, identify the source of funds and describe the method of distribution.*

*(5) If the insurer will be a member of an insurance holding company system following consummation of the proposed transaction, provide the following: (a) A pro forma*

20060147v5

Confidential
ST-000782

*balance sheet and income statement showing the effect of the proposed transaction, prepared on a consolidated basis. (b) If the applicant is an insurer actively engaged in the business of insurance, the statements shall be prepared in accordance with statutory accounting principles. (c) If the applicant is not an insurer actively engaged in the business of insurance, the statements shall be prepared in accordance with generally accepted accounting principles.*

*(6) State the amount of premiums written by the domestic insurer and all affiliates for each line of business transacted in Ohio, as of the thirty-first day of December next preceding. State the amount of premiums written by the applicant and all affiliates for each line of business transacted in Ohio, as of the thirty-first day of December next preceding.*

    (a) <u>Dividends, Liquidation, Dissolution, Sale of Assets, Etc.</u>

    *(i) Extraordinary Dividends.* As described in Item 1(e), the Domestic Insurer will, prior to the Closing of the Acquisition, pay an extraordinary dividend to its current parent in connection with the Acquisition. After the Closing, the Closing Total Surplus of the Domestic Insurer will be not less than $63,200,000. The Applicants have no present plans to cause the Domestic Insurer to declare any extraordinary dividend other than any dividends required for the Domestic Insurer to make the Purchase Price Adjustment contemplated by the Stock Purchase Agreement (Stock Purchase Agreement § 2.5) and described in Item 1(g). In every event, ordinary dividends or extraordinary dividends would be paid only after notice to and/or receipt of the applicable insurance regulatory consents.

    *(ii) Liquidation and Dissolution.* The Applicants have no present plans to liquidate or dissolve the Domestic Insurer.

    *(iii) Sale of Assets.* The Applicants have no present plans to sell any asset of the Domestic Insurer.

    *(iv) Rental, Leasing or Financial Arrangements.* The Applicants have no present plans for the Domestic Insurer to enter into any rental or leasing arrangements. As described in Item 5(b)(iii), the Applicants plan that the Domestic Insurer will enter into an Investment Management Agreement with City Capital Counseling, Inc.

    *(v) Merger.* No mergers involving the Domestic Insurer are contemplated by the Applicants.

    (b) <u>3-Year Plan of Operations.</u>

    *(i) Type of Business to be Written.* It is the primary objective of Dukes Place Holdings, L.P. to run-off the affairs of the Domestic Insurer in an orderly and efficient

manner. The Applicants have no present plans to recapitalize the Domestic Insurer or to have the insurer recommence underwriting insurance or reinsurance business.

(ii) *Amount of Anticipated Premiums.* Because the Domestic Insurer will be run-off, there are no plans to write new insurance or reinsurance premiums.

(iii) *Investment Policy.* The Domestic Insurer plans to enter into an Investment Management Agreement with City Capital Counseling, Inc., a Georgia corporation incorporated on November 14, 1988.

City Capital Counseling, Inc. is a registered investment adviser with a main office in Atlanta, Georgia, and a sales and liaison office in London, England. City Capital Counseling, Inc. began business in 1969 and took its present corporate form in 1988. City Capital Counseling, Inc. serves approximately 100 clients in the U.S., the U.K. and Bermuda. Among its clients is Unigard Security Insurance Company (renamed Seaton Insurance Company) which was acquired by Dukes Place Holdings, L.P. on March 31, 1999. City Capital Counseling U.K., an affiliate of City Capital Counseling, Inc., provides investment management services for Unione Italiana (U.K.) Reinsurance Company Ltd. which was acquired by Dukes Place Holdings, L.P. on May 21, 1998.

Assets under management by City Capital Counseling, Inc. total approximately $1.0 billion, with over two-thirds of this amount, $700 million, being funds invested for insurers. Insurance clients, which number 32, include entities engaged in property, casualty, workers' compensation, major medical and medical malpractice insurance. Over eighty percent of total insurance funds are invested in fixed income securities. These consist of high quality intermediate term securities such as U.S. treasury securities, U.S. government agency securities, corporate securities (rated A or higher) and mortgage-backed and asset-backed securities. Personnel of City Capital Counseling, Inc. number 20, including 11 professionals involved in portfolio management, research, trading and marketing.

A copy of the Investment Management Agreement is attached for your information to this Statement as Exhibit E. The Investment Management Agreement provides that the Domestic Insurer will establish an Investment Policy in the form attached as Schedule B to the Investment Management Agreement. The Investment Policy will guide the investment decisions made under the Investment Management Agreement subject to compliance with all qualitative and quantitative limitations under the Ohio Insurance Code.

(iv) *Marketing Plans.* Because the Domestic Insurer will be run-off, there are no marketing plans.

14

20950147v5

Confidential
ST-000784

*(v) Relocation of Home Office or Corporate Records.* As described in Item 5(c), Eastgate, Inc. will manage the run-off of the Domestic Insurer. Since the primary office of Eastgate, Inc. is in Boston, Massachusetts, it is expected that the home office and corporate records of the Domestic Insurer will be moved to Boston, Massachusetts.

*(vi) Changes in Reinsurance or Reinsurers.* There are no plans to change the reinsurance or reinsurers of the Domestic Insurer other than the Domestic Insurer entering into the Aggregate Reinsurance Agreement described in Item 1(f).

(c) <u>Changes to Board of Directors and Officers.</u>

*(i) Agreement Relating to the Administration of Run-Off Business.* Eastgate, Inc., a Delaware corporation incorporated on September 26, 1997 and an indirect wholly-owned subsidiary of Eastgate Group Limited, will manage the run-off of the Domestic Insurer. Eastgate, Inc. provides run-off management for Unigard Security Insurance Company, a Washington property/casualty insurer (renamed Seaton Insurance Company), which was acquired by Dukes Place Holdings, L.P. on March 31, 1999. Eastgate Insurance Services, Ltd., another wholly-owned subsidiary of Eastgate Group Limited, provides run-off management for Unione Italiana (U.K.) Reinsurance Company Ltd., a U.K. insurer, which was acquired by Dukes Place Holdings, L.P. on May 21, 1998. Other U.S. clients of Eastgate Group Limited and its subsidiaries include Travelers Insurance Company, Metropolitan Life Insurance Company, Exxon Mobil Corporation, Allstate Insurance Company and Northwestern National/Reliastar. BCS Management Inc., another wholly-owned subsidiary of Eastgate Group Limited, was acquired by Eastgate Group Limited in August 1997.

Eastgate, Inc. will bring its specialist run-off management skills to bear on the Domestic Insurer, ensuring that the Domestic Insurer's assets are maximized to the advantage of policyholders particularly through the efficient and timely collection of reinsurance debt and through more cost-effective management and administration, combined with the reinsurance protection afforded by National Indemnity Company described in Item 1(f). Thus the balance sheet resources of the Domestic Insurer available to meet its liabilities to policyholders will be enhanced by virtue of its acquisition by Dukes Place Holdings, L.P. by the following: (1) firmer control on liabilities supported by a reinsurance cover of $240 million available to fund estimated liabilities of $157 million; and (2) improved specialist management and controlled operating costs. The Domestic Insurer will enter into an Agreement Relating to Administration of Run-Off Business with Eastgate, Inc. to be effective as of the Closing of the Acquisition. A copy is attached as <u>Exhibit F</u>. Since Eastgate Group Limited is "controlled," within the meaning of Ohio Insurance Code Section 3901.32(B), by Dukes Place Holdings, LLC, a person that will control the Domestic Insurer, and Eastgate, Inc. is controlled by Eastgate Group Limited, the Agreement Relating to Administration of Run-Off Business will be an affiliate transaction subject to approval of the Ohio

20960147v5

Confidential
ST-000785

Superintendent of Insurance under Ohio Insurance Code Section 3901.341(A)(4). The Applicants request the approval of the Agreement Relating to Administration of Run-Off Business by the Ohio Superintendent of Insurance under Ohio Insurance Code Section 3901.341(A)(4) that that such approval be granted contemporaneously with approval of the Acquisition requested by this Statement. The Applicants represent that the cost of the services of Eastgate, Inc. under the Agreement Relating to Administration of Run-Off Business will be less than the cost of the Domestic Insurer to directly provide the same services.

(ii) *Change in Management.* The Applicants will reconstitute the board of directors of the Domestic Insurer with the following persons:

Matthew Kaufman
Robert L. Barclay
Robert A. Hamwee
Thomas V. Ingelsby
Christine K. Vanden Beukel

All these persons other than Robert Barclay are U.S. citizens.

The Applicant will elect the following persons as officers of the Domestic Insurer:

Robert A. Hamwee, Chairman
Robert L. Barclay, President
David I. Wallis, Treasurer
Peter J. Goddard, Secretary

Biographical affidavits and authority for release of information forms for each of these proposed directors and officers of the Domestic Insurer are attached or included in Exhibit D.

There are no commitments to or agreements or understandings with the present officers and directors of the Domestic Insurer.

The following proposed agreements concerning the Domestic Insurer are attached as Exhibits to this Statement: (1) Investment Management Agreement between the Domestic Insurer and City Capital Counseling, Inc., Exhibit E, and (2) Agreement Relating to Administration of Run-Off between the Domestic Insurer and Eastgate, Inc., Exhibit F. As of the date of this Statement, there are no other proposed employment, consultation, advisory or management contracts concerning the Domestic Insurer.

(d) Projected Domestic Insurer Financial Statements. Attached hereto as Exhibit G are statutory statements of admitted assets, liabilities and capital and surplus and statutory statements of operations and changes in capital and surplus of the Domestic

20950147v5

Confidential
ST-000786

Insurer as at December 31, 1999 on a historical basis and as of the closing of Acquisition and as at December 31, 2001, 2002 and 2003 on a projected basis (the "Projected Financial Statements"). The Projected Financial Statements are based on assumptions and estimates that, while considered reasonable when taken as a whole, are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Domestic Insurer and the Applicants. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions on which the projections are based will not materialize or will vary significantly from actual results. Consequently, the inclusion of the Projected Financial Statements herein should not be regarded as a representation by the Domestic Insurer or the Applicants or any other person or entity of the results that will actually be achieved. No part of the consideration for the Acquisition involves borrowed funds. Consideration from affiliates of the Applicants is described in Item 4(a).

(e) Pro Forma Financial Statements of Dukes Place Holdings, L.P.

Attached as Exhibit H is a pro forma balance sheet and income statement of Dukes Place Holdings, L.P. showing the effect of the Acquisition, prepared on a consolidated basis.

(f) Ohio Written Premiums by the Domestic Insurer and its Affiliates.

The Domestic Insurer is in run-off and had no premiums written in Ohio as of December 31, 1999. The only other insurer owned by the Applicants licensed to do business in Ohio is Seaton Insurance Company (formerly Unigard Security Insurance Company) which is also in run-off and had no premiums written in Ohio as of December 31, 1999.

**Item 6. Voting Securities to be Acquired.**

*State the number of shares of the insurer's voting securities which the applicant, its affiliates and any person listed in Item 3, plans to acquire. Describe the terms of the offer, request, invitation, agreement or acquisition. State the method used to determine the fairness of the proposal.*

Dukes Place Holdings, L.P. plans to acquire 100,000 shares of common stock, par value $20.00 per share, issued and outstanding of the Domestic Insurer on the Closing. Other than Dukes Place Holdings, L.P., none of the Applicants, their affiliates, or any person listed in Item 3 plans to acquire any voting securities of the Domestic Insurer.

The terms of the Acquisition are set forth in the Stock Purchase Agreement described in Items 1 and 4. Pursuant to the Stock Purchase Agreement, Dukes Place Holdings, L.P. has agreed to acquire all of the Shares on the date of the Closing for the

17

Confidential
ST-000787

20950147v6

purchase price described in Item 1, payment for which will be made from the funds described in Item 4.

**Item 7. Ownership of Voting Securities.**

*State the amount of each class of any voting security of the insurer which is beneficially owned or concerning which there is a right to acquire beneficial ownership by the applicant, its affiliates or any person listed in Item 3.*

Except for the right of the Applicants (through their control of Dukes Place Holdings, L.P.) to acquire the Shares pursuant to the Stock Purchase Agreement, as of the date of this Statement, none of the Applicants, their affiliates or any person listed in Item 3 (1) beneficially owns any voting security of the Domestic Insurer, or (2) has the right to acquire beneficial ownership of any voting security of the Domestic Insurer.

**Item 8. Contracts, Arrangements, or Understandings with Respect to Voting Securities of the Insurer.**

*Fully describe any contracts, arrangements or understandings with respect to any voting security of the insurer in which the applicant, its affiliates or any person listed in Item 3 is involved, including but not limited to: transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits or the giving or withholding of proxies. Identify the persons with whom such contracts, arrangements or understandings have been entered. File as exhibits copies of all tender offers for, requests or invitations for, tenders of, exchange offers for, and agreements to acquire or exchange any voting securities of the insurer and, if distributed, of additional soliciting material relating thereto and annual reports to the stockholders of the insurer and applicant for the last two fiscal years.*

Other than the Stock Purchase Agreement described in Item 1 above, as of the date of this Statement, none of the Applicants, their affiliates or any person listed in Item 3 are involved in any contract, arrangement or understanding with respect to any voting security of the Domestic Insurer, including but not limited to, transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits or the giving or withholding of proxies.

There have been no tender offers for, requests, or invitations for tenders of, exchange offers for, or agreements to acquire or exchange any voting securities of the Domestic Insurer.

Confidential
ST-000788

20950147v5

**Item 9.  Recent Purchases of Voting Securities.**

*Describe any purchases of any voting securities of the insurer by the applicant, its affiliates or any person listed in Item 3 during the twelve calendar months preceding the filing of this statement.  Include in the description the dates of purchase, the names of the purchasers, and the consideration paid or agreed to be paid therefore.  State whether any such shares are pledged or hypothecated.*

There have been no purchases of any voting securities of the Domestic Insurer by the Applicants, their affiliates or any person listed in Item 3 during the 12 calendar months preceding the filing of this Statement.

**Item 10.  Recent Recommendations to Purchase.**

*Describe any recommendations to purchase any voting security of the insurer made by the applicant, its affiliates or any person listed in Item 3, or by anyone based upon interviews or at the suggestion of the applicant, its affiliates or any person listed in Item 3 during the twelve calendar months preceding the filing of this statement.*

None of the Applicants, their affiliates or any person listed in Item 3 has made any recommendations to purchase any voting security of the Domestic Insurer during the 12 calendar months preceding the date of this Statement.  No one, based upon interviews with or at the suggestion of the Applicants, their affiliates, or any person listed in Item 3, has made any recommendations to purchase any voting security of the Domestic Insurer during the 12 calendar months preceding the date of this Statement.

**Item 11.  Agreements with Broker-Dealers.**

*Describe the terms of any agreement, contract or understanding made with any broker-dealer as to solicitation of voting securities of the insurer for tender and the amount of any fees, commissions or other compensation to be paid to broker-dealers with regard thereto.*

No agreement, contract or understanding has been made by the Applicants, their affiliates or any person listed in Item 3 with any broker-dealer as to solicitation of voting securities of the Domestic Insurer for tender and no amount of fees, commissions, or other compensation have been paid by the Applicants, their affiliates or any person listed in Item 3 above to broker-dealers with regard to solicitation of voting securities of the Domestic Insurer for tender.

Confidential
ST-000789

20950147v5

**Item 12.  Financial Statements.**

*(1) Financial statements shall be attached to this statement as exhibits. However, list under this item the financial statements so attached. (2) The financial statements shall include: (1) the annual financial statements of the persons identified in Item 2(c) for the preceding five fiscal years or for such lesser period as such applicant and its affiliates and any of its predecessors shall have been in existence and (2) similar information covering the period from the end of such person's last fiscal year, if such information is available. Such statements may be prepared on either an individual basis or, unless the Superintendent otherwise requires, on a consolidated basis, if the consolidated statements are prepared in the usual course of business. (3) The annual financial statements of the applicant shall be accompanied by the certificate of an independent public accountant to the effect that such statements present fairly the financial position of the applicant and the results of its operations for the year then ended, in conformity with generally accepted accounting principles or with requirements of insurance or other accounting principles prescribed or permitted under law. If the applicant is an insurer which is actively engaged in the business of insurance, the financial statements must be based on the annual statement of such person filed with the insurance department of the person's domiciliary state and be in accordance with the requirements of insurance or other accounting principles prescribed or permitted under the law and regulations of such state.*

    (a)  <u>Listing of Financial Statements</u>. A list of financial statements and exhibits to this Statement immediately follows the response to Item 14.

    (b)  <u>Description of Financial Statements Attached as Exhibits</u>.

    <u>Dukes Place Holdings, L.P.</u>  Attached as <u>Exhibit I</u> are the audited financial statements for Dukes Place Holdings, L.P. for the years ended December 31, 1996 through December 31, 1998. Audited financial statements for Dukes Place Holdings, L.P. for the year ended December 31, 1999 will be submitted as a supplement to this Statement as soon as they are completed.

    <u>Dukes Place Holdings, Ltd.</u>  Attached as <u>Exhibit J</u> are audited financial statements for Dukes Place Holdings, Ltd. for the for the years ended December 31, 1996 through December 31, 1998. Audited financial statements for Dukes Place Holdings, Ltd. for the year ended December 31, 1999 will be submitted as a supplement to this Statement as soon as they are completed.

    <u>Dukes Place Holdings, LLC</u>  Attached as <u>Exhibit K</u> are audited financial statements for Dukes Place Holdings, LLC for the for the years ended December 31,

Confidential
ST-000790

20950147v5

1996 through December 31, 1998. Audited financial statements for Dukes Place Holdings, LLC for the year ended December 31, 1999 will be submitted as a supplement to this Statement as soon as they are completed.

Greenwich Street Capital Partners II, L.P.  Attached as Exhibit L are audited financial statements for Greenwich Street Capital Partners II, L.P. for the for the years ended December 31, 1998 through December 31, 1999 and an unaudited balance sheet for the quarter ended March 31, 2000.

Greenwich Street Investments II, LLC  Attached as Exhibit M is an unaudited balance sheet for Greenwich Street Investments II, LLC for the years ended December 31, 1998 through December 31, 1999.

Unione Italiana (U.K.) Reinsurance Company Ltd.  Attached as Exhibit N are the Reports and Accounts for the years ended December 31, 1995 through December 31, 1999 for Unione Italiana (U.K.) Reinsurance Company Ltd.

Robert A. Hamwee  Attached as Exhibit O is a net worth affidavit by Robert A. Hamwee.

Seaton Insurance Company (formerly Unigard Security Insurance Company) is licensed to do business in Ohio. Therefore, we incorporate by reference the 1994 through 1998 audited annual statements and the 1999 unaudited annual statement already filed by Seaton Insurance Company with the Ohio Superintendent of Insurance.

Please be advised that DP Holding, LLC does not prepare financial statements (whether audited or unaudited). Therefore, we are unable to provide financial statements for this entity.

**Item 13. Corporate Authority.**

*If the applicant is not an individual, file a certified copy of: (1) The resolution of the board of directors of the applicant approving the transaction and directing that the agreement underlying the transaction be submitted to a vote of the shareholders, members or policyholders entitled to vote on the matter. (2) The resolution of the shareholders, members or policyholders of the applicant approving the transaction.*

A certified copy of a resolution of the board of directors of Dukes Place Holdings, Ltd. and a copy of a written consent of Member of Greenwich Street Investments II, L.L.C., each approving the Acquisition, are attached as Exhibit P.

Confidential
ST-000791

20850147v5

**Item 14. Notice to Domestic Insurer.**

*State whether the applicant has sent a copy of Form A to the domestic insurer.*

Counsel for the Applicants is sending a copy of this Statement to the Domestic Insurer contemporaneous with the submission of this Statement to the Ohio Department of Insurance.

Confidential
ST-000792

20950147v5

A complete index to the Exhibits to this Statement follows:

| Exhibit | Name of Exhibit |
|---------|-----------------|
| A | Stock Purchase Agreement, dated as of May 5, 2000, between Great American Insurance Company and Dukes Place Holdings, L.P. |
| B | Aggregate Reinsurance Agreement between the Domestic Insurer and National Indemnity Company |
| C | Applicants Organizational Chart |
| D | Biographical Affidavits and Authority for Release of Information for of Persons Identified in Item 3 and Proposed Directors and Officers of the Domestic Insurer Identified in Item 5 |
| E | Investment Management Agreement between the Domestic Insurer and City Capital Counseling, Inc. |
| F | Agreement Relating to Administration of Run-Off between the Domestic Insurer and Eastgate, Inc. |
| G | Projected Financial Statements |
| H | Pro Forma Financial Statement of Dukes Place Holdings, L.P. |
| I | Audited financial statements for Dukes Place Holdings, L.P. for the years ended December 31, 1996 through December 31, 1998 |
| J | Audited financial statements for Dukes Place Holdings, Ltd. for the for the years ended December 31, 1996 through December 31, 1998 |
| K | Audited financial statements for Dukes Place Holdings, LLC for the for the years ended December 31, 1996 through December 31, 1998 |
| L | Audited financial statements for Greenwich Street Capital Partners II, L.P. for the for the years ended December 31, 1998 through December 31, 1999 |
| M | Unaudited balance sheet for Greenwich Street Investments II, LLC for the years ended December 31, 1998 through December 31, 1999 |
| N | Reports and Accounts for the years ended December 31, 1995 through December 31, 1999 for Unione Italiana (U.K.) Reinsurance Company Ltd. |
| O | Net worth affidavit by Robert A. Hamwee. |
| P | Certified Copy of a Resolution of the Board of Directors of Dukes Place Holdings, Ltd. and a copy of a written consent of Member of Greenwich Street Investments II, L.L.C., each approving the Acquisition |

Confidential
ST-000793

20950147v5

**Item 15. Signature and Certification.**

*Signature and certification required as follows:*

SIGNATURE

Pursuant to the requirements of Section 3901.321 of the Revised Code, Dukes Place Holdings, L.P. has caused this application to be duly signed on its behalf in the Borough of Florham Park and State of New Jersey on the _____ day of June, 2000.

Dukes Place Holdings, L.P., a Bermuda
Limited Partnership
By: Dukes Place Holdings, Ltd., a
Bermuda corporation, general partner

Attest:

By: _____
Name: Robert A. Harnwee
Title: Vice President

_____
Name: Wayne Morgan
Title: Secretary

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached application dated June ___, 2000, for and on behalf of Dukes Place Holdings, Ltd., and that he is authorized to execute and file such instrument. Deponent further says that he is the Vice President of such company and that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information, and belief.

By: _____
Name: Robert A. Harnwee

STATE OF NEW JERSEY    )
                       ) SS
COUNTY OF MORRIS       )

The foregoing instrument was acknowledged before me this 9th day of June, 2000.

_____
Notary Public

**NANCY A. NUTT**
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Feb. 7, 2005

24

20050147v5

Confidential
ST-000794

Item 15. Signature and Certification.

*Signature and certification required as follows:*

SIGNATURE

Pursuant to the requirements of Section 3901.121 of the Revised Code, Dukes Place Holdings, L.P. has caused this application to be duly signed on its behalf in the Borough of Florham Park and State of New Jersey on the ____ day of June, 2000.

Dukes Place Holdings, L.P., a Bermuda Limited Partnership
By: Dukes Place Holdings, Ltd., a Bermuda corporation, general partner

Attest:

Name: Wayne Morgan
Title: Secretary

By: _____
Name: Robert A. Hazzwor
Title: Vice President

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached application dated June ___, 2000, for and on behalf of Dukes Place Holdings, Ltd., and that he is authorized to execute and file such instrument. Deponent further says that he is the Vice President of such company and that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information, and belief.

By: _____
Name: Robert A. Hazzwor

STATE OF NEW JERSEY    )
                                              ) SS
COUNTY OF MORRIS       )

The foregoing instrument was acknowledged before me this ___ day of June, 2000.

_____
Notary Public

24

X0960147v6

Confidential
ST-000795

SIGNATURE

Pursuant to the requirements of Section 3901.321 of the Revised Code, Dukes Place Holdings LLC has caused this application to be duly signed on its behalf in the Borough of Florham Park and State of New Jersey on the _____ day of June, 2000.

Duke's Place Holdings, LLC, a Delaware
limited liability company
By: Robert A. Hamwee, managing member

Name: Robert A. Hamwee

CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated June ___, 2000, for and on behalf of Duke's Place Holdings, LLC, and that he is authorized to execute and file such instrument. Deponent further says that he is the managing member of such company and that he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information, and belief.

By:
Name: Robert A. Hamwee

STATE OF NEW JERSEY    )
                       ) SS
COUNTY OF MORRIS       )

The foregoing instrument was acknowledged before me this 9th day of June, 2000.

Notary Public

NANCY A. NUTT
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Feb. 7, 2005

20950147v5

25

Confidential
ST-000796

# EXHIBIT 3

11/28/63  14:48  ☎203                                    ☎014

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington

AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321

Ex. 4

08/21/2000 11:21 FAX                    DEBEVOISE & PLIMPTON                    002/020

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington


AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321

EXHIBIT A

This Aggregate Retrocession Loss Portfolio Agreement ("Retrocession") is made between UNIGARD SECURITY INSURANCE COMPANY, Seattle, Washington (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

## ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Retrocession shall incept on the Effective Date. This Retrocession shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Retrocession ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Retrocession shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

## ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $327,000,000 (Three Hundred Twenty-Seven Million United States Dollars). UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $327,000,000 (THREE HUNDRED TWENTY-SEVEN MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS RETROCESSION.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Retrocession follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Retrocession.

## ARTICLE 3.  EXCLUSIONS

A.  This Retrocession shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  This Retrocession shall not cover any liability (a) in respect of the fraud of a director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts, not reinsured hereunder.

C.  This Retrocession shall not cover any Unallocated Loss Adjustment Expense.

D.  This Retrocession shall not cover any policyholder dividends or return premiums except to the extent Reinsured receives a full and final release from the Insured in consideration of such return premium.

E.  This Retrocession shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

F.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the FASR Book which relate to an occurrence on or after January 1, 1978 or, for claims made coverage, a claim made on or after January 1, 1978. With respect to the FASR Book, this Retrocession excludes any

    G.  liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1977.

    G'.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the RA Book which relate to an occurrence on or after January 1, 1987 or, for claims made coverage, a claim made on or after January 1, 1987. With respect to the RA Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1987.

    H.  This Retrocession shall not cover any liability excluded in the Insurance Policies/Reinsurance Contracts or as otherwise agreed between the Reinsured and Reinsurer.

## ARTICLE 4.   DEFINITIONS

    A.  Wherever used in this Retrocession, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was included in the FASR Book prior to or on December 31, 1977, or in the RA Book prior to or on December 31, 1986. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the FASR Book or the RA Book (subject to the terms, exclusions and conditions hereof). and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured in this regard.

    B.  Wherever used in this Retrocession, the term "FASR Book" shall mean any and all binders, policies of insurance and contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured insures or reinsures any portion of the risk written and which are included within the Facultative and Special Risks ("Allen Miller") Book.

    C.  Wherever used in this Retrocession, the term "RA Book" shall mean any and all binders, contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured reinsures any portion of the risk written and which are included in the Reinsurance Assumed Book.

    D.  Wherever used in this Retrocession, the term "Ultimate Net Loss" shall mean that sum which has in fact been paid by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured. Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(H). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs

incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

E. Wherever used in this Retrocession, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Service and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

F. Wherever used in this Retrocession, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

G. Wherever used in this Retrocession, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

H. Wherever used in this Retrocession, the term "Claims Servicer" shall mean Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, or such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of Reinsured.

I. Wherever used in this Retrocession, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on the later of the 1) day of the closing of the acquisition of Reinsured by Dukes Place Holdings, L.P., and 2) the day Reinsurer receives the premium due under Article 6.

## ARTICLE 5.    SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Retrocession is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/Reinsurance Contracts. The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall aggressively take all steps reasonably necessary to collect from solvent reinsurers. Reinsured shall promptly draw down all letters of credit, withdraw funds from trusts or charge collections against funds held to collect promptly amounts due Reinsured.

## ARTICLE 6.    PREMIUM

As the consideration for the rights and obligations set forth in this Retrocession, Reinsurer agrees to accept and the Reinsured agrees to pay a premium of U.S. $191,000,000 (One Hundred Ninety-One Million United States Dollars). Payment shall be made in immediately available U.S. funds by wire transfer to:

Norwest Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058

Account No. 1150-001-452

It is understood and agreed that the premium stated in this Retrocession is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Retrocession as such charges are the responsibility of the Reinsured. The premium is non-refundable.

## ARTICLE 7. CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

## ARTICLE 8. ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Retrocession to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Retrocession do not constitute a waiver of any rights or remedies that the party has under this Retrocession to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Retrocession, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Retrocession shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the Reinsurer. This Retrocession may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

## ARTICLE 9. ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer at all reasonable times, all records of the Reinsured and Claims Servicer relating to this Retrocession and The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer at all reasonable times, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Retrocession. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Retrocession. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily undertake any material change in corporate structure, administrative practices in respect of the Insurance Policies/Reinsured Contracts which are reinsured under this Retrocession or its domicile, without prior written consent of the Reinsurer which consent will not be unreasonably withheld or delayed.

5 of 12

Reinsured warrants and represents that it will not buy any additional reinsurance protection in respect of any Insurance Policy/Reinsurance Contract either above or below this Retrocession without prior written consent of the Reinsurer which will not be unreasonably withheld or delayed.

## ARTICLE 11. CONDITIONS

A. Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B. In addition to the Reinsurer's general right to associate as set forth in A. above, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any gross claim settlements or other payments covered by this Retrocession in excess of U.S. $250,000; (2) any payments not in settlement of specific claims, including insurance policy buy-backs, return premiums or commutations of assumed reinsurance obligations, in excess of U.S. $250,000; and (3) any commutations or assignments of ceded reinsurance regardless of value. With respect to items (1) and (2) herein, Reinsurer's approval shall not be unreasonably withheld or delayed.

C. No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Retrocession; (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Retrocession and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been and is satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given, Reinsurer shall still have the right to become the Claims Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Retrocession in a manner reasonably acceptable to Reinsurer.

In the event that, on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, then Reinsurer shall have the right to become the Claims Servicer until this

Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer.

In the event Reinsurer becomes the Claims Servicer, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expense it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12. OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Retrocession or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer. This right of offset shall apply regardless of whether either party was assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance.

## ARTICLE 13. INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this Retrocession shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Retrocession shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/Reinsurance Contracts. It is agreed, that the Liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer as part chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14. ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Retrocession, including its formation and validity, and whether arising during or after the period of this Retrocession, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Retrocession). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt of the Respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession. The arbitration shall be conducted in the English language. This Retrocession shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other

may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

### ARTICLE 15.  NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Retrocession upon exhaustion of the Aggregate Limit or for any other reason.

### ARTICLE 16.  NO RIGHTS OF THIRD PARTIES

Nothing in this Retrocession, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Retrocession.

### ARTICLE 17.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

        National Indemnity Company
        3024 Harney Street
        Omaha, Nebraska 68131
        Attn: General Counsel
        Telecopy:  (402) 536-2255

        Unigard Security Insurance Company
        c/o Eastgate, Inc.
        44 Wall Street
        New York, NY 10005
        Attention: Mr. David Wallis
        Chief Executive Officer
        Telecopy:  (212) 425-4564

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.  Notice shall be deemed effective:

1. if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2. if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

### Article 18.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

ARTICLE 19.  ENTIRE AGREEMENT

The parties hereto agree that this Retrocession is not cancelable or voidable. This Retrocession is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

ARTICLE 20.  REPORTS AND REMITTANCES

A.  **Reports.**  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Retrocession within 45 days of the close of each calendar quarter (the "Quarterly Reports"). The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Retrocession and estimating receipts and disbursements for the following month.  The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Retrocession.

B.  **Annual Statement.**  As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

C.  **Claims Account.**  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account"). The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Retrocession. In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 21 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Retrocession. Interest on funds in the Claims Account shall be the property of the Reinsurer.

ARTICLE 21.  RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the underlying claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.

ARTICLE 22.  CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by a state insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Retrocession, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable state insurance regulatory authority in the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables

hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Retrocession in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities. The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer. In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California.

## ARTICLE 23.    TERRITORY

The Retrocession shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

## ARTICLE 24.    INTERMEDIARY

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Retrocession.

## ARTICLE 25.    COUNTERPARTS

This Retrocession may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

ARTICLE 26.    HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _BOSTON_    _MASS_    on this _30th_ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____. _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By _____
Title:

Dukes Place Holdings L.P.

By _____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

12 of 12

ARTICLE 26.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____ _____ on this _____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____, _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By _____            By _____
Title:                                   Dukes Place Holdings Ltd.
                                         as General Partner of
                                         Dukes Place Holdings L.P.

12 of 22

ARTICLE 25.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____ . _____ on this _____ day of November, 1998.

UNITED SECURITY INSURANCE COMPANY

By _____
Title:

and at _____ . _____ on this _____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited

Dukes Plaza Holdings L.P.

By _____
Dukes Plaza Holdings Ltd.
as General Partner of
Dukes Plaza Holdings L.P.

By _____
Title:

12 of 12

08/07/2008 11:28 FAX                    DEBEVOISE & PLIMPTON                    018/020

+1 BARGER & WOLEN LLP                        772 P23    NOV 20 '98  12:56

**ARTICLE 14.   HEADINGS**
The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____ _____ on this 90th day of November, 1998.

UNICARD SECURITY INSURANCE COMPANY

By _____
Title: _____

and at _____ _____ on this _____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title: _____

Acknowledged and Accepted:

Westgate Group Limited

By _____
Title: _____
DIRECTOR

Dukes Place Holdings L.P.

By _____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

17 of 17

05/07/2000 11:26 FAX          DEBEVOISE & PLIMPTON                    ☒817/020

Amendment No. 1

Unigard Security Insurance Company
of Seattle, Washington

Aggregate Retrocession of Loss Portfolio Agreement

No. RA 1321

This Agreement is hereby amended as follows:

Article 12

    The last sentence of Article 12, which states "This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance" is deleted in its entirety.

Article 13

    The second sentence of Article 13, which states "Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency" is deleted in its entirety. This deletion shall not be construed to create any right to accelerate or otherwise alter the timing or amount of Reinsurer's liabilities.

Article 20

    The following is added as the last sentence of Article 20(c): "Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash."

Article 21

    The following is added as the last sentence of Article 21, "Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims."

Article 22

    The last sentence of Article 22, which states "In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California" is deleted in its entirety.

    All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date set forth in the Agreement.

Page 1 of 2

Executed at _New York_ , _New York_ on this _31st_ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____

Title: _____

and at _Stanford_ , _Connecticut_ on this _29th_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____

Title: _____

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By_____              By_____
Title:                                   Dukes Place Holdings Ltd.
                                         as General Partner of
                                         Dukes Place Holdings L.P.

Page 2 of 2

08/07/2000 11:27 FAX                    DEBEVOISE & PLIMPTON                    ☒018/020

Executed at _____ on this _____ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____

Title: _____

and at _____ _____ on this 29ᵗʰ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____

Title: _____

Acknowledged and Accepted:

Eastgate Group Limited

By _____

Title: _____
DIRECTOR

Dukes Place Holdings L.P.

By _____
Dukes Place Holdings Ltd.
as General Partner of
Dukes Place Holdings L.P.

Page 2 of 2

02/07/2000 11:27 FAX                    DEBEVOISE & PLIMPTON                    ☒020/020
                        03 28/99   16:33   ☎203

Executed at New York, New York on this 31st day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: Vice President

and at Stanford, Connecticut on this 29th day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: Brian Jetter
       Vice President

Acknowledged and Accepted:

Eastgate Group Limited                              Dukes Place Holdings L.P.

                                                    By _____
By _____                          Dukes Place Holdings Ltd.
Title:                                              as General Partner of
                                                    Dukes Place Holdings L.P.

Page 2 of 2

# EXHIBIT 4

5/04/2000 17:39 FAX 212 909 8836    DEBEVOISE & PLIMPTON    ~P. ~02
MAY-05-2000 FRI 02:04 PM    , FAX NO.

RA-1385

# AGGREGATE REINSURANCE AGREEMENT

between

## STONEWALL INSURANCE COMPANY,

Cincinnati, Ohio

and

## NATIONAL INDEMNITY COMPANY

Omaha, Nebraska

MICHAEL FRIEDMAN, CSR

NO.: 24

DATE: 3/6/07

Contract No. RA 1385

This Aggregate Reinsurance Agreement ("Reinsurance") is made between Stonewall Insurance Company, Cincinnati, Ohio (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

## ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Reinsurance shall take effect on the Effective Date. This Reinsurance shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Reinsurance ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Reinsurance shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

## ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $240,000,000.  UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $240,000,000 (TWO HUNDRED AND FORTY MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS REINSURANCE.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Reinsurance follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance.

## ARTICLE 3.  EXCLUSIONS

A.  This Reinsurance shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  In addition to Article 3(A) above, this Reinsurance shall not cover any sums which, after application of best practice procedures for the adjustment and settlement of claims in accordance with the terms and conditions of an Insurance Policy/Reinsurance Contract, should have been paid or which should have been booked as paid in the books and records of Reinsured prior to the Effective Date. This Article 3(B) shall be capped at $4,000,000 net of applicable reinsurance (other than this Reinsurance) and shall expire two years from the date of Reinsurer's receipt of Premium under Article 6 of this Reinsurance.

C.  This Reinsurance shall not cover any liability (a) in respect of the fraud of a

director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts not reinsured hereunder.

D.  This Reinsurance shall not cover any Unallocated Loss Adjustment Expense.

E.  This Reinsurance shall not cover any policyholder dividends, return premiums and retrospective or loss sensitive premiums (except reinstatement or adjustment premiums (1) paid in connection with reinsurance inuring to the benefit of the Reinsurer with respect to risks reinsured under this Reinsurance or (2) where the payment of such amounts benefits the Reinsurer either by way of reduction in the net present value of the liabilities of the Reinsurer with respect to risks reinsured under this Reinsurance or by increasing reinsurance recoverables or coverage available to the Reinsurer hereunder in an amount greater than the dividend or premium.

F.  This Reinsurance shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

G.  This Reinsurance shall not cover any liability incurred by the Reinsured under insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

H.  This Reinsurance shall not cover any liability with respect to occurrences or, for claims-made exposures, claims made, which are properly allocated to insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

## ARTICLE 4. DEFINITIONS

A.  Wherever used in this Reinsurance, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was issued on or prior to January 1, 1992. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under

Page 3

10/04/2000 17:39 FAX 212 909 6836     DEBEVOISE & PLIMPTON     ℗ 05
MAY-05-2000 FRI 02:05 PM                FAX NO.

this Reinsurance, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the scope of business covered hereunder (subject always to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured in this regard.

B.  Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean (1) that sum which is paid or payable by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured; and (2) the amounts excepted from the exclusion in Article 3(E). Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(C). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

C.  Wherever used in this Reinsurance, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

D.  Wherever used in this Reinsurance, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

E.  Whenever used in this Reinsurance, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

F.  Whenever used in this Reinsurance, the term "Claims Servicer" shall mean (1) the Reinsured; (2) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof; or (3) such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of the Reinsured.

0/04/2000 17:40 FAX 212 909 6836    DEBEVOISE & PLIMPTON    P. 06
MAY-05-2000 FRI 02:05 PM    FAX NO.

G. Whenever used in this Reinsurance, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on May 1, 2000.

H. Whenever used in this Reinsurance, "Acquisition" shall mean the acquisition of the Reinsured by Dukes Place Holdings, L.P. pursuant to the Stock Purchase Agreement entered into between Great American Insurance Company and Dukes Place Holdings, L.P.

I. Whenever used in this Reinsurance, "Closing" shall mean the closing of the Acquisition.

J. Whenever used in this Reinsurance, "Closing Date" shall mean the date of the Closing.

## ARTICLE 5. SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Reinsurance is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any reinsurance recoverables, salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/ Reinsurance Contracts with respect to claims paid or reimbursed by Reinsurer to Reinsured under this Reinsurance. It is understood and agreed that reinsurance recoverables, salvage and subrogation in respect of claims paid by the Reinsured prior to the Effective Date (as determined by the books and records of the Reinsured or which should have been booked as paid prior to the Effective Date) shall be the property of the Reinsured, up to the amount recorded in Reinsured's closing balance sheet delivered following the Closing in accordance with the Stock Purchase Agreement. All sums in excess of such cap shall be solely for the account of the Reinsurer. The whole of any receipts for the account of the Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall take all steps reasonably necessary to collect from solvent reinsurers; including drawing down all letters of credit, withdrawing funds from trusts or charging collections against funds held to collect amounts due Reinsured.

## ARTICLE 6. PREMIUM

As the consideration for the rights and obligations set forth in this Reinsurance, Reinsurer agrees to accept and the Reinsured agrees to pay (I) a minimum base premium of U.S. $126 million (one hundred and twenty-six million United States Dollars); plus, in addition thereto, an amount equal to 7.5% of the base premium calculated on a per annum basis from the Effective Date through the date of receipt of the full amount of the premium by Reinsurer. Payment shall be made in immediately available U.S. funds

10/04/2000 17:40 FAX 212 909 6836     DEBEVOISE & PLIMPTON     P. 07
MAY-05-2000 FRI 02:08 PM                FAX NO.

by wire transfer to:

Norwest Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058
Account No. 1150-001-492

It is understood and agreed that the premium stated in this Reinsurance is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Reinsurance as such charges are the responsibility of the Reinsured, and further that the premium shall not be subject to any offsets or other reductions. The premium is non-refundable. The premium will be paid to the Reinsurer on or before the Closing Date, subject to a December 31, 2000 termination date.

Upon Reinsurer's receipt of the premium, Reinsurer will immediately reimburse Reinsured for Ultimate Net Loss paid by Reinsured on and after the Effective Date, for and only to the extent that reinsurance is otherwise provided hereunder, less all reinsurance recoveries, salvage and subrogation received by Reinsured arising out of the payment of such Ultimate Net Loss for the period from and including the Effective Date to and including the Closing Date.

## ARTICLE 7. CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

## ARTICLE 8. ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Reinsurance to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Reinsurance do not constitute a waiver of any rights or remedies that the party has under this Reinsurance to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Reinsurance, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the

10/04/2000 17:40 FAX 212 909 6836    DEBEVOISE & PLIMPTON    ⌐@000 P. 08
MAY-05-2000 FRI 02:08 PM                FAX NO.

Reinsurer. This Reinsurance may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

## ARTICLE 9. ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer during normal business hours, all records of the Reinsured and Claims Servicer relating to this Reinsurance. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer during normal business hours, all records to which the Reinsured and Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy during normal business hours all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Reinsurance. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily change its domicile without prior written consent of the Reinsurer, which consent will not be unreasonably withheld or delayed.

In the event that, following the Effective Date, the Reinsured buys any additional reinsurance or retrocessional protection in respect of any Insurance Policy/Reinsurance Contract reinsured under this Reinsurance, this Reinsurance will automatically become excess of such additional reinsurance or retrocessional protection.

## ARTICLE 11. CONDITIONS

A.  With effect from the Effective Date, Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B.  In addition to the Reinsurer's general right to associate as set forth in A. above, and with effect from the Effective Date, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any individual gross claim settlement, quarterly account settlements or other payments in respect of the adjustment of Underlying Claims covered by this Reinsurance in excess of U.S. $150,000; (2) any insurance policy buy-back, return premium, commutation or like payment in excess of U.S. $250,000; and (3) any commutations or assignment of ceded reinsurance regardless of value. With respect to items (1) and (2) herein,

Reinsurer's approval shall not be unreasonably withheld or delayed.

C.   If Reinsurer fails to approve any payment or settlement of an Underlying Claim for which Reinsurer's approval is required, and has in fact been sought, within a reasonable period of time following submission for approval to the Reinsurer, despite Reinsured's reasonable efforts to obtain such approval, during the period from the Effective Date to the Closing Date, Reinsurer agrees to indemnify and defend Reinsured from any and all losses, liabilities or reasonable expenses directly arising out of Reinsurer's failure to so approve the payment or settlement. It shall be a condition precedent of Reinsurer's obligation in this regard that Reinsured shall give Reinsurer immediate notice of any facts or circumstances likely to give rise to an indemnification or defense obligation of the Reinsurer, and Reinsurer shall furthermore have the right but not the obligation to assume direct control of negotiation, litigation, or settlement of any such loss or liability.  Reinsured shall be obligated to cooperate with Reinsurer in this regard.   This Article 11(C) shall survive termination hereof for any reason including the failure to consummate the Closing.

D.   No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than the Reinsured or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Reinsurance, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Reinsurance and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer.  Moreover, in the event Reinsurer's consent is so given,

Page 8

1/04/2000 17:40 FAX 212 909 6836       DEBEVOISE & PLIMPTON                   ~ P. 10
MAY-05-2000 FRI 02:07 PM                              FAX NO.

Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Reinsurance in a manner reasonably acceptable to Reinsurer.

In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer.

If at any time after the Effective Date, Reinsurer becomes the Claims Servicer and the Run-Off Agreement is no longer in force, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expenses it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12. OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Reinsurance or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer.

## ARTICLE 13. INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this

Reinsurance shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Reinsurance shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/Reinsurance Contracts. It is agreed, that the liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14.  ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Reinsurance, including its formation and validity, and whether arising during or after the period of this Reinsurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Reinsurance). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire.  The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt

of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Reinsurance. The arbitration shall be conducted in the English language. This Reinsurance shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

## ARTICLE 15. NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Reinsurance upon exhaustion of the Aggregate Limit or for any other reason.

## ARTICLE 16. NO RIGHTS OF THIRD PARTIES

Nothing in this Reinsurance, express or implied, is intended, or shall be construed

to confer upon or give to any person, firm or corporation (other than the parties hereto and their permitted assigns or successors), any rights or remedies under or by reason of this Reinsurance.

## ARTICLE 17. NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

National Indemnity Company
3024 Harney Street
Omaha, Nebraska 68131
Attn: General Counsel
Telecopy: (402) 536-3265

To the Reinsured (1) from the Effective Date to (but not including) the Closing Date, and (2) anytime if there is no Closing:

Great American Insurance Company
580 Walnut Street
Cincinnati, Ohio 45202
Attn: Eve Cutler Rosen, Esq.
Telecopy: (513) 369-3655

To the Reinsured on and after the Closing Date:

Stonewall Insurance Company
c/o Eastgate, Inc.
P.O. Box 9510
Boston, Massachusetts 02114-9510
(street address: 7 Bulfinch Place)
Attn: Bryan Klinck
Telecopy: (617) 725-1599

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties. Notice shall be deemed effective:

1.  If communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

10/04/2000 17:41 FAX 212 909 6836    DEBEVOISE & PLIMPTON    P. 14
MAY-05-2000 FRI 02:08 PM    FAX NO.

2    If sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

## ARTICLE 18.  STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

## ARTICLE 19.  ENTIRE AGREEMENT

The parties hereto agree that this Reinsurance is not cancelable or voidable. This Reinsurance is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

## ARTICLE 20.  REPORTS AND REMITTANCES

**Reports.**  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Reinsurance within 45 days of the close of each calendar quarter (the "Quarterly Reports"). The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Reinsurance and estimating receipts and disbursements for the following month. The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Reinsurance.

**Annual Statement.** As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

**Claims Account.** The Reinsured shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account"). The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time. In an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Reinsurance. In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Reinsurance. Interest on funds in the Claims Account shall be the property of the Reinsurer.  Subject

10/04/2000 17:41 FAX 212 909 6836    DEBEVOISE & PLIMPTON    ☒015
MAY-05-2000 FRI 02:09 PM    FAX NO.    P. 15

to all other terms of this Agreement and following receipt of Premium, Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash.

## ARTICLE 21.  RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate. Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims.

## ARTICLE 22.  CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by an insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Reinsurance, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable insurance regulatory authority in any jurisdiction within the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in any jurisdiction within the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Reinsurance in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities. The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer.

## ARTICLE 23.  TERRITORY

The Reinsurance shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

## ARTICLE 24.  INTERMEDIARY

10/04/2000 17:42 FAX 212 909 ~936          DEBEVOISE & PLIMPTON                    P. 18
MAY-05-2000 FRI 02:09 PM                         FAX NO.

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Reinsurance.

## ARTICLE 25. COUNTERPARTS

This Reinsurance may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

## ARTICLE 26. DUE DILIGENCE

Reinsurer acknowledges that it has conducted its own due diligence review of Reinsured's business and operations and that it is relying on its own independent investigation in making its decision to enter into this Agreement. Reinsurer is not relying upon any representation or warranty made on or prior to the Effective Date by Reinsured or any of its affiliates, subsidiaries or parent which is not expressly set forth in this Agreement.

)/04/2000 17:42 FAX 212 909 6A36          DEBEVOISE & PLIMPTON                    ☒017

        2008 13:46 FAX 212 808 8163       DEBEVOISE & PLIMPTON                 ☒003/003
MAY-03-2000 WED 03:46 PM                      FAX NO.                         P. 18/24

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Dukes Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at __Cincinnati, OHIO__ on this __9th day of __May_____, 2000.

STONEWALL INSURANCE COMPANY


By _____
    Gary J. Gruber
Title:   Chairman & Vice President


and at _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY



By _____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                    DUKES PLACE HOLDINGS L.P., by
                                          its General Partner Dukes Place
                                          Holdings Ltd.



By _____               By _____
Title:                                    Title:



Page 17

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at ___ ____, ____ on this 5ᵗ day of May, 2000.

NATIONAL INDEMNITY COMPANY


By_____

Title: VICE PRESIDENT

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                DUKES PLACE HOLDINGS L.P., by
                                      its General Partner Dukes Place
                                      Holdings Ltd.


By_____            By_____
Title:                                Title:

)/04/2000 17:42 FAX 212 909 6836          DEBEVOISE & PLIMPTON                    ☒019

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at _____, _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED

DUKES PLACE HOLDINGS L.P., by its General Partner Dukes Place Holdings Ltd.

By _____ _K. E. Randall_
Title: _____ _Chief Executive_

By_____
Title:

**Page 17**

04/2000 17:42 FAX 212 909 8836    DEBEVOISE & PLIMPTON    NO. 3591    P. 020
MAY. 5. 2000 4:04PM    RWICH ST. CAPITAL    FAX NO    P. 18/24
MAY-03-2000 WED 05:48 PM

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____ '_____ on this 5ᵗʰ day of May , 2000.

STONEWALL INSURANCE COMPANY


By_____
Title:


and at _____ '_____ on this ____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED                  DUKES PLACE HOLDINGS L.P., by
                                         its General Partner Dukes Place
                                         Holdings Ltd.

                                         By_____
By_____               Title:
Title:


Page 17

**Amendment No. 1**
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

**Article 11**

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at **Cincinnati, Ohio**
on this 29 day of September, 2000.

STONEWALL INSURANCE
COMPANY

By: _K. Hu plonell_
Name:  Karen Holley Borrell
Title:  Vice President

Executed at _____, _____
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY

By: _____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By: _____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General
Partner

By: _____
Name:
Title:

4/2000 17:42 FAX 212 909 6836        DEBEVOISE & PLIMPTON        0 6:22AM;                    022
; Chitogenics, Inc.;                   973 286 3332;          Sep-      Page 3/6

### Amendment No. 1
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

### Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____,_____          Acknowledged and Accepted:
on this __ day of September, 2000.
                                                   Eastgate Group Limited
STONEWALL INSURANCE
COMPANY

                                                   By:_____
                                                   Name:
By:_____               Title:
Name:
Title:                                             Dukes Place Holdings, L.P.
                                                   By: Dukes Place Holdings Ltd, General
Executed at _____,_____          Partner
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY                          By: _____
                                                   Name:
                                                   Title:
By:_____
Name:
Title:

2103363

Amendment No. 1
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

## Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____.
on this ___ day of September, 2000.

STONEWALL INSURANCE
COMPANY


By:_____
Name:
Title:

Executed at _Stamford_ , _Conn._
on this 28 day of September, 2000.

NATIONAL INDEMNITY COMPANY


By:_____
Name: _Brian Snover_
Title: _Vice President_

Acknowledged and Accepted:

Eastgate Group Limited


By:_____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner


By:_____
Name:
Title:

1/04/2000 17:42 FAX 212 909 6036     DEBEVOISE & PLIMPTON     ☑024

7/2600 10:48 FAX     DEBEVOISE & PLIMPTON     ☑001

**Amendment No. 1**
**Stonewall Insurance Company**
**of Cincinnati, Ohio**
**Aggregate Reinsurance Agreement**
**No. RA 1385**

This Agreement is hereby amended as follows:

**Article 11**

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer; provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____
on this ___ day of September, 2000.

STONEWALL INSURANCE
COMPANY

By: _____
Name:
Title:

Executed at _____, _____
on this ___ day of September, 2000.

NATIONAL INDEMNITY COMPANY

By: _____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By: _____
Name: V. Lavelle
Title: CHIEF EXECUTIVE OFFICER

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd. General
Partner

By: _____
Name:
Title:

21033838-1

# EXHIBIT 5

Kaufman, Matthew

From:           Patel, Mayur [mpstel@gscpartners.com]
Sent:           Wednesday, March 23, 2005 11:56 AM
To:             Kaufman, Matthew
Subject:        FW:

FYI see below - once we know the outcome of our dividend request it would make sense to see how they can manage Seaton/Stonewall better. I think that would also push ken to do a transaction if he is interested since he would otherwise lose the management fee income.

-----Original Message-----
From: Dominic.Silvester@castlewood.co.uk [mailto:Dominic.Silvester@castlewood.co.uk]
Sent: 23 March 2005 10:07
To: Patel, Mayur
Cc: jjoros@enstargroup.com; jcflowers@jcfco.com
Subject:

Dear Mayur:

We spoke a week ago about your US companies and the potential for doing a deal with you whereby Castlewood would acquire them.

I have discussed the situation in some detail with my colleagues and we are of the opinion that it will be difficult to reach an agreement with you on a purchase for no other reason than you are not a trade seller and it is only from such a seller that we can achieve the returns we require in order to service our capital. You, too, are expecting a good return and when you add together what we each require the economics are most unlikely to exist. I think that it is necessary to recognise this dynamic and I guess I should have focussed on this before as the last thing I want to do is to waste anyone's time.

Having said this I do think that you have potential issues of alignment with your managers for the reasons we have discussed before. I feel that we are fortunate at Castlewood having started again with a clean sheet of paper just 4 years ago and putting together a structure which perfectly aligns managers and shareholders/capital providers. I also consider that we strive to achieve the required alignment on those assignments where we manage rather than own companies.

I think that once alignment is compromised in this game it is almost a certainty that your returns suffer. Even with total management integrity, there could be occasions where dis-alignment may act in favour of management rather than capital provider if only through the exercise of judgment. I consider that your interests may lay third behind those of your managers and Berkshire Hathaway. We would rectify this situation for you as well as focus on "gross" returns since the most important part of the return equation is to make the gross returns in the first place. Without good profits, it matters not how they are shared between capital and management.

Whilst Castlewood as managers are totally behind fully aligned interests, we believe that our superior service is key to the enhancement of returns to capital. In this regard, we are keen to discuss with you how we can work with you to improve your overall results. We have key experience and knowledge within Castlewood concerning asbestos and pollution direct and reinsurance claims as well as wider skill sets applicable to other incoming reinsurance businesses. All of these skills have been developed by Castlewood through focussed staff selection rather than by the wholesale take-on of legacy staff upon acquisitions. We believe this allows us to chose the best people and to motivate them to achieve results for Castlewood and its clients as a whole. Our prior and current clients have faced issues similar to those that your investee entities do; we have achieved excellent results for them and believe we can do the same for you.

I think that there is some merit for us to have some discussions with you on a management rather than an equity basis. There are several connections between our respective firms with Chris Flowers, John Oros, Richard Haydon and Fred Eckert knowing each other and then you and me on the shop-floor!!

1

Confidential
ST-019775

Castlewood's record on our owned companies and situations where we are managers in run-offs and schemes of arrangement are exemplary and I am very confident that we could increase your anticipated returns. I would like to explore this with you if you thought it worthwhile.

regards, Dominic

==========================================================================
The information contained in this message, including any attachments, may be legally privileged and/or confidential and is intended only for the exclusive use of the recipient(s) named hereon. If you are not the intended recipient, you are hereby notified that any unauthorised disclosure, copying, distribution, storage or use of this information is strictly prohibited.

In addition, the views expressed herein do not necessarily represent the views of Castlewood (EU) Ltd or its member companies and/or affiliates.

If you have received this message in error, please notify us by telephoning collect on +44 1483 652 622 during United Kingdom business hours, or by emailing us at mail@castlewood.co.uk and please delete this message and all copies from your system.

Email attachments may contain software viruses; whilst we endeavour to minimise this risk we do not accept responsibility for any loss or damage arising from a virus in any email or attachment emanating or appearing to emanate from our systems. You should perform your own safety checks before opening any attachment.

In the event of technical difficulty with this email, please contact the sender or email postmaster@castlewood.co.uk

Confidential
ST-019776

ST-019776

# EXHIBIT 6

**Barclay Robert**

| | |
|---|---|
| From: | Patel, Mayur [mpatel@gscpartners.com] |
| Sent: | 30 May 2006 15:11 |
| To: | Barclay Robert; Shepherd Mark; Robert.Barclay@Stonewall-Insurance.com |
| Subject: | FW: Dukes Place UK and US |

Pls see below.

Mayur Patel
GSC Partners
12 East 49th Street, Suite 3200
New York, NY, 10017
+1 212-884-6206 (w)
+1 212-884-6184 (f)
+1 973 462 8678 (m)

This email is intended only for the person or entity to which it is addressed and may
contain information that is privileged, confidential or otherwise protected from
disclosure. Dissemination, distribution or copying of this message or the information
contained herein by anyone other than the intended recipient is prohibited. This email
is intended for informational purposes only and is not a solicitation, offer or
recommendation regarding the purchase or sale of securities or related financial
instruments. If you have received this message in error, please notify the sender by
reply email and delete this message. Thank you.

-----Original Message-----
From: Patel, Mayur
Sent: Sunday, May 28, 2006 6:48 PM
To: 'Paul.O'Shea@castlewood.bm'
Cc: 'dominic.silvester@castlewood.bm'; Kaufman, Matthew
Subject: Re: Dukes Place UK and US

Paul,

Let us digest and revert back to you. I would like to clarify two points though - (I)
it was my understanding that castlewood had done its diligence at cavell's offices last year (I think
november) and (ii) since fred mentioned a global stock deal to
you, I wanted to make it clear that we had received a serious offer for CIC that we
were working on and that Castlewood would need to move extremely quickly to avoid us
providing exclusivity.

Mayur

----------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Paul.OShea@castlewood.bm <Paul.OShea@castlewood.bm>
To: Patel, Mayur
CC: Dominic.Silvester@castlewood.bm <Dominic.Silvester@castlewood.bm>
Sent: Sun May 28 16:02:18 2006
Subject: Dukes Place UK and US

Mayur,

Dominic has brought me up to date on the discussion he had with you on Friday May 26.

As I understand it you have received an offer for the purchase of CICL UK that you are
seriously considering. However, your preference would be to sell both the US and the
UK companies to Castlewood if an acceptable offer can be agreed by both sides.

Stonewall and Seaton

You also expressed some disappointment with the communication from us on the SPA
process for Stonewall and Seaton. I believe you have a point and the responsibility

1

Confidential Cavell015008

for this is mine. I apologize in advance but would like to give you a little detail on the position as we see it.

When we took on the management in January this year, I think it was both Dukes Place and our belief that the situation had deteriorated with the Randall companies to such an extent that they had to be removed from the management as soon as possible. Obviously we could not complete any detailed due diligence until we had access to the files. We immediately became immersed in an all out battle with NICO to get control of the files. We believed then, and still do now, that ownership, control of and access to the files of an insurance company are such fundamental issues that no one would expect that such a company is in a saleable condition until these have been established.

We also transferred the accounting and administration processes to Castlewood on your behalf. However, we had NICO raising obstacles at every turn. As a consequence of the positions taken by NICO, both Dukes Place and Castlewood learned that NICO had been totally controlling and dominating Stonewall and Seaton. This could not be allowed to continue as once again we believed that the companies were not in a saleable condition while NICO maintained such total control of the companies. Therefore we have to work hard with you to fight the battles necessary for the companies to regain control of their own affairs so they can be sold.

NICO were also claiming that they could be Claims Servicer for not only Seaton but Stonewall as well and were attempting to give the Claims Servicer role extraordinary powers. Again we have to fight this battle as, if NICO are allowed to succeed, again, the companies would not be in a saleable position.

My view was that we could continue to negotiate and agree the SPA wording but that it was not top priority as we would not be able to sign it until we had made some progress with NICO. We are confident that together Dukes Place and Castlewood can win against NICO but it will take time, careful planning and effort. We are making progress against NICO and the files started arriving in our Rhode Island office last week and we believe that if we keep up the pressure we will gain major concessions from them in the near term.

I admit the Castlewood team became totally consumed with managing the companies and prosecuting the various fights with NICO and Cavell. It was my responsibility to balance this with the SPA process and ensure that you and I had the same understanding. Quite obviously I did not do this and I apologize for this. My view was, and still is, that we could finalize the SPA wording and then sign once we have possession of all the files and the NICO situation becomes clearer. *How long?*

Potential transaction involving CICL (UK) and US companies

If we were to agree on a transaction involving the US companies in the near term, before we make significant progress on re-establishing the control that these companies should have over their own destiny, then it would have to be primarily on an earn out basis. It is our opinion that the NICO strategy is against the economic interests of any potential owner other than NICO. If they are allowed to continue running the companies as they have done up to now then the US companies have very little if any value.

The situation of CICL is less complex and is therefore easier to value.

A potential transaction structure for both would be for Castlewood to offer say 90% of net asset value for CICL plus $5 million up front cash now for the US companies plus an earn out % of future distributions from the US companies. The $5 million up front payment would remain the same whether we initially take 49.9% of the US companies or 100% (unlikely due to the current NICO situation). *New Deal*

This suggestion deals with all the insurance entities in Dukes Place and aligns interests on the US companies. Let us know if you have any ideas along these lines or perhaps another structure which would take account of both of our concerns. Please advise how much you would like us to consider paying for the UK companies. I think the following should be taken into account in your assessment of the value of the UK companies, (i) relatively low risk portfolios (ii) scheme issues, (iii) timing (iv) run-off costs.

If you tell us what you think would work from your perspective we can work on trying to refine it and put something together before the Wednesday meeting. I am also available to talk at any time.

*Price Negotiation*

2

CICL Quarterly Financials

A couple of questions:

1.  The "narrative" of the results doesn't add up: the note talks about a loss of £0.849m but the table immediately below totals £0.489m. Please explain.

2.  The value of Cirrus Re seems to have reduced by £2.5m in the quarter. Is this correct?

Paul

*New Dividend plus*

3

# EXHIBIT 7

**Unknown**

| | |
|---|---|
| From: | Kaufman, Matthew [mkaufman@gscpartners.com] |
| Sent: | 21 December 2005 22:44 |
| To: | Patel, Mayur; Barclay Robert; Shepherd Mark; RSharfman@stroock.com; DROSS@stroock.com |
| Subject: | RE: Enstar update |

I think we definitely get a price first before we do anything. Selling 49% though does send the message to nico that we're doing this and no one is just going away. Selling the whole thing is better but playing our hand with Nico may not be a quick process. If we could sell 49% and have a put in a reasonable timeframe its not the worst result if the price is right.

-----Original Message-----
From: Patel, Mayur
Sent: Wednesday, December 21, 2005 3:56 PM
To: Kaufman, Matthew; 'robert.barclay@recapartners.com';
'mark.shepherd@recapartners.com'; 'RSharfman@stroock.com'; 'DROSS@stroock.com'
Subject: Enstar update

Caught up with paul who gave me the following update:

- due diligence information requests outstanding are fairly minor
- seaton reserve deterioration recently leads them to believe its not worth much. Commented that no effort whatsoever was made on commutations. Robert pls comment.
- they interview tom ryan. Expense sharing between nico companies and seaton/stonewall is not done on the basis of exposure but number of companies which is clearly not justified. Tom said that randall pays nico $1.3m for ceding claims control on seaton/stonewall through rebate on work he does for nico. This is outrageous given how much we pay randall for this major function. When asked about the burns letter tom was advised by his counsel not to comment.
- paul suggested they buy 49% of stonewall asap and get control of all information. They want to do this before jan end. They would then approach nico regarding a change of control and nico's thoughts on seaton given that the regulator will be interested in nico's role in claims settlements especially if seaton deteriorates further.
- I told him that we don't want to sell less than 100% of stonewall and then discussed a put call structure at the same price for the 51% to technically get us to the same place. I told him that we would think about it but preferred to focus on building a case against nico to force them to allow the stonewall transfer so that we could sell 100%.
Rick/dan, we should see if smart can get started any sooner than jan so that we can build a case against nico asap.
- I have asked him to get back to us with a valuation on stonewall and agreed to speak on friday. I would prefer to get their views on price before getting into put/call structures unless anyone else thinks otherwise.

-------------------------------
Sent from my BlackBerry Wireless Handheld

1

$E\kappa.215$

Confidential Cavell-045578

# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 4067

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NATIONAL INDEMNITY COMPANY,                   :

                  Plaintiff,                :

      vs.                                        :

GREENWICH STREET INVESTMENTS II, L.L.C.,:
GREENWICH STREET CAPITAL PARTNERS II,  :
L.P., DP HOLDINGS L.L.C., DUKES PLACE      :
HOLDINGS L.L.C., DUKES PLACE HOLDINGS :
LTD., DUKES PLACE HOLDINGS, L.P.,          :
ENSTAR GROUP LIMITED, and ENSTAR (US),  :
INC.,
                                   :

                Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

RECEIVED
COMPLAINT
APR 30 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1.    Plaintiff National Indemnity Company ("NICO") seeks damages arising from (a) breaches of fiduciary duties by Defendants; and (b) Defendants' intentional interference with NICO's contract rights and business relationships.

2.    The Defendants' misdeeds as described in this Complaint arise from a conspiracy to deprive NICO through tortious means of its contractual rights with two other insurance companies, Seaton Insurance Company ("Seaton") and Stonewall Insurance Company ("Stonewall").

## THE PARTIES

3.    Plaintiff NICO is an insurance company organized under the laws of the state of Nebraska, with its principal place of business in Omaha, Nebraska.

4.    Defendant Greenwich Street Investments II, L.L.C. ("GSC Partners") is a group of private equity/hedge fund investors who possessed no meaningful experience in

the insurance or reinsurance industries prior to the events outlined in this Complaint. Among the individuals at GSC Partners that were/are involved in the events described herein are Fred Eckert, Sanjay Patel, Matthew Kaufman, and Mayur Patel. GSC Partners is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

5. GSC Partners owns Defendant Greenwich Street Capital Partners II, L.P. ("Greenwich Fund"), which is a hedge fund. Greenwich Fund is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

6. Defendant DP Holdings L.L.C. is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

7. Defendant Dukes Place Holdings L.L.C. is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

8. Defendant Dukes Place Holdings Ltd. is organized under the laws of Bermuda, with its principal place of business in Hamilton, Bermuda.

9. Defendant Dukes Place Holdings, L.P. is a Bermuda Exempted Limited Partnership that was formed in 1996 for the specific purpose of acquiring insurance and reinsurance companies that are in claims "run-off" (*i.e.*, companies that no longer issue policies). (Dukes Place Holdings, L.P., DP Holdings L.L.C., Dukes Place Holdings L.L.C. and Dukes Place Holdings Ltd. are collectively referred to herein as "Dukes Place").

10. GSC Partners is the general partner of Greenwich Fund. Greenwich Fund holds an 89.34% interest in Defendant DP Holdings L.L.C. Greenwich Fund is a

managing member and general partner of DP Holdings L.L.C. Greenwich Fund and DP Holdings L.L.C. together own 100% of Defendant Dukes Place Holdings L.L.C., with Greenwich Fund holding a 1% interest and DP Holdings L.L.C. holding a 99% interest. Greenwich Fund is a general partner of Dukes Place Holdings L.L.C.

11.    Dukes Place Holdings L.L.C. owns 100% of Defendant Dukes Place Holdings Ltd. Dukes Place Holdings Ltd. is a corporation organized under the laws of Bermuda to act as the general partner of Defendant Dukes Place Holdings, L.P., and holds a 1% interest in Dukes Place Holdings, L.P. DP Holdings, L.L.C. holds the remaining 99% interest in Dukes Place Holdings, L.P.

12.    In 1996, GSC Partners was involved in the formation of Dukes Place Holdings, L.P. The direct owner of Dukes Place Holdings, L.P. is the Greenwich Fund.

13.    Each of the Dukes Place entities owned by GSC Partners and Greenwich Fund is a shell corporation whose sole purpose is to hold stock of other entities owned by GSC Partners and Greenwich Fund. Dukes Place is dominated and controlled by Defendants GSC Partners and Greenwich Fund. (GSC Partners, Greenwich Fund and all of the Dukes Place companies named as Defendants are collectively referred to as the "GSC Entities.")

14.    Dukes Place Holdings, L.P. owns 100% of the stock of Stonewall Acquisition Corporation, a shell corporation that owns Seaton and Stonewall. Stonewall Acquisition Corporation was created on or about July 21, 2000, and 100% of the stock of Seaton and Stonewall was transferred to Stonewall Acquisition Corporation on or about September 29, 2000.

3

15.    Defendant Enstar Group Limited ("Enstar"), formerly known as Castlewood Holdings, Ltd., is a holding company formed in 2001 for the purpose of holding a number of subsidiaries in the business of administering claims against insurance companies in run-off. Enstar is organized under the laws of Bermuda, with its principal place of business in Hamilton, Bermuda.

16.    Defendant Enstar (US), Inc., formerly Castlewood Holdings (US), Inc. ("Castlewood"), is the U.S. subsidiary of Enstar, organized under the laws of the State of Delaware, with its principal place of business in Warwick, Rhode Island.

17.    Seaton and Stonewall are shell corporations that do not have any employees. All of their officers are employees of Castlewood. All of their directors are employees of either Castlewood or the GSC Entities. At all times relevant to this Complaint, Seaton and Stonewall were owned by the GSC Entities, and have been administered by Castlewood.

## JURISDICTION AND VENUE

18.    Jurisdiction is appropriate under 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the amount in dispute, exclusive of interests and costs, is greater than $75,000.

19.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 in that the Defendants' bad faith conduct culminated in concluded arbitrations, in which NICO prevailed, that were conducted in New York, New York.

4

## GENERAL ALLEGATIONS

### Dukes Place's Purchase of Seaton and NICO's Reinsurance of Seaton

20.     Pursuant to a Stock Purchase Agreement dated November 20, 1998, Dukes

Place purchased Unigard Mutual Insurance Company (later renamed Seaton Insurance

Company) from John Hancock Mutual Life Insurance Company.

21.     At that time, Seaton was no longer actively writing policies. Instead, its

business was confined to running off its existing insurance and reinsurance liabilities and

collecting its own reinsurance. Seaton's liabilities and expenses were paid from reserves

it had set aside for this purpose and from reinsurance collected on its reinsurance.

22.     In order to accomplish its goal of purchasing Seaton, Dukes Place was

required to obtain approval from the State of Washington Office of the Insurance

Commissioner, which at that time had supervisory authority over Seaton.

23.     In its application for approval, Dukes Place stressed that its acquisition of

Seaton had as an integral element significant retroactive reinsurance coverage that it had

asked NICO to underwrite in order to support the acquisition.

24.     Pursuant to an Aggregate Retrocession of Loss Portfolio Agreement

effective on or about March 29, 1999 (the "Seaton Reinsurance Agreement," attached as

Exhibit A), NICO provided $327 million (later increased to $350 million) of reinsurance

coverage to Seaton for all of Seaton's liabilities, including allocated loss adjustment

expenses, declaratory judgment expenses and loss payments on all of its insurance and

reinsurance business. Seaton also agreed to pay NICO $100,000 per year to assist in the

administration of claims.

5

25.     The Seaton Reinsurance Agreement provided enormous coverage that few, if any, insurers other than NICO were able to provide. NICO assumed up to $343 million in Seaton liabilities on insurance business already written.

26.     This reinsurance coverage exposed NICO to large risks potentially without sufficient premium or investment income to cover those liabilities. Accordingly, in entering into this agreement, NICO was reliant upon the good faith of Seaton and its owners.

27.     In order to protect NICO's interests, the parties agreed in Article 18 of the Seaton Reinsurance Agreement that "[i]n undertaking the obligations and responsibilities described herein, [Seaton] and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of [NICO]."

28.     Also in order to protect NICO's interests, the Seaton Reinsurance Agreement gave NICO the right, *inter alia*, to approve all claims payments over $250,000.

**Dukes Place's Purchase of Stonewall and NICO's Reinsurance of Stonewall**

29.     Pursuant to a Stock Purchase Agreement dated May 5, 2000, Dukes Place agreed to buy Stonewall.

30.     Dukes Place expressly conditioned its purchase of Stonewall upon NICO's agreement to provide retroactive reinsurance coverage similar to that issued to Seaton. In its application for approval of the acquisition to the Ohio Department of Insurance, Dukes Place stressed that Eastgate Group Limited, an outside entity, would be providing administrative services to Dukes Place, supported by NICO's assistance in the administration of claims:

6

In consequence, in administering the settlement of claims and the collection of the reinsurance recoveries, Eastgate management and staff will liaise with designated management of National Indemnity to ensure that: (a) all claims made upon Stonewall are properly adjusted and settled as and when they fall due for payment in accordance with policy terms and conditions; and (b) reinsurance recoveries from third party reinsurers are properly processed and collected as they are generated following settlement of underlying claims.

Dukes Place believes that the combination of the resources, experience and expertise of Eastgate, supported by its parent corporation Eastgate Group Limited, backed up by the support of National Indemnity, will ensure that the run-off of the liabilities of Stonewall is fully resourced and well managed.

31.    NICO executed an Aggregate Reinsurance Agreement with Stonewall (the "Stonewall Reinsurance Agreement," attached as Exhibit B) on or about May 5, 2000.

32.    Pursuant to the Stonewall Reinsurance Agreement, NICO provided reinsurance coverage for all of Stonewall's liabilities, including allocated loss adjustment expenses, declaratory judgment expenses and loss payments, up to a limit of $240 million on insurance policies that Stonewall had already written.

33.    The Stonewall Reinsurance Agreement provided enormous coverage that few, if any, insurers beyond NICO were able to provide.

34.    This reinsurance coverage exposed NICO to large risks potentially without sufficient premium or investment income to cover those liabilities. Accordingly, in entering into this agreement, NICO was reliant upon the good faith of Stonewall and its owners.

35.    Article 18 of the Stonewall Reinsurance Agreement ("Standard of Care") states that "[i]n undertaking the obligations and responsibilities described herein,

7

[Stonewall] and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of [NICO]."

36.     Under the Stonewall Reinsurance Agreement, NICO has the right to associate in all claims and to approve claims above $150,000.  Moreover, by subsequent letter agreement, Stonewall agreed to pay NICO $50,000 per year to assist in administration of Stonewall's claims, which amount was in addition to the $100,000 already being paid to NICO for assisting in the administration of the Seaton claims.

**Dukes Place Retains Eastgate to Conduct the Run-off of Seaton and Stonewall**

37.     At the time of the acquisition of Seaton and Stonewall, Dukes Place had no employees whatsoever and no officers or directors with insurance or reinsurance experience.  Likewise, after the acquisition by Dukes Place, Seaton and Stonewall had no employees.

38.     Seaton, Stonewall and Dukes Place were under the domination and control of GSC Partners and Greenwich Fund.

39.     In order to conduct their business strategy, the GSC Entities caused Seaton and Stonewall to enter into agreements with Eastgate Group Limited ("Eastgate"), later renamed Cavell USA, Inc., for the administration of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement (collectively, the "Reinsurance Agreements").

40.     The Agreement Relating to Administration of Run-Off Business between Seaton and Eastgate (the "Seaton Administration Agreement") declared Eastgate to be the "Claims Servicer" for Seaton's claims, but gave recognition to the fact that NICO would have day-to-day involvement in the settlement of claims:

> Eastgate will provide a representative of NIC with full time
> access to the Company's offices and records and to allow
> such representative to monitor the payment of claims and to

8

> assist Eastgate and the Company in the settlement of such
> claims. In addition, Eastgate will pay NIC for all salary,
> benefits and like costs and expenses associated with such
> representative, but not more than $100,000 per annum.

41.     Stonewall likewise entered into an Agreement Relating to Administration

of Run-Off Business with Eastgate ("Stonewall Administration Agreement"), declaring

Eastgate to be the "Claims Servicer" for Stonewall's claims.

42.     Article 4 of the Seaton Reinsurance Agreement expressly provides that

NICO has complete control over the retention of any third-party entity to handle and

administer Seaton's claims and that NICO would assume control over the adjusting of

Seaton's liabilities should Dukes Place cease to own a controlling interest in Seaton.

43.     Article 4 of the Stonewall Reinsurance Agreement likewise expressly

provides that NICO has complete control over the retention of any third-party entity to

handle and administer Stonewall's claims and that, in the event Dukes Place should cease

to own a controlling interest in Stonewall, then (other than Stonewall itself), no other

party could administer Stonewall's claims without NICO's consent.

44.     Article 18 of both the Seaton Reinsurance Agreement and the Stonewall

Reinsurance Agreement provides that Eastgate, as Claims Servicer under the agreements,

owes a fiduciary duty to NICO:

> In undertaking the obligations and responsibilities
> described herein, the Reinsured and Claims Servicer will
> have a fiduciary duty to act in utmost good faith to the
> interests of [NICO].

45.     Both the Seaton Administration Agreement and the Stonewall

Administration Agreement expressly authorize Eastgate to sub-delegate any of its

respective responsibilities to third parties.

9

### Dukes Place Decides to Sell Seaton and Stonewall

46.    In 2003, Dukes Place caused Seaton and Stonewall to change their respective states of domicile to Rhode Island from Washington and Ohio. In 2004, the owners of Stonewall and Seaton applied to the Rhode Island Department of Business Regulation (the "Rhode Island Insurance Department") for a dividend of at least $25 million.

47.    The Rhode Island Insurance Department never approved the request for a dividend.

48.    Sometime after it made the request for a dividend, Dukes Place endeavored to sell Seaton and Stonewall in order to extract its capital investment and profit from the transaction.

49.    The GSC Entities began to solicit interest from prospective buyers.

50.    Sometime in the summer of 2005, the GSC Entities found a conditional buyer in what was then known as Castlewood Holdings (US), Inc., now Enstar (US), Inc. (hereafter, "Castlewood").

51.    The GSC Entities on the one hand, and Castlewood on the other hand, originally intended for Castlewood or an affiliate to purchase 100% of Stonewall Acquisition Corporation, which was and is the immediate corporate parent of both Seaton and Stonewall.

52.    Castlewood's intent in purchasing 100% of Seaton and Stonewall was to *become Claims Servicer for Seaton and Stonewall and to extract fees from those* companies for that service.

53.    Thereafter, the GSC Entities on the one hand, and Castlewood on the other hand, came to the realization that – upon a 100% sale of Seaton and Stonewall – the

10

Reinsurance Agreements required that NICO have the right to approve a new Claims Servicer or become Claims Servicer itself.

54.     The GSC Entities on the one hand, and Castlewood on the other hand, recognized that Castlewood could not purchase more than 50% of the Companies without triggering NICO's absolute right under the Reinsurance Agreements to become Claims Servicer, thus precluding Castlewood's access to claims servicing fees.

55.     Because Castlewood wanted to earn the fees for itself, NICO's contract rights rendered Seaton and Stonewall "unsaleable" in the view of the GSC Entities and Castlewood.

56.     Despite concluding that Seaton and Stonewall were "unsaleable," starting around November 2005, Castlewood and its attorneys began conducting due diligence in Eastgate's offices for the purported purpose of determining whether Castlewood would purchase Seaton and Stonewall.

57.     At the direction of GSC Partners and Greenwich Fund, Dukes Place represented to NICO that Castlewood would be performing routine due diligence for the purpose of potentially acquiring an interest in Seaton and Stonewall.

58.     At the direction of GSC Partners and Greenwich Fund, Dukes Place requested that NICO's representatives cooperate with the Castlewood due diligence and, in particular, that NICO's representative Thomas Ryan agree to be interviewed by Castlewood's representatives about the conduct of Seaton's and Stonewall's claims administration.

59.     On or about December 14, 2005, Mr. Ryan was interviewed at length by attorneys for Castlewood.

11

60.     NICO and Mr. Ryan believed that Mr. Ryan was being interviewed for purposes of legitimate due diligence and therefore Mr. Ryan was not represented by counsel at this interview.

61.     NICO has since learned that – prior to this interview – the GSC Entities and Castlewood had agreed to "build a case" against NICO for purposes of coercing NICO to relinquish its contract rights, thereby clearing the way for the sale of Seaton and Stonewall to Castlewood.

62.     The interview of Mr. Ryan was conducted under false pretenses.

63.     Attorneys for Castlewood and the GSC Entities who conducted the interview of Mr. Ryan were adverse to the interests of NICO and Mr. Ryan at the time of the interview, but never revealed their adversity.

**Dukes Place and Castlewood Hatch a Scheme to Coerce NICO into Relinquishing Its Contract Rights**

64.     What NICO and Mr. Ryan did not know at the time of the December 14, 2005 interview was that, in the fall of 2005, the GSC Entities on the one hand, and Castlewood on the other hand, had agreed to a scheme designed to improperly coerce NICO into relinquishing its contractual right to be Claims Servicer of Seaton and Stonewall in the event of a change of control of Seaton or Stonewall.

65.     On September 13, 2005, Paul O'Shea of Castlewood wrote a memorandum to Mayur Patel of GSC Partners, Greenwich Fund and Dukes Place, outlining the joint strategy for depriving NICO of its contract rights:

> • Integral to our being prepared to purchase Seaton and Stonewall is you agreeing to change manager of Seaton, Stonewall and Cavell immediately on the signing of the term sheet for sale of Seaton and Stonewall.

12

> • Together, Castlewood and Dukes Place need to agree a
> strategy to inform Berkshire Hathaway of your intention to
> sell Seaton and Stonewall to us and for Castlewood to meet
> with them to ensure that they do not exercise their right to
> take the management of the companies in-house for
> themselves.

66.     Mr. Patel reported the scheme in a December 21, 2005 e-mail that

memorialized his discussions with Mr. O'Shea.  Mr. Patel first reported that Castlewood

proposed that it be permitted to purchase only 49% of Stonewall (and 0% of Seaton), to

"get control of all information" and then "approach NICO regarding a change of control."

67.     Mr. Patel responded to Castlewood's proposal by declaring the

requirement of the GSC Entities that Castlewood and its attorneys build a case against

NICO in order to coerce NICO into relinquishing its contract rights:

> I told him that we don't want to sell less than 100% of
> stonewall and then discussed a put call structure at the same
> price for the 51% to technically get us to the same place.  I
> told him that we would think about it but preferred to focus
> on building a case against nico to force them to allow the
> stonewall transfer so that we could sell 100%.  Rick/dan,
> we should see if smart can get started any sooner than jan
> so that we can build a case against nico asap.

68.     Castlewood accepted and agreed to the proposal of the GSC Entities to aid

and abet the breach of Seaton's and Stonewall's fiduciary duties to NICO and to interfere

with NICO's contract rights and economic advantage.

69.     On or about January 18, 2006, Seaton and Stonewall each entered into an

Agreement Relating to Administration of Run-Off Business with Castlewood

("Castlewood Administration Agreements"), whereby Castlewood agreed to administer

the Seaton and Stonewall Reinsurance Agreements.

70.     Section 2.2 of the Stonewall Castlewood Administration Agreement

(attached as Exhibit C) provides:

13

> Castlewood warrants that it has read the Reinsurance
> Agreement in its entirety, that the Reinsurance Agreement
> creates various rights and obligations with respect to the
> Run-Off Business between [Stonewall], on the one hand,
> and NIC, on the other.  Castlewood agrees to administer the
> Reinsurance Agreement consistent with [Stonewall's] rights
> and obligations under the Reinsurance Agreement.

71.     Likewise, Section 2.2 of the Seaton Castlewood Administration

Agreement (attached as Exhibit D) provides:

> Castlewood warrants that it has read the Reinsurance
> Agreements in their entirety, that the Reinsurance
> Agreements create various rights and obligations with
> respect to the Run-Off Business between [Seaton], on
> the one hand, and National Indemnity Company ("NIC"), on
> the other hand, and that Castlewood will at all times cause
> the services to be performed in a manner consistent with
> [Seaton's] rights and obligations under the Reinsurance
> Agreements.

72.     Among Seaton's and Stonewall's obligations under the Reinsurance

Agreements is the "fiduciary duty to act in utmost good faith to the interests of [NICO]"

found in Article 18.

73.     Castlewood formed an affiliate, Virginia Holdings Corporation, which,

together with Dukes Place (acting under the direction of principals of GSC Partners and

Greenwich Fund), entered into a Stock Purchase Agreement ("Castlewood SPA") on June

16, 2006, contractually binding Castlewood to coerce NICO to relinquish its right to be

Claims Servicer:

> The parties shall each use commercially reasonable efforts
> to cause Castlewood US to obtain, as expeditiously as
> possible, (i) [NICO's] consent to Castlewood US, or an
> Affiliate of Castlewood US, serving as the Claims Servicer
> (as such term is defined in the Stonewall Reinsurance
> Agreement) and (ii) [NICO's] waiver of its right to become
> the Claims Servicer (such consent and waiver, collectively,
> the "Reinsurer Consent"), with such Reinsurer Consent to
> be in a form mutually acceptable to Seller and Purchaser.

14

> For purposes of the covenants contained in Section 5.10,
> time is of the essence.

74.    The Castlewood SPA thus requires Castlewood to use its best efforts to

force NICO to relinquish its contract rights.

75.    Under Defendants' scheme, if NICO could be forced to give up its contract

right to be Claims Servicer, then Castlewood would purchase 100% of Seaton and

Stonewall from Dukes Place.

76.    The GSC Entities agreed to allow Castlewood to use, without any

limitation whatsoever, the policyholder surplus of Seaton and Stonewall for the purpose

of coercing NICO to relinquish its contract rights.

77.    With the permission of the GSC Entities, Castlewood has spent millions of

dollars of Seaton's and Stonewall's funds for the purpose of advancing spurious claims

against NICO to effect the scheme.

78.    The expenditure of these funds is an abuse of Seaton's and Stonewall's

surplus that has had the effect of depriving Seaton's and Stonewall's policyholders from

the benefit of these funds.

79.    Dukes Place (at the direction of GSC Partners and Greenwich Fund) and

Castlewood further agreed in the Castlewood SPA that, if they were successful in

obtaining a monetary award of damages from NICO, these funds would become the

property not of Seaton or Stonewall (despite the fact that Seaton and Stonewall were

funding the litigation against NICO), but would be equally split between Castlewood on

the one hand, and the GSC Entities on the other hand.

80.    The parties to the Castlewood SPA agreed that they would exercise their

best efforts to obtain permission from the Rhode Island Insurance Department for Seaton

15

and Stonewall to pay any monetary damages obtained from NICO to Dukes Place and

Castlewood as a dividend within 15 days after receipt of any such damages.

**NICO Seeks Documents from the Defendants and Defendants Improperly Refuse, Thus Necessitating NICO's Demand for Arbitration**

81.    After the interview of Mr. Ryan, NICO became increasingly concerned

that the GSC Entities were not acting honestly and in good faith towards NICO.  This

was confirmed in a meeting between a representative of NICO and counsel to the GSC

Entities, who confirmed that they wished to sell Seaton and Stonewall and that they

wished NICO to comply with actions necessary to achieve the objectives of the GSC

Entities.

82.    In an attempt to lend ballast to claims by the GSC Entities that good faith

grievances had been developed by the GSC Entities about NICO's work on the Seaton

and Stonewall portfolios, counsel to the GSC Entities complained that the manner in

which NICO had indisputably *reduced* the legal fees incurred in defending claims against

Seaton and Stonewall was objectionable.

83.    Pursuant to the Access to Records clauses in the Reinsurance Agreements,

NICO sought access to records that might shed light on the true interest of Castlewood.

84.    Seaton and Stonewall, at the direction of the GSC Entities, denied NICO

access to any records or documents whatsoever, thereby concealing their scheme against

NICO.

85.    As a result, on January 4, 2006, NICO served separate arbitration demands

against Seaton and Stonewall pursuant to the arbitration clauses in the Reinsurance

Agreements, seeking access to documents that might shed light on the true interest of

Castlewood.

16

86.    NICO supplemented its arbitration demands on May 22, 2006.

87.    On June 22, 2006, Seaton and Stonewall each separately counterclaimed against NICO in the two arbitrations, seeking, *inter alia*, (a) rescission of the Reinsurance Agreements with NICO; (b) the right to service the claims; and (c) the right to collect amounts due from third-party reinsurers.

**Defendants Engage in Misrepresentations about NICO to the Rhode Island Insurance Department**

88.    In the Spring and Summer of 2006, representatives of the GSC Entities on the one hand, and Castlewood on the other hand, were making ex parte representations to representatives of the Rhode Island Insurance Department regarding NICO's handling of Seaton and Stonewall claims.

89.    In the course of these communications, representatives of the GSC Entities on the one hand, and Castlewood on the other hand, falsely represented to the Rhode Island Insurance Department that NICO was improperly interfering with the claims presented to Seaton and Stonewall under policies that they had issued, and that NICO was acting in its own self-interest and against the interests of Seaton and Stonewall.

90.    The allegations made to the Rhode Island Insurance Department were meant to support false allegations made in anonymous e-mails to the Rhode Island Insurance Department regarding alleged improprieties in NICO's claims handling.

91.    The GSC Entities on the one hand, and Castlewood on the other hand, represented to the Rhode Island Insurance Department that the anonymous e-mails were of concern, despite their having concluded internally that they were almost entirely false.

92.    Despite the foregoing, the GSC Entities and Castlewood arranged for counsel to Seaton and Stonewall to represent to the arbitration panels in the proceedings

17

then pending that the allegations in the anonymous e-mails would be proven and, in an attempt to support their legitimacy, that the e-mails had been obtained from a state regulator, when in fact the GSC Entities and Castlewood had not been informed that any state regulator could legitimize any of the allegations in the anonymous correspondence.

93.    Castlewood and Dukes Place (at the direction of GSC Partners and Greenwich Fund) engaged an outside consultant to investigate the allegations contained in the anonymous e-mails. That consultant found no evidence to support any allegations of improper claims handling by NICO.

94.    The GSC Entities and Castlewood have never informed the Rhode Island Insurance Department that their own internal analysis showed that the anonymous e-mails contained false allegations.

### Defendants Confirm Their True Purpose to NICO

95.    In the fall of 2006, Dominic Sylvester, on behalf of Castlewood, met with representatives of NICO for the purpose of discussing the demands of the Defendants against NICO.

96.    Although the stated purpose of the meeting was to discuss settlement of the then-pending arbitrations between NICO and Seaton and Stonewall, no good faith settlement discussions occurred.

97.    Instead, Mr. Sylvester candidly informed NICO that Castlewood was prepared to pursue very ugly claims against NICO which would not reflect well on NICO's "AAA" status, and that while he "did not wish to use the word blackmail," he imagined that NICO would be prepared to pay a premium in order to avoid the airing of such allegations.

18

**Castlewood and Dukes Place Hire Robert Burns to Fabricate Claims Against NICO**

98.     Robert Burns was an employee of Eastgate who was terminated on November 17, 2005. Mr. Burns was thereafter unemployed.

99.     Castlewood's attorneys interviewed Mr. Burns to see if he would be willing to testify adversely to NICO if offered a job by Castlewood.

100.     Upon completion of the interview, counsel for Castlewood reported to Defendants that Mr. Burns was indeed willing to testify against NICO in return for a job.

101.     With this not-so-tacit agreement in place, Castlewood hired Mr. Burns as an employee with a single purpose: to testify against NICO in the arbitrations.

102.     Castlewood openly confessed to the Rhode Island Insurance Department that it hired Mr. Burns because he would be a "creditable witness" against NICO.

103.     Mr. Burns has admitted that he re-created and backdated a claim record document and inserted it into a Stonewall claim file. The falsified document in question purported to support Mr. Burns' complaints about how a Stonewall claim had been managed by NICO.

104.     Mr. Burns also admitted that, while still an employee with Eastgate, he violated internal controls so that payments could be made to a lawyer involved in a fraudulent billing scam.

105.     When Mr. Burns' complaints about NICO aroused the concern of Seaton's and Stonewall's auditors, Ernst & Young, Mr. Burns' boss at Castlewood, Robert Carlson, suggested to Ernst & Young that they disregard Mr. Burns' accusations against NICO because there were no facts to support them.

106.     Mr. Carlson advised Ernst & Young that Mr. Burns was a person of "limited scope and professional skills."

19

107.    These warnings by Mr. Carlson to Ernst & Young about Mr. Burns' credibility and skill were made by July 15, 2006.

108.    Nonetheless, the GSC Entities on the one hand, and Castlewood on the other hand, caused Seaton and Stonewall to continue to argue to the underlying arbitration panels in September 2006 and thereafter that Mr. Burns was a credible witness who would present proof against NICO concerning the very matters that the Defendants had internally concluded were baseless.

109.    Despite the foregoing, Castlewood retained Mr. Burns until after he testified against NICO in the Stonewall arbitration.

110.    Shortly after the conclusion of his testimony and almost immediately after vindication of NICO and repudiation of Castlewood in the arbitrations, on information and belief, Mr. Burns' employment with Castlewood was terminated.

111.    Thus, at the time Seaton and Stonewall were arguing to the arbitration panels that NICO's conduct was so egregious that NICO should be stripped of its contractual right to act as Claims Servicer, the Defendants knew that the allegations were false, but caused Seaton and Stonewall to make those arguments anyway.

112.    NICO concluded the arbitrations with Seaton and Stonewall in the Summer of 2007.

113.    The arbitration panels ruled in favor of NICO and these rulings were confirmed as judgments of this Court in November 2007 (07-CV-10363 and 07-CV-10349).

**Defendants Reveal that They Seek Leverage Against NICO and Therefore They Demand Arbitration Against NICO for the Same Relief**

114.    Several months after the arbitration awards were confirmed, Seaton and Stonewall communicated to NICO through a representative that NICO's success in the arbitrations meant that Seaton and Stonewall would need to again find a new leverage point -- a self-described "silver bullet" -- that would convince NICO that it should buy Seaton and Stonewall at a premium, permitting the GSC Entities and Castlewood to achieve their financial objectives.

115.    As threatened, Seaton and Stonewall, under the domination and control of Defendants, recently delivered the "silver bullet," commencing new arbitrations seeking the same relief from NICO and clearly based on the same allegations that were rejected in the Seaton and Stonewall arbitrations.

## COUNT I

## BREACH OF FIDUCIARY DUTY

116.    NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 115 as if fully set forth herein.

117.    Under Article 18 of both the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement, Seaton and Stonewall owed fiduciary duties to NICO.

118.    Because Seaton and Stonewall had no employees, they were at all times dominated and controlled by their owners and parent corporations, Defendants Dukes Place, Greenwich Fund and GSC Partners. By dominating and controlling Seaton and Stonewall, these Defendants were obligated to uphold the fiduciary duties owed to NICO by Seaton and Stonewall.

119.    Upon entering into the Castlewood Administration Agreements, Defendant Castlewood agreed to administer the Reinsurance Agreements in accordance with Seaton's and Stonewall's obligations under the Reinsurance Agreements, including Seaton's and Stonewall's fiduciary duties to NICO.  Castlewood therefore assumed a fiduciary duty to NICO under the Reinsurance Agreements.

120.    NICO is a third party beneficiary under the Castlewood Administration Agreements by virtue of Castlewood's agreement to accept a fiduciary duty to NICO as laid out in the Reinsurance Agreements.

121.    As described more fully above, Defendants knowingly and intentionally entered into a scheme to deprive NICO of its rights under the Reinsurance Agreements. This scheme was in direct contravention of Defendants' "fiduciary duty to act in utmost good faith to the interests" of NICO and was in bad faith.

122.    As a result of the Defendants' scheme and breach of fiduciary duty, NICO suffered damages.

## COUNT II

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

123.    NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 122 as if fully set forth herein.

124.    Under Article 18 of both the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement, Seaton and Stonewall owed fiduciary duties to NICO.

125.    Defendants had knowledge of the fiduciary duties owed by Seaton and Stonewall to NICO.

22

126.    As described more fully above, Defendants knowingly and intentionally aided and abetted Seaton's, Stonewall's and Castlewood's breach of their fiduciary duties to NICO and deprived NICO of its rights under the Reinsurance Agreements.

127.    As a result of the Defendants' scheme and breaches of fiduciary duty, NICO suffered damages.

### COUNT III

### <u>BREACH OF CONTRACT</u>

128.    NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 127 as if fully set forth herein.

129.    Upon entering into the Castlewood Administration Agreements, Defendant Castlewood agreed to administer the Reinsurance Agreements in accordance with Seaton's and Stonewall's obligations under the Reinsurance Agreements, including Seaton's and Stonewall's fiduciary duties to NICO.

130.    Pursuant to Castlewood's assumption of a fiduciary duty to NICO, NICO is a third party beneficiary to the Castlewood Administration Agreements.

131.    Castlewood breached the Administration Agreements when it failed to administer the Reinsurance Agreements in accordance with its fiduciary duty to NICO.

132.    As a result of Castlewood's breach of the Administration Agreements, NICO suffered damages.

### COUNT IV

### <u>INTERFERENCE WITH CONTRACT</u>

133.    NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 132 as if fully set forth herein.

23

134.    Seaton and Stonewall entered into contractual relationships with NICO by virtue of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement.

135.    Defendants at all times were aware of the existence of the Reinsurance Agreements.

136.    As described more fully above, Defendants knowingly and intentionally entered into a scheme to deprive NICO of its rights under the Reinsurance Agreements. This scheme resulted in actual breaches of the Reinsurance Agreements by Seaton and Stonewall. Defendants' scheme to cause Seaton and Stonewall to breach their contract tortiously interfered with NICO's rights under the Reinsurance Agreements.

137.    But for Defendants' scheme to deprive NICO of its contract rights, the Reinsurance Agreements would not have been breached.

138.    Defendants' actions in entering into the scheme were improper and undertaken with malicious intent to deprive NICO of its contractual rights.

139.    As a result of the Defendants' scheme and breaches of the Reinsurance Agreements, NICO suffered damages.

## COUNT V

### INDUCING BREACH OF CONTRACT

140.    NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 139 as if fully set forth herein.

141.    Seaton and Stonewall entered into contractual relationships with NICO by virtue of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement.

142.    Defendants at all times were aware of the existence of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement.

24

143.    As described more fully above, Defendants intentionally entered into a scheme to deprive NICO of its rights under the Reinsurance Agreements and thereby improperly procured breaches of the Reinsurance Agreements.

144.    Defendants' actions in entering into the scheme were improper and undertaken with malicious intent to deprive NICO of its contractual rights.

145.    As a result of the Defendants' scheme and breaches of the Reinsurance Agreements, NICO suffered damages.

## PRAYER FOR RELIEF

146.    WHEREFORE, NICO seeks the following relief:

A.    A judgment for damages, in an amount to be determined at trial, arising from Defendants' breach of their fiduciary duties to NICO under the Reinsurance Agreements.

B.    A judgment for damages, in an amount to be determined at trial, arising from Defendants' aiding and abetting the breach of Seaton's and Stonewall's fiduciary duties to NICO under the Reinsurance Agreements.

C.    A judgment for damages, in an amount to be determined at trial, arising from Castlewood's breach of its fiduciary duties to NICO as third party beneficiary under the Seaton Administration Agreement and the Stonewall Administration Agreement.

D.    A judgment for damages, in an amount to be determined at trial, arising from Defendants' improper interference with NICO's

25

contractual relationships with Seaton and Stonewall under the

Reinsurance Agreements.

E.    A judgment for damages, in an amount to be determined at trial,

arising from Defendants' improper inducement of Seaton and

Stonewall to breach their respective Reinsurance Agreements with

NICO.

F.    Such other and further relief as the Court may deem equitable and

just, including costs and attorneys' fees pursuant to 28 U.S.C. §

1927.

Dated: April 30, 2008
       New York, New York

Respectfully submitted,

Clyde & Co US LLP

By: _____
Michael A. Knoerzer
The Chrysler Building
405 Lexington Avenue, 11th Floor
New York, New York 10174
(212) 710-3940

Dewey & LeBoeuf LLP

By: _____
John M. Nonna
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

*Attorneys for Plaintiff National Indemnity Company*

26

# EXHIBIT 9

 **National Indemnity Company**

A member of the Berkshire Hathaway group of insurance companies

BY E-MAIL dross@stroock.com
January 4, 2006

> **Demand for Arbitration by National Indemnity**
> **Company against Stonewall Insurance Company**

Dear Mr. Ross:

I am in receipt of your letter today concerning the December 26, 2005 requests by National Indemnity Company ("NICO") for access to the books and records of Stonewall Insurance Company ("Stonewall") under the aggregate reinsurance agreement between NICO and Stonewall.

You state in your letter that Stonewall is under no obligation to consider NICO's request. You are wrong. The reinsurance agreement between NICO and Stonewall states at Article 9 that Stonewall is obliged to provide NICO with access to its records. NICO's request includes access to books and records of Stonewall relating to reserves and other aspects of the business subject to the reinsurance agreement, all of which NICO has a legitimate and important interest at accessing. You claim that NICO has not responded to document requests made by Stonewall. Once again you are mistaken. I am unaware to date of any request by Stonewall to NICO for records. In your letter today, you assert entitlement on behalf of Stonewall to all sorts of records of NICO or its affiliated companies. What you fail to specify, as I have done, is the contract provisions under which Stonewall is making these requests of NICO.

In any case, given Stonewall's breach of the access to records provision contained in the reinsurance agreement that is confirmed in your letter, NICO hereby demands arbitration against Stonewall under Article 14 of the aggregate reinsurance agreement between NICO and Stonewall. NICO seeks in this proceeding both access to all of Stonewall's books and records that NICO has already requested and all other relief deemed fit and proper by the Panel. Unless the parties agree otherwise, NICO will name its arbitrator thirty days from the date of this letter, and demands that Stonewall do the same. All further correspondence or inquiry concerning this matter should be directed to the undersigned.

Sincerely,

Brian G. Snover
Vice President and Assistant General Counsel

# EXHIBIT 10

 **National Indemnity Company**
A member of the Berkshire Hathaway group of insurance companies

BY E-MAIL dross@stroock.com
January 4, 2006

**Demand for Arbitration by National Indemnity
Company against Seaton Insurance Company**

Dear Mr. Ross:

I am in receipt of your letter today concerning the December 26, 2005 requests by National Indemnity Company ("NICO") for access to the books and records of Seaton Insurance Company ("Seaton") under the aggregate reinsurance agreement between NICO and Stonewall.

You state in your letter that Seaton is under no obligation to consider NICO's request. You are wrong. The reinsurance agreement between NICO and Seaton states at Article 9 that Seaton is obliged to provide NICO with access to its records. NICO's request includes access to books and records of Stonewall relating to reserves and other aspects of the business subject to the reinsurance agreement, all of which NICO has a legitimate and important interest at accessing. You claim that NICO has not responded to document requests made by Seaton. Once again you are mistaken. I am unaware to date of any request by Seaton to NICO for records. In your letter today, you assert entitlement on behalf of Seaton to all sorts of records of NICO or its affiliated companies. What you fail to specify, as I have done, is the contract provisions under which Seaton is making these requests of NICO.

In any case, given Seaton's breach of the access to records provision contained in the reinsurance agreement that is confirmed in your letter, NICO hereby demands arbitration against Seaton under Article 14 of the aggregate reinsurance agreement between NICO and Seaton. NICO seeks in this proceeding both access to all of Seaton's books and records that NICO has already requested and all other relief deemed fit and proper by the Panel. Unless the parties agree otherwise, NICO will name its arbitrator thirty days from the date of this letter, and demands that Seaton do the same. All further correspondence or inquiry concerning this matter should be directed to the undersigned.

Sincerely,

Brian G. Snover
Vice President and Assistant General Counsel

# EXHIBIT 11

**Wilkins, Stephanie A.**

| | |
|---|---|
| **From:** | Robert Green [rbgreen.arb@comcast.net] |
| **Sent:** | Tuesday, May 01, 2007 12:40 PM |
| **To:** | Shawn Kelly; John Finnegan; Nonna, John M.; Knoerzer, Michael A. |
| **Cc:** | Mark Wigmore; Caleb Fowler |
| **Subject:** | NICO/Stonewall |
| **Attachments:** | Stonewall Discovery Order.doc |

Gentlemen:

Attached is the Stonewall Panel's discovery order.

Regards,
Robert B. Green

6/27/2007

## STONEWALL DISCOVERY ORDER

1.      The Panel is aware that there is an apparent disagreement between the Parties as to the issues that are to be heard by the Panel at the scheduled hearing. We require the Parties to meet and confer on this issue by May 2. If, following the meet and confer session there remain disagreements, both Parties should submit simultaneous statements to the Panel by May 4, with simultaneous replies due May 9.

2.      With respect to the pending application for reconsideration of the Panel's Order concerning the depositions of Messrs. Jain, Krutter and Snover, the Panel, having considered the various submissions of the Parties and following due deliberation, hereby rules as follows:

   a.      The depositions of Messrs. Jain, Krutter and Snover shall go forward after the Parties have reached agreement as to the scope of the issues to be heard by the Panel at the scheduled hearing as set forth in Paragraph 1 above; and

   b.      The scope of said depositions shall be limited to the issues agreed by the Parties as set forth in Paragraph 1 above; and

   c.      To the extent the parties are unable to resolve any dispute concerning the scope of the hearing as set forth in Paragraph 1 above and the Panel is forced to decide said issues, the depositions will be limited to the issues identified by the Panel.

3.      The discovery deadline previously set as April 30, 2007, is extended to May 31, 2007.


For the Panel
Robert B. Green

# EXHIBIT 12

**Wilkins, Stephanie A.**

| | |
|---|---|
| **From:** | Caleb Fowler [Caleb@raccoonpoint.com] |
| **Sent:** | Tuesday, May 01, 2007 7:34 AM |
| **To:** | 'Kelly, Shawn'; 'David Thompson'; 'Finnegan, John'; 'Snover, Brian'; 'Mark Wigmore'; Knoerzer, Michael A.; Nonna, John M.; 'Brandes, Larry'; 'Daniel Ross' |
| **Subject:** | RE: NICO v. Seaton |
| **Attachments:** | Final Seaton Discovery Order.doc |

Dear Counsels:
Umpire Thompson has requested that I send the following order on behalf of the Panel.
Regards,
Caleb

6/27/2007

## SEATON DISCOVERY ORDER

1. The Panel is aware that there is an apparent disagreement between the Parties as to the issues that are to be heard by the Panel at the scheduled hearing. We require the Parties to meet and confer on this issue by May 2. If, following the meet and confer session there remain disagreements, both Parties should submit simultaneous statements to the Panel by May 4, with simultaneous replies due May 9.

2. With respect to the pending application for the deposition of Messrs. Jain, Krutter and Snover, the Panel, having considered the various submissions of the Parties, as well as contemporaneous correspondence submitted to the Stonewall Panel, and following due deliberation, hereby rules as follows:

    a. The depositions of Messrs. Jain, Krutter and Snover shall go forward after the Parties have reached agreement as to the scope of the issues to be heard by the Panel at the scheduled hearing as set forth in Paragraph 1 above; and
    b. The scope of said depositions shall be limited to the issues agreed by the Parties as set forth in Paragraph 1 above; and
    c. To the extent the parties are unable to resolve any dispute concerning the scope of the hearing as set forth in Paragraph 1 above and the Panel is forced to decide said issues, the depositions will be limited to the issues identified by the Panel.

3. The discovery deadline previously set as April 30, 2007, is extended to May 31, 2007.

For the Panel:
N. David Thompson

# EXHIBIT 13

# LeBoeuf, Lamb, Greene & MacRae llp

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
SAN FRANCISCO

125 WEST 55TH STREET
NEW YORK, NY 10019-5389
(212) 424-8000
FACSIMILE: (212) 424-8500

E-MAIL ADDRESS: MICHAEL.KNOERZER@LLGM.COM
WRITER'S DIRECT DIAL: (212) 424-8077

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD
MOSCOW
RIYADH
AFFILIATED OFFICE
ALMATY
BEIJING

May 3, 2007

**VIA E-MAIL**

Mr. Robert B. Green  
14 North Drive  
Simsbury, Connecticut 06070

Mr. W. Mark Wigmore  
Avalon Consulting, LLC  
10 Station Street  
Simsbury, Connecticut 06070

Mr. Caleb L. Fowler  
27907 Revells Neck Road  
Westover, Maryland 21871

Re:  **Arbitration between National Indemnity Company**  
**and Stonewall Insurance Co.**

Gentlemen:

This letter has been reviewed and approved by both parties, who are pleased to report that an agreement has been reached concerning Stonewall's causes of action in the above-referenced arbitration, as well as the scope of the depositions of Messrs. Jain, Krutter and Snover. The parties' agreement is reflected in the document attached to this letter.

We are working to schedule the depositions at the earliest mutually agreeable date. NICO reserves its rights to make appropriate objections or directions at the depositions in the event that NICO perceives the questions to go beyond the scope of what has been agreed. Given the spirit of the negotiations, we are optimistic that this will not be necessary. If it becomes necessary, the parties will resort to the Panel for resolution.

Finally, while the parties have agreed that the attached documents reflect Stonewall's causes of action and permitted areas of inquiry, both parties reserve the right to challenge the relevance or admissibility of any evidence at the Hearing, irrespective of the issues agreed to be subject to exploration at deposition.

Messrs. Green, Wigmore and Fowler
May 3, 2007
Page 2

Kind regards.

Sincerely,

Michael A. Knoerzer

cc:   John M. Nonna, Esq.
      Shawn L. Kelly, Esq.
      John F. Finnegan, Esq.

Attachment

631535

**The Companies' Causes of Action in these Arbitrations**

Breach of Contract/Interference with Contractual Relations: NICO violated the Reinsurance Agreements (and the duties derived therefrom) and interfered with the contractual relations of Seaton and Stonewall (the "Companies") by dominating and controlling the Companies' claims and their run-off manager, Cavell, to the detriment of the Companies.

The relief being sought is:

a.     Money damages arising from the claims identified in Exhibits 22 (Stonewall) and 32 (Seaton).

       and

b.     Equitable Relief in the form of a declaration that Seaton/Stonewall may act as their own Claims Servicer.

       and

c.     An award of the Companies' attorneys' fees and costs in the arbitrations.

In support of these Causes of Action, the Companies seek discovery of Messrs. Jain, Krutter and Snover concerning the following topics:

1.     Their education and employment background.

2.     Their role, if any, in drafting and negotiation of the Reinsurance Agreements between NICO and Seaton/Stonewall, including in any discussions preceding the execution of the Reinsurance Agreements to purchase the Companies directly and in any modeling of payout patterns and investment returns projected under the Reinsurance Agreements.

3.     Their role generally, if any, in managing and controlling the Companies' claims, and specifically in regard to the claims set forth in Exhibits 22 and 32.

4.     Their role generally, if any, in establishing and monitoring the claims processes and procedures used by Cavell/NICO/Resolute in respect to the Companies, including without limitation, any procedures used to avoid conflicts of interest and the use of in-house law firms.

5.     Their role, if any, in monitoring and approving payments made on the Seaton and Stonewall books, and their review and use, if any, of the "run rate spreadsheet" and any other financial documents relating to the Companies.

6.     NICO's historical relationship, if any, with Ken Randall managed or owned enterprises including Eastgate and its successors.

NYC 631441 1 11454 00003 5/2/2007 11 46am

7.   NICO's role, if any, in drafting and negotiating the Administration Agreements between Eastgate and Seaton/Stonewall.

8.   The drafting and negotiation of the Collaboration Agreement, and any disclosure by NICO of its terms.

9.   NICO's use of bonuses and incentives based in whole or in part upon the financial performance of the Seaton and Stonewall books.

10.  Fees paid by NICO or to NICO vis a vis Eastgate and its successors (including whether NICO was paying the Cavell office rent or salaries of Cavell employees).

11.  The termination of Bob Burns.

12.  The Berkshire Boys e-mails.

13.  The Burns memo.

There is no claim that the Reinsurance Agreements are ambiguous or were fraudulently induced.

There is no claim against NICO sounding in fraud.

Each witness is being offered as a percipient witness and will testify from personal knowledge.

Each witness will be examined for no more than 7 hours total and all three depositions will take place in LLGM's N.Y. office.

# EXHIBIT 14

# LeBoeuf, Lamb, Greene & MacRae LLP

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
CHICAGO
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
PITTSBURGH
SAN FRANCISCO

125 WEST 55TH STREET
NEW YORK, NY 10019-5389
(212) 424-8000
FACSIMILE: (212) 424-8500

E-MAIL ADDRESS: MICHAEL.KNOERZER@LLGM.COM
WRITER'S DIRECT DIAL: (212) 424-8077
WRITER'S DIRECT FACSIMILE: (212) 649-9422

LONDON
A MULTINATIONAL
PARTNERSHIP
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
AFFILIATED OFFICE
BISHKEK
ALMATY
BEIJING

May 3, 2007

**BY E-MAIL**

Mr. N. David Thompson
47 Kettle Creek Road
Weston, Connecticut 06883

Mr. W. Mark Wigmore
12 The Glade
Simsbury, Connecticut 06070

Mr. Caleb L. Fowler
27907 Revells Neck Road
Westover, Maryland 21871

Re:  <u>Arbitration between NICO and Seaton</u>

Gentlemen:

This letter has been reviewed and approved by both parties, who are pleased to report that an agreement has been reached concerning Stonewall's causes of action in the above-referenced arbitration, as well as the scope of the depositions of Messrs. Jain, Krutter and Snover. The parties' agreement is reflected in the document attached to this letter.

We are working to schedule the depositions at the earliest mutually agreeable date. NICO reserves its rights to make appropriate objections or directions at the depositions in the event that NICO perceives the questions to go beyond the scope of what has been agreed. Given the spirit of the negotiations, we are optimistic that this will not be necessary. If it becomes necessary, the parties will resort to the Panel for resolution.

Finally, while the parties have agreed that the attached documents reflect Stonewall's causes of action and permitted areas of inquiry, both parties reserve the right to challenge the relevance or admissibility of any evidence at the Hearing, irrespective of the issues agreed to be subject to exploration at deposition.

Messrs. Thompson, Wigmore and Fowler
May 3, 2007
Page 2

       Kind regards.

                                         Sincerely,

                                         Michael A. Knoerzer

cc:   John M. Nonna, Esq.
       Shawn L. Kelly, Esq.
       John F. Finnegan, Esq.

Attachment

### The Companies' Causes of Action in these Arbitrations

Breach of Contract/Interference with Contractual Relations: NICO violated the Reinsurance Agreements (and the duties derived therefrom) and interfered with the contractual relations of Seaton and Stonewall (the "Companies") by dominating and controlling the Companies' claims and their run-off manager, Cavell, to the detriment of the Companies.

The relief being sought is:

a.    Money damages arising from the claims identified in Exhibits 22 (Stonewall) and 32 (Seaton).

   and

b.    Equitable Relief in the form of a declaration that Seaton/Stonewall may act as their own Claims Servicer.

   and

c.    An award of the Companies' attorneys' fees and costs in the arbitrations.

In support of these Causes of Action, the Companies seek discovery of Messrs. Jain, Krutter and Snover concerning the following topics:

1.    Their education and employment background.

2.    Their role, if any, in drafting and negotiation of the Reinsurance Agreements between NICO and Seaton/Stonewall, including in any discussions preceding the execution of the Reinsurance Agreements to purchase the Companies directly and in any modeling of payout patterns and investment returns projected under the Reinsurance Agreements.

3.    Their role generally, if any, in managing and controlling the Companies' claims, and specifically in regard to the claims set forth in Exhibits 22 and 32.

4.    Their role generally, if any, in establishing and monitoring the claims processes and procedures used by Cavell/NICO/Resolute in respect to the Companies, including without limitation, any procedures used to avoid conflicts of interest and the use of in-house law firms.

5.    Their role, if any, in monitoring and approving payments made on the Seaton and Stonewall books, and their review and use, if any, of the "run rate spreadsheet" and any other financial documents relating to the Companies.

6.    NICO's historical relationship, if any, with Ken Randall managed or owned enterprises including Eastgate and its successors.

7.  NICO's role, if any, in drafting and negotiating the Administration Agreements between Eastgate and Seaton/Stonewall.

8.  The drafting and negotiation of the Collaboration Agreement, and any disclosure by NICO of its terms.

9.  NICO's use of bonuses and incentives based in whole or in part upon the financial performance of the Seaton and Stonewall books.

10. Fees paid by NICO or to NICO vis a vis Eastgate and its successors (including whether NICO was paying the Cavell office rent or salaries of Cavell employees).

11. The termination of Bob Burns.

12. The Berkshire Boys e-mails.

13. The Burns memo.

There is no claim that the Reinsurance Agreements are ambiguous or were fraudulently induced.

There is no claim against NICO sounding in fraud.

Each witness is being offered as a percipient witness and will testify from personal knowledge.

Each witness will be examined for no more than 7 hours total and all three depositions will take place in LLGM's N.Y. office.

# EXHIBIT 15

In The Matter of the Arbitration Between:

NATIONAL INDEMNITY COMPANY,

Petitioner,

-and-

STONEWALL INSURANCE COMPANY,

Respondent and Counter-Claimant.

Before the Panel:

Robert B. Green, Umpire
Caleb L. Fowler, Arbitrator
W. Mark Wigmore, Arbitrator

---

## STONEWALL INSURANCE COMPANY'S PRE-HEARING MEMORANDUM

---

RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

-- and --

CADWALADER, WICKERSHAM &
TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000

Attorneys for Respondent and Counter-Claimant
Stonewall Insurance Company

Dated: June 22, 2007

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 6

A.   The Treaty Provides Stonewall With Control Over its Own
     Claims and Binds NICO to Stonewall's Claims Decisions ........................ 6

B.   Stonewall Appointed Cavell to Manage Stonewall's Claims
     and Protect its Interests ............................................................................ 8

C.   Unbeknown to Stonewall, NICO Usurped Total Control Over
     Stonewall's Claims .................................................................................. 10

     1.   The Collaboration Agreement provided NICO with
          absolute   control  over  Stonewall's  claims  and  the
          Cavell claims staff .................................................................... 10

     2.   Neither NICO nor Cavell provided the Collaboration
          Agreement  to  Stonewall,  or  sought  to  obtain
          Stonewall's consent to the Agreement ......................................... 13

     3.   Even  in  the  period  before  the  Collaboration
          Agreement, NICO controlled Stonewall's claims ......................... 17

D.   NICO  Exercised  All  of  its  "Authorities"  Under  the
     Collaboration  Agreement  to  Dominate  and  Control
     Stonewall's Claims .................................................................................. 19

E.   Exercising  Total  Control  Over  Stonewall's  Claims  Has
     Enabled NICO to Turn the Stonewall Reinsurance Premium
     Into "Free Money" for Berkshire's Investment Machine ........................ 23

F.   NICO's  Domination  and  Control  over  Stonewall's  Claims
     Has Damaged and Continues to Damage Stonewall ................................ 26

     1.   NICO's  failure  to  earlier  extinguish  Stonewall's
          liabilities  has  left  Stonewall  exposed  to  increased
          consumption of the NICO cover .................................................. 27

     2.   NICO's  per  capita  legal  fee  allocation  has  caused
          Stonewall to substantially subsidize the fees and costs
          of other NICO-managed entities .................................................. 33

     3.   NICO's  conduct  has  damaged  Stonewall  in  a
          multitude of other ways ............................................................. 38

RELIEF SOUGHT ...................................................................................... 41

I.      THE PANEL SHOULD RESCIND THE TREATY ........................................ 41

II.     ALTERNATIVELY, IN THE EVENT THE PANEL DOES NOT
        ORDER RESCISSION, THE PANEL SHOULD ENTER A
        DECLARATION RESTORING CONTROL OF STONEWALL'S
        CLAIMS TO STONEWALL AND MAKING STONEWALL ITS
        OWN CLAIMS SERVICER .............................................................. 49

        A.      The Panel Should Issue a Declaration Restoring Control
                Over Stonewall's Claims to Stonewall .................................... 49

        B.      In Light of the Discovery Produced Since the September
                Hearing, the Panel Should Declare Stonewall As Its Own
                Claims Servicer .................................................................... 50

III.    THE PANEL SHOULD AWARD STONEWALL DAMAGES ......................... 55

IV.     THE     PANEL     SHOULD     AWARD     STONEWALL     ITS
        ATTORNEYS' FEES IN THIS ARBITRATION ........................................ 58

CONCLUSION ....................................................................................... 61

## PRELIMINARY STATEMENT

In December 1999, Great American Insurance Company ("Great American"), the then owner of Stonewall Insurance Company ("Stonewall"), entered into discussions to sell Stonewall to Dukes Place Holdings, L.P. ("Dukes Place"). At this time, Dukes Place – an investment fund with little to no meaningful insurance experience – had just completed its acquisition of Seaton Insurance Company ("Seaton") in a transaction that would serve as a model for the Stonewall deal.

When Dukes Place first sought to acquire Stonewall, it had, as it now does, substantial asbestos and environmental long-tail liabilities. For this reason, Dukes Place, as a condition of the acquisition, sought to have Stonewall purchase retroactive reinsurance coverage from National Indemnity Company ("NICO") – as in the Seaton deal. Dukes Place wanted protection in the event that Stonewall's long-tail liabilities proved greater than anticipated. As evidenced by the wording of the document, the Aggregate Reinsurance Agreement between Stonewall and NICO (the "Treaty" or "Stonewall Treaty") represented a genuine reinsurance transaction, with meaningful risk transfer. Stonewall paid NICO a premium of $126 million for aggregate reinsurance coverage of $240 million. For this reason, Stonewall has always reflected the Treaty on its books as reinsurance and has never accounted for it on a deposit basis.

Unbeknown to Dukes Place and Stonewall until late 2005, NICO intended to dominate and control Stonewall's claims from the outset of the Treaty, perverting the letter and spirit of the Treaty. NICO never intended that the Treaty operate as true

reinsurance, all along planning for it to operate as a time and distance contract, under which NICO assumed no insurance risk but was guaranteed to make a handsome profit.

NICO transformed the Treaty from reinsurance and rendered it a banking transaction by co-opting Stonewall's run-off manager, Cavell USA Inc. ("Cavell").[1] Upon acquiring Stonewall, Dukes Place retained Cavell – as it had in the Seaton transaction – to provide claim management services on Stonewall's behalf. Dukes Place understood and believed that Cavell was an independent Third Party Administrator, which would settle claims and extinguish liabilities as efficiently and inexpensively as possible, as any administrator of a run-off company would – and should – do. The claims administration agreement between Stonewall and Cavell makes clear that Cavell was Stonewall's agent and owed fiduciary duties to Stonewall. Among other provisions, it specifically provides that Cavell, subject to Stonewall's "direction," would "carry out the review, handling and adjusting of Claims," "admit, compromise and settle Claims," "prepare reinsurance collections," and would at all times "protect the Company's position."

NICO, however, had co-opted Cavell – a fact Dukes Place did not learn until late 2005 – and, in so doing, had usurped all of the claims and reinsurance collection functions that Stonewall had entrusted Cavell to perform. In fact, without seeking Stonewall's prior consent, NICO entered into a confidential Collaboration Agreement with Cavell under which NICO seized all responsibility for Stonewall's claims. Among other provisions, the Collaboration Agreement expressly provides, "For the avoidance of doubt, NIC retains *all authorities* to supervise and *control* claims

2

handling and reinsurance collections." (emphasis added). This Agreement, which was initially negotiated in 2001, formalized many of the procedures that had been in place from the day the Treaty was signed: NICO had controlled and would continue to control whether, when and for how much Stonewall's claims were settled and when such claims were paid.

NICO's domination and control over the claims function eviscerated the key claims provisions of the claims administration agreement between Stonewall and Cavell and breached the express provisions of the Treaty. Article 4A of the Treaty specifically provides that Stonewall – whether acting on its own initiative or through its trusted agent, Cavell – shall act as the "sole judge" as to (1) what constitutes a claim or loss under the Stonewall policies and contracts, (2) the extent of Stonewall's liability to its insureds and reinsureds, and (3) the amounts at which it shall be proper for Stonewall to pay.

As Stonewall will demonstrate at the final hearing, NICO's total control over the claims function has caused substantial damage to Stonewall. These damages include, but are not limited to:

- Damages caused by NICO's unreasonable failure to settle Stonewall's liabilities – including but not limited to the DuPont and Fuller Austin claims – which now threaten to consume a much greater share of the reinsurance cover than would have occurred had NICO settled these liabilities at an earlier time.

- Damages caused by NICO's inequitable allocation of legal fees between Stonewall and other insurance carriers jointly managed by NICO, including OneBeacon and Kemper, which faced far greater exposures than Stonewall.

---

[1] At the time, Cavell was known as Eastgate, Inc. Eastgate later changed its name to Ken Randall America, Inc. before adopting its current moniker.

- Damages caused by NICO's tortious interference with the Stonewall-Cavell Administration Agreement, which deprived Stonewall of the benefit of the more than $11 million in fees paid by Stonewall to Cavell.

- Damages resulting from NICO's unreasonable refusal to fund the TIG Claim settlement and the corresponding legal fees.

More fundamentally, and far more damaging to Stonewall than the specific examples of misconduct with respect to individual claims, NICO's co-opting of Cavell and the entire claims-handling function has deprived Stonewall of the benefit of the reinsurance contract it made. Under that contract, Stonewall had the necessary reinsurance protection in place to allow it to settle claims in a prompt and cost-effective manner, as many other companies in run-off have done, and thus preserve value in the company for its shareholder. Such prompt and cost-effective settlements may or may not have benefited NICO; by being prompt, they would have limited the investment income NICO could realize on the premium paid to it, but by being cost-effective they would have limited the possibility or extent of losses that NICO would have to pay. Thus, under the Agreement as intended and written, NICO might make money or lose money, as in any true risk-transferring transaction.

Unbeknown to Stonewall, NICO was unwilling to take that risk. It subverted Stonewall's claims handler, Cavell, to ensure that claims handling was done neither promptly nor cost effectively. By delaying the payment of claims, NICO ensured that it would earn enough investment income on the premium received to guarantee itself an enormous profit on the Agreement, while guaranteeing that the run-off would drag on indefinitely, increasing claims costs and depriving Stonewall's shareholder of the opportunity to realize any value out of the company. The financial impact of what NICO has done is as staggering as it is unconscionable.

4

Stonewall estimates that over the past seven years, during which time NICO has controlled Stonewall's payout pattern, NICO has earned $122.225 million in investment income on the $126 million in premium paid to NICO at the outset. In other words, NICO has already generated $8 million more than its contract limits of $240 million. Moreover, applying the current actuarial-based ceded incurred amounts rather than the total limits of the Treaty, NICO's current profit on the Stonewall deal stands at not less than $122,229,501, exclusive of future investment income. (Id.)

The only thing here that is more offensive than NICO's misconduct is the fact that NICO has profitted so greatly from being underhanded and duplicitous. The only proper remedy for this is rescisison. NICO has subverted the entire letter and spirt of the contract for the past seven years. The Panel should disgorge NICO of its ill-gotten gains and return the parties to the position they were in before the contract was executed. This requires that NICO return all premium that it received of $126 million, plus the investment income it earned of $122.225 million, less the losses it paid of $56.35 million, for a total return payment to Stonewall of $191.9 million. Alternatively, if the Panel is not willing to rescind, it should restore control of Stonewall's claims to Stonewall and declare Stonewall as its own Claims Servicer. Additionally, the Panel should order NICO to reimburse Stonewall for all damages caused to it by NICO's domination and control of Stonewall's claims, and award Stonewall its attorneys' fees and expenses in this arbitration.

# FACTUAL BACKGROUND

### A.    The Treaty Provides Stonewall With Control Over its Own Claims and Binds NICO to Stonewall's Claims Decisions

While NICO's conduct suggests otherwise, the Treaty does not provide NICO with the right to control Stonewall's claims.  In fact, the Treaty expressly recognizes that Stonewall alone reserves this right.  Article 4A of the Treaty states in relevant part:

> The Reinsured [Stonewall] shall be the *sole judge* [1] as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance and [2] as to the Reinsured's liability thereunder and [3] as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder.

(Treaty, Art. 4A, at Exh. 1)[2] (emphasis added).  The Treaty thus makes clear that Stonewall alone must determine what constitutes a claim, the extent of Stonewall's liability in respect to such claim, and the amount or amounts which Stonewall should pay.  While these provisions do not confer any additional rights on Stonewall that it did not already possess, their inclusion in the Treaty demonstrates that Stonewall did not agree to transfer claims-handling responsibilities to its reinsurer in exchange for NICO's provision of the finite cover – a fact which the Ohio Department of Insurance undoubtedly considered in its review and approval of the Treaty.

In addition to recognizing Stonewall's inherent right to make its own claim decisions, the Treaty – like most any other reinsurance agreement – binds the

---

[2] As used herein, the phrase "Exh. ___" will denote documents in the Appendix of Exhibits submitted herewith.

reinsurer to the reasonable, good faith claims decisions of the reinsured.   Article 4A specifically provides:

> [T]he Reinsurer [NICO] *shall be bound* by the reasonable, good faith judgment of the Reinsured [Stonewall] as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance, subject to the terms, exclusions and conditions hereof.

(Id.) (emphasis added).   Article 4A, accordingly, unambiguously binds NICO to the reasonable, good faith claims decisions of Stonewall, subject to terms, exclusions and conditions of the Treaty, including NICO's rights under Article 11B to approve claims payments in excess of $150,000 and policy buy-backs in excess of $250,000, which NICO cannot unreasonably withhold or delay.   (See id. at Art. 11B).   Article 4A provides no basis for NICO to second-guess Stonewall's claims decisions, let alone usurp Stonewall's rights to make such decisions.

In short, Article 4A merely confirms that, subject to the remaining terms, exclusions and conditions of the Treaty, the Stonewall-NICO reinsurance relationship should operate no differently than any other reinsurance relationship: the reinsured, Stonewall, should in the first instance decide what constitutes a claim, the extent of its liability, and the amount or amounts which the reinsured should pay; and the reinsurer, NICO, should then be bound by the reasonable, good faith claims decisions of its reinsured.   The Treaty on its face does not effect a novation of Stonewall's liabilities or claims responsibilities to NICO,[3] nor alter the dynamic of the typical reinsured-reinsurer relationship.

---

[3] Indeed, as evidenced by the aggregate cap on the Stonewall Treaty and the negotiations leading to the execution of the reinsurance agreement between NICO and Unigard Security Insurance Company (footnote continued...)

7

### B.  Stonewall Appointed Cavell to Manage Stonewall's Claims and Protect its Interests

In connection with the sale of Stonewall by Great American, Stonewall entered into an Agreement Relating to Administration of Run-Off Business ("Administration Agreement") with Eastgate, Inc. – the predecessor to Ken Randall America, Inc. and later Cavell USA Inc. (hereinafter "Cavell"). (See Administration Agreement, at Exh. 3). Under the Administration Agreement, Stonewall appointed Cavell to provide run-off management services for Stonewall as fully set forth in Schedule 1 to the agreement. (See id. ¶ 2.1).

Within Schedule 1, Cavell agreed to perform a full range of run-off management services on Stonewall's behalf, including claims-handling services. (See id. at Sch. 1, ¶ 3). Among the claims-handling services that Cavell contractually agreed to perform on Stonewall's behalf, Cavell undertook to:

- "Carry out the review, handling and adjusting of Claims."

- "Admit, compromise and settle Claims."

- "Monitor and aggregate Claims, prepare reinsurance collections and advices,[4] and keep the reinsurance agreements of the Run-Off Business under review."

- "Liase with professional advisers in respect of disputed Claims in terms of providing information, initial instructions and negotiating a budget."

---

("Unigard" or "Seaton") – which served as a model for the Stonewall Treaty – NICO would not agree to assume the risk of Stonewall becoming insolvent or falling under regulatory control. (See June 9, 1997 fax, at Exh. 2) (setting forth Ajit Jain's comments that even if Berkshire agreed to buy Seaton, Berkshire would not agree to accept the risk of Seaton becoming insolvent or falling under regulatory control).

[4] As discussed in Stonewall's reply submission on the Claims Servicer issue, Article 5 of the Treaty provides Stonewall with exclusive authority to pursue reinsurance collections. (See Treaty, Art. 5, at Exh. 1).

(<u>Id.</u>) Simply put, pursuant to paragraph 3 of Schedule 1, Stonewall entrusted Cavell to perform all claims-handling services on Stonewall's behalf.

Further, pursuant to paragraph 4 of Schedule 1, Stonewall granted Cavell settlement authority up to $1 million for "all Claims where the Company's liability is clearly pledged." (<u>See</u> <u>id.</u> at Sch. 1, ¶ 4.1). Additionally, in cases where Stonewall's potential liability exceeded $1 million and/or was not clearly pledged, Stonewall granted Cavell authority to "take such steps as it deems necessary *to protect the Company's position*" in the absence of instructions from the Company Representative, Robert Barclay. (<u>See</u> <u>id.</u> at Sch. 1, ¶ 4.1, and Sch. 2) (emphasis added). The Administration Agreement thus makes explicitly clear that Stonewall appointed Cavell to protect Stonewall's interests in connection with the management of Stonewall's claims.[5]

In consideration for Cavell's agreement to manage Stonewall's claims and protect Stonewall's interests, Stonewall agreed to pay Cavell a substantial annual fee. As set forth in a spreadsheet prepared by Cavell Chief Operating Officer Pam Hoelsken in or about August 2005, Stonewall paid Cavell fees of $11,037,500 for services provided between September 30, 2000 and March 31, 2006 – an average of slightly more than $2 million per year. (<u>See</u> Spreadsheet accompanying Aug. 25, 2005 e-mail, at Exh. 4). Cavell contracted to earn these fees in addition to the fees Stonewall's sister company, Seaton, agreed to pay Cavell, which totaled $16,988,750 in the seven-year period between March 31, 1999 and March 31, 2006. (<u>See</u> <u>id.</u>)

---

[5] Under paragraph 2.1 of the Administration Agreement, Cavell agreed to perform its services "with reasonable care and skill in a professional and efficient manner." (Administration Agreement ¶ 2.1, at Exh. 3).

Lastly, neither Stonewall nor Cavell made NICO a party to the Administration Agreement. The Administration Agreement does not provide NICO with any authority to assume total control of Stonewall's claims[6] or relieve Cavell of its contractual obligation to manage Stonewall's claims and protect Stonewall's interests.

### C.    Unbeknown to Stonewall, NICO Usurped Total Control Over Stonewall's Claims

Less than six months after the effective date of the Administration Agreement, NICO entered into a shocking and confidential "Collaboration Agreement" with Cavell that eviscerated the core provisions of the Administration Agreement, re-wrote the terms of the Treaty and provided NICO with absolute control over Stonewall's (and Seaton's) underlying claims and reinsurance collections. Incredibly, neither NICO nor Cavell sought Stonewall's consent before entering into this licentious pact. (See Collaboration Agreement, at Exh. 5; Deposition Transcript of Robert Barclay ("Barclay Dep. Tr.") 51:11-14, at Exh. 6).

#### 1.    The Collaboration Agreement provided NICO with absolute control over Stonewall's claims and the Cavell claims staff

It was not until shortly before these arbitration proceedings began that Stonewall first obtained a copy of the Collaboration Agreement. (See Barclay Dep. Tr. 53:5-8, at Exh. 6). A review of the document's key terms is nothing short of astonishing. Under the Collaboration Agreement, NICO seized absolute control over

---

[6] As reflected in the recitals to the Collaboration Agreement, Cavell purported to justify its absolute abdication of claims handling responsibility to NICO by reference to paragraph 8 of the Administration Agreement, which states in relevant part that Cavell "shall have the authority to delegate to any person *such functions* as it deems *necessary* for the performance of its obligations under the Agreement." (Administration Agreement ¶ 8.1, at Exh. 3) (emphasis added). Such provision, however, by no means authorized Cavell to effect a wholesale and unilateral delegation of all claims handling responsibilities **(footnote continued...)**

both 1) Stonewall's underlying claims and reinsurance collections, and 2) the Cavell claims staff. As respects Stonewall's underlying claims and reinsurance collections, the Collaboration Agreement explicitly states:

- "NIC and Randall America now wish to collaborate . . . with the intent that . . . NIC will be responsible for the management of **all** Schedule 4 Services [the claims-handling services Cavell agreed to perform under paragraphs 3 and 4 of Schedule 1 of the Stonewall Administration Agreement]." (Collaboration Agreement ¶ G and Sch. 4, at Exh. 5) (emphasis added).

- "Randall America hereby delegates to NIC and NIC accepts responsibility for the management of claims in respect to Seaton and Stonewall." (<u>Id.</u> ¶ 3.1).

- "For the avoidance of doubt, **NIC retains all authorities to supervise and control** [Seaton's and Stonewall's] **claims handling and reinsurance collections.**" (<u>Id.</u>) (emphasis added).

Through the Collaboration Agreement, NICO thus usurped **all** authority to supervise and control the claims-handling services which Cavell had contractually agreed to perform on Stonewall's behalf. Moreover, NICO effected a unilateral re-writing of the terms of the Treaty, which designated Stonewall – not NICO – as the "sole judge" of 1) what constitutes a claim or loss under the reinsured policies and contracts, 2) the extent of Stonewall's liability thereunder, and 3) the amount or amounts which it shall be proper for Stonewall to pay. In his deposition, Mr. Ryan testified, "I'm not in a position to rewrite it [the Treaty]," yet that is precisely what NICO sought to achieve through the Collaboration Agreement. (Deposition Transcript of Tom Ryan ("Ryan Dep. Tr.") 123:11, at Exh. 7).

---

to NICO – Stonewall's reinsurer – particularly in the absence of any indication that such delegation was "necessary."

With regard to the Cavell claims staff, the Collaboration Agreement provided NICO with absolute authority over the management, review and funding of the entire staff. The relevant sections specifically provides:

- **"Randall America authorises and requires NIC to direct the Claims Handling Staff in the performance of their duties."** (Collaboration Agreement ¶ 3.1, at Exh. 5) (emphasis added).

- "The salary and bonus of all Claims Handling Staff shall be set by NIC." (Id.)

- "Claims Handling staff: -**salaries to be charged fully to NIC, together with employment related costs** (payroll taxes, 401K contributions, health and dental premiums, short term disability and workers compensation premiums) on an actual basis. . . .  **NIC will also pay the cost of any annual bonus to members of the Claims Handling Staff** . . . ." (Id. at Sch. 3, ¶ 1.1) (emphasis added).

- "Randall America agrees that it shall not add any feature to the employee benefit structure for any member of the Claims Handling Staff that increases the total cost of benefits for that individual without prior approval of NIC. (Collaboration Agreement ¶ 3.1).

- "NIC shall have the right to require Randall America to redeploy any member of the Claims Handling Staff and cease to levy any charge to NIC in respect of such person if in the reasonable opinion of NIC such person is no longer suitable or is no longer required for the purpose of performing the Schedule 4 [claims] Services." (Id.)

The Collaboration Agreement, for all intents and purposes, converted the Cavell claims staff into employees of NICO.  As a result of the secret pact, NICO 1) dictated the salary and bonus of the entire claims staff, 2) funded all compensation costs of the claims staff, including salaries, bonuses and all employee-benefits costs, and 3) reserved total authority to direct the claims staff and to cut off funding of any member of the claims staff that NICO deemed no longer suitable for the performance of claims services.

12

NICO also agreed to fund virtually all of Cavell's overhead costs, including but not limited to rent, utilities, property insurance, taxes, equipment, computer system costs, furniture, office supplies and telephone charges. (See Jan. 30, 2006 e-mail from Tom Ryan to Forrest Krutter attaching 2005 Cavell budget, at Exh. 8). Although Cavell agreed to pay an annual fee of approximately $1.3 million to NICO for claims services provided to Seaton and Stonewall (see Collaboration Agreement, Sch. 3, at Exh. 5), it appears that Cavell retained the balance of the more than $4.4 million in average annual fees paid by Seaton and Stonewall to Cavell – resulting in a likely annual profit to Cavell of more than $3 million.[7]

Following the execution of the Collaboration Agreement, it is no exaggeration to say that Cavell was working for NICO. Indeed, NICO's John Arendt stated as much when he boldly advised Cavell's Pam Hoelsken, "**I'm the customer**." (See Nov. 5, 2003 e-mail, at Exh. 9) (emphasis added).

    2.    Neither NICO nor Cavell provided the Collaboration Agreement to Stonewall, or sought to obtain Stonewall's consent to the Agreement

A cursory review of the Collaboration Agreement confirms that neither NICO nor Cavell sought to make Stonewall a party to the agreement or to otherwise secure Stonewall's consent to the Agreement. In fact, an e-mail produced by Cavell preceding the execution of the Collaboration Agreement demonstrates that NICO and Cavell specifically excluded the Stonewall Company Representative, Robert Barclay, from the negotiations leading to the agreement. (See July 24, 2001 e-mail from

---

[7] In connection with Cavell's entry into the Collaboration Agreement, NICO undertook to provide E&O insurance to Cavell covering Cavell's activities in respect to Seaton, Stonewall, CGU and Kemper. (See Collaboration Agreement ¶ 6.2, at Exh. 5).

Kathryn Skoyles, at Exh. 10). While NICO cannot dispute this point, it may argue that Stonewall had knowledge of the Collaboration Agreement, yet failed to object to its terms. Such an argument reflects a callous indifference to NICO's duty of utmost good faith and overlooks three important points.

First, neither NICO nor Cavell provided a copy of the Collaboration Agreement to Robert Barclay, the Stonewall Company Representative. As Mr. Barclay testified in his deposition:

> Q. Did you tell Mr. Patel in 2005 that you'd not known about the collaboration agreement until 2005?
>
> A: I had not known that the collaboration agreement had implications for Seaton and Stonewall of any substance until 2005 when I first saw a copy of that agreement.
>
> Q. So your testimony is you never saw a copy of the collaboration agreement until 2005.
>
> A. That is my testimony.

(Barclay Dep. Tr. 51:9-17, at Exh. 6).   A November 11, 2005 e-mail from Mark Shepherd to Mayur Patel further confirms Mr. Barclay's testimony:

> I discussed the collaboration agreement (he understands that discussion is to be kept confidential) with Robert.   He advises that we've never seen the collaboration agreement between NICO and Cavell.

(Nov. 11, 2005 e-mail, at Exh. 11).

Second, Stonewall's representative, Mr. Barclay, always held the understanding that any collaboration agreement that may have existed between NICO and Cavell pertained to the OneBeacon and Kemper line of business managed by Cavell, and had no substantive impact on Cavell's contractual agreement to manage

14

Stonewall's claims or Stonewall's contractual rights under the Treaty.    NICO
questioned Mr. Barclay regarding this point in his deposition:

> Q. And it is your testimony that Mr. Randall entered into
> this collaboration agreement, sent out an announcement
> about because he was delighted, according to the memo, and
> you're working on the same – in the same small building on
> the same floor as Mr. Randall and you know nothing about
> this agreement?
>
> A. I have never said that, with respect.  I have said that I
> was aware of the collaboration agreement relating to the One
> Beacon account. **I was not aware that it had any material
> impact for Seaton and Stonewall.**

(Barclay Tr., 160:22-161:6, at Exh. 6) (emphasis added).  A presentation by Randall &
Quilter to the Pennsylvania Insurance Department in 2005 further corroborated Mr.
Barclay's understanding of the Collaboration Agreement.   In a slide highlighting Ken
Randall's accomplishments, Randall & Quilter made the following note with respect to
the Collaboration Agreement: "2001: US Collaboration agreement with NICO
(*CGU/Kemper*)" – with no reference to Seaton or Stonewall.  (See Slide Except, at Exh.
12) (emphasis added).

Third, the documents clearly show that Stonewall lacked any knowledge
that NICO had obtained control of Stonewall's claims or the Cavell claims staff.  For
example, in 2003, Pam Hoelsken wrote to Robert Barclay to inquire regarding the
payment of a broker's fee.  In her e-mail, Ms. Hoelsken noted, "The biggest question is
who pays for [the broker's] fee – Dukes or NICo.  I think this needs to be determined
especially in light of the collaboration agreement."  (July 7, 2003 e-mail, at Exh. 13).
Mr. Barclay responded in part:

> If NICO want to further incentivise the broker, then that is
> up to NICO and must be at the sole expense of NICO and not
> offset against the limit of the Loss Portfolio Reinsurance.
> *The Collaboration Agreement is [sic] nothing to do with
> Seaton and, from Seaton's perspective, is entirely
> irrelevant.*

(Id.) (emphasis added). Ms. Hoelsken replied to Mr. Barclay's e-mail the same day, stating, "I actually knew this would be your answer but I needed to 'hear' it from you. I have passed this information on to Tom Ryan." (Id.) Notably, despite receiving Mr. Barclay's e-mail, neither Ms. Hoelsken nor NICO's Mr. Ryan advised Mr. Barclay that the Collaboration Agreement had actually effected a wholesale transfer of Cavell's claims-handling responsibilities for Seaton and Stonewall over to NICO — the Companies' reinsurer. (See, e.g., Barclay Dep. Tr. 139:15-18, at Exh. 6).

Likewise, in December 2004, upon learning of a potential transaction with Equitas and NICO's reference to the Collaboration Agreement in support of its decision to approve the transaction, Mr. Barclay repeated his understanding that the Collaboration Agreement had nothing to do with Seaton and Stonewall:

> Stonewall does not have any run-off management agreement
> with NICO. The relationship between Cavell America and
> NICO set out in the Collaboration Agreement referred to by
> Tom Ryan is of no concern to Stonewall which can only look
> to Cavell America to fulfil [sic] its obligations under the
> Run-Off Management Agreement. The Collaboration
> agreement has no effect upon the relationship between
> Stonewall and NICO which, as I have explained above, is
> governed by the Aggregate Reinsurance Agreement. . . .
>
> Stonewall looks to Cavell America to advise it upon whether
> or not to settle this particular liability to Equitas . . .
> Stonewall will also take into account any representations
> made by NICO in exercising their right of association under
> the Aggregate Reinsurance Agreement. . . .

16

(Dec. 10, 2004 e-mail, at Exh. 14). As evidenced by the above e-mail, as late as December 2004, the Stonewall Company Representative, Mr. Barclay, had no knowledge that NICO had assumed absolute control over Stonewall's claims. Indeed, Mr. Barclay continued to view the parties' relationships as they were defined by the Treaty and Administration Agreement, and firmly believed that Cavell was the proper party to advise Stonewall upon whether to settle a particular liability with Equitas. Once again, neither Mr. Ryan nor Mr. Hoelsken responded to Mr. Barclay's e-mail by advising him that Cavell had abdicated all authority for claims matters to NICO, and thus lacked any capacity to independently advise Stonewall in connection with the Equitas transaction.

In Mr. Barclay's deposition, NICO specifically questioned Mr. Barclay regarding NICO's control of the Cavell claims operation:

> Q. Did Ms. Hoelsken ever tell you that Mr. Ryan had taken such control of the claims operations of Eastgate/Cavell that Eastgate could no longer function?
>
> A. No. That would be a shocking statement.

(Barclay Dep. Tr. 139:15-18, at Exh. 6). Shocking as it is, NICO did in fact seize total control of the Cavell operation without ever advising Stonewall or seeking Stonewall's consent thereto. Moreover, as set forth below, the evidence demonstrates that NICO exercised such control from the very outset of the Treaty.

3. Even in the period before the Collaboration Agreement, NICO controlled Stonewall's claims

Since this arbitration began, Stonewall has learned that NICO exercised complete control over Stonewall's claims from the outset of the Treaty. Indeed, the documentary record establishes that, even before the Collaboration Agreement and Tom

Ryan's arrival at Berkshire, NICO's Brian Snover personally approved numerous claims payments, including payments as low as $15,000 (see June 6, 2001 e-mail, at Exh. 15) and personally approved the selection of counsel on Stonewall's behalf (see D.J. Procedures & Oversight memo, at Exh. 16). In the deposition of a former Cavell and current Resolute claims handler, Mike Powers, Mr. Powers discussed the absolute control that NICO exercised over claims payment matters before the Collaboration Agreement:

> Q. Did you have any settlement authority in 1999 when you started working at Eastgate?
>
> A. No.
>
> Q. Okay. So you had settlement authority when you were at Unigard, when you were with John Hancock Management; but you did not -- you lost that settlement authority when you came to Eastgate?
>
> A. Yes.
>
>         *      *      *      *
>
> Q. So, to your knowledge, as you sit here today, you can't give me the name of one person at Eastgate in 1999 who had any settlement authority on a Unigard claim?
>
> A. Yes.
>
> Q. Who did have the settlement authority on Unigard claims?
>
> A. National Indemnity personnel.
>
>         *      *      *      *
>
> Q. If you had a settlement proposal for $1,000, did you have authority to settle that?
>
> A. No.

Q. You had absolutely zero settlement authority, correct?

A. Yes.

          *      *      *      *

Q. You had no understanding that you could settle -- that you on behalf of Seaton had settlement authority up to $250,000 in connection with the Unigard/Seaton book of business, correct?

A. Yes.

Q. You had to get authority for any dollar amount from NICO . . . correct?

A. Yes.

(Deposition Transcript of Mike Powers ("Powers Dep. Tr.") 53:16-22, 54:6-13, 68:7-13, 95:22-96:8, at Exh. 17).  Mr. Powers' testimony could not be clearer: from the very outset of the Treaty, NICO exercised absolute control over whether, when and for how much Stonewall's claims were settled and when such claims were paid.

**D.     NICO Exercised All of its "Authorities" Under the Collaboration Agreement to Dominate and Control Stonewall's Claims**

Shortly after the effective date of the Collaboration Agreement, August 8, 2001, Berkshire hired Tom Ryan to oversee NICO's management of the Seaton, Stonewall and OneBeacon line of business, which NICO centrally located in a Cambridge, Massachusetts office (the Kemper business would arrive later).  As a result of the Collaboration Agreement, all members of the Cavell claims staff now reported to NICO (i.e., Mr. Ryan), which controlled and funded their compensation, benefits and position in the organization.  (See Collaboration Agreement ¶3.1, and Sch. 3, at Exh. 5).  An organizational chart for the Cavell operation illustrates Mr. Ryan's control, as all lines of authority in the chart lead to Mr. Ryan.  (See November 1, 2004 Chart, at Exh.

18).  As correctly observed in the introductory Berkshire Boys' e-mails, the Cavell claims office became Mr. Ryan's "shop." (See Exh. 77).

Under the direction of Mr. Ryan, NICO exercised its full "authorities" to dominate and control Stonewall's claims.  In fact, NICO did not permit members of the Cavell claims staff to authorize the payment of a single penny on Stonewall's behalf without NICO's approval.  In his deposition, Mr. Ryan candidly admitted this fact:

> Q:  With the exception of reinsurance recoveries and whatever else you said, salvages –
>
> A.  There's salvages there's reimbursements, there's voids, you know, there's all kinds of things.
>
> Q. With the exception of that, **has every dollar that NICO has been responsible for to Stonewall and Seaton under these treaties been approved by you on behalf of Stonewall and Seaton?**
>
> A.  Boy I hate to say anything in absolute, but **I think so.  I think so.**  There may be -- there may be an odd instance, so -- but **I think so.**
>
> Q. But as far as you know --
>
> A. As far as I know.
>
> Q.  -- that would be a correct statement?
>
> A.  Right.

(Ryan Dep. Tr. 155:4-21, at Exh. 7) (emphasis added).  Mr. Ryan similarly admitted that no members of the Cavell claims staff could approve the settlement of a claim or the payment of a legal fee on Stonewall's behalf without Mr. Ryan's approval.

> A:  . . . [I]n the context of Seaton and Stonewall, . . . the way that the structure was was that **the Cavell claims handlers, all right, could not settle a Stonewall or Seaton claim without getting my approval** . . . .

20

Q. How about with respect to legal fees? . . . **nobody paid a legal fee [on behalf of Seaton and Stonewall] until you signed off on it, correct**?

A. **That's correct**.

\*      \*      \*      \*

Q. What gave you the right to sign off and approve all legal fees for Stonewall and Seaton?

A. That's the way . . . . -- the companies directed [me] to do it.

Q. Who directed you to do it that way?

A. Ms. Hoelsken, certainly. I talked to Mr. Randall about it. Those two come to mind.

(Id. 59:24-62:20). Both Ms. Hoelsken and Mr. Randall, of course, are senior members of the Cavell organization who unbeknown to Stonewall participated in the negotiations leading to the Collaboration Agreement.[8] (See July 24, 2001 e-mail from Kathryn Skoyles, at Exh. 10). Mr. Ryan neither sought nor obtained the approval of Robert Barclay or the Stonewall Board to a payout scheme under which NICO exercised absolute authority over all of Stonewall's payout decisions. That Mr. Ryan failed to seek such authority should come as no surprise, as NICO's total domination and control of Stonewall's claims payouts directly contradicted the provisions of the Treaty which make Stonewall the "sole judge" of its own liability and which bind NICO to Stonewall's reasonable, good faith payments. (See Treaty, Art. 4, at Exh. 1). NICO's payout scheme, of course, also interfered with Cavell's contractual obligation to Stonewall to, inter alia, "admit, compromise and settle Claims." (See Administration

---

[8] Under the Collaboration Agreement, NICO agreed to pay two-thirds of Ms. Hoelsken's salary and employment-related costs of Ms. Hoelsken. (See Collaboration Agreement, Sch. 3, ¶ A.1.1, at Exh. 5).

Agreement, Sch. 1, ¶ 3, at Exh. 3). Testimony by several other former Cavell claims handlers provides further evidence of NICO's domination and control of all claims payout decisions. (See Deposition Transcript of Brooke Green ("Green Dep. Tr.") 47:20-21, 49:13-18, at Exh. 19; Powers Dep. Tr. 86:2-8, at Exh. 17; Deposition Transcript of Edward Albanese ("Albanese Dep. Tr.") at 36:12-17, 45:1-8, at Exh. 20).

In addition to consolidating all authority over Stonewall's cash payouts, upon assuming control of the Cavell claims office, Mr. Ryan re-assigned counsel to represent Stonewall. In many such instances, counsel also represented the interests of other NICO-managed carriers, such as OneBeacon. While such action undoubtedly resulted in a cost-savings to NICO, the joint representation relationships presented inherent conflicts of interest, as the lines of coverage written by OneBeacon often fell below the excess lines written by Stonewall. Indeed, as the Panel is well aware, the interests of primary and excess carriers can often diverge on a variety of issues, including the existence of aggregate limits, number of "occurrences," choice of allocation methodologies and annualization issues. Despite the presence of these inherent conflicts, Mr. Ryan admitted that he not once sought a waiver of any conflicts from Stonewall's Company Representative, Robert Barclay. (Ryan Dep. Tr. 215:11-15, at Exh. 7). In fact, Mr. Ryan could not recall receiving a written conflict waiver from anyone on behalf of Stonewall. (Id.).[9] Having co-opted the agent that Stonewall had appointed to protect its interests, NICO had a free hand to dominate and control every

---

[9] As discussed in Section F below, the joint representation schemes implemented by Mr. Ryan also caused Stonewall to subsidize the legal costs of OneBeacon and other NICO-managed carriers, which despite their comparatively greater exposures than Stonewall, shared counsel fees with Stonewall on a per-capita basis at the direction of NICO.

aspect of Stonewall's claims in a manner that best suited NICO's financial interests, regardless of the impropriety.

**E.    Exercising Total Control Over Stonewall's Claims Has Enabled NICO to Turn the Stonewall Reinsurance Premium Into "Free Money" for Berkshire's Investment Machine**

While it may seem curious, at first impression, why a reinsurer would seek to dominate and control the claims of its cedent, an understanding of the Berkshire business model provides the answer to this question. Warren Buffett explained this model in an annual letter to Berkshire Hathaway's shareholders: "what counts in [Berkshire's] insurance business is, first, the amount of 'float' we generate [i.e, the premium paid to Berkshire which it can then invest] and, second, its cost to us [the net payouts by Berkshire over time]." (See February 28, 1997 letter, at Exh. 21). For Berkshire, "an insurance business has value if its cost of float over time is less than the cost the company would otherwise incur to obtain funds." (March 1, 2000 letter, at Exh. 22). Reducing the cost of float, accordingly, is a paramount consideration to the Berkshire business model.

Understanding that Berkshire has a strategic business objective to reduce the cost of float explains why NICO sought to control the claims payouts and reinsurance collections of its cedent. Indeed, what better way for NICO to limit or delay its reinsurance payouts to Stonewall, i.e., the cost of float, than to usurp total control of the process by which Stonewall agreed to pay underlying claims and collected inuring reinsurance in the first place.

In his annual letter to shareholders, Warren Buffet regularly praises Ajit Jain for "manufacturing" appreciable "no-cost float" year after year after year.

According to Buffet, "It's simply impossible to overstate Ajit's value to Berkshire." (Id.)

Mr. Buffet's compliments are well deserved.   Ajit Jain has single-handedly transformed the run-off segment of the reinsurance industry, which until relatively recently was looked upon with disdain, into a cash cow, generating enormous annual profits (or, to use another of Buffet's phrases, "free money") for NICO. Stonewall's figures starkly illustrate this point (in microcosm).[10]

In May 2000, NICO agreed to provide Stonewall $240 million in retroactive reinsurance cover in exchange for a $126 million premium.  Now, seven years later, having seized control of Stonewall's claims, NICO has paid out only $56,350,267 million in losses and LAE.  Over this same period, NICO has earned investment income of $122,225,220 on the Stonewall premium, assuming that NICO has earned an average return of 11.7%, as reflected in NICO's financial statements for the period 2001-2006.  (See Spreadsheet prepared by Bob Carlson, at Exh. 26).  This means that today, the cash balance of the Stonewall reinsurance premium stands at **$191,874,953**, and that NICO has guaranteed itself a profit of not less than **$8,225,220** (the margin by which premium plus investment income earned to date exceeds the remaining limit on NICO's cover) assuming the full payout of the Treaty limits and excluding calculation of NICO's future investment income.  (Id.)  Moreover, applying the current actuarial-based ceded incurred amounts rather than the total limits of the

---

[10] Many of the retroactive reinsurance deals that NICO has completed to acquire or provide cover to run-off books have dwarfed the Stonewall deal. Most notably, NICO's deal with Equitas involved a premium of $7.1 billion. (Berkshire Hathaway Inc. 2006 Annual Report, at 9, at Exh. 23).  Other billion dollar premiums, include the Commercial Union ($1.3 billion) and CIGNA ($1.25 billion) run-offs.  (White Mountains Insurance Group Ltd. 10Q, at 4 (Mar. 31, 2003), at Exh. 24; and ACE Ltd. 10Q, at 1 (Aug. 16, 1999), at Exh. 25).

Treaty, NICO's current profit on the Stonewall deal stands at not less than **$122,229,501**, exclusive of future investment income. (Id.)

Remarkably, ever since November 2006, every dollar of investment income earned by NICO on the Stonewall transaction has represented pure profit for NICO[11] and any future monies earned by NICO will only increase NICO's already substantial profit. In November 2006, as now, if not from the inception of the deal, NICO's and Stonewall's interests have been in conflict. NICO's interests are best served by deferring loss payments for as long as possible, thereby maximizing the pool of money available to it to generate "free float." Unlike Stonewall, NICO has no interest in extinguishing liabilities as soon as possible and on the broadest possible terms, such as through policy buy-backs.

Any doubt that NICO fully subscribes to this simple dynamic is dispelled by Mr. Buffett's most recent letter to shareholders. In it, Mr. Buffett candidly acknowledges that on retroactive reinsurance deals like Stonewall, the key variables that influence how NICO will fare are "how soon claim payments [are] made and how much [Berkshire Hathaway] can earn on the cash we received before it must be paid out." (See Feb. 28, 2007 letter, at p. 9, at Exh. 21). Of course, where NICO controls the payout pattern (as it has indisputably done with respect to Stonewall) the question is not whether NICO will fare well or make a profit. Rather, the real question is how well will NICO fare and how much "free money" will Jain be able to "manufacture" for Berkshire Hathaway.

---

[11] In November 2006, it became mathematically impossible for NICO to sustain a loss (assuming one was ever theoretically possible) on the Stonewall deal. In November 2006, the amount of premium plus investment income ($126 million plus $114.9 million) exceeded the limit on the Stonewall contract.

**F.   NICO's Domination and Control over Stonewall's Claims Has Damaged and Continues to Damage Stonewall**

As documented above, the single greatest benefit to NICO of securing absolute control over Stonewall's claims and the Cavell claims staff was the ability of NICO to control the outflow of all cash payouts by Stonewall. Indeed, by controlling all of Stonewall's cash, NICO provided itself with the maximum means to defer, delay and reduce all cash payouts by Stonewall, i.e., the cost of float, thereby maximizing the pool of money available for Berkshire to invest.

That NICO did indeed act to defer, delay and reduce Stonewall's cash payouts cannot be reasonably disputed. First, NICO did not allow any members of the Cavell claims staff to approve settlements or payments of any kind on Stonewall's behalf without Mr. Ryan's approval – a control mechanism which undoubtedly delayed the payment of cash. (See Ryan Dep. Tr. 59:24-62:20, at Exh. 7). In addition, NICO regularly generated a "run-rate spreadsheet" for review by Ajit Jain in connection with funding requests which established an "allowable annual payment" for the Stonewall book representing a percentage of the cash balance of Stonewall's reinsurance premium. (See Run-rate Spreadsheet, at Exh. 27; Deposition Transcript of Arvind Krishnamurthy ("Krishnamurthy Dep. Tr.") 79:13-80:10, 82:13-15, 83:3-14, 109:25-11:18, at Exh. 28). A review of one such run-rate spreadsheet demonstrates that NICO's average annual net payouts to Stonewall through November 2005 nearly mirrored NICO's prescribed "allowable annual payment" for the book – a compelling piece of evidence which confirms NICO's adherence to the payout model. (Compare, e.g., Run-rate Spreadsheet Line 83, Column R, at NICO 027122, with Line 160, Column D, at Exh. 27).

Former Cavell claims handlers who have been deposed in this arbitration have also testified that, despite Seaton's and Stonewall's status as an insurance company in run-off, they had little to no experience in pursuing and achieving policy buy-backs on Seaton's and Stonewall's behalf. (See Powers Dep. Tr. 256:22-259:6, at Exh. 17; Albanese Dep. Tr. 105:1-4, at Exh. 20). Such settlements, of course, would have required NICO to accelerate the payment of funds to extinguish Stonewall's liability – an anathema to Berkshire's cash control scheme.

Accordingly, NICO's domination and control of Stonewall's claims caused substantial damage to Stonewall in a myriad of ways. The damages to Stonewall have manifested in the form of, among other ways, 1) increased consumption of the NICO cover caused by NICO's failure to earlier authorize settlements of Stonewall's liabilities at amounts substantially less than Stonewall's present exposure, 2) excessive legal fees allocated to Stonewall by NICO's inequitable per-capita fee allocation scheme, and 3) fees paid by Stonewall to Cavell, the benefit of which NICO deprived Stonewall by usurping control of Cavell's claims functions under the Administration Agreement. A further discussion of these matters follows below.

1.    NICO's failure to earlier extinguish Stonewall's liabilities has left Stonewall exposed to increased consumption of the NICO cover

NICO's conduct has damaged Stonewall by failing to extinguish liabilities on Stonewall's behalf that should have settled several years ago. While NICO has reaped a financial windfall by delaying the settlement of these liabilities and investing the float, its actions have left Stonewall exposed to increased consumption of the NICO reinsurance cover to Stonewall's detriment. NICO's conduct in this regard has manifested itself in two primary forms: 1) failing to proactively extinguish liabilities on

27

Stonewall's behalf; and 2) failing to authorize settlements of underlying claims at amounts far less than the policyholders' current demand and/or Stonewall's current reserves. As respects the latter of these issues, we would specifically point to, among other claims, the DuPont and Fuller Austin claims, which are among Stonewall's largest exposures.

**DuPont**:

The DuPont claim involves coverage litigation filed in Delaware Superior Court in 2000 under which DuPont sought coverage of Delrin Pipe products claims. (See June 28, 2004 Request for Settlement Authority ("RFSA"), at Exh. 29). Previously, starting in 1983, DuPont sold Delrin to other manufacturers who utilized the product -- made of an acetal resin plastic material -- to mold fittings for polybutylene ("PB") plumbing systems in homes. (Id.) The PB plumbing systems had a pronounced failure rate, resulting in leaks and damage. (Id.) Litigation subsequently ensued, resulting in DuPont paying $600 million in April 1992 to settle three PB cases filed by 700 plaintiffs in Harris County, Texas. (Id.)

In the coverage litigation filed in Delaware -- DuPont's home state -- DuPont sought coverage under, inter alia, two policies issued by Stonewall for the period March 1, 1985 to March 1, 1986. (Id.) The policies provided coverage of $1 million p/o of $5 million excess of a $50 million SIR, and $4 million p/o $15 million excess of $55 million. (Id.) Under Delaware law, which applied in the case, pre-judgment interest accrued at a statutory rate of 10.25%. (See id., and Aug. 4, 2006 letter from DuPont, at Exh. 30). In March 2003, DuPont entered into a settlement with

28

London pursuant to which London paid $2,132,183 to release all PB claims as to policies from 1971 through March 1, 1984. (June 28, 2004 RFSA, at Exh. 29).

On the heels of the London settlement, DuPont advised Stonewall's counsel in April 2003 of a demand to settle the Delrin litigation with Stonewall for $2 million. (See Apr. 28, 2003 e-mail from William Gantz, at Exh. 31). In response thereto, Cavell's staff prepared a RFSA to NICO dated July 29, 2003 requesting settlement authority of $750,000. (See July 29, 2003 Progress Note, at Exh. 32). A Decision Tree prepared on July 17, 2003 directly supported this authority request, as it estimated Stonewall's "Overall Expected Exposure" at $940,769. (See July 17, 2003 Decision Tree, at Exh. 33). Subsequently, Cavell's staff again requested settlement authority of $750,000 through an RFSA dated June 28, 2004. (See June 28, 2004 RFSA, at Exh. 29). Once again, a Decision Tree analysis directly supported the request, as a Decision Tree dated May 5, 2004 estimated Stonewall's "Overall Expected Exposure" at $1,060,786. (See May 5, 2004 Decision Tree, at Exh. 34). Notwithstanding Cavell's requests and the Decision Tree analysis, NICO refused to extend the requested settlement authority. (See, e.g., Oct. 11, 2004 e-mail, attached at 35).

Following NICO's refusal to grant authority to settle DuPont's Delrin coverage claims, Stonewall's exposure dramatically increased. Indeed, in light of an August 31, 2004 ruling from the Delaware Court which rejected DuPont's attempt to "spike coverage" in the 1983 policy period, DuPont redirected its attention to the 1985 policy period occupied by Stonewall. (See Oct. 26, 2004 e-mail, at Exh. 36; Oct. 10, 2006 draft RFSA, at Exh. 37). In specific, DuPont withdrew its $2 million offer and

submitted a written settlement demand of $4.5 million. (See Oct. 26, 2004 e-mail, at Exh. 36; Nov. 8, 2004 letter, at Exh. 38). Later, after the Delaware Court issued a July 31, 2006 opinion on Stonewall's and Travelers' supplemental motions for summary judgment, DuPont increased its demand to $7 million. (See Oct. 10, 2006 draft RFSA at 4, at Exh. 37). NICO countered with an offer of $550,000, which DuPont summarily rejected. (See Feb. 16, 2007 letter, at Exh. 39).

DuPont's coverage claims remain pending against Stonewall to the present day, with the court's summary judgment rulings on appeal to the Delaware Supreme Court. Recently, Travelers – the only other carrier remaining in the litigation – proposed that Stonewall contribute $4 million to a $10 million joint offer to be made on behalf of Stonewall and Travelers. (See June 6, 2007 memo, at Exh. 40). Although Stonewall's outside counsel has expressly recommended in a written opinion that Stonewall join in this settlement proposal, NICO has refused to grant Stonewall the requested authority. (See id.) Frustrated by NICO's unwillingness to commit to Travelers' sensible proposal, Travelers provided a deadline of June 20 for Stonewall to agree to a $4 million share of a $10 million proposal. (See June 12 through 20, 2007 e-mails, at Exh. 41). That deadline has since passed without NICO providing the requested authority, and Travelers has presumably now withdrawn its joint proposal. (See id.)

NICO's actions in respect to the DuPont coverage claims have caused serious and significant damage to Stonewall. Stonewall clearly had an opportunity to settle the litigation in 2003 for $2 million or less, and NICO's own analysis supported a settlement offer of almost $1 million. NICO, however, refused to extend authority, and

now Stonewall faces the prospect of paying out its full policy limits of $5 million, in addition to pre-judgment interest which continues to accrue at a rate of 10.25% - on top of all the legal fees and expenses that Stonewall has paid since NICO refused to provide settlement authority in 2003. Moreover, given a sensible opportunity to potentially cap Stonewall's indemnity exposure at $4 million, NICO has also declined to authorize Stonewall to join in Travelers' proposal, notwithstanding the express recommendation of Stonewall's own outside counsel!    Stonewall's damages on the DuPont claim, accordingly, represent all indemnity and interest amounts that Stonewall ultimately must pay in excess of DuPont's $2 million settlement offer, in addition to all attorneys' fees and expenses that Stonewall has incurred since Cavell first sought authority to settle the coverage claims in July 2003.

**Fuller Austin**:

Stonewall remains a party to the widely reported Fuller Austin litigation pending in California – the largest single exposure in the Stonewall book. In this matter, the Fuller Austin Asbestos Settlement Trust ("Trust") has sought coverage of asbestos liabilities arising from the installation of asbestos-containing insulation. Stonewall's policies at issue in the matter consist of a three-year policy with limits of $25 million excess of $5 million and a single year policy with limits of $3 million excess of $5 million. (See Sept. 30, 2002 Litigation Plan, at Exh. 42). For purposes of this Brief, we will not attempt to re-count the procedural history of this matter, much of which the California Court of Appeals discusses in its 69-page January 19, 2006 opinion. (See Opinion, at Exh. 43). Rather, we would direct the Panel to the relevant settlement negotiations.

On June 25, 2002 – four months after the trial court issued its initial statement of decision dated February 26, 2002 – Retired Judge Daniel Weinstein held a JAMS mediation in San Francisco, California.  Although Robert Burns acted as the account manager at the time, NICO directed another Cavell claims handler who already had plans to travel to California, Robert Vermes, to attend the mediation on Stonewall's behalf.  We have spoken to Mr. Vermes about the June 25, 2002 mediation and we understand that the Panel has issued a subpoena to compel his testimony at the hearing.

Based on our conversation with Mr. Vermes, we expect him to testify that, while at the June 25, 2002 mediation, he received an offer to individually settle the Fuller Austin matter on behalf of Stonewall for $18 million, an amount $12 million less than Stonewall's current reserve on the account and more than $25 million less than the Trust's current demand.  (See also Sept. 30, 2002 Litigation Plan, at Exh. 42) (referencing demand received by Mr. Vermes).  We expect Mr. Vermes to testify that the opportunity to settle for $18 million on an individual basis arose after group settlement discussions between the parties did not progress, and that Mr. Vermes relayed this offer back to the Cambridge office.

We further expect the evidence to demonstrate that, notwithstanding NICO's October 2002 decision tree analysis which estimated Stonewall's discounted expected exposure at $15,545,262 and a written request made by a Cavell in-house counsel for settlement authority in this same amount, NICO declined to extend authority for Stonewall to settle the matter for $18 million in 2002 – leaving Stonewall exposed to a potential full-policy limits loss. (See Oct. 10, 2002 Decision Tree, at Exh. 44; Oct. 10, 2002 Memorandum from Robert A. Whitney, at Exh. 45).

Like the DuPont claim, NICO's actions in the Fuller Austin matter have caused serious and significant damage to Stonewall. Stonewall was presented in 2002 with an opportunity to settle a potentially full limits exposure for $18 million. Despite preparing models which estimated Stonewall's present value exposure at more than $15.5 million, NICO refused to extend appropriate settlement authority to Stonewall at that time. As a result of NICO's actions, Stonewall has incurred more than five years of unnecessary attorneys' fees and expenses, including fees incurred in connection with a costly trial and appeal, and remains exposed to a potential full limits loss in excess of $50 million.

> 2.  NICO's per capita legal fee allocation has caused Stonewall to substantially subsidize the fees and costs of other NICO-managed entities

As noted above, upon consolidating control over the Seaton, Stonewall and OneBeacon books, NICO re-assigned counsel to represent Stonewall that in many cases also represented the interests of other NICO-managed carriers, such as OneBeacon. In almost all such instances, NICO typically dictated a per-capita legal fee allocation scheme, whereby it required Stonewall to share equally in the fees and expenses of outside counsel.[12] (See Feb. 21, 2007 e-mail from Tom Ryan, at Exh. 46) ("NICO has always shared counsel [costs] on a per capita basis.").

This per-capita fee allocation scheme dictated by NICO often proved particularly inequitable to Stonewall, as it forced Stonewall to pay the same relative share as other NICO-managed entities, which often faced far greater exposure on those

---

[12] One exception to NICO's per capita legal fee allocation scheme is the Burlington Northern/St. Louis – San Francisco Railroad ("BNSF") claim, discussed further *infra*, where NICO directed an allocation of 80 percent of fees to Stonewall and 20 percent to OneBeacon.

same claims. (See Boston Operations worksheet, at Exh. 47) (showing disparity in size between OneBeacon and Stonewall payouts).[13] Despite these inherent inequities and the resulting damage to Stonewall's interests, NICO not once sought or obtained Stonewall's consent to the inequitable fee allocation practice.

As it relates to particular claims, we would specifically refer the Panel to the Kraft/P.R. Mallory ("Kraft"), "Congoleum" and "BNSF" accounts. Additionally, we note that NICO's fee allocation scheme has harmed Stonewall on at least the following other accounts: Federal Mogul, Glatfelter, Archdiocese of Milwaukee, Viacom/Gulf+Western, City of Long Beach, United States Pipe & Foundry ("U.S. Pipe") and Clow Corporation.

**Kraft**:

In the Kraft matter, Kraft instituted litigation seeking coverage for liabilities resulting from hazardous waste claims. (See Feb. 2, 2004 OneBeacon RFSA, at Exh. 48). In defense of the matter, NICO appointed joint counsel on behalf of all the "Berkshire carriers" – CU (OneBeacon), AMICO (Kemper) and Stonewall (see Apr. 30, 2002 e-mail, at Exh. 49) and directed counsel to submit a "general bill" for "services that are not attributable to any specific carrier" divided equally among all the carriers (see May 12, 2003 e-mail, at Exh. 50).

NICO directed Stonewall to share costs on a per-capita basis even though Stonewall faced substantially less exposure than OneBeacon and Kemper. Indeed, OneBeacon issued seven primary and excess policies with total limits of $64,050,000

---

[13] For instance, the OneBeacon book of business, with which NICO frequently assigned Stonewall joint counsel, principally consists of primary layer exposures while the Stonewall book principally consists of excess level exposures. (Compare Albanese Dep. Tr. 39:6-10, with id. 38:20-25, at Exh. 20).

(Feb. 2, 2004 OneBeacon RFSA, at Exh. 48) and Kemper issued 13 primary and excess policies with total limits of $106,000,000, broken down as $16,000,000 in primary coverage, $3,000,000 in umbrella and $87,000,000 excess (Feb. 2, 2004 Kemper RFSA, at Exh. 51). Stonewall, on the other hand, issued one policy with limits of $6,000,000 excess of $25,000,000. (Feb. 2, 2004 Stonewall RFSA, at Exh. 52).

NICO's own exposure models demonstrate the sheer disparity between the relative exposures of the "Berkshire carriers." In or about February 2004, NICO prepared an exposure model for Stonewall, OneBeacon and Kemper to assess each carrier's respective settlement value. NICO's models yielded the following "discounted expected exposures": Stonewall - $63,542; OneBeacon - $14,980,092, and Kemper - $2,662,723. (See model excerpts, at Exh. 53). Thus, although Stonewall faced only *.36%* of the relative exposure on the Kraft claim, NICO allocated one-third of the counsel fees to Stonewall!

Ultimately, in 2004, Stonewall and OneBeacon settled with Kraft. (May 6, 2004 draft Term Sheet, at Exh. 54). Stonewall settled for $10,000 while OneBeacon settled for $7,990,000.[14] (Id.) After having been compelled by NICO to incur fees equal to OneBeacon's for the duration of the case, Stonewall eventually settled for *.125%* of the OneBeacon settlement amount. NICO's application of its per capita fee allocation methodology, accordingly, damaged Stonewall by forcing it to pay an equal share of the legal fees notwithstanding its miniscule total exposure relative to the other "Berkshire carriers."

---

[14] NICO has not produced any evidence of a Kemper settlement or the amount of settlement, if any such settlement occurred.

**Congoleum**:

On the Congoleum claim, NICO directed Stonewall to share the same counsel as OneBeacon and Seaton, with each insurer paying a one-third share. (See Oct. 19, 2004 Randall America Legal Invoice Tracking Form, at Exh. 55; Jan. 4, 2006 e-mail, at Exh. 56 (dividing a joint defense assessment "equally among One Beacon, Seaton and Stonewall")). Both the Stonewall and Seaton policies at issue, however, sit higher than the [OneBeacon] policy. (Apr. 28, 2005 e-mail, at Exh. 57).

Indeed, Stonewall and Seaton face significantly less relative exposure than OneBeacon. For example, on September 13, 2006, NICO's Tom Ryan sent an e-mail to Forrest Krutter advising of an offer which NICO intended to make at a settlement meeting the next day. (See Sept. 13, 2006 e-mail, at Exh. 58). As part of an $18 million proposal over three years on behalf of six books, Mr. Ryan recommended settlement on behalf of Stonewall, Seaton and OneBeacon in the following amounts: Stonewall - $819,835; Seaton - $3,442,613 and OneBeacon - $10,238,233. (Id.) Other settlement demands in this matter likewise reflect the significant disparities between the OneBeacon and Stonewall exposures.

Although the OneBeacon exposure dwarfs that of Stonewall in the Congoleum matter, NICO continues to allocate the same amount of counsel fees to OneBeacon as it allocates to Stonewall – an action which has damaged Stonewall and continues to damage Stonewall to the present day.

**Burlington Northern/St. Louis/San Francisco Railroad ("BNSF")**:

Although NICO dictated that Stonewall share counsel fees on a per-capita basis on nearly all joint counsel matters (see Feb. 21, 2007 e-mail, at Exh. 46), NICO's

handling of the BNSF claim represents an anomaly that worked to the detriment of Stonewall. On the BNSF claim, NICO retained joint counsel on behalf of OneBeacon and Stonewall, and from inception until November 2006, NICO allocated 80 percent of the costs to Stonewall and only 20 percent to OneBeacon. (See Nov. 8 and Nov. 9, 2006 e-mails, at Exh. 59).

In April 2003, Tom Ryan instituted the 80/20 allocation on the BNSF claim. (See Apr. 22, 2003 hand-written Randall America Memorandum by Robert Burns, at Exh. 60) ("After Discussion w/TMR cost share with Stonewall and CU is 80/20 (Stonewall 80%)"). Despite Robert Burns' protestations at the time that the fee split "should be 50/50 at worst for Stonewall," Mr. Ryan would not "listen" and rejected Mr. Burns' suggestion. (Id.) Mr. Ryan directed the 80/20 fee split despite the fact that the Stonewall policies have total limits of $750,000 and the OneBeacon policies have total limits of $2,290,000. (See Dec. 10, 2003 Litigation Plan, at Exh. 61).

Following policyholder demands to Stonewall and OneBeacon on August 31, 2006 (Aug. 31, 2006 e-mail, at Exh. 62) and further protestations from Mr. Burns (Feb. 21, 2007 e-mail, at Exh. 46), NICO implemented a going forward per capita split on this claim (id.). At no time from inception to November 2006, however, was there any justification for the 4-to-1 share of costs NICO allocated to Stonewall relative to OneBeacon. NICO's allocation of 80 percent of the fees on BNSF to Stonewall from inception to November 2006 is patently inequitable and damaged Stonewall to the extent NICO forced Stonewall to subsidize OneBeacon's fees on this claim.

37

3.    NICO's conduct has damaged Stonewall in a multitude of other ways

**Cavell Fees:**

As noted above, Stonewall paid Cavell fees of $11,037,500 for services Cavell contractually agreed to perform on Stonewall's behalf from September 30, 2000 to March 31, 2006.  Unbeknown to Stonewall, however, NICO had seized absolute control over Cavell's claims-handling function – depriving Stonewall of any benefit of the services Stonewall handsomely paid Cavell to perform.  By hijacking the claims function, therefore, NICO has damaged Stonewall in an amount not less than $11,037,500 – the total amount of fees paid by Stonewall to Cavell pursuant to the Administration Agreement.

**The TIG Claim:**

NICO's actions have also damaged Stonewall by failing to reimburse Stonewall for its $600,000 settlement of the TIG claim.  In 2005, TIG commenced an action against Stonewall in Illinois Federal Court seeking reimbursement of billings in respect to the Kansas City Southern Railway Claims ("KCSR") totaling $791,765.48. (July 7, 2006 letter, at Exh. 63).  TIG also sought treble damages for unfair and deceptive trade practices under Chapter 93A of the Massachusetts Consumer Protection Act which, accordingly, exposed Stonewall to potential damages in excess of $2.375 million. (Id.)

On June 14, 2006, TIG advised Stonewall that TIG would agree to compromise the KCSR claim for 75% of the disputed balances. (Id.)  To evaluate TIG's demand, Stonewall retained the firm of Hargraves McConnell & Costigan, P.C. ("Hargraves").  In a letter to Stonewall, Hargraves recommended that Stonewall settle

38

the KCSR claim for 75% of the disputed balances. (Id. at p. 6) (stating, "[A] settlement at 75% of the disputed claim is reasonable."). Stonewall then sought NICO's consent to settle the claim for $600,000. (July 19, 2006 letter, at Exh. 64). Despite the recommendation of Stonewall's outside counsel, Stonewall's considerable potential exposure to treble damages, and NICO's own agreement that a discounted resolution was appropriate, NICO refused to authorize payment of the proposed discounted settlement, and likewise refused to pay any share of the Hargraves counsel fees and expenses of more than $104,500. NICO's actions in respect to the TIG account have therefore damaged Stonewall in the amount not less than $704,500.

### The Equitas Cross-Company Transaction:

NICO's domination and control of Stonewall's claims has also damaged Stonewall through NICO's entry into a cross-company transaction by which it caused Stonewall to pay $692,223.48 to Equitas to secure Equitas' release of balances due to Commercial Union ("CU") in the same amount. In 2004, Stonewall and Equitas each commenced arbitrations against each other. In the arbitration brought by Equitas in the United Kingdom in February 2004, Equitas sought payment of assumed balances in the amount of $1,178,462.92. (Feb. 27, 2004 Arbitration Demand, at Exh. 65). In the arbitration commenced by Stonewall in November 2004, Stonewall sought payment by Equitas of balances in the amount of $838,804. (Dec. 9, 2004 e-mail, at Exh. 66).

Within a month of commencing arbitration against Equitas, NICO ordered Stonewall to pay $692,223.48 to Equitas, without receiving any payment or assurance of payment from Equitas in regard to the balances due Stonewall. (Oct. 29, 2004 e-mail, at Exh. 67). NICO's interest in securing the payment by Equitas of a CU balance clearly motivated the transaction. Indeed, in response to a December 9, 2004 e-mail

from Kevin Lewis to Tom Ryan inquiring when "the check for $692k be cut and mailed to Equitas," Pam Hoelsken responded:

> Under my fiduciary responsibilities as Treasurer of SICO and Seaton, I cannot understand why a payment should be made to Equitas of $700k when they owe SICO, $800k and owe Seaton in excess of $1M. This will be a decision of Robert's and I will send him the necessary information tonight.

(Dec. 9, 2004 e-mail, at Exh. 14).

In response to Ms. Hoelsken's e-mail, Tom Ryan responded that the decision whether to pay the claim belonged to NICO and that, by virtue of the collaboration agreement, Ms. Hoelsken had no authority to "second guess" NICO's decision. (Id.) Mr. Ryan alone was making the "claim handling decisions" on the Equitas claim, stating:

> On what basis are you overruling NICO's determination? I do not see a basis in the contract. Nor do I believe the fact that Equitas is funding claims it has approved from CGU provides a reasonable basis to second-guess my claim handling decisions.

(Id.)

Less than one week later, NICO caused Stonewall to make payment to Equitas of $692,223.48, which funded a like payment by Equitas to OneBeacon on the very same day. This cross-company transaction provided yet another example of the extent to which NICO's domination and control of Stonewall's claims subverted the interests of Stonewall to NICO's own interests, and Stonewall shall seek all consequential damages resulting therefrom.

## RELIEF SOUGHT

### I.    THE PANEL SHOULD RESCIND THE TREATY

Rescission is an equitable remedy that is available in myriad circumstances to redress wrongdoing.  E.g., Freedman v. Airline Stewardesses Assoc., 730 F.2d 509, 513 (7th Cir. 1984) (Tab M)[15]; Weissman v. Bondy & Schloss, 230 A.D.2d 465, 469, 660 N.Y.S.2d 115 (1st Dep't 1997) (Tab X); Aetna Cas. & Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1569 (1st Cir. 1994) (Tab A).  First, rescission is an appropriate remedy where one party to a contract has misled its counterparty during negotiations or has misrepresented a material fact to its counterparty.  E.g., Compagnie de Reassur D'Ile de France v. New England Reins. Corp., 57 F.3d 73, 81 (1st Cir.) (Tab K), cert denied, 516 U.S. 1009 (1995).  In this circumstance, rescission can be – and often is – granted even where the misrepresentation or misleading conduct was innocent.  E.g., Michigan Nat'l Bank-Oakland v. Am. Centennial Ins. Co. ("Union Indemnity"), 89 N.Y.2d 94, 107, 651 N.Y.S.2d 383, 387, 674 N.E.2d 313, 317 (1996) (Tab U) ("an innocent failure to disclose a material fact is sufficient for rescission"); Allendale Mutual Ins. Co. v. Excess Ins. Co., 992 F. Supp. 278, 282 (S.D.N.Y. 1998) (Tab B); A/S Ivarans Rederei v. Puerto Rico Port Auth., 617 F.2d 903 (1st Cir. 1980) (Tab E).  This is so because one purpose of this equitable remedy – perhaps, its principal purpose – is to prevent unjust enrichment.  See Kennard v. Indianapolis Ins. Co., 420 F. Supp. 2d 601, 611 (N.D. Tex. 2006) (Tab Q) ("rescission is an equitable remedy that operates to extinguish a contract that is legally valid but must be set aside

due to fraud, mistake, or for some other reason to avoid unjust enrichment"); American Telemarketing Specialists, Inc. v. Heidel, 2005 WL 2837475, at *5, n.2 (S.D. Ohio, Oct. 27, 2005) (Tab D) (same).

Second, rescission is also available for material breach of contract. See, e.g., Callanan v. Powers, 199 N.Y. 268 (1910) (Tab H); United States Postal Serv. v. Phelps Dodge Refining Corp., 950 F. Supp. 504, 514 (E.D.N.Y. 1997) (Tab W) (rescission available for breaches of contract which "are material and willful, or, if not willful, so substantial or fundamental as to strongly tend to defeat the object of the contract"); see also Restatement (Second) of Contracts §§ 237-38, 240-41 (Tab BB). This principle "applies to insurance [and reinsurance] contracts as well as other contracts." E.g., Aetna, 43 F.3d at 1569 (Tab A) (insurance contract); Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co., 44 F.3d 826, 832 (9th Cir. 1995) (Tab T) (reinsurance contract).

For example, in John Hancock Property & Casualty Insurance Co. v. Universale Reinsurance Co., 147 F.R.D. 40 (S.D.N.Y. 1993) (Tab P), a court ordered rescission of two profitable reinsurance treaties based on the reinsurer's deliberate failure to post a contractually required letter of credit or to pay losses. The court found that rescission was the appropriate remedy because "the failure to comply with these provisions strikes at the root of these two treaties." Id. at 48.

Likewise, in Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co., 526 F. Supp. 623 (D. Neb. 1980) (Tab I), aff'd 676 F.2d 707 (8th Cir. 1982), reinsurers sought to

---

[15] As used herein, the phrase "Tab ___" will denote documents in the Appendix of Authorities submitted herewith.

rescind reinsurance agreements based upon, among other transgressions, the cedent's "failure to render timely and accurate reports" in accordance with the terms of the reinsurance treaties. Id. at 648. The court held that the cedent's failure to comply with these "essential" contractual obligations was a material breach of the terms of the treaties, thereby entitling the reinsurers to rescission. Id. at 657.

More recently, in Michigan Mutual, the court concluded that the cedent's "refusal to divulge the information requested by the [reinsurers] constituted a material breach of contract" for which an available remedy was "to allow the non-breaching party [the reinsurers] to treat the contract as at an end, terminating any duty of [performance] owed by [them]." 44 F.3d at 832. The court found that this remedy – avoidance of the contract – is available for any material breach of the parties' agreement. Id.; accord American Hosp. Supply Corp. v. Hospital Products, Ltd., 780 F.2d 589, 599 (7th Cir. 1986) (Tab C).

An essential and integral term of every contract is the implied duty of fair dealing. See, e.g., Allendale, 992 F. Supp. at 285 (Tab B). This duty requires "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Blank v. Chelmsford OB/GYN, P.C., 420 Mass. 404, 407, 649 N.E.2d 1102, 1105 (1995) (Tab F). As with any other contractual duty, a willful breach by a reinsurer, or a breach that "strikes at the root" of the contract by depriving the cedent of safeguards under the parties' agreement, entitles the cedent to rescission. See, e.g., Hancock, 147 F.R.D. at 48.

Third, rescission is also available where there is a mistake of one party at the time a contract was made as to a basic assumption on which it made the contract.

E.g., <u>Cox v. Lehman Bros., Inc.</u>, 15 A.D.2d 239, 239, 790 N.Y.S.2d 16 (1st Dep't 2005) (Tab L) ("a unilateral mistake can be the basis for rescission if failing to rescind would result in unjust enrichment of one party at the expense of the other"); <u>Kurtz v. Lelchuk</u>, 824 N.Y.S.2d 763, 2006 WL 1982598, at * 7 (N.Y. Sup. Ct. July 10, 2006) (Tab R) (same); <u>Weissman</u>, 230 A.D.2d at 469 (Tab X) ("even where a mistake is unilateral, as herein, not mutual, a court acting in equity may rescind the contract if failing to do so would result in unjust enrichment"); <u>Heifetz Metal Crafts, Inc. v. Peter Kiewett Sons Co.</u>, 264 F.2d 435, 438 (8th Cir. 1959) (Tab O) ("generally, it may be said that equitable relief by way of rescission will be given for unilateral mistake relating to a material feature of the contract of such grave consequence that enforcement of the contract would be unconscionable"); <u>No Burn North America, Inc. v. Sam's West</u>, 2006 WL 3692863, at * 3 ((N.D. Ohio Dec. 12, 2006) (Tab V); <u>see also</u> Restatement (Second) of Contracts § 153 (1981) (Tab BB).

The facts before the Panel when considered in light of these principles – as well as fundamental fairness – compel rescission of the Treaty; otherwise, NICO will benefit – profit handsomely – from having misled Stonewall as to the fundamental nature and character of the Treaty. Stonewall believed and understood that it was purchasing reinsurance from NICO and that NICO was assuming substantial risk under the Treaty. Indeed, from the outset, Stonewall accounted for the Treaty as if it were risk-transferring reinsurance, <u>not</u> a deposit contract. In any event, on its face, the Treaty is true reinsurance.

In practice, however, the Treaty has operated and continues to operate as a time and distance cover. NICO fundamentally changed the Treaty's character when –

unbeknown to Stonewall – NICO subverted and co-opted Cavell and usurped responsibility for all of Stonewall's claim functions and for collecting Stonewall's reinsurance.

The Treaty, unlike most reinsurance contracts, directly and explicitly addresses which of the two parties, as between the cedent and the reinsurer, would have the responsibility and the obligation to handle claims. Article 4A provides, in part:

> The Reinsured [Stonewall] shall be the *sole judge* [1] as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance and [2] as to the Reinsured's liability thereunder and [3] as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder.

(Treaty, Art. 4A, at Exh. 1) (emphasis added). It is thus crystal clear that one of the fundamental deal terms – one of the material provisions of the Treaty – was the parties' mutual agreement that Stonewall would retain the right to handle all underlying claims and that Stonewall (or Stonewall's designee acting on Stonewall's behalf and in Stonewall's interests) would alone decide whether, when and in what amount to settle claims.

Stonewall retained the right to pursue policy buy-backs and commutations, and to resolve policyholder losses, on the timetable and in the manner deemed appropriate by Stonewall. NICO was not given responsibility for these functions under the Treaty; NICO's rights under the Treaty were quite limited as respects claims. NICO could associate in the handling of claims and had the right to approve settlements above certain dollar thresholds, which NICO could not unreasonably withhold or delay. Lacking knowledge of the wholesale delegation of claims-handling responsibilities by Cavell to NICO under the Collaboration Agreement,

45

Stonewall, through its Company Representative Robert Barclay, continued to understand that NICO's right under the Treaty was one of association, not claims handling. (See Barclay Dep. Tr. 109:6-10, 111:8-13, 16-19, at Exh. 6).

It was important for NICO and Stonewall to address in the Treaty which of the parties had responsibility for claims handling for at least two reasons. First, doing so ensured clarity. There could later be no misunderstanding; NICO's rights were limited, essentially to associating in claim handling; NICO had no right to direct or dictate claims handling. Second, by squarely addressing the issue, the parties negated any potential that a regulator might disallow accounting for the Treaty as reinsurance. If NICO had had the right to decide whether and when claims were paid and in what amount – or, if the issue were unclear or ambiguous – a regulator might balk and conclude that the Treaty was an impermissible time and distance cover, in which the reinsurer could vitiate any assumption of risk by manipulating (and controlling) the cedent's payout pattern.[16]

Here, NICO did precisely what the parties agreed at the outset NICO could not do and what the Treaty provides NICO may not do – dominate and control Stonewall's claims. The parties agreed and the Treaty expressly states that Stonewall, not NICO, would be the "sole judge" of what constitutes a claim and the amount to pay in satisfaction of any given loss. (See Treaty, Art. 4A, at Exh. 1). Naturally, Stonewall, a company in run-off, wanted to preserve this right because, unlike NICO,

---

[16] Significantly, Mercer, which was retained by the Rhode Island DBR, raised this very flag once it became aware of the Collaboration Agreement, which vested claim control in NICO's hands. (Mercer Report, at 18, at Exh. 68) (noting that "the Collaboration Agreement" allows for the possibility of questionable practices by NIC). Mercer, though it raised the issue, never expressed an opinion as to how the contract operated. (Id.) (noting that, as actuaries, that this was not an actuarial matter or one that Mercer was qualified to decide).

which had an economic interest in prolonging payments, thereby enabling it to earn additional investment income, Stonewall wanted to accelerate the extinguishment of its liabilities and to resolve claims as efficiently and as inexpensively as possible.

By co-opting Cavell, NICO surreptitiously and without Stonewall's assent, assumed control over Stonewall's claims handling. NICO supplanted Stonewall's ability to protect its own interests. And the evidence demonstrates that NICO intended this insidious result from the outset. In May 2000, shortly after the Treaty became effective, Brian Snover of NICO directed Cavell's claims staff to obtain NICO's authority before settling any claim, paying any loss or paying any expense. (See discussion on the "Period Before the Collaboration Agreement" supra). Even settlements in trivial amounts (for example, $10,000) required NICO's blessing before Cavell could proceed with them. (June 6, 2001 e-mail, at Exh. 15).

NICO's subversion of Cavell and the entire claims handling function has deprived Stonewall of the benefit of the Treaty. The Treaty provided Stonewall the necessary reinsurance protection to settle claims in a prompt and cost-effective manner, as many other companies in run-off have done, to preserve the shareholder's value. On the other hand, prompt and cost-effective settlements were not necessarily in NICO's interests, as prompt payments would have limited NICO's investment income on the premiums paid, while cost-effective settlements would have limited the possibility or extent of NICO's losses. Thus, as written, NICO might make money or lose money under the Treaty, as in any true risk-transferring transaction. Stonewall, however, was unaware that NICO was unwilling to take that risk. NICO co-opted Cavell to ensure that the claims handling was done neither promptly nor cost effectively. NICO thus

ensured that it would earn enough investment income on the premium received to guarantee itself an enormous profit on the Treaty, while depriving Stonewall's shareholder of the opportunity to realize value out of the company.

Under these circumstances, rescission is an appropriate remedy on several legal bases: most notably, misrepresentation, mistake and material breach. Stonewall understood when it entered into the Treaty that it alone would oversee and control the handling of claims. Stonewall's understanding was eminently reasonable and continued up until the time Stonewall discovered Cavell's delegation of the Stonewall claims-handling responsibilities to NICO. NICO had represented (albeit, falsely) to Stonewall that Stonewall could and would retain responsibility for claims handling. Further, in the Treaty itself, NICO agreed that Stonewall alone would have this right. Thus, at best, there was a mistake. The evidence establishes beyond peradventure that once the Treaty was in place, Stonewall had little, if any, control over its claims; NICO had usurped complete authority to handle claims by subverting Cavell; and Stonewall's rights were eviscerated. At worst, there was deliberate misconduct by NICO in purposefully misleading Stonewall as to the claims role NICO would assume. In either case, in May 2000, NICO began to materially breach the Treaty and has done so ever since by exercising the discretionary claim control that under the Treaty is vested solely to Stonewall.

In fashioning a remedy for NICO's misconduct, the Panel should ensure that NICO is stripped of all of its ill-gotten gains, which requires NICO to forfeit the original premium, together with any and all investment income earned on it, less only amounts paid in reimbursement of losses. The very reason why NICO subverted Cavell

48

and perverted the contract was to enable it to earn this investment income. If the Panel were to allow NICO to keep its ill-gotten gains it would effectively be rewarding NICO's misconduct. NICO should not be permitted to benefit from the unjust enrichment that flowed from its wrongdoing with respect to its participation in the Treaty.

Anything short of rescinding the Agreement and forcing NICO to disgorge the obscene profit it made under it would be a reward of NICO's deliberate misconduct. NICO unconscionably subverted Stonewall's agent, Cavell, and perverted the letter and spirit of the Agreement for the precise purpose of delaying claim payments and allowing itself to generate massive investment income. Allowing NICO to keep any portion of that wrongfully procured investment income will sanction and reward NICO's deliberate and material breach of the Agreement. This Panel should not lend its imprimatur to such a miscarriage of justice.

## II. ALTERNATIVELY, IN THE EVENT THE PANEL DOES NOT ORDER RESCISSION, THE PANEL SHOULD ENTER A DECLARATION RESTORING CONTROL OF STONEWALL'S CLAIMS TO STONEWALL AND MAKING STONEWALL ITS OWN CLAIMS SERVICER

### A. The Panel Should Issue a Declaration Restoring Control Over Stonewall's Claims to Stonewall

Irrespective of who acts as Stonewall's "Claims Servicer," the Treaty indisputably designates Stonewall as the "sole judge" of 1) what constitutes a claim or loss under the reinsured policies and contracts, 2) the extent of Stonewall's liability thereunder, and 3) the amount or amounts which it shall be proper for Stonewall to pay. (See Treaty, Art. 4A, at Exh. 1). Stonewall, accordingly, reserves the exclusive right under the Treaty to make all decisions pertinent to the disposition of claims against it.

49

Neither NICO's rights to associate in the adjustment of underlying claims nor its rights to approve settlements in excess of $150,000 and policy-buy-backs and commutations in excess of $250,000 divests Stonewall of its contractual rights.

While the language of the Treaty could not be clearer, NICO has dominated and controlled every aspect of Stonewall's claims for the past seven years, running rough-shod over Stonewall's rights under the Treaty. Even today, NICO – through its run-off management arm, Resolute Management, Inc. – dominates the claims function. (See, e.g., June 21 and 22, 2007 e-mail on the "Newmont Mining Corp." account, at Exh. 69).

To make it absolutely clear going forward that Stonewall's rights as are reflected in Article 4A of the Treaty, Stonewall requests that the Panel issue a declaration providing that, in all cases, Stonewall shall act as the "sole judge" of its liability in respect to claims brought against it and that NICO "shall be bound" by Stonewall's reasonable, good faith claims decisions, subject to the terms, conditions and exclusions of the Treaty.

**B.    In Light of the Discovery Produced Since the September Hearing, the Panel Should Declare Stonewall As Its Own Claims Servicer**

As the Panel will recall, NICO advanced two primary arguments in support of its position that Stonewall may not act as its own Claims Servicer pursuant to Articles 11D and 4F of the Treaty. First, NICO contended that Dukes Place's assignment of its rights to purchase the shares of Stonewall to Dukes Place's wholly owned subsidiary, Stonewall Acquisition Corporation, which Dukes Place purportedly "actively and deliberately concealed from NICO," constituted a separate "sale" of 50% more of the voting securities of Stonewall such that it triggered NICO's rights to

50

become Claims Servicer.    Second, NICO argued that the agreement of Virginia Holdings Limited to purchase 44% of the shares of Stonewall Acquisition Corporation also constituted a sale that triggered NICO's claims servicing rights.    This second argument clearly could not sustain NICO's position, however, because the Virginia Holdings transaction involves a sale of less than 50% of the voting securities of Stonewall and, in any event, the Rhode Island DBR had yet to approve the sale.   Even today, the DBR still has yet to approve the sale, which NICO has attempted to block through its intervention in the Form A proceedings.   We expect a hearing on this matter to occur in August.

While NICO clearly could not support an argument last September respecting the Virginia Holdings transaction, NICO may have gained some traction by arguing that Dukes Place "actively and deliberately concealed" its assignment of rights to purchase the shares of Stonewall to a wholly owned corporation, Stonewall Acquisition Corporation.    Documents produced in discovery since the September hearing, however, have revealed the sheer folly of this claim.   Indeed, the documents establish that, from the very outset of its negotiations to reinsure Stonewall's liabilities, NICO had full and complete knowledge of Dukes Place's intent to have a wholly owned corporation purchase the shares of Stonewall in 2000.   A brief discussion of this matter now follows.

In December 1999, Robert Barclay provided NICO's Brian Snover with a seven-page proposal relating to the purchase of the entire issued capital stock of Stonewall.   (See December 30, 1999 proposal, at Exh. 70; Deposition Transcript of

Brian Snover ("Snover Dep. Tr.") 135:7-19, at Exh. 71). Item 2 of the proposal stated as follows:

> That Dukes Place and Great American will each make an election under Section 338(h)(10) of the Internal Revenue Code to cause the purchase and sale of stock to be treated for tax purposes as an asset sale.

(December 30, 1999 proposal, at Exh. 70) The inclusion of this provision within the proposal is quite significant for it specifically discloses an intent to have the purchaser of Stonewall make an election under Section 338(h)(10) of the Internal Revenue Code ("Section 338 election"). For a purchaser to make such an election, Section 338 requires the interested party to constitute a *purchasing corporation* – which the Code defines as "*any corporation* which makes a qualified stock purchase of stock of another corporation." See 26 U.S.C. § 338(a) and (d)(1) (2000) (Tab Y). Thus, a Bermuda *limited partnership* such as Dukes Place could not possibly make a Section 338 election because it did constitute a "purchasing corporation" as that term is defined by the Code. Dukes Place would therefore have to assign its rights to purchase the shares of Stonewall to a wholly owned **corporation** to allow for the Section 338 election to occur.

In a July 21, 2000 letter to the Ohio Insurance Department, Debevoise & Plimpton – Dukes Place's counsel – discussed this very point:

> The reason for the assignment to Assignee-Purchaser is to allow the purchaser to make a Section 338 election under the IRC, an election that can be made by a corporation but not by a limited partnership like Dukes Place.

(July 21, 2000 letter, p. 18, at Exh. 72). Having learned that Dukes Place intended to pursue a Section 338 election in connection with its purchase of Stonewall, NICO – the

highly sophisticated deal-maker that it is – undoubtedly understood and/or determined that Dukes Place (which NICO knew to be a Bermuda limited partnership from NICO's involvement in the Seaton deal[17]) would need to establish a wholly owned corporation to purchase Stonewall's shares.

Moreover, the Stock Purchase Agreement between Dukes Place and Great American dated May 5, 2000 – which NICO received before executing the Treaty (<u>see</u> Snover Dep. Tr. 139:2-5, at Exh. 71) – expressly provides for a Section 338 election (<u>see</u> 2000 SPA, p. 37, at ¶ 6.1.8, at Exh. 73) and an assignment of rights by Dukes Place to a wholly owned entity with the consent of Great American (<u>see</u> <u>id.</u>, p. 46, at ¶ 9.8). NICO also received notice of the Section 338 election and/or assignment of rights from several other sources, including but not limited to the following:

1.    <u>A Joint Presentation to the Ohio Insurance Department</u>: Documents produced by Cavell evidence that NICO's John Arendt attended a joint presentation to the Ohio Insurance Department regarding the proposed acquisition. (<u>See</u> presentation slides, at Exh. 74). Within the briefing slides accompanying this presentation, the third point of a four-point "Proposed Transaction Summary" states, "Sale of stock in Stonewall Dukes Place pursuant to Section 338(h)(10) election." (<u>Id.</u>)

2.    <u>Stonewall's 2000 Annual Statement</u>: Stonewall's year 2000 annual statement made express reference to the Section 338 election:

---

[17] The 1998 Stock Purchase Agreement in connection with the sale of Seaton and NICO's provision of a retroactive reinsurance cover specifically identified Dukes Place Holdings, L.P as a Bermuda limited partnership. (<u>See</u> 1998 SPA excerpts, at Exh.78).

53

> As a result of the acquisition of Stonewall . . . . by Dukes
> Place Holdings, L.P., an election was made under the
> Internal Revenue Service Code 338(h)10.  This election
> generated a deferred tax liability of $22,651,823 which is
> primarily due to the difference between the tax basis of the
> assets acquired and their respective book basis.

(2000 annual statement excerpts, at Exh. 75).[18]

    3.    Arthur Anderson's Actuarial Review As of December 31, 2000:

Arthur Anderson's Actuarial Review of Reinsurance Assumed Loss and Adjustment

Expenses as of December 31, 2000 – which NICO itself produced in discovery – makes

specific reference to Stonewall Acquisition Corporation:

> "Great America Insurance Company sold 100% of the stock
> of *Stonewall Acquisition Corporation* (the owner of
> Stonewall) to Dukes Place Holdings L.P. (Bermuda)
> effective September 30, 2000. . . . "

(See Exh. 76) (emphasis added).

    The documentary record could not be more clear: NICO received full and

complete notice of the parties' intent to incorporate a Section 338 election into the sale

of Stonewall – an election which a limited partnership such as Dukes Place could not

possibly make except through a wholly owned *corporation*.  Contrary to the assertions

of NICO in its Claims Servicing papers, Dukes Place did not undertake any action to

"actively and deliberately conceal" the Section 338 election or the consequent

assignment of rights to a wholly owned corporation.  In fact, Mr. Snover's deposition

testimony punctuated this very point:

---------------------------------------

[18] Although it would appear inconceivable that NICO would not receive a copy of Stonewall's annual statement, Mr. Snover testified in his deposition that he did know whether he received the document. (Snover Dep. Tr. 142:19-21, at Exh. 71).

Q. Are you aware of any action by Dukes Place or Stonewall or Seaton to conceal the fact that a 338 election would be involved in this transaction?

A. **I'm not aware of that.**

(Snover Dep. Tr. 145:13-17, at Exh. 71) (emphasis added).

Because NICO always knew that Dukes Place intended to pursue a Section 338 election and a consequent assignment of rights to purchase the shares of Stonewall to a wholly owned corporation – and NICO raised no objection to the transaction (see id. 144:24-145:2) – the 2000 transaction by which Dukes Place assigned its rights to purchase the shares of Stonewall to Stonewall Acquisition Corporation could not have possibly constituted a separate "sale" of 50% or more of the voting securities of Stonewall that could trigger NICO's rights to become Claims Servicer under Article 11D of the Treaty. As no such sale has yet occurred, the Panel should enter an Order declaring that Stonewall may act as its own Claims Servicer pursuant to Article 4F and 11D of the Treaty.

## III.    THE PANEL SHOULD AWARD STONEWALL DAMAGES

As discussed at length above, NICO's total domination and control of Stonewall's claims has damaged Stonewall in a myriad of ways. Accordingly, at the conclusion of the final hearing Stonewall shall seek an Order from the Panel awarding Stonewall all consequential damages resulting from NICO's perversion of the Treaty and evisceration of the Administration Agreement. Under the arbitration clause of the Treaty, Article 14, the Panel clearly has the authority to award such damages. The Treaty's only limitation on the Panel's authority to award damages extends to

"exemplary, punitive, multiple or other damages of a similar nature." (Treaty, Art. 14, at Exh. 1).

For the Panel's convenience, we will now outline the damages which Stonewall would respectfully request that the Panel award:

1.  Damages Resulting From NICO's Unreasonable Failure to Settle Stonewall's Liabilities at an Earlier Time: Stonewall requests that the Panel award it all consequential damages resulting from NICO's unreasonable failure to authorize settlement of Stonewall's liabilities at an earlier time. (See Treaty, Art. 11B) (providing that NICO's rights to approve settlements in excess of $150,000 and policy buy-backs in excess of $250,000 "shall not be *unreasonably* withheld or delayed.") (emphasis added). In the case of the DuPont and Fuller Austin claims, which remain unresolved to the present day, the Panel should enter an Order requiring NICO to reimburse Stonewall outside the reinsurance cover for all 1) indemnity amounts which Stonewall must pay in excess of the respective $2 million and $18 settlement offers, and 2) all allocated loss adjustment expenses which Stonewall has incurred subsequent to NICO's refusal to authorize settlement of these matters. Entering such an Order would serve to justly return Stonewall to the same position it would have occupied under the Treaty had NICO properly authorized the earlier settlements.

As to the multitude of open exposures in the Stonewall book which NICO failed to properly extinguish on Stonewall's behalf, Stonewall cannot provide an actual damages number at this time. Stonewall is currently working on a methodology upon which it may present these damages to the Panel, which we hope to be in a position to provide to the Panel in connection with Stonewall's reply brief.

56

2.    Damages Resulting From NICO's Inequitable Allocation of Attorneys' Fees:  Stonewall also requests that the Panel order NICO to reimburse Stonewall outside the reinsurance cover for the entire portion of fees and expenses paid by Stonewall to joint counsel which exceed Stonewall's equitable share.  By usurping absolute control over Stonewall's claims, including over the appointment of Stonewall's counsel and allocation of Stonewall's legal fees, NICO assumed a heightened duty to protect Stonewall's legitimate interests.  Indeed, NICO's Tom Ryan admitted in his deposition that he was responsible for "watching out for Stonewall and Seaton's interests." (Ryan Dep. Tr. 237:14-16, at Exh. 7).  The evidence recited above, however, demonstrates that NICO clearly did not protect Stonewall's interests.  As respects the issue of fee allocations, NICO forced Stonewall into per-capita fee sharing schemes even when Stonewall faced only *.36%* of the relative exposure on this claim.  (See Kraft discussion, supra, at pp. 34-35).  While these type of arrangements undoubtedly benefited the interests of other NICO-managed carriers and NICO, they clearly damaged Stonewall and the Panel should require NICO to reimburse Stonewall for each of the claims identified in this memorandum covering the entire portion of fees and expenses paid by Stonewall which exceeded Stonewall's equitable share.

3.    Damages Resulting from NICO's Tortious Interference with the Administration Agreement:  Stonewall also requests that the Panel order NICO to reimburse Stonewall for the entire amount of fees Stonewall paid to Cavell, an amount totaling $11,037,500 – the value of which NICO completely deprived Stonewall from receiving by hijacking the claims function Cavell agreed to perform on Stonewall's behalf pursuant to the Administration Agreement. See 14 N.Y. Prac., New York Law of

Torts § 3:17 (citing Lurie v. New Amsterdam Casualty Co., 270 N.Y. 379 (1936)) (Tab AA) (the measure of damages on a claim for tortious interference with contractual relations is the benefit of the bargain under the contract had it remained intact).

       4.    Damages Resulting from NICO's Unreasonable Refusal to Fund the TIG Claim Settlement and Corresponding Legal Fees: For the reasons set forth above, Stonewall also requests that the Panel order NICO to fully reimburse Stonewall for the $600,000 TIG Claim settlement and the associated counsel fees of $104,500, all of which NICO has unreasonably refused to pay.

       5.    All Other Damages Caused by NICO's Domination and Control of Stonewall's Claims: Lastly, the Panel should award Stonewall all such other damages caused by NICO's domination and control of Stonewall's claims, including but not limited to all damages resulting from the Equitas cross-company transaction by which NICO compelled Stonewall to fund a OneBeacon recovery. (See supra, at pp. 39-40).

## IV.   THE PANEL SHOULD AWARD STONEWALL ITS ATTORNEYS' FEES IN THIS ARBITRATION

      Should Stonewall prevail before this Panel, it is entitled to recover all of its costs, including the attorney fees it incurred in defending and prosecuting claims against NICO. Under New York law, a party may recover attorney fees if the contract or agreement which is the subject of the dispute so provides. City of New York v. Zuckerman, 234 A.D.2nd 160, 651 N.Y.S.2d 473, 474 (1st Dept. 1996) (Tab J); N.Y. Civil Practice Law and Rules ("CPLR") § 7513 (Tab Z).

      With the exception of the costs of the Umpire and party-appointed Arbitrators, Article 14 of the Treaty – the arbitration clause – grants authority to the

Panel to direct payment of all costs of the arbitration. (Treaty, Art. 14, at Exh. 1). The provision states, in relevant part:

> Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. *All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.*

(Id.) (emphasis added).

It is incontrovertible that attorney fees are a direct and necessary cost of this arbitration and, therefore, should be made part of the award in favor of Stonewall. See Ludgate Ins. Co. v. Banco De Seguros Del Estado, 2003 WL 443584 (S.D.N.Y. Jan. 6, 2003.) (affirming an award of attorney fees granted in an arbitration) (Tab S). In Ludgate, the District Court for the Southern District of New York noted that use of the words "cost of arbitration" was sufficiently broad to encompass attorney fees, even though the word "fees" was not used. (Id. at *5).

Moreover, NICO's conduct was egregious and wrongful by placing its own interests ahead of the interests of Stonewall, demonstrating a total disregard for its duties and contractual obligations due to Stonewall which it was obligated to serve. Where a party acts in bad faith, New York courts, as an exception to the general law, have awarded attorney fees to the injured party even when the parties have not agreed to pay each other's attorney fees. Brook Shopping Centers, Inc. v. Bass, 107 A.D.2d 615, 483 N.Y.S. 2d 1021 (1st Dep't 1985) (Tab G); Green v Fischbein Olivieri Rosenholc & Badillo, 119 A.D.2d 345, 507 N.Y.S. 2d 148 (1st Dep't 1986) (Tab N).

Where, as here, the parties have provided for the payment of all costs to the prevailing party, the Panel should exercise its discretion in favor of awarding to Stonewall reimbursement of all its arbitration costs, including the attorney fees it has incurred in defending and prosecuting its claims against NICO.

## CONCLUSION

For all of the foregoing reasons, Stonewall respectfully requests that the Panel rescind the Treaty, disgorge NICO of its ill-gotten gains and return the parties to the position they were in before the contract was executed. Alternatively, if the Panel is not willing to rescind, it should restore control of Stonewall's claims to Stonewall and declare Stonewall as its own Claims Servicer. Additionally, the Panel should order NICO to reimburse Stonewall for all damages caused to it by NICO's domination and control of Stonewall's claims, and award Stonewall its attorneys' fees and expenses in this arbitration.

Respectfully submitted,

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP

-- and --

CADWALADER, WICKERSHAM & TAFT LLP

Attorneys for Respondent and Counter-Claimant Stonewall Insurance Company

By: _____
        Shawn L. Kelly

By: _____
        Lawrence I. Brandes

Dated: June 22, 2007

61

# EXHIBIT 16

In The Matter of the Arbitration Between:

NATIONAL INDEMNITY COMPANY,

Petitioner,

-and-

STONEWALL INSURANCE COMPANY,

Respondent and Counter-Claimant.

Before the Panel:

Robert B. Green, Umpire
Caleb L. Fowler, Arbitrator
W. Mark Wigmore, Arbitrator

---

## STONEWALL INSURANCE COMPANY'S PRE-HEARING REPLY MEMORANDUM

---

RIKER DANZIG SCHERER HYLAND &
PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

-- and --

CADWALADER, WICKERSHAM &
TAFT LLP
One World Financial Center
New York, NY 10281
(212) 504-6000

Attorneys for Respondent and Counter-Claimant
Stonewall Insurance Company

Dated: June 29, 2007

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

LEGAL ARGUMENT ........................................................................................... 5

I.  NICO'S BRIEF IS LITTERED WITH UNTRUTHS, DISTORTIONS AND UNSUPPORTED ALLEGATIONS .................................. 5

II.  NICO'S NEWLY STATED ARGUMENT THAT THERE EXISTED A "PRE-FUNDING" AGREEMENT OTHER THAN AS SET FORTH IN ARTICLE 20 OF THE TREATY REPRESENTS EITHER AN ILLOGICAL DEFENSE BY NICO TO ITS DOMINATION AND CONTROL OF STONEWALL'S CLAIMS OR AN ADMISSION BY NICO THAT IT DECEIVED STONEWALL AS WELL AS REGULATORS ...................................... 6

III.  BY USURPING TOTAL CONTROL OVER STONEWALL'S CLAIMS, NICO NECESSARILY PREVENTED DUKES PLACE FROM MAXIMIZING ITS RETURN AND GUARANTEED NICO A MAGNIFICENT PROFIT ............................................................ 15

IV.  NICO'S DOMINATION AND CONTROL OF STONEWALL'S CLAIMS HAS INEXORABLY EXTENDED THE RUN-OFF OF THE COMPANY AND SEVERELY DAMAGED STONEWALL ..................... 18

    A.  A Comparison of NICO's Run-Off of Stonewall to That Conducted By Other Run-Off Insurers Demonstrates the Lengths to Which NICO Has Inexorably Extended the Stonewall Run-Off ..................................................... 18

    B.  NICO's Failure to Extinguish Stonewall's Liabilities Has Damaged Stonewall ....................................................... 20

        1.  The evidence demonstrates that NICO has unreasonably delayed settlement of the Fuller Austin claim ................................................................ 20

        2.  NICO's failure to extinguish Stonewall's exposures has damaged Stonewall .......................................... 24

V.  THERE IS NO MEANINGFUL DISTINCTION BETWEEN THE RESOLUTE CLAIMS OPERATION AND THE CAVELL CLAIMS OPERATION BEFORE IT; LIKE CAVELL, RESOLUTE ACTS AT THE DIRECTION OF NICO AND CANNOT BE TRUSTED TO MANAGE STONEWALL'S CLAIMS IN FURTHERANCE OF STONEWALL'S INTERESTS ......................................................... 29

A.     For All Intents and Purposes, the Cavell Claims Staff and Resolute Claims Staff are One in the Same ............................................. 29

B.     NICO/Resolute Cannot be Trusted to Protect Stonewall's Interests ................................................................................................ 32

       1.     NICO/Resolute severely impedes the attorney-client relationship between Stonewall and its counsel ............................ 32

       2.     NICO/Resolute delays the investigation and evaluation of claims and otherwise fails to mitigate and eliminate Stonewall's liabilities ............................................. 33

       3.     Contrary to the Protocols, Resolute acts subject always to the direction of NICO, not Stonewall ............................ 35

CONCLUSION ........................................................................................................ 37

## PRELIMINARY STATEMENT

While NICO's Pre-Hearing Brief goes into great detail about a number of irrelevant facts, and takes great liberties with several marginally pertinent facts, it cannot obscure the handful of undeniable facts which are dispositive of this dispute.

First, as NICO admits (NICO Memorandum, p. 57), the Treaty was intended to be true reinsurance with genuine risk transfer, as written it *is* true reinsurance with genuine risk transfer and it was represented to auditors and regulators to be true reinsurance with genuine risk transfer.

Second, the Treaty clearly provides that Stonewall alone has sole discretion to evaluate and settle claims, with NICO only having the right to approve settlements in excess of specified amounts, which approval it may not unreasonably withhold or delay. (Treaty, Art. 4A, at Stonewall Memorandum Exh. 1). These provisions are among the most crucial in establishing that the Treaty is true reinsurance with genuine risk transfer. Given the Treaty's aggregate limit, and the fact that manipulating the timing of claims settlements could guarantee the reinsurer a profit, it is extremely doubtful that regulators or auditors would have found sufficient risk transfer for the Treaty to qualify as true reinsurance if the Treaty delegated to NICO unfettered discretion to determine when and on what terms all claims were to be settled.

Third, almost as soon as the ink on the Treaty had dried (or, as the evidence suggests, even before that time), NICO, with the active connivance of Stonewall's agent, Cavell, obtained unfettered discretion to determine when and on what terms NICO would authorize the settlement of Stonewall's claims. In this week's deposition of Forrest Krutter, Mr. Krutter testified that NICO obtained this right even

before the inception of the Treaty as part of oral agreement with Ken Randall under which NICO agreed to pre-fund claims payments in return for Randall's agreement to have NICO pre-approve Stonewall's claims, rather than having Stonewall pay them and bill NICO. (NICO Memorandum, p. 20-21; Deposition Testimony of Forrest Krutter ("Krutter Dep. Tr.") 48:12-17, 49:12-19, 51:7-52:4, at Exh. 82). This testimony makes no sense, however, because Article 20 of the Treaty expressly binds NICO to pre-fund all of Stonewall's loss and expense payouts without NICO's prior approval, subject to Article 11. Stonewall never had any need to procure an additional oral agreement adding to NICO's pre-funding obligation.

Accordingly, NICO's admission that it entered into such an oral side agreement would appear to represent either an illogical defense to its domination and control of Stonewall's claims or an admission by NICO that it never intended to be bound by the provisions of the Treaty giving Stonewall control over its own claims. Whether the Panel concludes that NICO 1) materially breached the terms of the Treaty by usurping total control over Stonewall's claims, or 2) materially deceived Stonewall as well as regulators by concealing a pre-existing oral side agreement with Randall giving NICO more rights than the Treaty provides, the Panel should rescind the Treaty *ab initio* and disgorge NICO of its ill-gotten and obscene gains.

Fourth, it was Dukes Place's stated objective to run off Stonewall's business as quickly as possible and to sell its investment in Stonewall at maximum value within five years. (NICO Memorandum, p. 5). There is no dispute that Stonewall's run-off manager, Cavell, knew this was Stonewall's objective, and Cavell owed a fiduciary duty to Stonewall to attempt to accomplish that objective. There also

2

is no dispute that Cavell knew NICO's objective was precisely the opposite: prolong claim settlements as long as possible to maximize the float, as Mr. Buffett has been stating in Berkshire Hathaway's financial statements for the last 10 years, or more. And there can be no dispute that when Cavell sold out Stonewall's interests by handing full claims authority to NICO, in the Collaboration Agreement with NICO that was worth some $40 million to Cavell, Stonewall was forever denied the benefit it had bargained for in the Treaty; NICO's plan is for the run-off to last 32 years from inception of the Treaty. (See Exh. 80, at NICO059496). Simply, and inarguably, handing full claims authority to NICO made it impossible for Stonewall to come close to achieving its objective of a speedy run-off.

The proof, as they say, is in the pudding. When the Treaty was signed, Stonewall's net reserves were $110 million (See Exh. 81, at ST-002614). In the seven years since then, the total net claim and expense payments authorized by NICO amount to $56 million -- approximately $8 million per year. NICO currently estimates Stonewall's reserves at $142 million. At this rate, the run-off will last at least another 18 years, or 25 in total. The notion that it should take 25 *years* to run off $110 million of reserves is *insane!* By way of comparison, as further discussed herein, other run-off insurers unencumbered by NICO management and control have achieved reductions in gross reserves at rates in excess of 50% over as five-year period.

In sum, as is demonstrated in our initial brief and further below, and as we will prove at the hearings, NICO subverted Cavell to pervert the Treaty by acquiring the full claims control contractually vested in Stonewall; and then NICO brought claims settlements to a crawl, destroying Stonewall's objective of a speedy run off when

3

earning for itself, to date, more than $120 million of investment income and guaranteeing itself a massive profit. (See Stonewall Memorandum, p. 24). If this business indeed takes just another 10 years to run off and NICO continues to realize an 11.7% rate of return on its investments, NICO's ultimate profit on this contract ten years from today will *exceed $498 million!* NICO materially breached the Treaty to enrich itself unconscionably while destroying any chance of Stonewall receiving the benefit of its bargain. The only equitable thing for this Panel to do is rescind the Treaty *ab initio* and disgorge NICO'S obscene and wrongfully obtained profits.

## LEGAL ARGUMENT

I.  NICO'S BRIEF IS LITTERED WITH UNTRUTHS, DISTORTIONS AND UNSUPPORTED ALLEGATIONS

NICO's opening brief takes great liberties with the "facts" it contends are relevant to the hearing of this matter. While we will not attempt in this submission to recount each of NICO's misstatements, the following few examples provide a flavor of NICO's distortion of the record:

- NICO confuses Eastgate Group Limited – the organization which helped broker the Seaton and Stonewall deals – with Eastgate, Inc., the U.S. run-off manager retained by the Companies which later became Cavell. (See NICO Memorandum, pp. 4-8). This distinction is significant, as Stonewall's Company Representative, Robert Barclay, never held a position with Eastgate, Inc./Cavell – the entity which entered into secret Collaboration Agreement with NICO.

- NICO erroneously states that "Stonewall agreed to pay NICO $50,000 per year to assist in the administration of Stonewall's claims." (NICO Memorandum, p. 18). In fact, Stonewall entered into no such agreement. Cavell, through its representative David Wallis, apparently entered into this agreement with NICO. (Deposition Exhibit ("Dep. Exh.") 193).[1]

- NICO states that "Mr. Ryan had *a say* in the raises and bonuses paid" to Cavell employees. (NICO Memorandum, p. 26) (emphasis added). This represents a drastic understatement in light of the express language of the Collaboration Agreement which provided NICO unfettered discretion over the raises and bonuses of the Cavell claims staff. (See Collaboration Agreement at ¶ 3.1, at Stonewall Memorandum Exh. 5).

- NICO inaccurately states that Robert Barclay and Mark Shepherd "denied" that evidence existed to support any allegations of the Berkshire Boys' e-mails. (NICO Memorandum, p. 36). In truth, there are numerous allegations within such e-mails that Messrs. Barclay and Shepherd did not deny. (See Dep. Exh. 196). For example, as to the allegation that "through a 'collaboration agreement,' Cavell has ceded control of all claims operations for these companies to Berkshire," Mr. Barclay's

---

[1] The references contained herein to "Dep. Exh. ___" refer to the numbered exhibits provided by NICO with its Memorandum to the Panel on CD-Rom.

handwritten comment notes, "Entered into without the consent of Seaton and Stonewall." (Id.) In the same e-mail, Mr. Barclay also notes his lack of awareness that Berkshire pays for Cavell's operational costs and staff, as correctly observed by the Berkshire Boys. (Id.)

- Without any support, NICO asserts that its "modified per capita fee sharing practice" was known to Mr. Barclay. (NICO Memorandum, p. 70). As Mr. Barclay will testify, he had no knowledge of any such fee-sharing practice.

As demonstrated above, many of NICO's assertions simply cannot be accepted at face value. Perhaps more seriously, as discussed below, it appears that NICO's mischaracterization of the factual record may have extended to the very formation of the Treaty, when NICO represented to Stonewall and regulators that it intended to honor the Treaty's terms making Stonewall the sole judge of its own liability and binding NICO to pre-fund Stonewall's loss and expenses payouts without NICO's prior approval of such payouts.

II.    NICO'S NEWLY STATED ARGUMENT THAT THERE EXISTED A "PRE-FUNDING" AGREEMENT OTHER THAN AS SET FORTH IN ARTICLE 20 OF THE TREATY REPRESENTS EITHER AN ILLOGICAL DEFENSE BY NICO TO ITS DOMINATION AND CONTROL OF STONEWALL'S CLAIMS OR AN ADMISSION BY NICO THAT IT DECEIVED STONEWALL AS WELL AS REGULATORS

As fully set forth in Stonewall's Pre-Hearing Memorandum, the evidence overwhelmingly demonstrates that NICO dominated and controlled Stonewall's claims from the very inception of the Treaty. Although the Treaty, as written, provides for the actual transfer of risk by making Stonewall the "sole judge" of its liability and by binding NICO to Stonewall's reasonable, good faith claims determinations, NICO deliberately removed all the risk from the Treaty by co-opting Stonewall's agent, Cavell, and asserting absolute control over Stonewall's claims and payouts. Under its confidential Collaboration Agreement with Cavell, and even before that time, NICO

6

exercised "all authorities to supervise and control" Stonewall's claims handling and reinsurance collections. (Collaboration Agreement at ¶ 3.1, at Stonewall Memorandum Exh. 5). Stonewall's agent, Cavell (whose operations and salaries NICO secretly funded), had <u>zero basis</u> to "second-guess [NICO's] claim handling decisions." (<u>See</u> Stonewall Memorandum Exh. 14). As Mr. Ryan himself admitted in his deposition, no member of the Cavell claims staff could settle a single claim or approve the payment of a single dollar on Stonewall's behalf without first getting Mr. Ryan's approval. (<u>See</u> Ryan Dep. Tr. 59:24-62:20; 155:4-21, at Stonewall Memorandum Exh. 7) (<u>See also</u> Krutter Dep. Tr. 70:3-8, at Exh. 82).

Unable to dispute any of the above facts, NICO argued for the first time in its opening brief that Stonewall invited NICO to control Stonewall's claims, as a "business strategy," so to ensure that NICO would "pre-fund" Stonewall's losses and expenses before Stonewall had to pay any such amounts. (<u>See</u> NICO Brief, pp. 20-21, 25-26, 48-49). As discussed below, this argument represents either an illogical defense by NICO to its domination and control of Stonewall's Claims or an admission by NICO that it deceived Stonewall as well as regulators.

First, Stonewall never would have had any need to enter into a separate "pre-funding" agreement with NICO because the Treaty, as written, expressly requires NICO to pre-fund Stonewall's loss and expense payouts without NICO's prior approval of such payments. Article 20 (Reports and Remittances) states in relevant part:

> <u>Claims Account</u>.  **The Reinsurer [NICO] shall establish and maintain an account for use by the Reinsured [Stonewall] for the payment of claims hereunder** (the "Claims Account").  The amount of funds to be maintained in the Claims Account shall be agreed between [NICO] and [Stonewall] as may be necessary from time to time, In an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Reinsurance.    In addition, **[Stonewall] shall have the right to make reasonable requests of immediate additional funding from [NICO] to such Claims Account from time to time and [NICO] shall immediately honor, subject to Article 11 herein, such request for immediate additional funding** provided that the liability for claims paid are otherwise covered and immediately due under this Reinsurance.  Interest on funds in the Claims Account shall be the property of [NICO]. . . .

(Treaty, Art. 20, at Stonewall Memorandum Exh. 1) (emphasis added).  Under Article 20, NICO has a contractual obligation to establish and maintain a Claims Account for use by Stonewall for the payment of claims.  Further, in the event the balance of the Claims Account lacks sufficient funds to pre-fund Stonewall's claims payouts, NICO has a contractual obligation to "immediately honor" Stonewall's requests for additional funding, subject to NICO's rights under Article 11 to approve claims payments in excess of $150,000 and policy buy-backs/commutations in excess of $250,000.  Simply put, subject to Article 11, Article 20 <u>binds</u> NICO to pre-fund <u>all</u> of Stonewall's loss and expense payouts without NICO's prior approval of any such amounts.

In light of the express wording of Article 20, it is illogical for NICO to contend that Stonewall invited NICO to pre-approve all claims payments as part of a "business strategy . . . to avoid drawing upon [Stonewall's] surplus for the payment of

claims." (See NICO Memorandum, p. 20).[2]  Provided that NICO abided by the terms of the Treaty, Stonewall would have under no circumstance been compelled to draw upon its surplus for the payment of claims except possibly with respect to claims payouts in excess of $150,000 for which NICO declined, whether reasonably or unreasonably, to approve settlement, e.g., the TIG claim.  The inclusion of the Claims Account provision in the Treaty undoubtedly helped assure the Ohio Insurance Department that the Treaty represented a genuine risk transfer instrument.

Indeed, without this pre-funding requirement the Treaty would have made little sense.  Stonewall was turning over to NICO in premium an amount greater than its net reserves. Stonewall's remaining surplus, $43 million was needed by Stonewall to pay losses not covered by the Treaty as well as administrative expenses.  Both parties recognized, before the Treaty was signed, that Stonewall could not afford to pay losses and then seek reimbursement from NICO, and they put Article 20 in the Treaty to make clear that as soon as Stonewall settled a claim, NICO would pay it directly. Since the Treaty both (a) gives Stonewall sole discretion to settle claims and (b) requires NICO to fund such settlements, the notion that, after the Treaty was in force, Stonewall had to give up the control of settlements to get pre-funding by NICO makes no sense.

Perplexed by NICO's illogical and unsupported pre-funding arguments, Stonewall deposed NICO's General Counsel, Forrest Krutter, on this very subject earlier this week.  While Mr. Krutter's testimony is less than a model of clarity, we

---

[2] Even if one accepts NICO's assertion that Ms. Hoelsken expressed a desire for NICO to "pre-fund" claims payments (see NICO Memorandum, pp. 25-26), such expression merely reflects NICO's obligation under Article 20 of the Treaty, not an invitation for NICO to "pre-approve" Stonewall's claims.

understand him to have stated that NICO entered into an oral side agreement with Ken

Randall before the inception of the Treaty under which Randall agreed to allow NICO

to pre-approve all claims payouts in exchange for NICO's agreement to pre-fund these

payments. Mr. Krutter testified in relevant part:

> A. In 1999 Mr. Randall and I had a conversation in which Mr. Randall said to me that he wanted [NICO] to approve prior to agreement or payment legal fees that would be charged to the Seaton, at that time the Seaton reinsurance agreement.

>        \*      \*      \*      \*

> Q. . . . did these conversations with Mr. Randall result in an agreement?

> A. Yes.

> . . . Q. It was an oral agreement?

> A. Yes.

>        \*      \*      \*      \*

> Q. . . . Explain to me, if you could . . . what this oral agreement was.

> A. This oral agreement was essentially that [NICO] would review legal expense bills or loss payments recommended by Cavell . . . advise [Cavell] . . . as to whether [NICO] agreed with those payments or disagreed with those payments . . . . [W]ith respect to each of the payments or each [of] the bills or loss of claims presented . . . that [NICO] approved of . . . to prefund those payments.

>        \*      \*      \*      \*

> Q. [D]o you recall as you sit here today what this oral agreement provided that Article 20 didn't provide to Mr. Randall in terms of funding?

> A. It provided prefunding in advance without regard to the limitation of Article 20 on prefunding.

10

Q. Do you think there are any limitations on Article 20 on prefunding? Do you think there's a dollar limitation?

A. I recall some type of dollar limitations, but obviously the document is what it is.

     \*     \*     \*     \*

Q. . . . Who are the parties to this agreement?

A. My view was the parties to this agreement were Randall America and [NICO].

Q. Stonewall and Seaton were not parties to this agreement?

A. Not initially.

Q. . . . do they ever become parties to this agreement?

A. I believe they effectively did.

     \*     \*     \*     \*

Q. Did it ever cross your mind to that maybe you ought to prepare a document to be signed by all the parties to reflect this agreement?

A. No.

Q. So you've been operating – you operated for five or six years on the basis of an oral agreement?

A. That is correct.

Q. . . . Do you have any documents which refer to the agreement in writing?

A. I don't recall any specific documents.

Q. Am I correct you didn't talk to Mr. Barclay about it?

A. I have no recollection of talking to Mr. Barclay about this procedure.

     \*     \*     \*     \*

11

Q. . . . When did you first discuss this agreement with Mr. Randall . . . ?

A. . . . [M]y general recollection was that it was in 1999

\*    \*    \*    \*

Q. Did you ever consider taking the terms of the oral prefunding agreement and putting them in the Stonewall treaty?

A. No.

(Krutter Dep. Tr. 48:12-17; 49:12-22; 51:7-52:4; 52:20-53:7; 55:13-23; 56:21-57:8; 77:18-23; 80:6-9., at Exh. 82).

Provided we understand the above testimony correctly, Mr. Krutter conceded that NICO entered into an undisclosed oral side agreement[3] with Randall before the inception of the Treaty which 1) continued to remain in effect after the execution of the Treaty, and 2) materially differed from NICO's agreement under the Treaty to pre-fund all of Stonewall's loss payouts under $150,000 without NICO's prior approval.[4] Stated another way, Mr. Krutter admitted that NICO submitted a reinsurance agreement to Stonewall and to the regulators containing material terms, i.e., Articles 4A and 20, which NICO never intended to honor by virtue of a prior oral side agreement between NICO and Randall. Provided our understanding is correct, NICO deceived

---

[3] Mr. Krutter's deposition testimony that NICO entered into an oral agreement with Ken Randall directly contradicts the testimony of Mr. Krutter's boss, Ajit Jain, who testified that "We do not enter into oral agreements or side agreements." (See Jain Dep Tr. 107:16-22 , at Exh. 79) ("Q. So, in other words, if NICO enters into an agreement, it will be in writing. Is that your testimony? A. Yes, otherwise it is -- it is not binding on us.").

[4] It is more than a little ironic that NICO now relies so heavily upon the testimony of Mr. Krutter to support its prefunding arguments when less than three months ago NICO resisted producing Mr. Krutter for a deposition due to his purported lack of knowledge relevant to the case.

12

both Stonewall and the regulators by falsely representing that Stonewall would control its own claims. The Treaty they approved was not the real deal.

Last Friday's deposition of Ajit Jain further confirms this conclusion. Indeed, in his deposition, Mr. Jain candidly acknowledged that NICO always intended to supervise, direct and control Stonewall's claims, notwithstanding the terms of the Treaty and the Administration Agreement:

> . . . **what I wasn't prepared to do was just hand over our checkbook to some third party** and say, "Do the best you can and come back to me 20 years later."
>
> Q.    So you were contemplating that -- **were you contemplating that Cavell was going to handle the claim under NICO's direction, supervision and control**?
>
> A.  **Yes.**
>
> \*      \*      \*      \*
>
> Q.  When you used the word checks and balances, what did you mean?
>
> A: You know, **that they couldn't just go out, right – settle claims on our behalf and say just reimburse us**. We were not going to be, as in any reinsurance transaction, we are not going to be an ATM that they can go and help themselves.

(See Jain Dep. Tr. 87:6-21; 89:3-9, at Exh. 79) (emphasis added). Mr. Jain's revealing testimony thus confirms what is now the obvious: from the very beginning of the Treaty (and indeed before that time), NICO always intended to dominate and control Stonewall's claims. It mattered not to NICO that the Treaty made Stonewall the "sole judge" of its own liability and bound NICO to pre-fund Stonewall's claims. NICO was not willing to accept the risk of "handing its checkbook" over to Stonewall or Cavell or

13

any other third party. As a result, NICO removed any risk from the transaction by keeping the checkbook in its own pocket.

Provided the Panel concludes that NICO misled Stonewall as well as regulators, the Panel should not hesitate to rescind the Treaty *ab initio* and disgorge NICO of its ill-gotten and obscene gains. Should the Panel, however, determine that NICO's domination of the claims function did not arise from a pre-existing oral side agreement with Randall but rather from NICO's subsequent and confidential entry into the Collaboration Agreement with Cavell, this determination also provides a basis for the Panel to rescind the Treaty.

Indeed, the Collaboration Agreement between NICO and Cavell not only removed any risk transfer from the Treaty, it also transferred from Stonewall's Board of Directors to NICO control of Stonewall's fortunes and future. Stonewall was in run off; its only functions were adjusting and settling claims and investing its assets. The Collaboration Agreement put NICO alone in charge of the first, and most significant of these functions. This made NICO a controlling person of Stonewall for regulatory purposes. See R.I. Stat. § 27-35-1(c) (2007) (Tab KK).[5] As both a material change in the terms of the Treaty, and a material change in the control of Stonewall, both Stonewall and NICO were legally obligated to bring the Collaboration Agreement to the

---

[5] The Rhode Island statute defines "control" as:

> 'Control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract other than a commercial contract for good or non-management services, or otherwise, unless the power is the result of an official position with or corporate office held by the person.

R.I. Stat. § 27-35-1(c).

14

attention of state regulators. <u>See</u> <u>id.</u> § 27-35-2(a).[6] Neither did: Stonewall because the Collaboration Agreement was hidden from it, NICO presumably because it knew this secret side deal would never be condoned by the regulators. Although Stonewall is wholly innocent of any conscious misconduct, it may nonetheless be deemed to have violated the Rhode Island regulatory regime. NICO, on the other hand, would seem to be in deliberate violation of that regime. Rescission of the Treaty *ab initio* may be the only way to cure these violations

III.    BY USURPING TOTAL CONTROL OVER STONEWALL'S CLAIMS, NICO
        NECESSARILY PREVENTED DUKES PLACE FROM MAXIMIZING ITS
        RETURN AND GUARANTEED NICO A MAGNIFICENT PROFIT

        An immediate casualty of NICO's assumption of absolute control over Stonewall's claim was Dukes Place's stated objective to accomplish a speedy run-off, and, in so doing, to maximize Stonewall's value for resale in five to seven years. As discussed in NICO's opening brief, Dukes Place's "ultimate objective . . . [was] to realize a risk-adjusted rate of return to investors in the range of 20-30 percent compound upon private equity capital invested" over a five to seven year horizon. (<u>See</u> NICO Memorandum Exh. 300). Indeed, Dukes Place planned a "**target time-frame for acquisition, run-off and liquidation of each company acquired [of] five years.**" (<u>Id.</u>) (emphasis added).

---

[6] RI Statute sec. 27-35-2(a) states, in relevant part:

    . . . [N]o person shall enter into an agreement to merge with or otherwise to acquire control of a domestic insurer unless, at the time the offer, request, or invitation is made or the agreement is entered into . . . the person has filed with the commissioner and has sent to the insurer . . . a statement containing the information required by this section and the offer, request, invitation, agreement or acquisition has been approved by the commissioner in the manner prescribed by subsection (d) of this section.

RI Statute sec. 27-35-2(a).

To accomplish Dukes Place's overall goal to maximize Stonewall's value in short order, it would have required Cavell to aggressively seek out commutations and policy buy-backs of Stonewall's liabilities. For run-off insurance companies like Stonewall, this represents the best possible and most cost-effective means to mitigate and eliminate the Company's future exposures. Without obtaining such closure, insurance pursuit firms have persuaded courts to find coverage for asbestos liabilities under even policies that were thought to be exhausted. See, e.g., Continental Casualty Co. v. Employers Ins. Co. of Wausau, No. 601037/03, 2007 N.Y. Misc. LEXIS 3336 (N.Y. Sup. Ct. May 8, 2007) (Tab CC). Accordingly, an aggressive commutation and buyback plan represents the best way to resolve liabilities not just quickly and cost effectively but with finality. That's what Cavell's charge from Dukes Place was.

Cavell, for its part, was fully aware of Dukes Place's intention to maximize Stonewall's value and then to sell the Company after five years. (See Exh. 83) (a draft copy of Dukes Place's capital appreciation strategy which includes the handwritten comments of Cavell's Chairman, Ken Randall). As Stonewall's run-off manager, Cavell owed Stonewall a fiduciary duty to help achieve this objective. Cavell, of course, was also aware that Dukes Place's business objective directly conflicted with Berkshire's objective to prolong claims payments as long as possible to maximize NICO's investment return on the float. Indeed, Warren Buffett has publicly acknowledged this objective on numerous occasions in his annual letter to Berkshire Hathaway's shareholders. (See Stonewall Memorandum Exhs. 21-22). Despite its appreciation of the inherent conflicts between the business objectives of Dukes Place and NICO, Cavell sold out complete and total authority over Stonewall's claims to

16

NICO in exchange for NICO's agreement to fund Cavell's operations and salaries – a "corrupt bargain" (to use the words of NICO) which deprived Stonewall of any benefit of the services it paid more than $11 million for Cavell to perform.

In its opening brief, NICO mocks Dukes Place's stated objectives for the speedy run-off of Stonewall as unrealistic and naïve. It is telling, however, that NICO was not willing to assume the risk that Dukes Place might accomplish its objectives. (See Jain Dep. Tr. 87:6-21; 89:3-9, at Exh. 79). Instead, with the active connivance of Stonewall's trusted agent, Cavell, and without seeking the consent of Stonewall, NICO usurped total authority over Stonewall's claims and cash payouts. By controlling Stonewall's claims and payouts, NICO could draw out Stonewall's cash outlays for as long as feasibly possible – guaranteeing NICO a magnificent investment return on the Stonewall premium and foreclosing any possibility that Dukes Place would accomplish its objective to maximize Stonewall's value.

In this regard, the numbers speak for themselves. Since Stonewall paid a premium of $126 million to NICO in 2000, NICO has made net payouts of only $56 million – resulting in an increase in Stonewall's net reserves from $110 million (in May 2000 when the deal closed) to $142 million (as estimated by NICO). (Compare Exh. 81, with Exh. 86). Over that same period, NICO has earned investment income of more than $122,225,220 on the Stonewall premium, assuming an 11.7% rate of return reflected in NICO's financial statements. (Stonewall Memorandum Exh. 26). This means that today, applying the current actuarial-based ceded incurred figures, NICO has already earned a profit of more than *$122 million* (the amount of the premium plus NICO's investment income less future payouts). (Id.) If the Stonewall book takes

another ten years to run off, and NICO continues to realize an 11.7% rate of return on its investments, NICO's ultimate profit on the contract will exceed *$498 million*! (Id.)

    The numbers could not be more be clear. By co-opting Stonewall's agent and assuming absolute control of Stonewall's claims, NICO yielded a staggering profit for itself while impairing Dukes Place's ability to add value to Stonewall. Under the circumstances, the only equitable thing the Panel can do to remedy NICO's material breach of the Treaty is to rescind the contract *ab initio* and disgorge NICO of its obscene and ill-gotten gains.

IV.   NICO'S DOMINATION AND CONTROL OF STONEWALL'S CLAIMS HAS INEXORABLY EXTENDED THE RUN-OFF OF THE COMPANY AND SEVERELY DAMAGED STONEWALL

    A.   A Comparison of NICO's Run-Off of Stonewall to That Conducted By Other Run-Off Insurers Demonstrates the Lengths to Which NICO Has Inexorably Extended the Stonewall Run-Off

    To gain a proper perspective as to how NICO's domination and control of Stonewall's claims has detrimentally impacted the run-off of the Stonewall book, it is helpful to compare NICO's run-off of Stonewall to that conducted by other insurers in run-off. As noted above, when the parties signed the Treaty, Stonewall held net reserves of $110 million – approximately $16 million less than the premium paid to NICO under the Treaty. In the seven years since then, NICO has only paid out $56 million on a net basis, with the result that Stonewall's net reserves have increased, rather than decreased over time (as one would expect for a company in run-off). According to NICO, Stonewall's net reserves are now $142 million. At this rate, the run-off will last at least another 18 years, or 25 in total. Worse yet, NICO's own internal estimates forecast a 30-year run-off! (See Exh. 80, at NICO059496).

By way of comparison, the gross reserves of American Centennial Insurance Company ("ACIC") decreased from $995 million on December 31, 1987 to a little more than $26 million at the end of 2006. (See Exh. 106). Perhaps more significantly, in the five-year period from December 31, 1991 to December 31, 1996, ACIC's reserves decreased by a multiple of more than 85% from $354 million to $50.7 million. (Id.)

Other run-off insurers unencumbered by NICO management and control have experienced similar success. In this regard, we would point to the following examples:

- Cavell Insurance Company Ltd.: Experienced a decrease in total gross reserves from $214,286,000 as of 12/31/01 to $102,404,000 as of 12/31/06. (Id.)

- Unione Italiana (UK) Reinsurance Co.: Experienced a decrease in total gross reserves from $189,210,000 as of 12/31/01 to $54,682,000 as of 12/31/06. (Id.)

- River Thames Insurance Company Ltd.: Experienced a decrease in total gross reserves from $249,870,000 as of 12/31/01 to $63,733,000 as of 12/31/06. (Id.)

The above examples illustrate well what the trajectory of a run-off insurer's exposures should look like over time. Unlike Stonewall, whose reserves have actually increased in the six to seven years since NICO assumed total control of Stonewall's claims, each of the above insurers has experienced at least a 50% decrease in their reserves over a comparable period of time. By placing the run-off of Stonewall in the appropriate context, only then can only truly appreciate the extent to which NICO's domination and control of Stonewall's claims has inexorably and unnecessarily prolonged the Company's run-off.

19

**B.    NICO's Failure to Extinguish Stonewall's Liabilities Has Damaged Stonewall**

Having assumed control of Stonewall's claims in material breach of the Treaty, NICO must now account for all damages it caused Stonewall. Stonewall's damages claim extends to both active claims for which NICO has refused to authorize settlement, i.e., the DuPont and Fuller Austin claims, and the multitude of open exposures for which NICO failed to properly extinguish on Stonewall's behalf.[7] We will now further address each of these points.

1.    The evidence demonstrates that NICO has unreasonably delayed settlement of the Fuller Austin claim

Although NICO's opening brief omits any discussion of the DuPont claim, it launches a scurrilous attack on Robert Burns in an attempt to establish that Stonewall never received an opportunity to settle the Fuller Austin claim for $18 million in 2002. Casting aside these sad personal attacks, which we shall not dignify with a response in this Brief, the evidence demonstrates that Stonewall did indeed receive an offer to settle the Fuller Austin claim for $18 million in 2002 and that NICO unreasonably refused to authorize settlement of the claim -- undoubtedly because such payment would have substantially reduced the float that NICO could have earned for its own benefit. In further support of this claim, we specifically note the following:

First, as set forth in Stonewall's opening Memorandum, Stonewall expects a former Cavell claim handler who attended a June 25, 2002 mediation, Robert Vermes,

---

[7] Stonewall also seeks damages resulting from 1) NICO's inequitable allocation of legal fees, 2) NICO's tortious interference with the Cavell Administration Agreement, and 3) NICO's unreasonable refusal to fund the TIG claim settlement and associated counsel fees, along with all other damages resulting from NICO's domination and control of Stonewalls' claims. (See Stonewall Memorandum, pp. 26-40).

to testify that while at the mediation, he received an offer to individually settle the Fuller Austin claim on behalf of Stonewall for $18 million.    (See Stonewall Memorandum, p. 32).  We expect Mr. Vermes to testify that the opportunity to settle for $18 million on an individual basis arose after group settlement discussions between the parties did not progress, and that Mr. Vermes relayed this offer back to the Cambridge office.  (Id.)

Second, on Thursday of this week, Stonewall received a sworn affirmation from an attorney who personally attended the June mediation which corroborates Mr. Vermes' recollection of the June mediation.  (See Twomey Affirmation, at Exh. 84).  In that affirmation, Timothy M. Twomey, Esq., an attorney that represented the interests of a Fireman's Fund carrier in the Fuller Austin matter,[8] specifically states in relevant part:

- Mr. Twomey recalls meeting Mr. Vermes at the June mediation and socializing with him after the mediation concluded.

- The initial focus of the June mediation centered upon putting together a settlement proposal on behalf of a group of insurers present for the mediation.  During this process, Mr. Twomey recalls generating group settlement contribution values using a laptop computer and spreadsheet software that he brought with him to the mediation.

- At some point in the June mediation, the attorneys for London Market Insurers took a very strong position which effectively derailed any further group settlement discussions at the mediation.

- After learning that a group settlement could not be achieved, the Trust – through its representative, W.D. Hilton, Jr.[9] – advised that it would

---

[8] The Fireman's Fund carriers involved the Fuller Austin matter reached a settlement of that litigation with the Fuller Austin Asbestos Settlement Trust (the "Trust") in 2003. (Exh. 84, at ¶ 3).

[9] A close examination of the letter from W.D. Hilton submitted by NICO in support of its position on the Fuller Austin claim reveals that, contrary to NICO's argument (see NICO Memorandum, p. 67), Mr. Hilton does not deny that he extended an $18 million settlement offer to Stonewall; rather, he only claims a lack of recollection of having done so.  (See Dep. Exh. 255).

entertain individual settlement offers along the same terms as proposed for each carrier within the group discussions earlier that day.

• As to Mr. Vermes' assertion that after group settlement discussions broke down but before the June mediation concluded, Mr. Vermes was advised of an opportunity for Stonewall to reach an individual settlement of the Fuller Austin matter for $18 million, <u>Mr. Twomey has no reason to believe Mr. Vermes' recollection is not accurate.</u>

(<u>See</u> Exh. 84, at ¶¶ 6-12). Thus, Mr. Twomey's affirmation corroborates the essential facts which we expect Mr. Vermes to describe for the Panel at the hearing.

Third, although NICO goes to great lengths to attack the Litigation Plan document generated by Mr. Burns, it cannot dispute that a Litigation Plan document created on September 18, 2002 and last edited on September 30, 2002 specifically makes reference to the settlement offer relayed to Mr. Vermes at the mediation. (<u>See</u> Stonewall Memorandum Exh. 42) (noting "If we want to settle this case at this time, I believe such is possible in the $18-$22 million range. I base this on information provided to Robert Vermes at the last settlement meeting by the mediator, Judge Weinstein.").

In sum, the facts establish that Mr. Vermes was advised of an opportunity for Stonewall to settle the Fuller Austin claim for $18 million at the June mediation, and that NICO refused to extend settlement authority. NICO's interests in maximizing its investment return on the Stonewall premium simply would not permit NICO to outlay $18 million in cash less than two years into the life of the Treaty. A complaint filed by SantaFe Braun, Inc. in California Superior Court against, <u>inter alia</u>, Stonewall and Cavell perhaps best describes NICO's tactics in the Fuller Austin matter – and how such tactics have smeared Stonewall's good name with policyholders:

The propensity of the Berkshire parties to delay payment for
the claims purchased and assumed, and to earn as much
investment income as possible from delay to the detriment of
policyholders . . . is underscored by the Fuller-Austin
coverage litigation in Los Angeles. There, almost all of the
policyholders' insurers settled before trial with the
policyholders, whose estimated asbestos liabilities exceed $1
billion.    Stonewall, however, proceeded to trial, had a
judgment in excess of $50 million entered against it and
continues to litigate instead of settling, as did many insurers
that issued coverage to policyholders at much higher excess
levels than did Stonewall.    This delay, however, is not
necessarily about Stonewall. It is part of NICO's strategy of
attempting to maximize its investment income at the expense
of the policyholders of the insurer, by delaying payment of
valid claims. As noted above, this is particularly true when
the Berkshire parties write "finite risk" reinsurance cover for
run-off companies such as Stonewall and AMICO, which are
not concerned with how unreasonably delays in the payment
of their claims will fare in the insurance marketplace since
they no longer sell insurance coverage.

(See Complaint, pp. 29-30, at Exh. 85). As the policyholders' complaint in the SantaFe

Braun matter aptly illustrates, NICO has at all times placed its financial interests in

maximizing its investment return on the float and controlling Stonewall's cash outlays

above the legitimate interests of Stonewall.    In the case of the Fuller Austin claim,

NICO's actions have deprived Stonewall of an opportunity to settle the claim for an

amount less than 34% of Stonewall's exposed policy limits, leaving Stonewall exposed

to a potential $53 million loss. Accordingly, in the event the Panel does not rescind the

Treaty *ab initio*, it should enter an Order requiring NICO to reimburse Stonewall

outside the reinsurance cover for all 1) indemnity amounts which Stonewall must pay in

excess of the $18 million settlement offer in the Fuller Austin claim and the $2 million

settlement offer in the DuPont claim, and 2) all allocated loss adjustment expenses

which Stonewall has incurred subsequent to NICO's refusal to authorize settlement of these matters.

    2.    NICO's failure to extinguish Stonewall's exposures has damaged Stonewall

        By co-opting Cavell, NICO ensured that Stonewall could not – and would not – implement an aggressive run-off strategy (as one would have expected Stonewall to do), in which claims were settled and potential exposures were extinguished sooner rather than later. Incredibly, Stonewall's net reserves are appreciably higher today than they were seven years ago when Dukes Place acquired the company. According to NICO, Stonewall's net reserves as at December 31, 2006 were $142 million (see Exh. 86), $32 million more than the company's net reserves in May 2000 (see Exh. 81), when NICO assumed control over claims handling and Stonewall's payout pattern. If NICO remains in control of Stonewall's claims, NICO will continue to eschew commutations, buy backs and expeditious claim settlements, generating more risk free income for itself but creating the risk that net reserves will continue to increase, which will further impair Stonewall's value to its shareholders.

        The precise amount of damages suffered by Stonewall – because little, if anything meaningful, has been done over the past seven years to extinguish its exposures (and to mitigate its development risk) – is incalculable, which is one reason – a good reason in fact – to rescind the Treaty, thereby ensuring that NICO does not profit from its wrongdoing. See, e.g., Kennard v. Indianapolis Ins. Co., 420 F. Supp. 2d 601, 611 (N.D. Tex. 2006) (Tab Q) (rescission is an appropriate remedy to prevent unjust enrichment). While a party's inability to quantify its damages is often an impediment (and, on occasion, a complete bar) to recovering damages, the situation

here is different. Where, like here, the fact of damage is certain and it is only the quantum of damage that is unclear monetary damages may be awarded using approximation, estimation and, even, conjecture. See, e.g., Esposito v. Mister Softee, Inc., 1983 U.S. Dist. LEXIS 17849, *7 (E.D.N.Y. April 11, 1983) (Tab DD) ("any other rule would enable the wrongdoer to profit from his wrongdoing at the expense of his victim"); In Re Mark Rothke, 43 N.Y.2d 305, 323 (1977) (Tab EE) (holding that the trier of fact had the right to "make the best approximation possible through the exercise of good judgment and common sense").

The law has long recognized that a wrongdoer should not escape the consequences of his misconduct simply because the injured party cannot measure its injury with precision or certainty. It is the wrongdoer, not the injured party, who must bear the risk of uncertainty in measuring damages. This principle has been repeatedly enunciated by the Supreme Court of the United States, as well as countless other federal courts and state courts.

More than seventy-five years ago the Supreme Court, in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931) (Tab FF), described the uncertainty principle in the following terms:

> Where the tort [the misconduct] itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

Id. at 563.

25

Fifteen years later the Supreme Court again enunciated this basic principle

in <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251 (1946) (Tab GG):

> The most elementary conceptions of justice and public
> policy require that the wrongdoer shall bear the risk of the
> uncertainty which his own wrong has created. That principle
> is an ancient one, and is not restricted to proof of damages in
> antitrust suits ... the wrongdoer may not object to the
> plaintiff's reasonable estimate of the cause of injury and of
> its amount, supported by the evidence, because not based on
> more accurate data which the wrongdoer's misconduct has
> rendered unavailable...
>
> The constant tendency of the courts is to find some way in
> which damages can be awarded where a wrong has been
> done. Difficulty of ascertainment is no longer confused with
> right of recovery for a proven invasion of the plaintiff's
> rights.

<u>Id.</u> at 265 (citations omitted).

In <u>Commonwealth Trust Co. v. Hachmeister Lind Co.</u>, 320 Pa. 233, 181 A.

787 (1935) (Tab HH), the Pennsylvania Supreme Court, relying extensively on U.S.

Supreme Court precedent, firmly embraced the uncertainty principle. The court wrote:

> [A] defendant whose wrongful conduct has rendered difficult
> the ascertainment of the precise damages suffered by the
> plaintiff, is not entitled to complain that they cannot be
> measured with the same exactness and precision as would
> otherwise be possible.

<u>Id.</u> at 790 (quoting <u>Eastman Kodak Co. v. Southern Photo Materials Co.</u>, 273 U.S. 359,

379 (1927)).

The court in <u>Hachmeister</u> then went on to quote approvingly the following

language from the U.S. Supreme Court's opinion in <u>Story Parchment Co.</u>:

> The wrongdoer is not entitled to complain that [damages]
> cannot be measured with the exactness and precision that
> would be possible if the case, which he alone is responsible
> for making, were otherwise.* * * The risk of uncertainty
> should be thrown upon the wrongdoer instead of upon the

26

> injured party. * * * The precise amount cannot be
> ascertained by a fixed rule, but must be a matter of opinion
> and probable estimate. And the adoption of any arbitrary
> rule in such a case, which will relieve the wrongdoer from
> any part of the damages, and throw the loss upon the injured
> party would be little less than legalized robbery.

Id. at 239-40.

In short, an aggrieved party (here, Stonewall) has a very limited burden as respects the amount of its damages where the defendant's wrongdoing "preclude[s] the ascertainment of the amount of damages with certainty...." (Story Parchment Co., supra, 282 U.S. at 563). In such situations, the amount of damages may be proven by "reasonable inference," using "estimates," with any "risk of uncertainty ... thrown upon the wrongdoer...." Id.; see also Grace v. Corbis-Sygma, 2007 U.S. App. Lexis 12215 (2d Cir. May 25, 2007) (Tab II); Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926-27 (2d Cir. 1977) (Tab JJ) (observing that "some improvisation" is permitted).

Here, by not allowing Stonewall to aggressively seek commutations, policy buy backs and claim settlements, NICO has left Stonewall vulnerable to additional unfavorable development. Exposures that should – and would – have been extinguished long ago remain open solely because it was in NICO's interests not to resolve the matters sooner, allowing NICO a more prolonged period in which to earn investment income. The damage to Stonewall and to Stonewall's shareholders can never be measured with precision; there are simply too many variables that would come into play. The Panel, however, is not powerless to redress NICO's misconduct and one way in which the Panel might do so is to require NICO to provide unlimited cover (transferring to NICO all risk of future adverse development) and, in addition, requiring

NICO to pay all investment income earned to date to Stonewall. This remedy provides relief both to Stonewall (in the form of additional coverage) and to Stonewall's investors (to account for the diminished value of the company),[10] and compensates each for the distinct injury done to it. Stonewall, which is potentially exposed to tens of millions of dollars in additional liabilities on those exposures that improvidently remain open, see, e.g., Continental Casualty Co., supra, 2007 N.Y. Misc. LEXIS 3336, is made whole by having unlimited cover available to it to absorb any additional liabilities that might mature. And Stonewall's shareholders receive the maximum amount of additional value that potentially could have accrued on their investment had they chosen to emphasize an aggressive investment strategy (as NICO did) in lieu of an aggressive run-off strategy. This remedy is appropriate for still an additional reason. It ensures that the Treaty operates as genuine, risk-transferring reinsurance, which was the parties' stated intent when the Treaty was negotiated.

---

[10] Assuming an 11.7% rate of return, NICO has earned approximately $122.2 million in investment revenue since May 2000. (See Stonewall Memorandum Exh. 26). If the Panel were to use a 6% or 7.5% rate of return instead, the amount of investment income earned since May 2000 would be $52.8 million and $68.5 million, respectively. Applying a 6% rate of return would more closely approximate the amount of investment income Stonewall would have earned had it not purchased the NICO cover and invested the $126 million premium itself (assuming the same payout pattern that did occur). The use of a 7.5% rate of return is also an appropriate measure in that it is the rate charged by NICO to Stonewall on the premium due from the effective date of the agreement to date paid. (See Treaty, Art. 6, at Stonewall Memorandum Exh. 1).

V.    **THERE IS NO MEANINGFUL DISTINCTION BETWEEN THE RESOLUTE CLAIMS OPERATION AND THE CAVELL CLAIMS OPERATION BEFORE IT; LIKE CAVELL, RESOLUTE ACTS AT THE DIRECTION OF NICO AND CANNOT BE TRUSTED TO MANAGE STONEWALL'S CLAIMS IN FURTHERANCE OF STONEWALL'S INTERESTS**

A.    **For All Intents and Purposes, the Cavell Claims Staff and Resolute Claims Staff are One in the Same**

As the Panel is by now aware, when Stonewall learned that NICO had secretly co-opted Stonewall's agent, Cavell, Stonewall took action to immediately terminate its run-off management contract with Cavell. By virtue of a confidential Term Sheet, this termination took effect as of March 31, 2006. At that point, Stonewall reasonably and justifiably expected that, subject to the three-month transition period, Cavell would cease any future role in the Company's affairs. Little did Stonewall know, the very same entity which Stonewall had terminated for cause would continue to act as Stonewall's de facto Claims Servicer up until the present day.

Indeed, soon after March 31, 2006, Cavell represented to Stonewall that NICO had retained Cavell "to act as NICO's agent in respect of NICO's rights and responsibilities vis-à-vis Seaton and Seaton." (See May 18, 2006 letter, at Dep. Exh. 155). NICO's Tom Ryan repeated this understanding in at least three subsequent e-mails. (See June 2, 2006 e-mail, at Exh. 87; June 27, 2006 at Exh. 88, and July 28, 2006 e-mail, at Exh. 89). Mr. Ryan's July 28, 2006 e-mail is particularly instructive. There, he advised: "They [Cavell] are acting under the direction of NICO, the entity responsible for servicing the claims against Stonewall." (Exh. 89). As it had done before Stonewall had terminated Cavell as its run-off manager, Cavell continued to "service" Stonewall's claims at the "direction of NICO" even after its dismissal by Stonewall.

Moreover, the subsequent appointment of Resolute Management, Inc. – New England Division ("Resolute") – a NICO affiliate – as Stonewall's Claims Servicer has proven to represent the continuation of the very same claims regime which Stonewall had intended to terminate as of March 31, 2006. First, the very same claims handlers who held the nominal title of Cavell employees before the introduction of Resolute continue to perform the same claims functions – only wearing a Resolute hat. (See Ryan Dep. Tr. 83:7-11, at Exh. 90). Second, the Resolute claims staff continues to work out of the very same physical office space occupied by the "Cavell" claims staff in Cambridge, Massachusetts. (See Albanese Dep. Tr. 72:3-5, at Exh. 91). Third, just as NICO funded the salaries, benefits and all employment-related costs of Cavell claims staff pursuant to the Collaboration Agreement (see Collaboration Agreement Sch. 3, ¶ 1.1, at Stonewall Memorandum Exh. 1), NICO/Berkshire continues to fund the salaries, benefits and all employment-related costs of the claims staff that now formally hold titles with the Berkshire organization. Fourth, just as NICO supervised, directed and controlled the Cavell claims staff (see id. ¶ 3.1), NICO continues to supervise, direct and control the Resolute claims staff to the present day. In fact, the NICO executive who stood at the top of the Cavell organizational chart and approved every dollar spent by Stonewall, Tom Ryan, continues to perform the very same functions – now with the official title of Resolute's President. (See Ryan Dep. Tr. 82:23-35, at Exh. 90 (noting his status as President)).

Less there by any doubt that the Resolute claims staff lacks any meaningful distinction from the Cavell claims staff before it, the deposition of Ed Albanese helps put any such doubts to rest:

Q. What is [your] job?

A. It's the same thing I've been doing all since I've been [at Cavell]. I'm a senior claims specialist. Well, now we've just -- we have new titles so I am now, I guess, an AVP and they're trying to work out the actual – the exact title of what my job is.

Q. Who do you report to?

A. Tom Ryan.

Q. Is your salary the same?

A. Yes.

Q. Benefits the same?

A. Benefits the same. More or less, yes.

Q. Do you go to the same location? You work in the same location?

A. Yes.

Q. *Has anything changed?*

A. *No, just who I work for.*

Q. *Now you're just working for a different company, but your duties and responsibilities will be the same?*

A. *Same thing.*

(See Albanese Dep. Tr. 71:15-72:11, at Exh. 91) (emphasis added). For all intents and

purposes, the Cavell claims staff and the Resolute claims staff are one in the same.

Further, as discussed below, Resolute's performance as Claims Servicer has proven the

wisdom of Stonewall's decision to terminate its relationship with Cavell.

Indeed, events over the past year have demonstrated that Resolute/NICO

cannot be trusted to manage Stonewall's claims in furtherance of Stonewall's interests.

While Stonewall will develop this matter further at the final hearing, we would specifically point out the following examples of Resolute/NICO's recent actions:

**B.    NICO/Resolute Cannot be Trusted to Protect Stonewall's Interests**

      1.    NICO/Resolute severely impedes the attorney-client relationship between Stonewall and its counsel

NICO, through its subsidiary Resolute, has substantially impeded the working relationship between Stonewall and its outside counsel. For example, NICO does not permit Stonewall's counsel to provide Stonewall with a traditional exposure analysis – an analysis that insurers ordinarily expect from their counsel. Rather, NICO directs that Stonewall's counsel complete a form entitled "Request For Settlement Authority" ("RFSA"), in which counsel merely assigns percentage chances of success on the various coverage issues, leaving the "Settlement Authority Recommendation" "to be fi[l]led out by Resolute." (See, e.g., Exh. G to Resolute Management Outside Coverage Guidelines, at Dep. Exh. 7; Cain Petroleum (L.P. Busch) RFSA, at ST-014471, at Exh. 92; Mallinckrodt RFSA, at ST-009281, at Exh. 93 ("Insert the amount requested.")). NICO then incorporates these estimates, tweaking them as NICO sees fit, and provides Stonewall with a final number. (See, e.g., Feb. 19, 2007 e-mail from Tom Ryan, at Exh. 94).

Similarly, NICO frequently objects to any attempt by Stonewall to solicit advise from its counsel as to whether Stonewall should resolve a given claim. (See, e.g., June 7, 2007 e-mail, at Exh. 95) (See also June 11, 2007 e-mail, at Exh. 96) (wherein Mr. Ryan refused to authorize Seaton's request to have its outside counsel provide a settlement-value recommendation on the UNOCAL matter). In the rare instance where NICO has permitted Stonewall's counsel to opine as to appropriate

settlement valuations and as to whether Stonewall should resolve a claim, NICO has refused to allow Stonewall to follow the advice of its counsel. Indeed, this is precisely what has occurred in the pending DuPont matter, wherein NICO has declined to permit Stonewall to follow the recommendation of its counsel, Marks, O'Neill, to resolve the pending litigation for up to the $5 million policy limits if necessary to avoid a significant interest award and additional and significant legal fees. (See Stonewall Memorandum, pp. 28-31 & Memorandum Exh. 40).

2.    NICO/Resolute delays the investigation and evaluation of claims
       and otherwise fails to mitigate and eliminate Stonewall's liabilities

Recent history has also confirmed that NICO/Resolute avoids and delays the investigation of evaluation of Stonewall's latent-claim liabilities. The Union Oil of California ("UNOCAL") pollution account provides a prime example of this fact. In that matter, UNOCAL has asserted environmental-related damages exceeding $2 billion, and in late-2005, UNOCAL presented Stonewall with a $93 million settlement demand. (See Exh. 97). Since that time, NICO/Resolute has neither formulated a reserve recommendation nor assembled a settlement evaluation. (Id.)

Rather, it would appear that NICO and Resolute are content to allow the UNCOAL matter to drift in coverage litigation in California with no game-plan for resolution and with a significant litigation budget. When Stonewall requested that NICO/Resolute arrange a conference call with Stonewall's counsel to explore the prospects of a discounted resolution, NICO refused such request, indicating that ". . . we do not yet know what Stonewall's actual exposure for these claims are." (See November 11, 2006 e-mail, attached at Exh. 98). Of course, in the context of multiple-waste-site claims with unresolved coverage issues, Stonewall may never truly know its

33

actual exposure unless it tries each case to conclusion – a strategy which NICO and Resolute appear intent to impose on Stonewall.

NICO's handling of the UNOCAL matter reflects a claims handling strategy that has infected the entire Stonewall book. Indeed, NICO's propensity to avoid and delay the extinguishment of Stonewall's liabilities has manifested itself in a host of large exposure Stonewall accounts, including, among others, DuPont (see Stonewall Memorandum, pp. 28-31), Fuller Austin (see supra pp. 20-23), City of Bellingham (see Oct. 27, 2006 email from Stonewall's counsel, at Exh. 99 ("We have been unable to recommend a solid reasonable counteroffer because the information needed to do so has not yet been gathered and analyzed")), Newmont Mining (Stonewall Memorandum Exh. 69); Salt River Project (see Exhs. 100 and 101), and Cain Petroleum (see Exh. 102).

Any doubt that a pro-active manager can reduce and extinguish existing exposures is dispelled by Joseph Follis' handling of Tesoro and Hercules on behalf of Seaton. Mr. Follis was able to settle Seaton's remaining exposure on these accounts by obtaining a policy buy-back release in the amount of $925,000 on Tesoro, extinguishing Seaton's liabilities under policies that provide $60 million in umbrella limits, and $2.8 million on Hercules, eliminating Seaton's $12.4 million coverage obligation that was the subject of a October 2004 coverage-in-place agreement that Seaton entered into with Hercules. NICO, however, has not provided the employees of Stonewall with the same latitude to achieve similar discounted settlements.

3.    Contrary to the Protocols, Resolute acts subject always to the
      direction of NICO, not Stonewall

Under the protocols agreed to by the parties, Resolute ostensibly agreed to act "subject always to Stonewall's direction." Events since the adoption of the protocols, however, demonstrate that Resolute reports to only one master: NICO. Indeed, the Panel need look no further than to fact that 1) the NICO executive responsible for controlling the Stonewall book, Tom Ryan, also holds title of President of Resolute, and 2) NICO/Berkshire pays the salaries, benefits and employment-related costs of the Resolute claims staff and presumably reserves the power to terminate, promote or demote any Resolute claims staffer at NICO/Berkshire's will. Under these circumstances, it would be sheer fantasy to believe that Resolute would act in any manner inconsistent with NICO's interests – even if such course of action furthered Stonewall's interests, i.e., the mitigation and elimination of Stonewall's liabilities through an aggressive strategy of policy buy-backs and commutations.

NICO's control over the claims services provided by Resolute to Stonewall has manifested itself in a variety of ways. At the direction of Tom Ryan, who acts as both President of Resolute and Vice President of NICO, NICO has interjected itself in all aspects of Resolute's claims functions, including but not limited to:

- Requiring that it review and approve all claim evaluation and model results before their release to Stonewall.

- Deciding whether, when, and how much to pay Stonewall's counsel for legal services rendered to Stonewall, resulting in numerous complaints by outside counsel which impede Stonewall's relationship with such counsel. (E.g. Marks O'Neill (see Exh. 103); Berkes Crane (see Exh. 104); Bingham McHale (see Exh. 105).

35

- Dictating who in Mr. Ryan's "shop" (<u>see</u> Jain Dep. Tr. 199:5-7, at Exh. 79) will handle which Stonewall accounts, and routinely transferring accounts among the claims staff with no benefit to or input from Stonewall.

- Deciding when conference calls and other communications between Stonewall and its counsel may occur.

- Deciding whether and under what circumstances Resolute employees may act as Stonewall's counsel.

- Deciding when and under what circumstances Stonewall may retain experts, consultants, and other professionals to assist Stonewall in the investigation and evaluation of its claims.

- Deciding when Resolute may provide Stonewall with reserve recommendations and the amounts of such recommendations.

In sum, NICO – through its run-off management arm, Resolute – continues to dominate and control Stonewall's claims. Because Resolute has always acted – and will always act – subject to the direction of Stonewall's reinsurer, it simply cannot be trusted to protect Stonewall's interests, which clearly diverge from NICO's investment interests. Accordingly, for these reasons and the reasons set forth in Stonewall's pre-hearing Memorandum, in the event the Panel does not rescind the Treaty *ab initio*, the Panel should issue a declaration restoring control over Stonewall's claims to Stonewall pursuant to Articles 4A and 20 of the Treaty and declaring that Stonewall may act as its own Claims Servicer pursuant to Articles 4F and 11D of the Treaty.

**CONCLUSION**

For all of the foregoing reasons, Stonewall respectfully requests that the Panel rescind the Treaty, disgorge NICO of its ill-gotten gains and return the parties to the position they were in before the contract was executed. Alternatively, if the Panel is not willing to rescind, it should restore control of Stonewall's claims to Stonewall and declare Stonewall as its own Claims Servicer. Additionally, the Panel should order NICO to reimburse Stonewall for all damages caused to it by NICO's domination and control of Stonewall's claims, and award Stonewall its attorneys' fees and expenses in this arbitration.

Respectfully submitted,

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP

-- and --

CADWALADER, WICKERSHAM & TAFT LLP

Attorneys for Respondent and Counter-Claimant Stonewall Insurance Company

By: _____
        Shawn L. Kelly

By: _____
        Lawrence I. Brandes

Dated: June 29, 2007

37

# EXHIBIT 17

Page 1

1

2     In the Matter of the Arbitration Between:

3     ----------------------------------------x

4     NATIONAL INDEMNITY COMPANY,

5                          Petitioner,

6         -against-

7     STONEWALL INSURANCE COMPANY,

8                          Respondent and Counter-Claimant.

9     ----------------------------------------x

10                        July 9, 2007

11            LeBoeuf, Lamb, Greene & MacRae LLP

12                   125 West 55th Street

13               New York, New York 10019

14                        9:35 a.m.

15

16    B E F O R E:

17        ROBERT B. GREEN, Umpire

18        CALEB L. FOWLER, Arbitrator

19        W. MARK WIGMORE, Arbitrator

20

21        J. DAVID THOMPSON, Arbitrator

22        (Sitting in on Hearing.)

23

24

25                   Amy Klein - Hearing Reporter

Page 62

-Opening Statement - by Respondent/Counter-Claimant-
1  screen.                                    10:51:59
2     MR. FOWLER: They were not in this        10:52:02
3  booklet.                                    10:52:04
4     THE UMPIRE: Thank you.                   10:52:04
5     MR. FOWLER: But other pages numbered 32  10:52:08
6  and 33 were in.                             10:52:11
7     THE UMPIRE: Can somebody take a look at  10:52:25
8  this. It was on for about five minutes.     10:52:27
9     (A recess was taken.)                    11:08:10
10    THE UMPIRE: Let's go on the record.      11:08:10
11    Mr. Brandes.                             11:08:12
12    MR. BRANDES: Thank you. Good morning.    11:08:14
13 I listened intently, as I know you did,     11:08:16
14 to Mike's opening. It struck me that the facts as 11:08:20
15 he presented them to you are significantly  11:08:28
16 different in a number of respects than we   11:08:31
17 understand them to be.                      11:08:34
18    But it's not my intent or purpose to go  11:08:35
19 through this one by one, or even one at all in my 11:08:40
20 opening. Over the next few weeks you will be 11:08:44
21 seeing a lot of the documentary evidence and 11:08:48
22 hearing from the witnesses, and you will decide 11:08:50
23 what the facts are.                         11:08:53
24    We believe that you will conclude, after 11:08:54

Page 63

-Opening Statement - by Respondent/Counter-Claimant-
1  hearing that evidence, that there has been a clear 11:09:00
2  and material breach of the treaty by NICO. A 11:09:03
3  breach that goes so directly to the heart of the 11:09:07
4  treaty and the bargain struck by Stonewall that you 11:09:10
5  will conclude that the most appropriate remedy for 11:09:16
6  that breach is to rescind the treaty.        11:09:19
7     NICO does not deny and has never denied   11:09:22
8  that recision is an appropriate remedy for a 11:09:25
9  material breach of contract. Nor could it.   11:09:28
10    The law, including cases dealing with     11:09:31
11 reinsurance contracts, is quite clear that a 11:09:34
12 material breach of contract can warrant recision of 11:09:37
13 the contract.                               11:09:41
14    In our initial brief we cited to you      11:09:41
15 cases that have rescinded reinsurance contracts for 11:09:46
16 breach of the reporting clause, for breach of the 11:09:49
17 access to records clause and for breach of the 11:09:53
18 letter of credit clause.                    11:09:56
19    NICO does not mention those cases in its  11:09:57
20 reply brief, nor did Mike refer to them this 11:10:01
21 morning, we believe effectively conceding the point 11:10:05
22 that recision is an appropriate remedy for a 11:10:08
23 material breach.                            11:10:12
24    Now, NICO does say that that remedy is    11:10:13

Page 64

-Opening Statement - by Respondent/Counter-Claimant-
1  barred by the May 3rd, 2007 joint letter that the 11:10:19
2  parties sent you. They claim it's a breach of your 11:10:26
3  order. We don't think that's accurate at all. 11:10:30
4     If you look at your order that Mike       11:10:34
5  handed up to you, paragraph 1 says the Panel is 11:10:37
6  aware that there is an apparent disagreement 11:10:40
7  between the parties as to the issues that are to be 11:10:43
8  heard by the Panel at the scheduled hearing. 11:10:48
9     And you asked us to set forth the issues  11:10:51
10 to be heard.                                11:10:55
11    In the letter, the joint letter of May    11:10:57
12 3rd, 2007 that Mike referred to, the issue is set 11:11:00
13 forth concisely.                            11:11:05
14    The company's causes of action in these   11:11:06
15 arbitrations -- it's the top of page 2 -- breach of 11:11:08
16 contract/interference with contractual relations. 11:11:12
17    NICO violated the reinsurance agreements  11:11:18
18 and the duties derived therefrom, and interfered 11:11:21
19 with the contractual relations of Seaton and 11:11:24
20 Stonewall, the companies, by dominating and 11:11:27
21 controlling the company's claims servicer and their 11:11:30
22 run-off manager, Caveile, to the detriment of the 11:11:33
23 companies.                                  11:11:36
24    That's the issue that we told you in May  11:11:36

Page 65

-Opening Statement - by Respondent/Counter-Claimant-
1  would be heard.                             11:11:39
2     Nothing in your order required the        11:11:40
3  parties to put forth the relief they were seeking. 11:11:43
4     And I'm not quite sure why they did.      11:11:46
5  But there certainly was never an agreement, to my 11:11:50
6  knowledge, and Mike hasn't pointed to any, and 11:11:54
7  there's certainly nothing in your order that says 11:11:57
8  we had to decide by May 3rd what relief we were 11:11:59
9  seeking for the issue we were presenting to you. 11:12:03
10    And while Mike stood here and said to     11:12:06
11 you that NICO will be prejudiced, they won't get a 11:12:10
12 fair hearing -- I think those were his exact words, 11:12:14
13 they won't get a fair hearing if you consider the 11:12:17
14 remedy of recision -- well, that's just silly. 11:12:20
15    He hasn't told you one thing they would   11:12:23
16 have done differently had on May 3rd we presented 11:12:26
17 you this exact same issue and said one of the 11:12:33
18 remedies we seek is recision.               11:12:35
19    He hasn't talked about one deposition     11:12:37
20 they would have taken differently, or one document 11:12:39
21 they would have asked for that they don't already 11:12:42
22 have. Nothing. Where's his prejudice?        11:12:44
23    There is none.                           11:12:49
24    NICO prepared its case to defend against  11:12:51

17 (Pages 62 to 65)

Page 122

```
1              -Proceedings-
2         MR. BRANDES: I have to say I reject the   12:29:02
3    notion that we violated anything. Your order says   12:29:05
4    simply that you want to be apprised of the issues   12:29:09
5    to be heard. That's what the order says. It   12:29:12
6    doesn't say we want an exhaustive list of every   12:29:14
7    remedy you might potentially ever seek.   12:29:18
8         Now, I agree the document does set forth   12:29:21
9    remedies at that point in time. You know? And the   12:29:23
10   remedy we seek now is different than the remedy we   12:29:26
11   sought then.   12:29:28
12        But that's clearly not a violation of   12:29:29
13   any Panel order or of any agreement. And it's not   12:29:32
14   asking you to hear anything different than you   12:29:35
15   would have heard.   12:29:38
16        And Mike doesn't say it does. He   12:29:39
17   acknowledges the claim is material breach of   12:29:41
18   contract. You're going to hear the exact same   12:29:44
19   evidence, which means he had to prepare his case   12:29:46
20   the exact same way, and that's why he can't tell   12:29:49
21   you one thing he would have done differently,   12:29:51
22   because there is nothing.   12:29:53
23        THE UMPIRE: Thank you.   12:29:55
24        Why don't we take a --   12:29:57
25        MR. NONNA: We have lunch outside. Each   12:30:00
```

Page 123

```
1              -Proceedings-
2    of the breakout rooms has lunch.   12:30:03
3         THE UMPIRE: Why don't we come back   12:30:08
4    here, then, at 1:30.   12:30:09
5         (Time noted: 12:30 p.m.)   12:30:12
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 124

```
1              -Proceedings-
2         AFTERNOON SESSION:   12:30:12
3         (Time noted: 1:49 p.m.)   01:49:58
4         THE UMPIRE: Back on the record, please.   01:49:58
5         I apologize for the Panel being a little   01:50:00
6    late here, but we were discussing some of the   01:50:03
7    issues put before us for the first time.   01:50:05
8         The Panel, after hearing arguments by   01:50:14
9    the parties, denies NICO's motion for entering   01:50:19
10   relief as set forth this morning, and rules that   01:50:25
11   the motion can be renewed by NICO after the   01:50:29
12   completion of the evidentiary hearing if it so   01:50:33
13   wishes. We'll all have more information.   01:50:36
14        MR. NONNA: I didn't hear the end of   01:50:43
15   what the Umpire said.   01:50:45
16        THE UMPIRE: However, the motion can be   01:50:49
17   renewed by NICO, after the completion of the   01:50:50
18   evidentiary hearing, if it deems appropriate at   01:50:52
19   that time.   01:50:56
20        And then, on the other -- a couple of   01:50:59
21   the other items that are before the Panel in   01:51:03
22   various stages, rather than take a lot of hearing   01:51:06
23   time at this point for extended argument on the   01:51:12
24   issues of the submission of the runoff information,   01:51:15
25   the Tumi affidavit and the Equitas e-mails, we will   01:51:20
```

Page 125

```
1              -Proceedings-
2    entertain argument at the appropriate time in the   01:51:26
3    hearing, if you want to put it forth, and we will   01:51:29
4    give the appropriate weight to the evidence if it   01:51:31
5    is ultimately admitted. So we can put those off,   01:51:34
6    is probably the best way to go.   01:51:38
7         MR. NONNA: Just so the record is clear,   01:51:40
8    I think we have to make our objection that we do   01:51:42
9    not believe the -- we do not believe -- NICO does   01:51:45
10   not believe that the Panel has the authority to   01:51:48
11   hear the claim for recision or the claim for other   01:51:51
12   damages requested by Stonewall, including the   01:51:55
13   return of the Cavelle fees, on the grounds that the   01:51:59
14   parties have reached an agreement which is, in a   01:52:01
15   sense, an agreement that supplements the   01:52:05
16   arbitration clause as to what is an arbitral in this   01:52:07
17   matter, so we have to reserve our right to that   01:52:13
18   effect.   01:52:16
19        MR. BRANDES: You addressed all the   01:52:18
20   issues that were raised this morning except one,   01:52:20
21   which I don't think we have to argue, but I think   01:52:23
22   we do need a ruling at some point, and that is when   01:52:26
23   Mr. Jain will testify, whether that is the 19th or   01:52:30
24   the 20th.   01:52:33
25        MR. NONNA: We don't much care whether   01:52:35
```

32 (Pages 122 to 125)

1

2     In the Matter of the Arbitration Between:

3     ----------------------------------------x

4     NATIONAL INDEMNITY COMPANY,

5                         Petitioner,

6          -against-

7     STONEWALL INSURANCE COMPANY,

8               Respondent and Counter-Claimant.

9     ----------------------------------------x

10                    July 20, 2007

11              LeBoeuf, Lamb, Greene & MacRae LLP

12                  125 West 55th Street

13                  New York, New York 10019

14                         9:15 a.m.

15

16    B E F O R E:

17         ROBERT B. GREEN, ESQ., Umpire

18         CALEB L. FOWLER, ESQ., Arbitrator

19         W. MARK WIGMORE, ESQ., Arbitrator

20

21

22

23

24              Amy Klein - Hearing Reporter

25

Page 2785

1  -Summation - By Respondent-
2  because they are not before this Panel. You're the    11:23:28
3  gate keepers. If you let Stonewall and those    11:23:32
4  pulling the strings here escape any penalty for    11:23:35
5  this abuse of the arbitration process, I'm sorry I    11:23:38
6  am preaching, but really believe that what I've    11:23:42
7  heard in the last two weeks demonstrate that the    11:23:46
8  claims made in this arbitration by Stonewall should    11:23:48
9  never have been brought.    11:23:51
10  Thank you.    11:23:51
11  THE UMPIRE: Thank you, Mr. Nonna.    11:23:56
12  Mr. Brandes, do you want to start right    11:24:02
13  now?    11:24:03
14  MR. BRANDES: We need a couple of    11:24:07
15  minutes to set up our technology.    11:24:09
16  MR. NONNA: Maybe you're better at it    11:24:11
17  than we are.    11:24:14
18  (A recess was taken.)    11:32:26
19  THE UMPIRE: Mr. Brandes.    11:32:26
20  MR. BRANDES: Thank you. A couple of    11:32:28
21  preliminary points.    11:32:30
22  First of all, unlike my friends, I    11:32:31
23  wouldn't dare to try to do my own technology. So    11:32:34
24  that's all going to be done by Ms. Kinsella. And    11:32:37
25  if anything goes wrong it's all her fault and don't    11:32:42

Page 2786

1  -Summation - By Respondent-
2  blame me.    11:32:47
3  Secondly, I'm going to be showing you on    11:32:47
4  the screen the actual evidence, or some of it that    11:32:51
5  we rely on. The actual documents, or portions of    11:32:55
6  them, and the actual testimony. So you can see for    11:32:58
7  yourself what it says.    11:33:01
8  But if I was going to do that with every    11:33:03
9  document and every piece of testimony I cite, we'd    11:33:06
10  be here all day. So on a number of instances I'm    11:33:09
11  going to give you my take on the testimony and what    11:33:12
12  the documents say, and I'm going to refer you to    11:33:16
13  the document numbers, the exhibit numbers, and the    11:33:19
14  pages of the testimony. And I urge you to check it    11:33:22
15  yourself, to make sure that what I'm telling you is    11:33:25
16  accurate.    11:33:28
17  We tried very hard to make it accurate,    11:33:29
18  but I'm a lawyer and my job is to advocate. So my    11:33:31
19  take on what was said or what is said in these    11:33:36
20  documents and testimony may differ from yours and    11:33:39
21  you really ought to check it.    11:33:43
22  MR. FOWLER: Larry, the presentations    11:33:46
23  that appear on this screen, will they ultimately be    11:33:49
24  in hard copy?    11:33:53
25  MR. BRANDES: In a book. But I will    11:33:54

Page 2787

1  -Summation - By Respondent-
2  also orally be referring to things that won't be on    11:33:56
3  the screen, and they will be in the transcript so    11:33:59
4  you can see.    11:34:01
5  And I urge you to check it and I urge    11:34:02
6  you to do the same for what was said about    11:34:05
7  documents and testimony by my friends. They chose    11:34:07
8  not to show you the actual documents and testimony.    11:34:11
9  And sitting there listening to them I felt a lot of    11:34:16
10  what they said about the documents and testimony    11:34:21
11  was accurate, but I also felt there were instances    11:34:23
12  their spin on the document was certainly different    11:34:26
13  than what I understood it to mean. Or their take    11:34:29
14  on someone's testimony was different than what I    11:34:32
15  understood them to say.    11:34:36
16  So I think it's important -- they are    11:34:38
17  advocates like I am, so just as you ought to    11:34:40
18  double-check what I tell you, I would urge you to    11:34:44
19  double-check the accuracy of what they told you.    11:34:47
20  One final preliminary point. Mr. Nonna    11:34:52
21  read from a document. I don't know what it was    11:34:55
22  that suggested that Stonewall's reserves at the    11:34:57
23  time of the transaction might have been $157    11:35:00
24  million. I don't know where that came from. I    11:35:03
25  think it's been undisputed throughout the case that    11:35:06

Page 2788

1  -Summation - By Respondent-
2  the reserves on covered claims at the time of this    11:35:10
3  transaction were 110 million.    11:35:13
4  The -- I think Mr. Jain acknowledged it    11:35:15
5  yesterday. The premium he charged was 126 million,    11:35:20
6  which was a slight premium over the reserves.    11:35:22
7  So again, maybe there's a document that    11:35:25
8  says 157 million. I'm not familiar with it. But I    11:35:29
9  really don't think it's a contested item that the    11:35:32
10  reserves on covered business being carried by    11:35:35
11  Stonewall at the time of this transaction were 110    11:35:38
12  million.    11:35:41
13  With those preliminaries out of the way,    11:35:43
14  we think there are three issues that you have to    11:35:47
15  decide.    11:35:50
16  The first is: Did NICO materially    11:35:51
17  breach the treaty.    11:35:55
18  The second is: If it did, what remedy    11:35:57
19  is Stonewall entitled to. Is it entitled to    11:36:01
20  recision and return of the premium it paid plus    11:36:04
21  interest or investment income? Or is it entitled    11:36:07
22  to just monetary damages for the breach?    11:36:11
23  And finally, if the treaty is not    11:36:15
24  rescinded either because you find that NICO did not    11:36:18
25  materially breach it or because you decline to    11:36:22

27 (Pages 2785 to 2788)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2789

-Summation - By Respondent-

1  rescind even if NICO did materially breach it, you  11:36:25
2  have to determine who acts as the claim servicer in  11:36:30
3  running off the remainder of the liability subject  11:36:33
4  to the treaty and on what conditions.  11:36:38
5
6      So we think those are the three issues  11:36:40
7  before you, and I intend to address them in order.  11:36:43
8      We submit that the evidence demonstrates  11:36:46
9  beyond of a shadow of a doubt -- notwithstanding my  11:36:51
10  friend's efforts to convince you otherwise -- that  11:36:54
11  NICO materially breached the treaty and that it did  11:36:58
12  so deliberately and consciously.  11:37:01
13      As I hope you saw yesterday during my  11:37:04
14  examination of Mr. Jain, the relevant provisions of  11:37:07
15  the treaty were carefully negotiated so as to  11:37:11
16  strike a balance between Stonewall's interests and  11:37:15
17  NICO's.  11:37:18
18      Stonewall's interests were to realize a  11:37:20
19  return on its shareholders' investment within five  11:37:24
20  years. And NICO knew it. It was in a letter that  11:37:28
21  Mr. Barclay sent to Mr. Jain dated July 10, 1998.  11:37:32
22      And the last highlighted sentence  11:37:36
23  says: "You should understand that our investment  11:37:40
24  parameters are based upon realization after five  11:37:42
25  years."  11:37:45

Page 2790

-Summation - By Respondent-

1
2      And Mr. Jain testified he knew exactly  11:37:46
3  what that meant. This is an investment banking  11:37:49
4  transaction for them. And they hope to get their  11:37:51
5  money out in five years.  11:37:54
6      Hancock thought there might even be a  11:37:55
7  realization on the investment within three years.  11:38:00
8  And that's the whole purpose of this letter.  11:38:02
9  Hancock's looking for a contingent payment in the  11:38:05
10  event of an early realization of investment by  11:38:09
11  Dukes Place within three years.  11:38:12
12      Now, that doesn't mean that all the  11:38:14
13  liabilities are run off and the last claim has been  11:38:18
14  paid within three years or five years.  11:38:22
15      What it means *is that* you have  11:38:24
16  aggressively attacked your liabilities so that  11:38:27
17  you're at the point where you can say with some  11:38:31
18  degree of comfort that the reserves are adequate.  11:38:34
19  And, therefore, the surplus is accurate and you can  11:38:40
20  get them.  11:38:46
21      Obviously, at the time of these deals  11:38:48
22  nobody felt that way. If they felt that way they  11:38:50
23  wouldn't be buying covers in an amount that are  11:38:52
24  almost double the amount of the existing reserves.  11:38:56
25  They understood there was the possibility -- in  11:38:58

Page 2791

-Summation - By Respondent-

1
2  fact, the probability -- and Mr. Jain said it -- it  11:39:01
3  was expected that these reserves that were on the  11:39:05
4  books would not be sufficient to contain the  11:39:08
5  liabilities.  11:39:11
6      What they expected after five years was  11:39:11
7  to have a number on the books that would be  11:39:15
8  sufficient to contain the liabilities at that point  11:39:17
9  in time. And I submit to you that's not an  11:39:19
10  unrealistic objective if a runoff is handled  11:39:22
11  properly.  11:39:26
12      NICO's interests were of course to avoid  11:39:26
13  an acceleration of liability. There's absolutely  11:39:31
14  no dispute about that.  11:39:33
15      That was the way it could get most hurt,  11:39:34
16  if liabilities are paid out more quickly. As  11:39:37
17  Mr. Jain said: I expected the reserves to  11:39:41
18  deteriorate. I've got to make investment income to  11:39:43
19  make a profit.  11:39:47
20      He told you that. He expected an  11:39:48
21  underwriting loss. So investment income is the key  11:39:51
22  to him. No doubt about that.  11:39:54
23      In fact, in connection with the  11:39:56
24  redomestication, if you remember, NICO sought and  11:39:58
25  obtained a commitment from Stonewall and Seaton not  11:40:02

Page 2792

-Summation - By Respondent-

1
2  to take advantage of Rhode Island's solvency scheme  11:40:06
3  of arrangement provisions in order to accelerate  11:40:09
4  liabilities. And Stonewall and Seaton gave that  11:40:13
5  commitment.  11:40:16
6      Now, I'll talk about this more later.  11:40:17
7  If NICO for one minute thought that Seaton and  11:40:20
8  Stonewall owed it an unlimited fiduciary duty where  11:40:23
9  they couldn't do anything that was contrary to  11:40:26
10  NICO's interest, NICO would have never had to ask  11:40:29
11  for this commitment as part of the redomestication.  11:40:31
12  They would have known they were already protected  11:40:34
13  against it in the reinsurance contract.  11:40:37
14      More on that later...  11:40:38
15      Mr. Jain admitted, and this is at page  11:40:41
16  183 of yesterday's transcript -- and we don't have  11:40:45
17  the final of yesterday's, so it's the running  11:40:47
18  transcript as Amy was taking it. He admitted that  11:40:50
19  the parties had conflicting interests. And I'm  11:40:53
20  going to blow that up for you a little later.  11:40:55
21      And like many reinsurance deals where  11:40:57
22  the cedent and the reinsurer have conflicting  11:41:01
23  interests, they negotiated a contract that  11:41:03
24  protected them both.  11:41:06
25      As you saw yesterday, NICO's initial  11:41:09

28 (Pages 2789 to 2792)

Page 2793

-Summation - By Respondent-
1
2    draft of the slip, Exhibit 501, gave NICO virtually   11:41:13
3    complete control over when and on what terms claims   11:41:19
4    would be settled. Read it. Unconditional control   11:41:23
5    vests in NICO under that draft.   11:41:30
6        Wholly aside from the fact that no   11:41:32
7    regulator would have approved it if it were written   11:41:35
8    that way, both Hancock, who really had no skin in   11:41:38
9    the game, they were selling the company, but   11:41:41
10   Hancock objected to that, as did Eastgate acting on   11:41:43
11   behalf of Dukes Place.   11:41:49
12       They both rejected it. They revised the   11:41:50
13   slip instead to read -- and the underlying language   11:41:54
14   comes from Hancock and Eastgate -- "The reinsured   11:42:00
15   shall be the sole judge -- sole judge -- of what   11:42:04
16   constitutes a covered liability under the   11:42:07
17   reinsured's original policy, contract or binder and   11:42:10
18   as to the reinsured's liability thereunder and as   11:42:13
19   to the amount or amounts which shall be proper for   11:42:18
20   the reinsured to pay thereunder; and the reinsurer   11:42:21
21   shall be bound by the judgment of the reinsured as   11:42:25
22   to the liability and obligation of the reinsured   11:42:27
23   under its original policies, contracts or binders."   11:42:31
24       Could that be any more clear?   11:42:35
25       "Sole judge." We determine what we owe   11:42:37

Page 2794

-Summation - By Respondent-
1
2    under our policies and binders and you're bound   11:42:41
3    by it.   11:42:45
4        And this language almost word for   11:42:46
5    word -- it gets tweaked a little -- and gets carried   11:42:52
6    forward into the reinsurance contract itself and   11:42:57
7    here it is.   11:42:59
8        And the tweaking, where it says, "The   11:43:00
9    reinsurer shall be bound," I think they add "by the   11:43:09
10   reasonable good faith judgment of the reinsured."   11:43:12
11   That obligation is added. So it's got to be a   11:43:15
12   reasonable, good faith judgment before it's binding   11:43:18
13   on NICO.   11:43:20
14       And then they also add the last   11:43:21
15   line: "Subject to the terms, exclusions and   11:43:25
16   conditions hereof."   11:43:30
17       Well, you'll see one of the conditions   11:43:32
18   of this contract is that NICO's liability follows   11:43:33
19   the liability of the company under its policies.   11:43:36
20       So if the company alone is the sole   11:43:38
21   judge of that liability, and NICO is bound by its   11:43:41
22   reasonable good faith judgments, it is the company,   11:43:45
23   it is Seaton or Stonewall in our case, who's making   11:43:49
24   the determination of what we owe and when we owe   11:43:52
25   it. And NICO agreed to that.   11:43:56

Page 2795

-Summation - By Respondent-
1
2        Similarly, every single draft of the   11:43:58
3    slip prepared by NICO gave it unfettered discretion   11:44:03
4    whether or not to consent to settlements or   11:44:09
5    buybacks above a threshold amount.   11:44:11
6        There you go. This is the very language   11:44:14
7    that was in the first draft stayed in every draft   11:44:18
8    that NICO prepared of the slip until the final one.   11:44:21
9    That the reinsurer's right to associate, the   11:44:26
10   conditions of the contract will be "(1) A   11:44:30
11   reinsurer's right to associate clause, including   11:44:34
12   reinsurer's preapproval of any insurance policy   11:44:37
13   buybacks, commutations of ceded or assumed   11:44:40
14   reinsurance and any other payments not in   11:44:43
15   settlement of a specific claim."   11:44:46
16       No dollar limit. No condition on the   11:44:47
17   exercise of their right of preapproval.   11:44:52
18       And same thing in the next one on claim   11:44:55
19   settlements. They have the right of preapproval of   11:44:58
20   settlements above $250,000. Again unconditionally.   11:45:01
21   They don't have to justify it in any way, shape or   11:45:06
22   form. We just don't want to pay it. It is enough   11:45:09
23   to say it under this language.   11:45:12
24       But as Mr. Krutter admitted during his   11:45:15
25   testimony, Dukes Places' -- I have trouble saying   11:45:18

Page 2796

-Summation - By Respondent-
1
2    that -- Dukes Place's lawyers rejected that, too.   11:45:25
3    And they added the requirement that NICO could not   11:45:29
4    unreasonably withhold its approval or delay in   11:45:32
5    giving it.   11:45:35
6        And if you go -- here's Mr. Krutter   11:45:36
7    telling you: "How did the requirement that the   11:45:40
8    approval not be unreasonably withheld or delayed   11:45:42
9    get in? Do you recall that?"   11:45:46
10       His answer was: "My recollection was   11:45:49
11   at Mr. Dembeck's request."   11:45:52
12       Mr. Dembeck was the lawyer from   11:45:53
13   Debevoise & Plimpton representing Dukes Place.   11:45:55
14       But the fact of the matter is, this   11:45:58
15   language may have come from Mr. Dembeck, but its   11:46:00
16   genesis was the California Insurance Department. I   11:46:04
17   showed you yesterday the correspondence between   11:46:10
18   Mr. Studley and the California Insurance Department   11:46:11
19   where the California Insurance Department form   11:46:15
20   expressly says that the reinsurer must be bound by   11:46:19
21   the settlements of the reinsured.   11:46:21
22       I don't think I blew that up. That's   11:46:25
23   one of the exhibits from yesterday. But it's right   11:46:29
24   there. It's only after the contract is submitted   11:46:31
25   to the California department that that clause gets   11:46:33

29 (Pages 2793 to 2796)

Page 2797

-Summation - By Respondent-

1  
2  put in. Dukes Place didn't even insist on it in  11:46:35
3  any of the slips. But the California department  11:46:39
4  was the genesis of that.  11:46:42
5      And NICO accepted it.  11:46:44
6      It accepted that just as it accepted  11:46:46
7  that Stonewall would be the stole judge of its own  11:46:50
8  liabilities and that NICO would be bound by  11:46:53
9  Stonewall's reasonable good faith judgments.  11:46:56
10     NICO also accepted that on settlements  11:46:59
11  above the threshold, where it had a right of  11:47:06
12  preapproval, it could not unreasonably withhold  11:47:09
13  that approval or delay in giving it. That's what  11:47:12
14  Article 11(b) says.  11:47:20
15     "With respect to Items 1 and 2  11:47:23
16  herein" -- which are the policy buybacks and  11:47:25
17  settlements above the thresholds -- "reinsurer's  11:47:28
18  approval shall not be unreasonably withheld or  11:47:31
19  delayed."  11:47:36
20     That's what the contract says.  11:47:36
21     We got the right to settle. We go to  11:47:38
22  them. We tell them this is the decision we've  11:47:41
23  made. This is the judgment we've reached. They've  11:47:44
24  got to tell us quickly, do they consent. And if  11:47:46
25  they don't, they got to tell us why and how it's  11:47:50

Page 2798

-Summation - By Respondent-

1  
2  reasonable.  11:47:52
3      That's what the contract requires.  11:47:54
4      NICO also accepted Dukes Place's demand  11:47:56
5  that NICO create a claims fund so that the cedent  11:48:03
6  would not be out-of-pocket on making claims  11:48:09
7  payments.  11:48:12
8      We showed you the correspondence  11:48:12
9  yesterday. This is from Mr. Barclay's April 8th,  11:48:15
10  1998 letter to Mr. Jain, Exhibit 604. And he talks  11:48:21
11  about under the payment provisions drafted by NICO,  11:48:27
12  the cedent, Unigard -- it later become Seaton and  11:48:33
13  in our case Stonewall -- would be out of pocket on  11:48:38
14  average 105 days because it would have to pay, at  11:48:41
15  the close of the quarter send out a bill, 60 days  11:48:46
16  after the close of the quarter send out a bill, and  11:48:49
17  45 days later get paid. That's 105 days.  11:48:51
18      And he said, this is unreasonable.  11:48:56
19  We're turning over the reserves to you. You got  11:48:57
20  the money. Not us.  11:49:00
21      "We believe that the claims revolving  11:49:01
22  fund proposed by Hancock" -- by Hancock, again.  11:49:04
23  Hancock has no skin in the game. But they are the  11:49:08
24  ones who's saying that we got to get this past the  11:49:11
25  Insurance Department.  11:49:14

Page 2799

-Summation - By Respondent-

1  
2      -- "proposed by Hancock is the  11:49:15
3  appropriate funding mechanism for a reinsurance of  11:49:18
4  this nature and would ask for that wording to be  11:49:20
5  reinstated."  11:49:23
6      It was wording that they had proposed  11:49:23
7  previously in a prior draft of the slip.  11:49:25
8      And Mr. Jain agrees.  11:49:28
9      This is his cover letter responding.  11:49:30
10  April 14th, 1998, Exhibit 605. And in the first  11:49:33
11  paragraph of the letter he thanks Mr. Barclay for  11:49:39
12  his letter, and in the second sentence he says:  11:49:42
13  "We have considered the points addressed in your  11:49:46
14  letter, all of which are well taken."  11:49:48
15      And then in the last sentence of that  11:49:50
16  first paragraph he says: "As you will see, in  11:49:52
17  every instance we have incorporated revisions based  11:49:54
18  upon the points you raised in your April 8th  11:49:57
19  letter."  11:50:01
20      And then two pages later, in the -- or  11:50:01
21  the next page I guess it is -- he specifically  11:50:04
22  discusses a revolving claims fund. And he says  11:50:06
23  that the slip has been revised to provide for the  11:50:13
24  establishment of a claims account by the reinsurer.  11:50:16
25  We established an account, NICO establishes the  11:50:19

Page 2800

-Summation - By Respondent-

1  
2  account to be managed by you and Eastgate as claims  11:50:22
3  servicer. NICO puts up the money. Eastgate  11:50:25
4  manages it as claims servicer. Because they are  11:50:29
5  the ones agreeing the claims and paying the claims,  11:50:33
6  so they got to have access to NICO's money so they  11:50:35
7  can immediately reimburse Stonewall for paying the  11:50:39
8  claims.  11:50:42
9      And Mr. Jain says, we've also provided  11:50:42
10  that interest on the account, if any, should be for  11:50:47
11  our benefit. Which is exactly right. It's NICO's  11:50:50
12  money. The interest should belong to them. But  11:50:53
13  the account's got to be administered by Eastgate  11:50:57
14  because that's the only way there's not going to be  11:51:02
15  a delay in reimbursing Stonewall or Seaton.  11:51:05
16      Remember, Stonewall/Seaton agrees a  11:51:11
17  claim. Where it's below the threshold they settle  11:51:14
18  it, they cut a check or they wire transfer amounts.  11:51:19
19  They've got to have the funds immediately available  11:51:24
20  in a claims account to move from that claims  11:51:26
21  account into Seaton or Stonewall's account, because  11:51:29
22  that's the only way Seaton and Stonewall are not  11:51:32
23  out-of-pocket.  11:51:34
24      You cannot read this stuff any other  11:51:35
25  way. And Mr. Jain's interpretation yesterday was  11:51:37

30 (Pages 2797 to 2800)

Page 2801

-Summation - By Respondent-
1
2  so off the wall as to be utterly beyond belief.    11:51:41
3       The notion that in a contract that makes    11:51:45
4  Seaton or Stonewall the sole judge of their own    11:51:47
5  liabilities and sets up a revolving claims account,    11:51:52
6  that after Seaton and Stonewall as sole judge pays    11:51:55
7  a claim NICO can then second-guess that payment and    11:51:58
8  say, wait a second, we're going to make our own    11:52:01
9  determination of exposure and liability before we    11:52:04
10 reimburse you? Sheer nonsense.    11:52:08
11      And I believe Mr. Jain didn't know it    11:52:11
12 was sheer nonsense.    11:52:14
13      And the slip Mr. Jain attached to this    11:52:15
14 letter has the provision. "The reinsurer shall    11:52:19
15 establish and maintain an account for use by the    11:52:24
16 reinsured for the payment of claims hereunder."    11:52:27
17      Remember, claims get paid hereunder    11:52:30
18 under the reinsurance contract after they are first    11:52:34
19 paid by Seaton and Stonewall. So Seaton and    11:52:36
20 Stonewall cuts a check, the claim has been paid,    11:52:39
21 it's due hereunder. Look in this contract. There    11:52:43
22 is no provision for billing a claim.    11:52:46
23      There's provision for quarterly    11:52:49
24 accounts. And there's a provision that says    11:52:52
25 anything that hasn't been paid to us within 45 days    11:52:54

Page 2802

-Summation - By Respondent-
1
2  has to be paid. But there's no provision for    11:52:57
3  actually billing a claim. Because there was no    11:53:00
4  need to.    11:53:02
5       Now, Mr. Noonna, as I said, he tried to    11:53:04
6  look at the language here of amounts becoming due.    11:53:14
7  It says: "The amount of funds to be maintained in    11:53:20
8  the account shall be agreed between reinsured and    11:53:24
9  reinsurer as may be necessary from time to time."    11:53:27
10      Actually, it must have been the sentence    11:53:30
11 before. Where it says, "for payment of claims    11:53:32
12 hereunder." That this language changed the meaning    11:53:37
13 and intent of what Barclay and Jain had agreed to.    11:53:43
14 That it meant that Stonewall could actually be    11:53:48
15 out-of-pocket under the treaty.    11:53:50
16      Well, Mr. Barclay completely rejected    11:53:52
17 that in his testimony. And as I said, Mr. Jain's    11:53:54
18 testimony, to the contrary, was completely lacking    11:53:57
19 in credibility.    11:54:00
20      Reading Articles 4(a), 11(b), and 20    11:54:01
21 together, what they provide, in our view, is simply    11:54:14
22 undeniable. Stonewall is the sole judge of its    11:54:17
23 liability. As respects settlements made by    11:54:23
24 Stonewall below the threshold, NICO is    11:54:24
25 unconditionally bound by them, as long as they are    11:54:30

Page 2803

-Summation - By Respondent-
1
2  reasonable and in good faith, and NICO must have    11:54:32
3  provided enough money for the claims account to    11:54:35
4  fund them.    11:54:38
5       As respects settlements proposed by    11:54:39
6  Stonewall above the thresholds, NICO cannot delay    11:54:42
7  in giving its consent and it cannot withhold its    11:54:49
8  consent if those settlements are objectively    11:54:52
9  reasonable.    11:54:56
10      And, again, NICO must immediately    11:54:57
11 provide the funds to pay them immediately upon a    11:55:00
12 request from Stonewall.    11:55:06
13      That's the language in Article 20.    11:55:07
14      The only time NICO can withhold consent    11:55:11
15 to a proposed settlement above the thresholds is if    11:55:16
16 it can show the proposal is objectively    11:55:19
17 unreasonable.    11:55:22
18      NICO cannot withhold consent or payment    11:55:22
19 just because it is or just because Tom Ryan disagrees    11:55:29
20 and might have done things differently.    11:55:34
21      That's what NICO wanted the contract to    11:55:37
22 read. NICO wanted to have complete control. You    11:55:41
23 saw the early draft of the slip.    11:55:44
24      But NICO dropped that demand and agreed    11:55:48
25 to contract language that was very different.    11:55:51

Page 2804

-Summation - By Respondent-
1
2  Interpreting the treaty today to say    11:55:53
3  that in effect NICO has complete control over    11:55:58
4  whether a claim gets approved and when it gets paid    11:56:04
5  is to give NICO exactly what it sought but was    11:56:08
6  denied during the negotiation of the contract.    11:56:14
7       Now, there are two other provisions in    11:56:20
8  the treaty that we should address. But neither in    11:56:22
9  any way changes the meaning or effect of Articles    11:56:25
10 4(a), 11(b) and 20.    11:56:28
11      And by the way, I'm sure you noticed    11:56:30
12 throughout my friends' two-hour discussion this    11:56:34
13 morning there was no discussion of the treaty    11:56:38
14 language or the negotiations leading up to it.    11:56:40
15      This case is whether there was a    11:56:43
16 material breach of contract. And they told you    11:56:45
17 over and over there wasn't, but they never showed    11:56:48
18 you what the contract said or how it came to say    11:56:50
19 that. There was a reason they didn't, and it's the    11:56:52
20 reasons I just gave you.    11:56:55
21      But they did at one point during    11:56:56
22 Mr. Knoerzer's examination of Mr. Ryan point to    11:57:00
23 Article 11© and pretended that that changed    11:57:05
24 everything.    11:57:10
25      I refer you to page 1283, lines 9 to 24.    11:57:13

31 (Pages 2801 to 2804)

Page 2805

-Summation - By Respondent-

1
2  of the transcript. I'm not going to blow up the    11:57:18
3  whole thing, but it is where Mr. Knoerzer    11:57:20
4  questioned Mr. Ryan about Article 11©, and    11:57:23
5  Mr. Knoerzer suggested, and Mr. Ryan agreed, that    11:57:26
6  under 11© the onus was on Stonewall to tender to    11:57:29
7  NICO defense of any claim on which NICO refused to    11:57:35
8  approve a settlement.    11:57:40
9        But what neither of them made any    11:57:43
10  reference to was the highlighted language on the    11:57:47
11  screen: That that provision only applied during    11:57:49
12  the period from the effective date to the closing    11:57:54
13  date.    11:57:57
14        And those are defined terms in the    11:57:59
15  contract, as Mr. Kelly took Mr. Ryan through on    11:58:02
16  redirect.    11:58:05
17        And if you look at those definitions in    11:58:07
18  the contract, what you will see is that Article    11:58:09
19  11© only applied between May 1st and September    11:58:13
20  2000, the effective date of the transaction and the    11:58:18
21  closing date of the transaction. And that's why I    11:58:22
22  assume we haven't heard anything about it in my    11:58:27
23  friends' closing this morning.    11:58:30
24        We did hear a lot about the other    11:58:32
25  provision -- in fact, I think it was the only    11:58:35

Page 2806

-Summation - By Respondent-

1
2  provision in the contract they talked about, which    11:58:38
3  is Article 18.    11:58:40
4        Now, NICO says that this means that    11:58:43
5  Stonewall must put NICO's interests above its own.    11:58:47
6  We don't think NICO ever really believed that's    11:58:54
7  what it meant.    11:58:57
8        Because, as I said before, if it did, in    11:58:58
9  connection with the redomestication to Rhode Island    11:59:02
10  why would it feel compelled to seek and obtain a    11:59:06
11  written confirmation from Stonewall that Stonewall    11:59:10
12  would not take advantage of the Rhode Island    11:59:16
13  solvent scheme of arrangement to accelerate NICO's    11:59:20
14  liabilities?    11:59:24
15        We all know that a knowing acceleration    11:59:25
16  of NICO's liabilities, especially -- well, a    11:59:29
17  knowing acceleration of NICO's liabilities is    11:59:36
18  contrary to NICO's interests.    11:59:39
19        So if this provision meant that    11:59:41
20  Stonewall had to put NICO's interest ahead of    11:59:44
21  Stonewall's, I don't know why NICO would need    11:59:48
22  further written agreements protecting its interest    11:59:53
23  in connection with the redomestication.    11:59:57
24        But as you can see, this is not an    11:59:59
25  absolute fiduciary duty. I don't think once in the    12:00:04

Page 2807

-Summation - By Respondent-

1
2  two weeks of this case any one witness or counsel    12:00:09
3  for NICO has ever referred to the full language.    12:00:14
4        And what it says is:  There is a    12:00:19
5  fiduciary duty to act in utmost good faith to the    12:00:22
6  interests of reinsurer.    12:00:30
7        That's why Mr. Barclay considered it no    12:00:31
8  different or little different than any other    12:00:37
9  reinsurance contract. That's why Mr. Barclay felt    12:00:40
10  this is implicit in every reinsurance agreement,    12:00:44
11  the obligation to act in good faith towards my    12:00:47
12  reinsurer's interests.    12:00:50
13        Here's the definition of "utmost good    12:00:52
14  faith." This was the first reinsurance text ever    12:00:56
15  written in the United States. It was Mr. Strain's    12:00:59
16  book, issued in I think -- I think it was first    12:01:02
17  published in 1980. And I had the great good    12:01:05
18  fortune to have been called upon by Henry Kramer    12:01:08
19  who was hired by Mr. Strain to write the lead    12:01:11
20  article, write the glossary and pick the authors    12:01:14
21  and topics for all the other articles in the book.    12:01:18
22        Henry gave me the honor of forwarding to    12:01:20
23  me some of these things in draft form and actually    12:01:24
24  asking what my opinion was.    12:01:26
25        Here's the definition of utmost good    12:01:28

Page 2808

-Summation - By Respondent-

1
2  faith or, uberrimae fidei, that finally made its    12:01:31
3  way into the agreement: "Literally of the utmost    12:01:37
4  good faith. A defining characterization or quality    12:01:40
5  of some (contractual) relationships, of which    12:01:43
6  reinsurance is universally recognized to be one.    12:01:49
7  Among other differences from ordinary    12:01:53
8  relationships, the nature of reinsurance    12:01:55
9  transactions is dependent upon a mutual trust and a    12:01:57
10  lively regard for the interests of the other party    12:02:01
11  even if inimical to one's own."    12:02:03
12        It's a mutual obligation, and it's an    12:02:14
13  obligation to have a lively regard to the interest    12:02:16
14  of the other party even if inimical to one's own.    12:02:16
15        It is not an obligation to make the    12:02:23
16  other party's interest primary or ahead of your    12:02:24
17  own.    12:02:29
18        And frankly, I doubt that any insurance    12:02:32
19  Department would understand it that way. Because    12:02:36
20  that would make the interest of reinsurers more    12:02:39
21  important than the interest of policyholders. And    12:02:43
22  no insurance department is going to say yes to    12:02:47
23  that.    12:02:51
24        "The fiduciary duty to act in the utmost    12:02:56
25  good faith." That's what it says: "A fiduciary    12:03:00

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2809

-Summation - By Respondent-

1
2  duty to act in the utmost good faith."           12:03:02
3      That means that Stonewall cannot enter       12:03:04
4  into settlements just because NICO's going to be  12:03:06
5  funding them.                                     12:03:09
6      It means that Stonewall can't over pay        12:03:10
7  for policy buybacks or do policy buybacks it      12:03:16
8  wouldn't do in the absence of reinsurance from    12:03:19
9  NICO. And we submit it means nothing more than    12:03:23
10 that.                                             12:03:27
11     And if you look at page 239, line 23, to      12:03:31
12 240, line 13, of the transcript, you will see that 12:03:36
13 Mr. Kruter, the author of that provision, could   12:03:39
14 think of no other circumstance in which it would  12:03:44
15 apply, other than Stonewall deliberately          12:03:46
16 accelerating NICO's liability by overpaying for a 12:03:52
17 policy buyback simply because the money was going 12:03:56
18 to come out of NICO's pocket. That's the only     12:04:00
19 example he could think of.                        12:04:02
20     Article 1 of the treaty, the Stonewall        12:04:03
21 treaty, like the Seaton treaty before it, was     12:04:10
22 expressly conditioned on receiving all necessary  12:04:13
23 approvals from state insurance regulatory         12:04:16
24 authorities.                                      12:04:20
25     The treaties that the regulators             12:04:23

Page 2810

-Summation - By Respondent-

1
2  approved clearly gave the ceding company, in our  12:04:26
3  case Stonewall, full control over the settlement of 12:04:31
4  its liabilities, requiring only that it not       12:04:38
5  knowingly do excessive settlements at NICO's      12:04:43
6  expense, and that NICO could withhold consent and 12:04:46
7  payment to settlements or buybacks above the      12:04:51
8  threshold only if it could demonstrate that they  12:04:55
9  were objectively unreasonable. Namely, that       12:04:58
10 Stonewall had made an error in its evaluation.     12:05:02
11     That's what Barclay and Jain negotiated.       12:05:08
12 That's what the parties put in their contract.     12:05:12
13 That's what the regulators approved. And that's    12:05:16
14 what NICO breached.                                12:05:20
15     And it breached it because Mr. Jain            12:05:22
16 admitted that he knew when he did the deal it was  12:05:27
17 structurally flawed.                               12:05:32
18     Here's his testimony.                          12:05:34
19     I asked him: "Why did you need checks          12:05:39
20 and balances to make sure that the right claims and 12:05:42
21 expenses were being paid at the right time?        12:05:44
22     Answer: Well, the way the reinsurance         12:05:48
23 transaction had been structured one of the        12:05:52
24 structural flaws" -- and later he talked about     12:05:54
25 there were many -- "one of the structural flaws, in 12:05:58

Page 2811

-Summation - By Respondent-

1
2  my mind, was that the way it was set up was we as  12:06:02
3  the reinsurer could end up losing money" -- God    12:06:10
4  forbid -- "but the cedent could end up making      12:06:15
5  money. The converse was not true."                 12:06:17
6      He later admitted the converse was true.       12:06:19
7  But let's stick with this for a minute.             12:06:22
8      "And so it was very important for me to        12:06:24
9  make sure that we had a say and had the appropriate 12:06:27
10 checks and balances to make sure that our economics 12:06:30
11 were not being compromised by somebody who did not 12:06:32
12 have the exact same incentives and economic        12:06:35
13 interests that we did."                             12:06:39
14     One would have thought that the               12:06:41
15 contractual terms he agreed to contained the       12:06:49
16 necessary checks and balances. But NICO didn't     12:06:53
17 believe that, even though it agreed to the         12:06:59
18 contrary.                                           12:07:02
19     The collaboration agreement between NICO      12:07:03
20 and Eastgate/Randall/Cavell -- I'll probably use   12:07:07
21 them interchangeably -- completely destroyed the   12:07:12
22 careful balance negotiated by the parties and      12:07:16
23 obliterated Stonewall's rights under the treaty.   12:07:20
24     But they were completely consistent.           12:07:24
25 The terms of the collaboration agreement are       12:07:29

Page 2812

-Summation - By Respondent-

1
2  completely consistent with what Mr. Jain at the end 12:07:32
3  of the day admitted was his objective from the very 12:07:36
4  outset of the negotiations; namely, to direct and  12:07:40
5  control the claims handling.                        12:07:45
6      I don't have a blowup. It's page 258 of       12:07:47
7  yesterday's transcript. I think it was the last    12:07:50
8  thing I asked him.                                  12:07:52
9      "Wasn't it always your objective to           12:07:53
10 direct and control the claims handling?"            12:07:57
11     And he said: "Yeah."                            12:08:00
12     There's no dispute that at the time the        12:08:02
13 Stonewall and the Seaton treaty were negotiated and 12:08:06
14 approved by the insurance regulators Eastgate was  12:08:10
15 acting as agent for Seaton and Dukes Place --       12:08:13
16 Seaton, Stonewall and Dukes Place, and that NICO   12:08:19
17 knew it.                                            12:08:22
18     This is page 2 of -- I think it's             12:08:23
19 Exhibit 500, Mr. Barclay's July 10th, 1998 letter  12:08:28
20 to Mr. Jain. Page 1 of it was the first blowup of  12:08:34
21 it, where he talks about: "Our objective is to     12:08:38
22 realize our investment in five years."              12:08:41
23     Here are just a couple of places where        12:08:43
24 he makes clear that he is acting as an agent for a  12:08:45
25 principal. And the principal is Dukes Place.        12:08:48

33 (Pages 2809 to 2812)

Page 2813

```
1        -Summation - By Respondent-
2        Now, Mr. Barclay went through the entire   12:08:51
3    derivation of all these concepts. Their         12:08:55
4    relationships with one another. Their ownership's 12:08:58
5    interests in one another. I urge you to read them. 12:09:01
6    Read that part of his testimony. I think it was   12:09:04
7    the very beginning of his direct testimony. And I  12:09:06
8    apologize, I don't have a page cite.              12:09:09
9        But I believe, and I'm sure it must have      12:09:12
10   been inadvertently, in their closings Mr. Nonna and 12:09:15
11   Mr. Knoerzer I believe got those relationships     12:09:19
12   wrong. I believe that they said that after the --  12:09:22
13   even after the collaboration agreement was in force 12:09:26
14   that Dukes had an ownership interest in            12:09:30
15   Eastgate. I think that was when he said Dukes      12:09:32
16   Place had an ownership interest in Eastgate. And I 12:09:36
17   believe that's wrong.                             12:09:39
18       I believe what Mr. Barclay said was at        12:09:41
19   the time of the transaction where they acquired    12:09:46
20   Cavell Insurance Company and Cavell Management     12:09:50
21   Company Dukes Place sold out its interest in       12:09:54
22   Eastgate to Capita. As did Ken Randall. And Ken    12:09:57
23   Randall formed a new organization, Ken Randall     12:10:03
24   America.                                          12:10:06
25       The collaboration agreement, if I'm not       12:10:10
```

Page 2814

```
1        -Summation - By Respondent-
2    mistaken -- and this would be embarrassing if I    12:10:12
3    was -- was with Ken Randall America. It was after 12:10:16
4    Dukes Place had sold its interest in Eastgate.     12:10:19
5    Eastgate had nothing to do with this anymore.      12:10:21
6        So from the time of the collaboration          12:10:23
7    agreement on, Dukes Place did not have an ownership 12:10:26
8    interest in Randall's company that made the deal   12:10:30
9    with NICO. And I think that's important.           12:10:32
10       But going back to at the time the deal         12:10:38
11   was negotiated, they did. They owned 30 percent of 12:10:40
12   Eastgate Group. And Eastgate Group owned Eastgate  12:10:43
13   Inc., which was going to be the claims servicer.   12:10:47
14       But clearly Eastgate Group is disclosing       12:10:50
15   that it's acting for principal Dukes Place.        12:10:54
16   There's no doubt that the treaty designates        12:10:58
17   Eastgate Inc. to act as agent for Seaton and       12:11:00
18   Stonewall in carrying out their claims handling and 12:11:03
19   settlement responsibilities under the treaty.      12:11:06
20       As claims servicer, that was their job.        12:11:08
21   To act in place of the cedent.                     12:11:11
22       And there's also no dispute that as            12:11:14
23   agents for these disclosed principals, Dukes Place 12:11:17
24   and then later Seaton and Stonewall, Eastgate owed 12:11:22
25   them a duty of undivided loyalty. That is what an  12:11:27
```

Page 2815

```
1        -Summation - By Respondent-
2    agent owes its principal.                 12:11:32
3        Mr. Krutter claims not to know that    12:11:32
4    actually, on page 207 and 208 of the transcript.  12:11:34
5    But NICO's counsel has never denied it. I would be 12:11:37
6    amazed if they did. And if they do, we'd be happy 12:11:42
7    to provide you reams of legal authority for that   12:11:45
8    proposition.                              12:11:49
9        So where the treaty gives the cedent the 12:11:49
10   sole authority to settle claims, NICO clearly      12:11:53
11   understood that such authority would be exercised  12:11:57
12   by Eastgate as agent for the cedent. And that in   12:11:59
13   exercising that authority Eastgate had a duty of   12:12:04
14   undivided loyalty to the cedent. Thus, Eastgate    12:12:09
15   would decide whether or on what terms to settle a  12:12:12
16   claim or buyback a policy, and it would do so      12:12:15
17   acting as if it were Stonewall. And subject to all 12:12:18
18   of Stonewall's obligations to policyholders on the 12:12:23
19   one hand and to reinsurers on the other.           12:12:27
20       In the collaboration agreement           12:12:29
21   Eastgate -- which is no longer Eastgate, now it's  12:12:33
22   Ken Randall America -- purports to delegate its    12:12:39
23   claims handling and settlement functions to NICO.  12:12:43
24       Paragraph 3. Thank God I got it right.   12:12:48
25   And it's Randall America. That would have been     12:12:53
```

Page 2816

```
1        -Summation - By Respondent-
2    embarrassing.                             12:12:55
3        Here's what they purport to do.        12:12:56
4    "Randall America hereby delegates to NIC and NIC   12:13:00
5    accepts responsibility for the management of claims 12:13:05
6    in respect of Seaton and Stonewall and NIC        12:13:09
7    undertakes to provide the Schedule 4 services on   12:13:15
8    Randall America's behalf."                 12:13:19
9        Schedule 4 are all the claim services.  12:13:21
10       Down at the very bottom: "For the       12:13:23
11   avoidance of doubt, NIC retains all" -- least      12:13:26
12   ambiguous word in the English language -- "all     12:13:31
13   authorities to supervise and control claims        12:13:35
14   handling and reinsurance collections as are        12:13:37
15   provided in each of the agreements referenced in   12:13:40
16   Recitals A through F."                     12:13:44
17       And among the agreements referenced in  12:13:47
18   those recitals are Randall's runoff management      12:13:49
19   agreement with Seaton and its runoff management    12:13:52
20   agreement with Stonewall.                  12:13:56
21       All of the claims control that NICO had 12:13:57
22   sought and had been denied in the negotiation of   12:14:02
23   the treaty Randall has now handed to it on a silver 12:14:06
24   platter.                                  12:14:13
25       Compare this with the negotiation of the 12:14:14
```

34 (Pages 2813 to 2816)

Page 2817

-Summation - By Respondent-
1
2    treaty. Everything NICO had asked for but didn't   12:14:18
3    get in the treaty, it now gets. And that's not a   12:14:23
4    material modification?   12:14:28
5        On every planet I've ever inhabited I   12:14:32
6    think that would be called a material modification.   12:14:37
7        MR. SNOVER: How many planets?   12:14:42
8        MR. BRANDES: Both Forrest Krutter and   12:14:47
9    Ken Randall himself, the negotiators of the   12:14:50
10   collaboration agreement, had to have known that it   12:14:53
11   completely rewrote the treaties to NICO's enormous   12:14:57
12   advantage and Stonewall's enormous detriment.   12:15:01
13       They would have to have been -- no, I   12:15:08
14   won't say that.   12:15:11
15       Remember, Krutter had drafted the   12:15:12
16   original ship, which would have given NICO complete   12:15:14
17   control of claims. And he was deeply involved, you   12:15:17
18   heard Mr. Jain say it yesterday, in the negotiation   12:15:20
19   of the treaty language that instead gave that   12:15:22
20   control to the cedant.   12:15:24
21       Do you believe he really failed to   12:15:25
22   recognize that the collaboration agreement was   12:15:27
23   undoing the negotiations and the treaty language?   12:15:30
24       You'll decide.   12:15:34
25       I don't believe it. I believe he had to   12:15:36

Page 2818

-Summation - By Respondent-
1
2    have known, and he also had to have known that to   12:15:42
3    do this he had to get an amendment of the treaty,   12:15:45
4    and that required Stonewall's consent and signature   12:15:48
5    on a written document. That's what the treaty   12:15:51
6    says. Article 8: "The terms of this reinsurance   12:15:53
7    shall not be waived, modified or changed except by   12:15:56
8    written amendment executed by a duly authorized   12:15:59
9    officer of the reinsured and the reinsurer."   12:16:02
10       You need a written amendment signed by s   12:16:05
11   duly authorized officer of Stonewall.   12:16:08
12       We believe that the collaboration   12:16:14
13   agreement had the effect of converting the claims   12:16:16
14   servicer from Randall to NICO. We don't believe   12:16:19
15   anyone can disagree that it had that effect.   12:16:22
16       Randall's claim servicer, and he   12:16:26
17   delegated all of his rights and obligations to   12:16:28
18   NICO. That's a material change in the contract.   12:16:31
19   That's a modification of the contract. And in   12:16:34
20   order to be done it should have been submitted for   12:16:37
21   amendment and signing by Stonewall.   12:16:40
22       But it never was. I think Krutter knew   12:16:42
23   he could never get it. He had negotiated the   12:16:46
24   treaty. He knew Barclay was not about to give him   12:16:49
25   what Barclay wouldn't give him during the treaty   12:16:52

Page 2819

-Summation - By Respondent-
1
2    negotiations. Especially since the collaboration   12:16:55
3    agreement gave Stonewall and Seaton nothing in   12:16:57
4    return. Nothing.   12:17:00
5        In its briefs NICO claimed that the   12:17:03
6    collaboration agreement did give Stonewall a quid   12:17:06
7    pro quo; namely, prefunding of claims. But the   12:17:10
8    collaboration agreement says nothing about   12:17:12
9    prefunding of claims. It doesn't require it.   12:17:15
10       And as we've seen, Seaton and Stonewall   12:17:17
11   had already negotiated and received a funding   12:17:21
12   obligation in Article 20 that wasn't prefunding,   12:17:24
13   but it was essentially as good as it. Stonewall   12:17:28
14   still had to first cut the check or first make a   12:17:31
15   wire transfer. But the minute it handed over the   12:17:34
16   check or pressed the button on the wire transfer it   12:17:37
17   could transfer funds from the claims account into   12:17:40
18   its own account.   12:17:43
19       At most, if it's a check, it is never   12:17:43
20   out of pocket because it takes a check some time to   12:17:47
21   clear. If it's a wire transfer, maybe they are   12:17:49
22   out of pocket an hour. Or if the wire transfer   12:17:52
23   goes out, hits at the end of the day and the wire   12:17:55
24   transfer coming in doesn't hit until the following   12:17:57
25   morning, maybe they are out of pocket overnight.   12:18:00

Page 2820

-Summation - By Respondent-
1
2    That's the most.   12:18:04
3        Under the treaty they had control of   12:18:05
4    claims and the claims account. They didn't have to   12:18:06
5    give up control of claims to get a claims account   12:18:09
6    or prefunding. That argument is just baseless.   12:18:12
7        The collaboration agreement completely   12:18:15
8    and materially rewrote the treaty. Ryan recognized   12:18:19
9    it. He acknowledged that the collaboration   12:18:22
10   agreement transferred Cavell's duties to NICO, gave   12:18:28
11   NICO control of claims and eliminated the threshold   12:18:33
12   set out in the treaty. He testified to all of   12:18:36
13   that. Pages 1149 to 50 and 1155 of the transcript.   12:18:39
14       Stonewall never agreed to the   12:18:43
15   collaboration agreement. And it certainly got no   12:18:47
16   benefit out of it. But Randall got a huge benefit   12:18:51
17   out of it. He got to run off the CU book with   12:18:54
18   NICO.   12:18:57
19       You heard Ryan tell you, instead of   12:18:58
20   having just 30 DJ actions to handle for Seaton and   12:19:00
21   Stonewall, all of a sudden Randall now gets 300   12:19:03
22   more in from Commercial Union.   12:19:07
23       That's page 918 of the transcript.   12:19:10
24       Overnight Randall goes from essentially   12:19:12
25   a nonentity when it comes to the U.S. runoff   12:19:16

35 (Pages 2817 to 2820)

Page 2821

-Summation - By Respondent-
1
2   market, to a major presence. And he reaped a      12:19:19
3   windfall profit in the bargain. He was being      12:19:25
4   paid -- his company, Randall America, was being   12:19:29
5   paid 4 to $5 million every year by Seaton and     12:19:32
6   Stonewall to run off their claims. Over the life  12:19:35
7   of their contract with Randall Stonewall paid them 12:19:37
8   over $11 million to handle their claims. And to do 12:19:40
9   some administration. But come on. The             12:19:44
10  administration was a tiny part of what he's being 12:19:47
11  hired for. He's being hired to run off the claims 12:19:50
12  and he's being paid handsomely to do it.          12:19:54
13      After the collaboration agreement was         12:19:58
14  signed, NICO was reimbursing him for virtually all 12:19:59
15  the costs he's incurring in running off those     12:20:02
16  claims. Not just running off his claims in Seaton 12:20:05
17  and Stonewall, but running off claims for CU also. 12:20:08
18  NICO is paying him 6 to $8 million a year in       12:20:12
19  reimbursement.                                     12:20:15
20      Now again, I can't tell you what part of      12:20:16
21  that is Seaton and Stonewall as opposed to CU.     12:20:18
22  Probably a relatively small part. But the fact     12:20:22
23  he's being paid by Seaton and Stonewall to run off 12:20:25
24  claims and now he's incurring no expense to do     12:20:28
25  that, and whatever expense he's incurring he's     12:20:31

Page 2822

-Summation - By Respondent-
1
2   being reimbursed dollar for dollar by NICO, a      12:20:36
3   windfall profit.                                   12:20:39
4       And the money he's receiving from Seaton       12:20:40
5   and Stonewall, 4 to 5 million a year, instead of   12:20:42
6   being used to pay a claim staff that now goes right 12:20:45
7   in his pocket, except for the 1.3 million a year   12:20:48
8   that he's got to kick back to NICO, which was part 12:20:51
9   of this deal.                                      12:20:54
10      Do you have any doubt that this is a           12:20:55
11  substantial economic benefit to Randall?           12:20:57
12      Mr. Krutter at page 251 of the                 12:20:59
13  transcript, Ms. Hoelsken at page 512 and again at  12:21:01
14  page 514 to 515, and Mr. Ryan at pages 1168 and    12:21:05
15  again 1171 to 1172 all denied that the             12:21:11
16  collaboration agreement was any financial benefit  12:21:15
17  to Randall because it was really reimbursing his   12:21:17
18  costs, not paying them.                            12:21:20
19      Can you believe that? If you pay your          12:21:22
20  gardener a thousand dollars a year, you're         12:21:26
21  out-of-pocket a thousand dollars, right? If you're 12:21:28
22  neighbor reimburses you for that thousand dollars, 12:21:31
23  isn't that a financial benefit to you?             12:21:34
24      If you say no, I'll offer to pay you           12:21:37
25  back the thousand.                                 12:21:45

Page 2823

-Summation - By Respondent-
1
2       Randall deliberately sold out the             12:21:46
3   interest of his principal, Seaton and Stonewall, to 12:21:48
4   line his own packets and enhanced his             12:21:51
5   U.S. operations, and Krutter took advantage of    12:21:54
6   Randall's greed and dishonesty to garner the very 12:21:57
7   control of claims that he had sought and that Jain 12:22:00
8   had demanded but which they had been denied in the 12:22:03
9   treaty.                                            12:22:08
10      If you don't think that's the case,           12:22:08
11  consider for a minute Krutter's explanation of why 12:22:10
12  the collaboration agreement was done.              12:22:13
13      According to him, it was done because         12:22:15
14  NICO was better able to handle claims than Randall. 12:22:20
15  But Randall had a better infrastructure than NICO. 12:22:24
16  He said that on page 158 of the transcript. It's   12:22:28
17  the most unbelievable testimony in the whole case, 12:22:32
18  in my opinion. Randall had a better infrastructure 12:22:35
19  than Berkshire Hathaway was able to provide.       12:22:40
20      When Tom Ryan came aboard, which was now       12:22:42
21  named Cavell, he said their systems were horrible. 12:22:47
22  938 to 940 of the structure. But this was the      12:22:50
23  infrastructure that Berkshire Hathaway needed.     12:22:53
24      On the other hand, NICO was better able        12:22:56
25  to handle the claims than Cavell/Randall was?      12:22:57

Page 2824

-Summation - By Respondent-
1
2       That's kind of interesting, since they        12:23:01
3   took over the Cavell claim staff. They had nobody 12:23:04
4   of their own.                                      12:23:06
5       That's NICO's tendered explanation for        12:23:09
6   why the collaboration agreement was done.          12:23:12
7       You can believe that or you can believe       12:23:14
8   our explanation, which was Ken Randall made himself 12:23:16
9   a lot of money and became a major player and NICO 12:23:19
10  got the control of claims that it had been denied  12:23:23
11  in the treaty.                                     12:23:26
12      Which do you think is more credible?          12:23:27
13  You tell us which is more credible.                12:23:28
14      But the fact that it's a material breach      12:23:30
15  we think is undeniable, and the proof is in the    12:23:33
16  pudding. You saw and heard Mr. Snover's testimony. 12:23:39
17  He was NICO's go-to guy in exercising its          12:23:42
18  association rights and its right to consent to      12:23:46
19  settlements above the threshold before the         12:23:50
20  collaboration agreement came into being.           12:23:52
21      That's for Stonewall. Not for Seaton.         12:23:53
22  He was their go-to guy for Stonewall. That's page 12:23:57
23  618 of the transcript.                             12:24:02
24      He told you during that same period he        12:24:03
25  had no claim files in front of him to consult and  12:24:05

36 (Pages 2821 to 2824)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2825

-Summation - By Respondent-
1
2  no basis not to consent whenever Bob Burns or    12:24:08
3  others proposed a settlement on behalf and    12:24:12
4  Stonewall. That's 616 and 617 of the transcript.    12:24:16
5      He also told you he be never withheld    12:24:19
6  payment. That is page 617.    12:24:19
7      No wonder Mr. Burns liked working with    12:24:22
8  him.    12:24:25
9      Mr. Knoerzer made a big deal during his    12:24:26
10  closing that Burns enjoyed working with Mr. Snover.    12:24:29
11  Well, of course he did. Brian was a rubber stamp.    12:24:32
12  He admitted it.    12:24:36
13      That's how the deal worked before the    12:24:38
14  collaboration agreement. We know it didn't work    12:24:41
15  that way after the collaboration agreement.    12:24:45
16      And Mr. Snover, again, told us -- and    12:24:48
17  it's worth looking at this part of his transcript.    12:24:52
18  I asked him: "Isn't it a fact that prior to the    12:24:55
19  execution of this collaboration agreement you    12:24:58
20  didn't do any of the things that NICO is authorized    12:25:01
21  to do in Article 3?"    12:25:05
22      And his answer was: "I believe that's    12:25:07
23  right. Before the collaboration agreement, NICO    12:25:10
24  did not do any of the things that it's authorized    12:25:12
25  to do and did do under the collaboration    12:25:17

Page 2826

-Summation - By Respondent-
1
2  agreement."    12:25:21
3      How can anybody say this is not a    12:25:21
4  material change?    12:25:24
5      And Ryan admitted after the    12:25:24
6  collaboration agreement, he did do it, all of the    12:25:30
7  things that Article 3 allowed him to    12:25:34
8      That's pages 1149 to 1151 of the    12:25:36
9  transcript. Again, undeniable.    12:25:39
10      Now, the testimony you heard from    12:25:45
11  Ms. Hoelsken and Mr. Krutter to the contrary is    12:25:47
12  interesting, to say the least.    12:25:51
13      First, their stories conflict with one    12:25:53
14  another. According to Hoelsken, within two weeks    12:25:58
15  after the sale of Seaton to Dukes Place Randall had    12:26:01
16  already given full claims control to NICO, and NICO    12:26:06
17  was already in Unigard's Seattle office taking    12:26:10
18  control. That's at pages 288 to 289 of the    12:26:13
19  transcript.    12:26:17
20      Well, when Ms. Hoelsken testified to    12:26:18
21  that, that was the first anybody on our side of the    12:26:21
22  room ever heard of it. And I strongly suspect it    12:26:24
23  was the first anybody on NICO's side ever heard of    12:26:27
24  it. Because nobody from NICO supports it.    12:26:30
25      Who on behalf of NICO made this deal two    12:26:36

Page 2827

-Summation - By Respondent-
1
2  weeks after the Seaton contract was done? It    12:26:42
3  wasn't Mr. Jain. It wasn't Mr. Snover. Mr. Snover    12:26:46
4  said he had nothing to do with Seaton. And it    12:26:49
5  wasn't Mr. Krutter. Mr. Krutter says he wasn't    12:26:52
6  approached about a prefunding deal until a few    12:26:55
7  months after the Seaton contract was in force. And    12:26:59
8  that's at page 146 to 147 of the transcript.    12:27:02
9      So which was it? Was it two weeks or    12:27:07
10  several months? Got me.    12:27:12
11      There's also not a shred of documentary    12:27:13
12  evidence to suggest that any such prefunding deal    12:27:20
13  was ever actually made. There is not a single    12:27:23
14  document in the entire case, Seaton or Stonewall,    12:27:26
15  that refers to this prefunding deal prior to the    12:27:31
16  time of the collaboration agreement.    12:27:36
17      Jain said he wasn't aware of any    12:27:38
18  prefunding deal. That's page 240 of his    12:27:44
19  transcript. Snover wasn't aware of it. That's    12:27:47
20  page 630.    12:27:49
21      And, again, the very notion that before    12:27:52
22  the ink was dry on the Seaton contract Seaton would    12:27:56
23  have abandoned its claims handling rights in order    12:28:01
24  to get prefunding simply makes no sense, because it    12:28:05
25  already had both in the treaty that Mr. Barclay    12:28:09

Page 2828

-Summation - By Respondent-
1
2  negotiated.    12:28:12
3      Mr. Jain wrote a letter to the    12:28:12
4  Washington Insurance Department that we saw    12:28:16
5  yesterday, Exhibit 645, in which he assured us that    12:28:18
6  "no material changes to the reinsurance agreement    12:28:26
7  are contemplated and that we will keep you apprised    12:28:29
8  of any material changes contemplated in the    12:28:32
9  future."    12:28:35
10      Well, if as Hoelsken and Krutter say    12:28:36
11  that either a couple of weeks or several months    12:28:41
12  after the treaty was written a new deal, oral side    12:28:44
13  deal, was struck under which the cedent abandoned    12:28:49
14  its claims handling right in return for prefunding    12:28:54
15  by the reinsurer, wouldn't you call that a material    12:28:58
16  change that the regulator ought to be advised of?    12:29:00
17      More importantly, for our case, whether    12:29:04
18  it was done two weeks after the Seaton contract was    12:29:10
19  signed or five months after, this oral agreement    12:29:13
20  was in force before the Stonewall contract was    12:29:17
21  submitted to the Ohio Insurance Department.    12:29:21
22      That's what both Hoelsken and Krutter    12:29:24
23  have told you.    12:29:27
24      Don't you think it should have been    12:29:30
25  disclosed to the Ohio department? You're    12:29:32

37 (Pages 2825 to 2828)

Page 2829

-Summation - By Respondent-

1
2  submitting a contract to the Ohio Department that's  12:29:35
3  got all the provisions I went through earlier.   12:29:37
4  Don't you think you ought to tell them, by the way,  12:29:40
5  we have no intention of operating that way?  In   12:29:44
6  fact, we have delegated complete control on claims  12:29:48
7  to the reinsurer?        12:29:52
8       Mr. Snover says no.  I asked him:  "If  12:29:55
9  you felt an agreement was in place for Stonewall  12:30:01
10  that Stonewall claims, even those below the   12:30:05
11  threshold, would have to be preapproved and   12:30:10
12  prefunded by NICO before they could be approved by  12:30:12
13  Stonewall, would you have felt compelled to bring  12:30:14
14  that to the attention of the Ohio regulators?"   12:30:17
15       He asked me a question.      12:30:20
16       I said:  "If the way the parties   12:30:21
17  intended to operate under the contract differed   12:30:23
18  from what the contract actually said, would you   12:30:26
19  have felt compelled to notify the department of   12:30:28
20  that?"          12:30:36
21       He said:  "I doubt it."      12:30:36
22       He probably wants that testimony back.  12:30:38
23       Let's look at what Mr. Jain said.  His  12:30:42
24  testimony was fascinating.      12:30:44
25       "Question:  Had you been aware of such  12:30:46

Page 2831

-Summation - By Respondent-

1
2  regulators.        12:31:48
3       And, take a look at Mr. Barclay's   12:31:54
4  testimony.  Mr. Barclay told us:  "I remember – I  12:31:58
5  do remember in conversations with the Ohio   12:32:06
6  Insurance Department that they were very concerned  12:32:09
7  that the responsibility for the settlement of   12:32:12
8  claims remained clearly vested in Stonewall   12:32:13
9  Insurance Company."       12:32:17
10       And then Shawn shows him a provision.  12:32:19
11  I'm not sure what provision, to tell you the truth.  12:32:24
12       And Barclay says:  "Whether it was this  12:32:27
13  specific provision or whether it was a general   12:32:29
14  discussion, I don't recall."      12:32:32
15       "Question:  And that general discussion  12:32:34
16  was what, as best you can recall?     12:32:35
17       "Answer:  It was categoric direction   12:32:38
18  from Ohio, claims handling must remain vested in  12:32:40
19  the company."        12:32:44
20       I won't read the last sentence.    12:32:45
21       Ohio insists that claims handling must  12:32:51
22  be vested in the company.  You've got – and the  12:32:54
23  treaty says that.  The treaty that's submitted to  12:32:56
24  Ohio says that.        12:32:59
25       But according to Krutter and Hoelsken  12:33:00

Page 2830

-Summation - By Respondent-

1
2  an oral preapproval prefunding deal would you have  12:30:48
3  felt obliged to tell the Washington and Ohio   12:30:52
4  Insurance Departments about it?     12:30:55
5       "Probably not."       12:30:57
6       He then went on to give a longer answer.  12:30:58
7  But I followed up.       12:31:00
8       "Mr. Jain, if you've got an oral or even  12:31:01
9  a written side agreement that's different than what  12:31:04
10  is set out in the contract, and it's not a one-off  12:31:07
11  exception, it's not an emergency situation like  12:31:10
12  Katrina, it's the absolute day-to-day,    12:31:13
13  week-to-week, year-to-year functioning of the   12:31:16
14  treaty, wouldn't you feel obliged to tell the   12:31:18
15  regulators that the treaty we've submitted to you  12:31:20
16  for approval does not in fact accurately reflect  12:31:23
17  the actual deal?"       12:31:26
18       And his answer was:  "There was   12:31:27
19  absolutely no intent to hide anything from the   12:31:30
20  regulators."        12:31:33
21       Then I said:  "That wasn't my question."  12:31:36
22       And he said:  "That is my response."  12:31:38
23       Okay, there was no intent to hide   12:31:39
24  anything from the regulators.  But no denial that  12:31:42
25  material information was hidden from the   12:31:46

Page 2832

-Summation - By Respondent-

1
2  you've got an oral side deal that claims handling  12:33:03
3  authority is vested in the reinsurer.  Do you think  12:33:09
4  Ohio would have known that?  Do you think Ohio  12:33:13
5  would have approved this if it had known that?  12:33:16
6       Remember, this treaty was     12:33:22
7  expressly conditioned on regulatory approval.   12:33:26
8  That's Article 1.        12:33:28
9       If the parties never intended to comply  12:33:29
10  with the treaty that the regulators approved, I  12:33:37
11  submit you absolutely have to rescind it, that you  12:33:41
12  have no choice but to rescind it.  Because if you  12:33:45
13  do not, you are becoming post facto contributors to  12:33:48
14  or sanctioners of a fraud on the Ohio Insurance  12:33:53
15  Department.  And frankly, that ought to be the end  12:33:59
16  of this case.        12:34:01
17       But since we spent two weeks here   12:34:03
18  talking about a lot of other things I'm going to  12:34:06
19  talk about that other stuff because it's worth  12:34:08
20  going into.        12:34:10
21       THE UMPIRE:  You want to take a break  12:34:11
22  now, Larry –        12:34:13
23       MR. BRANDES:  I'm going to want to take  12:34:15
24  a break at some point, but let me keep going.   12:34:17
25       THE UMPIRE:  Okay.      12:34:19

38 (Pages 2829 to 2832)

Page 2833

```
1        -Summation - By Respondent-
2        MR. BRANDES: Because NICO says even if        12:34:20
3    all of this is true, not the fraud on the        12:34:23
4    department, but even if everything we say about        12:34:25
5    what the treaty is intended to do and what the        12:34:28
6    collaboration agreement actually does, even if all        12:34:30
7    of that is true, even if it was a material breach,        12:34:34
8    none of it matters, because Barclay and the        12:34:37
9    Stonewall board knew all about it. And either        12:34:40
10   approved it or didn't object.        12:34:43
11       I think it's worth looking at the actual        12:34:49
12   evidence of what Mr. Barclay knew.        12:34:53
13       They are good, my friends, on giving you        12:34:56
14   charts and fancy colored blow-ups with seven or        12:35:00
15   eight items on them. But let's look at the actual        12:35:04
16   items, how far apart in time they are and what they        12:35:06
17   actually say where we hang Mr. Barclay.        12:35:10
18       The collaboration agreement is signed in        12:35:13
19   the summer of 2001. It would have been real easy        12:35:17
20   for Mr. Randall, as Stonewall's agent, to tell        12:35:22
21   Mr. Barclay and the Stonewall board, we've entered        12:35:28
22   into a collaboration agreement with NICO under        12:35:32
23   which we've delegated our responsibilities to them.        12:35:35
24   Here it is.        12:35:38
25       But that never happened. They don't        12:35:39
```

Page 2834

```
1        -Summation - By Respondent-
2    suggest, they don't allege that that happened.        12:35:43
3        Why not?        12:35:48
4        It would have been the easiest thing in        12:35:49
5    the world for Forrest Krutter to say I am your        12:35:52
6    subagent. Forrest admitted under the collaboration        12:35:57
7    agreement he's now a subagent to Stonewall. So he        12:35:59
8    owes them a duty of loyalty. But he never told        12:36:03
9    them of it.        12:36:05
10       He admitted that, by the way, at page        12:36:07
11   219 to 220 of the transcript.        12:36:10
12       Why didn't he as their subagent say,        12:36:11
13   hey, I'm now your agent, and here's the agreement        12:36:14
14   i'm operating under.        12:36:17
15       But he didn't do that either.        12:36:18
16       This is what they rely on to justify the        12:36:19
17   delegation. And I'll let you read it because I'm        12:36:26
18   losing my voice. Rather than me read these things        12:36:34
19   out loud, I'll give you a few seconds.        12:36:38
20       But the notion that this language allows        12:36:41
21   a complete delegation of the entire claims function        12:36:45
22   and that it allows such a delegation to someone        12:36:49
23   like NICO, whose interests were directly in        12:36:52
24   conflict with Stonewall's -- remember, they were in        12:36:56
25   that our interests and theirs were in conflict. To        12:36:59
```

Page 2835

```
1        -Summation - By Respondent-
2    think that your agent is allowed to delegate his        12:37:02
3    responsibilities to someone whose interests are in        12:37:06
4    conflict with yours based on this language, in        12:37:10
5    Mr. Barclay's words, is inconceivable.        12:37:12
6        Here's his testimony.        12:37:15
7        And he's asked why it's inconceivable.        12:37:15
8    Line 13.        12:37:22
9        "Well, the management of claims, the        12:37:23
10   gross and net of reinsurance are integral to the        12:37:25
11   function of a runoff manager. They are the        12:37:27
12   functions, along, if you like, with preparing        12:37:30
13   accounts and filing regulatory returns, but they        12:37:33
14   are the very heart of runoff.        12:37:36
15       "You wouldn't appoint a manager to do        12:37:39
16   the very thing that you wanted him to do and then        12:37:41
17   find that the very thing that you wanted him to do        12:37:43
18   has been delegated to a third-party. It's not        12:37:45
19   tenable."        12:37:50
20       And I cannot believe that any of you        12:37:50
21   would disagree with that. Especially to a        12:37:54
22   third-party who's in conflict with you.        12:37:55
23       And not only was Mr. Barclay never told        12:37:59
24   of the extent of the delegation, he was repeatedly        12:38:01
25   misled about it.        12:38:04
```

Page 2836

```
1        -Summation - By Respondent-
2        And now let's get to the documents.        12:38:05
3        Here's the first one in time that they        12:38:06
4    rely on. This doesn't go to Stonewall or Seaton.        12:38:10
5    It goes to the staff of Randall America. But        12:38:16
6    Barclay was technically an employee of Randall        12:38:23
7    America, so he did get this. This is the first        12:38:25
8    thing he gets. It's in August of 2001, right after        12:38:29
9    the collaboration agreement is done. Look what it        12:38:33
10   says.        12:38:35
11       "I am delighted to announce that we have        12:38:36
12   signed a long-term agreement whereby the Boston        12:38:38
13   office of Randall America will be providing        12:38:41
14   assistance to NICO in connection with its        12:38:44
15   reinsurance of various One Beacon underwriting        12:38:46
16   policies."        12:38:52
17       The second bullet point also says, "One        12:38:55
18   Beacon reinsurances."        12:39:01
19       And then the only mention of Seaton and        12:39:02
20   Stonewall: "There may be some realignment of        12:39:04
21   responsibilities within the claim teams designed to        12:39:07
22   achieve economies where Seaton and Stonewall        12:39:09
23   reinsured One Beacon policies have involvement in        12:39:13
24   the same claims." That's it.        12:39:16
25       Do you believe that's adequate        12:39:19
```

39 (Pages 2833 to 2836)

Page 2837

-Summation - By Respondent-

1
2  disclosure of the terms of the collaboration     12:39:20
3  agreement to the president of Stonewall? Does that 12:39:22
4  tell him there's been a complete delegation of     12:39:26
5  Randall America's claims control to NICO?          12:39:29
6       Barclay understood from this memo, as         12:39:39
7  anyone reading it would understand, that the       12:39:41
8  collaboration agreement applied to One Beacon. I   12:39:43
9  can't imagine you could read it any other way.     12:39:46
10      Barclay said that at pages 1847 to 1849       12:39:48
11 of the transcript.                                 12:39:51
12      And I ask you, would you have understood      12:39:53
13 it any differently?                                12:39:56
14      Now we got to the next thing, the first       12:39:58
15 notice to the Stonewall board. Let me blow up      12:40:02
16 fast Exhibit 113. This is the agenda for a         12:40:06
17 Stonewall board meeting in January of 2002.        12:40:09
18      This deal, the collaboration agreement,      12:40:13
19 has been in force for six months and nobody has    12:40:15
20 mentioned it to Stonewall, to the board or to      12:40:18
21 Mr. Barclay, other than in that one mention where  12:40:22
22 it's a deal with One Beacon.                        12:40:25
23      The agenda for the board meeting doesn't      12:40:27
24 mention it. But attached to the agenda there was   12:40:31
25 some notes by Ms. Hoelsken. And here, look what it 12:40:36

Page 2838

-Summation - By Respondent-

1
2  says:                                              12:40:42
3       "Issues: Tom Ryan has been hired by          12:40:42
4  Berkshire to oversee the claims of Seaton/Stonewall 12:40:48
5  and One Beacon. The new work flow is memorialized  12:40:51
6  through the National Indemnity/Randall America      12:40:55
7  collaboration agreement."                           12:40:58
8       Again, is this a disclosure of the           12:40:59
9  subdelegation that took place in the collaboration 12:41:03
10 agreement? Ms. Hoelsken knew exactly what the      12:41:05
11 terms of the subdelegation were. Why didn't she    12:41:09
12 tell the board?                                    12:41:12
13      And, remember, this says that Ryan has       12:41:13
14 been hired to oversee the claims, not to control   12:41:18
15 them.                                              12:41:22
16      Ms. Hoelsken knew exactly what she was       12:41:25
17 saying and what she was hiding.                    12:41:28
18      Ryan being hired to oversee the claims       12:41:30
19 did not alarm Barclay at all because he always knew 12:41:35
20 that NICO would be overseeing the claims. In fact, 12:41:40
21 Randall's runoff management agreement expressly    12:41:43
22 provides in Section 2.3 for NICO to have a          12:41:48
23 representative at Randall's office to perform       12:41:51
24 NICO's affiliation rights.                          12:41:56
25      So all he's being told is NICO is now        12:41:58

Page 2839

-Summation - By Respondent-

1
2  putting Tom Ryan in our office to perform his      12:42:00
3  oversight function.                                12:42:03
4       And that's what Mr. Barclay believed he      12:42:04
5  was being told. And he said that at pages 1853 to  12:42:07
6  1854 of the transcript.                            12:42:11
7       And again, I ask you, would you have         12:42:13
8  thought otherwise. Or would you have expected your 12:42:15
9  agent sometime in the prior six months to have told 12:42:19
10 you the truth, the whole truth.                    12:42:23
11      Of course, there's nothing in the board      12:42:30
12 minutes, Exhibit 114, that mentions it.            12:42:31
13      Now, the next thing, the next mention        12:42:34
14 they have chronologically -- do you remember we've 12:42:38
15 got those two mentions: One in August of '01 that  12:42:43
16 goes to Randall employees, one in January of '02,  12:42:46
17 six months later, five months later that goes to   12:42:50
18 the Stonewall board?                               12:42:53
19      The next mention is a year and a half        12:42:55
20 later, July '03. And it's an exchange of e-mails.  12:42:59
21      And in the bottom e-mail it's talking        12:43:08
22 about do we want to pay one of the brokers to      12:43:13
23 perform the services they should be performing     12:43:16
24 without getting paid. And Hoelsken writes: "I      12:43:19
25 need your thoughts on pursuing this, if at all.    12:43:27

Page 2840

-Summation - By Respondent-

1
2  The biggest question is who pays for their fee,    12:43:30
3  Dukes or NICO. I think this needs to be            12:43:33
4  determined, especially in light of the            12:43:36
5  collaboration agreement."                          12:43:38
6       That's all she says.                          12:43:39
7       MR. NONNA: What's the exhibit number?        12:43:41
8       MR. BRANDES: Exhibit 200.                     12:43:44
9       MR. NONNA: Thanks.                            12:43:46
10      MR. BRANDES: Look at Barclay's              12:43:46
11 response. "The collaboration agreement has nothing 12:43:49
12 to do with Seaton, and from Seaton's perspective is 12:43:51
13 entirely irrelevant."                              12:43:55
14      Now, from everything Barclay had been       12:43:56
15 told about it up to this point, the two little     12:43:59
16 mentions that he saw, wouldn't you think that      12:44:01
17 that -- that it had nothing to do with Seaton and  12:44:06
18 Stonewall, that it's irrelevant? They told him     12:44:08
19 it's got nothing to do with Seaton and Stonewall.  12:44:11
20 They told him it's One Beacon. They told him Tom   12:44:15
21 Ryan is supervising claims. That's it. Why in the 12:44:18
22 world would he think that the collaboration        12:44:21
23 agreement has anything to do with Seaton or        12:44:24
24 Stonewall?                                         12:44:26
25      And then look what Hoelsken writes back.     12:44:26

40 (Pages 2837 to 2840)

Page 2841

-Summation - By Respondent-

1     -Summation - By Respondent-
2  "I knew that would be your answer."      12:44:30
3     She knew it because she knew he didn't  12:44:32
4  know. And then she says: "I have passed the  12:44:34
5  information on to Tom Ryan."      12:44:38
6     Here both Hoelsken and Ryan are being  12:44:40
7  told that if Barclay doesn't think the      12:44:44
8  collaboration agreement has anything to do with  12:44:47
9  Seaton and Stonewall, do either one of them call  12:44:48
10  him back, call him up, write to him, saying, hey,  12:44:53
11  Robert, get a grip. The collaboration agreement  12:44:57
12  delegates all claims control of Seaton and  12:45:01
13  Stonewall to NICO?      12:45:04
14     Nope. They don't do that. They hadn't  12:45:06
15  done it in the two and a half years up — the two  12:45:10
16  years up to now and they didn't do it now.      12:45:14
17     These are his colleagues. His agent.  12:45:17
18  He trusts them. He assumes they are fulfilling  12:45:19
19  their contractual duties to him.      12:45:22
20     He's not told and has no reason to  12:45:23
21  believe that they have sold him out to NICO and  12:45:29
22  have transferred full claims control to NICO  12:45:33
23  because nobody ever told him or even hinted at  12:45:35
24  that.      12:45:37
25     And that's what brings us to the  12:45:38

Page 2842

1     -Summation - By Respondent-
2  redomestication. And this would be a good time to  12:45:44
3  take a couple-minute break.      12:45:47
4     THE UMPIRE: Ten minutes?      12:45:49
5     MR. BRANDES: Ten minutes would be  12:45:51
6  great.      12:45:52
7     THE UMPIRE: Thank you.      12:45:53
8     (A recess was taken.)      12:45:55
9     THE UMPIRE: Mr. Brandes?      12:56:50
10     MR. BRANDES: I went off script once in  12:56:51
11  my initial remarks and I have been told I've got it  12:56:57
12  wrong.      12:57:00
13     So I've been told that Mr. Patel  12:57:01
14  testified that Dukes Place still did have an  12:57:03
15  ownership interest in Ken Randall America after the  12:57:06
16  Capita – sale of their interest in Eastgate to  12:57:08
17  Capita, so I do apologize for that.      12:57:11
18     Now, we were at the point of the  12:57:18
19  redomestication in 2003. And again, just to bring  12:57:20
20  you back, at that point the collaboration agreement  12:57:26
21  had been in force for more than two years. In all  12:57:28
22  that time there had been precisely three mentions  12:57:31
23  of it to Mr. Barclay, two of which didn't even call  12:57:35
24  it the collaboration agreement.      12:57:39
25     Every mention of it he had received  12:57:40

Page 2843

1     -Summation - By Respondent-
2  either expressly said it dealt just with the One  12:57:47
3  Beacon book or said or implied that it had nothing  12:57:51
4  to do with Seaton or Stonewall.      12:57:53
5     He had written that he understood it to  12:57:55
6  have nothing to do with Seaton or Stonewall and  12:57:58
7  Ms. Hoelsken had written back saying I knew you'd  12:58:01
8  say that, you that you're wrong.      12:58:05
9     He never once been told the truth or had  12:58:07
10  been given even a hint of it. That was his mindset  12:58:11
11  at the time of the redomestication. And I submit  12:58:15
12  it was a perfectly reasonable mindset to have, but  12:58:18
13  you'll decide.      12:58:22
14     Then he gets a draft.      12:58:23
15     I think it's worth looking at what the  12:58:24
16  draft says and what his highlighting said.      12:58:27
17     The draft – and this is Exhibit 505 –  12:58:31
18  says: "Pursuant to management agreements entered  12:58:35
19  into between each of the companies and KRA, Ken  12:58:40
20  Randall America, KRA provides all administrative,  12:58:43
21  accounting, claims handling and other management  12:58:46
22  services for both companies.      12:58:48
23     Then it talks a little bit about KRA.  12:58:50
24     Then down at the bottom of that page,  12:58:53
25  continuing to the next, "All services required by  12:58:55

Page 2844

1     -Summation - By Respondent-
2  the companies in connection with their runoff  12:58:57
3  operations are provided by KRA pursuant to the  12:58:59
4  management agreements between the companies and  12:59:02
5  KRA."      12:59:05
6     A lot of KRA.      12:59:06
7     Then a little further down: "In  12:59:10
8  addition, as described below, all claims handling  12:59:13
9  activities, including settlements and final  12:59:16
10  payments, are reviewed by NICO, who has the right  12:59:18
11  to associate in claims settlement, although the  12:59:21
12  ultimate claims settlement responsibility remains  12:59:24
13  vested in the companies. All claims are paid only  12:59:27
14  after the companies have received the funds to pay  12:59:31
15  such claims from NICO."      12:59:34
16     All of that is completely as Mr. Barclay  12:59:37
17  understood it.      12:59:39
18     NICO did review and had the right to  12:59:41
19  associate in claim settlement, but ultimate  12:59:44
20  responsibility remained vested with the company.  12:59:48
21  Funds were received from NICO in the claims  12:59:52
22  account, which he had negotiated.      12:59:54
23     But there's no mention here as yet of  12:59:56
24  any subdelegation of all of KRA's rights to NICO.  12:59:59
25  Then we go ahead a few pages.      01:00:06

41 (Pages 2841 to 2844)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2845

```
 1      -Summation - By Respondent-
 2         Here look what Mr. Barclay crosses out. 01:00:08
 3   He crosses out where it says: "In addition, NICO   01:00:14
 4   directs all claims handling staff in the          01:00:17
 5   performance of their duties and sets their salaries 01:00:20
 6   and bonus levels."                                 01:00:22
 7         And then further down: "All claims   01:00:25
 8   handling of activities of the company, KRA,        01:00:29
 9   including the conduct of litigation, claims        01:00:32
10   settlement negotiations and agreements, commutation 01:00:34
11   of reinsurance agreements and settlement of        01:00:36
12   reinsurance arbitrations and disputes, and final   01:00:39
13   payment of claims is subject to the supervision and 01:00:41
14   final approval of NICO."                           01:00:45
15         Well, Mr. Randall removed that language 01:00:47
16   because he didn't think it was true.          01:00:52
17         And look what happens next.            01:00:56
18         Ms. Hoelsken sends an e-mail to        01:01:03
19   Mr. DeQuattro, the auditor for the Rhode Island    01:01:06
20   Department. And she encloses the draft with the    01:01:11
21   comments. And what does she write in her e-mail?   01:01:16
22   "Many of us have reviewed your draft report and    01:01:21
23   attached is the red-lined copy with our recommended 01:01:25
24   changes."                                          01:01:28
25         And the next sentence: "As you and I   01:01:28
```

Page 2846

```
 1      -Summation - By Respondent-
 2   briefly discussed on the phone, many of the items  01:01:31
 3   relating to the collaboration agreement are not    01:01:33
 4   relevant to the basic agreements between Randall   01:01:35
 5   America and Seaton and Stonewall and, as such, we  01:01:40
 6   deleted them."                                     01:01:43
 7         Ms. Hoelsken knew what she was saying  01:01:47
 8   was untrue. In fact, it's hard to imagine that she 01:01:51
 9   didn't know she was telling Mr. DeQuattro an       01:01:55
10   outright lie. But Mr. Barclay didn't know it was a 01:01:58
11   lie. It accurately reflected what he thought       01:02:02
12   because for the last two and a half years that's   01:02:08
13   what he had been told by Randall and Hoelsken.     01:02:11
14         And there's no question Barclay        01:02:19
15   continued to believe that after the                01:02:21
16   redomestication. And the correspondence in         01:02:24
17   connection with Equitas, no, we didn't put it in   01:02:25
18   just to show what Ryan wrote, we put it in to show 01:02:29
19   what Barclay wrote in response.                    01:02:33
20         Let's look at it.                      01:02:35
21         Actually, first, before we do that, I  01:02:39
22   missed a point.                                    01:02:40
23         Barclay testified that in January of   01:02:43
24   2004 he agreed to amend the runoff agreements with 01:02:45
25   Randall America for both Seaton and Stonewall and  01:02:52
```

Page 2847

```
 1      -Summation - By Respondent-
 2   to add several more years to their terms. And      01:02:55
 3   that's reflected in Exhibit 610.                   01:03:01
 4         And Barclay testified he never would   01:03:04
 5   have done that had he known that Randall had       01:03:06
 6   delegated all of its responsibilities under those  01:03:10
 7   agreements to NICO. And he told you that at page   01:03:13
 8   1905 of the transcript.                            01:03:18
 9         As he said, why in the world would he  01:03:21
10   continue to pay Randall 4 to $5 million a year to  01:03:24
11   run off claims when Randall wasn't doing the work, 01:03:28
12   NICO was.                                          01:03:32
13         Now, Mr. Barclay probably received a   01:03:35
14   copy of Mr. DeQuattro's final report, and if he did 01:03:37
15   receive it, he should have read it.                01:03:42
16         And I'm going to show you the language 01:03:45
17   that my colleagues have relied on. It says: "KRA, 01:03:50
18   as manager of the companies and pursuant to the    01:03:57
19   aforementioned Section 8.1, has entered into a     01:04:00
20   confidential collaboration agreement with NICO."   01:04:03
21         By the way, they call it a "confidential 01:04:07
22   collaboration agreement." We have been pilloried   01:04:10
23   this morning, us for calling it a confidential     01:04:13
24   collaboration agreement, but the Rhode Island      01:04:16
25   Insurance Department did.                          01:04:18
```

Page 2848

```
 1      -Summation - By Respondent-
 2         Anyway, "KRA agrees to delegate to NICO 01:04:20
 3   and NF&M certain responsibility for the handling of 01:04:22
 4   claims" -- only certain responsibilities -- "in    01:04:22
 5   respect of Seaton and Stonewall, and NICO          01:04:31
 6   undertakes to comply with the terms set out in the 01:04:32
 7   respective management agreements between KRA and    01:04:35
 8   Seaton and Stonewall."                             01:04:37
 9         And then they go on to talk about the  01:04:39
10   management -- that the terms in the management     01:04:41
11   agreements cover areas such as management of claim 01:04:45
12   staff, et cetera.                                  01:04:48
13         Then down at the bottom it             01:04:50
14   says: "However, NICO takes an active role in its   01:04:52
15   supervision of claims handling procedures and      01:04:55
16   approval of claims of the companies."              01:04:58
17         My friends point to this and say this is 01:05:00
18   the red flag that Barclay absolutely should have   01:05:05
19   known. There was a complete subdelegation of       01:05:08
20   claims handling authority from Randall to NICO.    01:05:12
21         I don't think it says that. It says    01:05:15
22   more. Admittedly it says much more than Barclay    01:05:18
23   had ever been told before.                         01:05:22
24         But what it actually says is there's   01:05:24
25   been a delegation of certain responsibilities, that 01:05:26
```

42 (Pages 2845 to 2848)

Page 2849

-Summation - By Respondent-

1  
2  NICO takes an active role.                        01:05:28
3      It doesn't say NICO controls everything.       01:05:32
4  It doesn't quote the language of the collaboration 01:05:36
5  agreement.                                         01:05:38
6      Now, like I said, if Barclay got it, he        01:05:40
7  should have read it. And if he read it, it         01:05:44
8  probably should have lead him to raise a question. 01:05:46
9  That's probably what I would have done. That's     01:05:52
10 probably what you have done. And if you choose to  01:05:53
11 hang him and Stonewall because he didn't, so be it. 01:05:56
12     But before you do that, just consider a        01:06:04
13 few things. While you're saying to yourself how    01:06:06
14 could Barclay not have asked, please also say to   01:06:10
15 yourself how could Randall, Hoelsken, Krutter and  01:06:15
16 Ryan not have told, two and a half years after the 01:06:21
17 collaboration agreement is signed and still there  01:06:27
18 is nothing from anyone who knows its terms         01:06:32
19 disclosing what they are to Mr. Barclay. Or to     01:06:42
20 anyone else on the Stonewall board.                01:06:45
21     The only people connected with Stonewall      01:06:48
22 who knew the terms were Randall and Hoelsken. And  01:06:51
23 they were in a conflict position. Because they     01:06:56
24 were Randall America. They were the ones who made  01:07:01
25 the deal. They had an absolute obligation to tell  01:07:06

Page 2850

-Summation - By Respondent-

1  
2  Barclay, as did NICO, and neither did.             01:07:11
3      And now NICO and Ms. Hoelsken also seek        01:07:18
4  to excuse their concealment of this material       01:07:22
5  information for two and a half years by saying, oh, 01:07:25
6  come on, over that two and a half years we dropped 01:07:29
7  a few turds, Barclay should have sniffed it out.   01:07:32
8      But that's not how it's supposed to be         01:07:37
9  done. Even an ounce of candor by Randall or NICO,  01:07:39
10 just one e-mail disclosing the delegation that     01:07:46
11 actually took place, and we wouldn't be here today. 01:07:49
12     But instead of disclosure from NICO we         01:07:55
13 got silence, and from Randall we got affirmative   01:07:58
14 misrepresentations.                                01:08:01
15     And when you deliberate and you think          01:08:02
16 that if you were Barclay you might have been more  01:08:04
17 suspicious and asked more questions, please also   01:08:07
18 think whether if you were Krutter or Randall or    01:08:10
19 Hoelsken or Ryan you would not have fully and      01:08:13
20 accurately told the truth to Mr. Barclay long      01:08:17
21 before the redomestication, and then consider who's 01:08:20
22 more culpable.                                     01:08:25
23     In doing so, also consider what happened      01:08:27
24 after the redomestication. And now I'm getting to  01:08:29
25 the Equitas e-mails.                               01:08:32

Page 2851

-Summation - By Respondent-

1  
2  Ryan writes in his e-mail, the                     01:08:34
3  collaboration agreement clearly states that        01:08:37
4  Stonewall has delegated to NICO -- here's somebody 01:08:40
5  is finally quoting things -- "responsibility for   01:08:46
6  the management of claims," and that NICO retains   01:08:48
7  all authority to supervise and control claims      01:08:51
8  handling. This situation clearly falls within      01:08:55
9  NICO's responsibility and is not subject to        01:08:59
10 second-guessing by Cavell."                        01:09:02
11     The only thing wrong with what Mr. Ryan        01:09:03
12 did here is he says Stonewall did this. And         01:09:06
13 Mr. Barclay knows for an absolute fact Stonewall   01:09:09
14 never did any such thing, and he writes back       01:09:12
15 saying it.                                         01:09:15
16     I will ask you to please read this to          01:09:16
17 yourself, because my voice is going. And it's too  01:09:20
18 much to read. But you will see that it sets forth  01:09:26
19 what Mr. Barclay, still to this point, a year and  01:09:28
20 some months after the redomestication, still       01:09:34
21 believed was the case.                             01:09:38
22     MR. FOWLER: Exhibit number, Larry?             01:09:47
23     MR. BRANDES: This is Exhibit 266. It           01:09:51
24 will be in the book that we hand out to you in the 01:09:53
25 end highlighted like this.                         01:09:56

Page 2852

-Summation - By Respondent-

1  
2  But he says flat out, we're not a party            01:09:57
3  to any collaboration agreement. We didn't delegate 01:10:01
4  any authority. We still look to Cavell, our agent. 01:10:03
5      Everyone who received this -- Hoelsken,        01:10:07
6  Ryan and Randall and Krutter -- I don't know about 01:10:10
7  Ms. Mullen -- four of the five people who received 01:10:16
8  this knew that Barclay's understanding was wrong,  01:10:19
9  but none of them wrote back telling him so.        01:10:22
10     Instead, they continued by their silence 01:10:25
11 their now three-and-a-half-year pattern of deceit. 01:10:30
12     And seven months later Randall did it          01:10:34
13 again. At a presentation to the Pennsylvania       01:10:37
14 Insurance Department concerning a proposed         01:10:39
15 acquisition of ACE Re, a presentation that Randall 01:10:42
16 and Ms. Hoelsken are making with Mr. Barclay       01:10:45
17 sitting right in the audience, they refer to the   01:10:50
18 collaboration agreement with NICO, and once again  01:10:54
19 indicate it only applies to CU, CGNU and Kemper,   01:10:59
20 not Seaton or Stonewall.                           01:11:06
21     Completely consistent with what they had      01:11:08
22 been telling Barclay and what Barclay had          01:11:10
23 understood for years now.                          01:11:12
24     It was not until November of 2005 that        01:11:14
25 Barclay and the Stonewall board finally learned the 01:11:19

43 (Pages 2849 to 2852)

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 2853

-Summation - By Respondent-

1    truth. It was triggered by the Burns memo. And   01:11:22
2    the Burns memo, in retrospect, may have turned out   01:11:25
3    to be everything that Mike Knoerzer said it was,   01:11:29
4    but it certainly, as a board member getting it,   01:11:34
5    it's got to trigger the type of investigation that   01:11:37
6    was undertaken. Because when you get it you don't   01:11:41
7    know to what extent it's credible. And that   01:11:47
8    investigation was begun. And of course it led to   01:11:51
9    the discovery, or a copy finally, of the   01:11:54
10   collaboration agreement. And the hiring of   01:11:56
11   Stroock.   01:12:00
12        And Stroock asked Mr. Barclay: What did   01:12:01
13   you know about this? Didn't you know about this?   01:12:04
14        And here's what he wrote on December 15,   01:12:07
15   2005. Hard to read. I thank John for blowing it   01:12:13
16   up. Because I think it's -- this is Exhibit 617.   01:12:17
17   "Being unaware of the terms of the   01:12:21
18   collaboration agreement, my assumption at the   01:12:23
19   time" -- and here he's talking about the   01:12:27
20   redomestication -- "my assumption at the time this   01:12:30
21   report was sent to me will have been that this   01:12:33
22   collaboration agreement was the one entered into by   01:12:36
23   Randall America and NICO when Randall took on   01:12:40
24   responsibility of the administration of the One   01:12:42

Page 2854

-Summation - By Respondent-

1    Beacon account in 2001."   01:12:45
2        Remember, the very first document that   01:12:46
3    Barclay got about the collaboration agreement he   01:12:49
4    got as an employee of Randall, where Randall says   01:12:51
5    we've entered into a collaboration agreement in   01:12:55
6    connection with the One Beacon book.   01:12:57
7        And then down at the bottom Mr. Barclay   01:12:59
8    writes: "Having now seen a copy of the   01:13:04
9    collaboration agreement and the extent of the   01:13:07
10   delegation of claims handling authority by Randall   01:13:08
11   to NICO, the references to the collaboration   01:13:11
12   agreement in the Examiner's report take on a   01:13:14
13   greater significance. However, at the time I   01:13:17
14   continued to believe that Randall remained solely   01:13:20
15   responsible for the management of the claims and   01:13:23
16   liabilities of Seaton and Stonewall, subject to   01:13:26
17   NICO's rights in the reinsurance contracts."   01:13:28
18        You saw Mr. Barclay testify. Do you for   01:13:32
19   one minute believe he wasn't telling you the truth?   01:13:36
20        This evidence that we've gone through at   01:13:44
21   length shows that Mr. Barclay never believed or   01:13:48
22   understood, until November 2005, that Randall had   01:13:50
23   sold out Seaton and Stonewall's interest or that   01:13:54
24   Randall had ceased functioning as Seaton and   01:13:57

Page 2855

-Summation - By Respondent-

1    Stonewall's agent or that it had given complete   01:14:00
2    control of claim handling to NICO.   01:14:03
3        Two other Stonewall board members   01:14:06
4    testified that they, too, were unaware of this   01:14:09
5    until November 2005, Messrs. Kaufman and Patel.   01:14:12
6        Do you really think all of them are   01:14:16
7    lying?   01:14:18
8        And Mr. Ryan's repeated testimony in   01:14:25
9    this arbitration that he always felt Seaton and   01:14:28
10   Stonewall were the boss, that they had the final   01:14:32
11   say over claims, is contradicted by his words and   01:14:35
12   his actions.   01:14:40
13        And this is the same Exhibit 266   01:14:43
14   e-mail -- no. Indira, I want to skip that.   01:14:49
15        This is the same Exhibit 66 e-mail train   01:14:59
16   triggered by the Equitas deal. Hoekksen is writing   01:15:05
17   to Ryan and she says: "Under my fiduciary   01:15:08
18   responsibilities as treasurer of Stonewall and   01:15:11
19   Seaton" -- okay? And then she goes on to state her   01:15:14
20   position. But she's clearly writing in her   01:15:18
21   capacity as an officer of Stonewall and Seaton   01:15:20
22   here. Not an officer of Cavell.   01:15:23
23        And what does Ryan say in response? You   01:15:26
24   saw it before. He says, wrongly, that Stonewall   01:15:29

Page 2856

-Summation - By Respondent-

1    delegated responsibility to NICO. And that this   01:15:35
2    situation clearly falls within NICO's   01:15:42
3    responsibility and is not subject to   01:15:44
4    second-guessing by Cavell.   01:15:47
5        Well, he wasn't being second-guessed by   01:15:48
6    Cavell. He was being second-guessed by Stonewall.   01:15:52
7    Pam Hoekksen for one time in all her years puts on   01:15:56
8    her Stonewall hat and says, as an officer of   01:16:01
9    Stonewall I'm saying this, and Tom Ryan says pound   01:16:04
10   sand.   01:16:10
11        You've also heard from Mr. Wall and   01:16:12
12   Mr. Follis that under the protocols that you   01:16:17
13   approved and which make claims handling subject to   01:16:20
14   Stonewall's direction -- that's Exhibit 580 -- it's   01:16:23
15   Mr. -- "Mr. Ryan's a very difficult man to give   01:16:29
16   direction to." I think his arrogance came across   01:16:34
17   during his testimony, but you'll decide.   01:16:37
18        But you did hear him admit that although   01:16:39
19   ordered directly by Robert Barclay to transfer   01:16:42
20   Seaton and Stonewall's files to Castlewood's office   01:16:45
21   in Rhode Island, he refused.   01:16:50
22        Seaton and Stonewall are the boss.   01:16:53
23   Barclay always had final say. But Ryan refuses to   01:16:55
24   move the files and didn't move them until receiving   01:17:00

44 (Pages 2853 to 2856)

Page 2857

```
1         -Summation - By Respondent-
2    a copy of the order from the Rhode Island      01:17:00
3    Department requiring it.                01:17:02
4         Ryan admitted that at pages 1266 to 1269  01:17:03
5    of the transcript. The order from the Rhode Island  01:17:07
6    Department is right here. I'll just show you the  01:17:12
7    last paragraph:                    01:17:15
8         "Based on the facts presented in this    01:17:15
9    letter, it is hereby requested that Stonewall and   01:17:18
10   Seaton move their books and records, including    01:17:21
11   original claim files, to Rhode Island in compliance  01:17:23
12   with" — et cetera, et cetera.              01:17:26
13        Only after that does Ryan move the       01:17:28
14   records.                        01:17:31
15        Under the collaboration agreement, the    01:17:35
16   carefully constructed balances of the treaty were  01:17:36
17   tossed aside and in direct breach of them NICO   01:17:39
18   exercised near dictatorial control over the claims  01:17:42
19   function.                        01:17:47
20        We think it's undeniable that it was a     01:17:48
21   material breach of the treaty and for a material   01:17:52
22   breach of the treaty a proper remedy is recision.   01:17:54
23   In this case we think it's the most appropriate   01:17:57
24   remedy. In part, for the reason that Mike pointed  01:18:00
25   out in his closing: Damages are hard to prove on a  01:18:06
```

Page 2858

```
1         -Summation - By Respondent-
2    claim-by-claim basis.                  01:18:11
3         I said that in my opening and I say it     01:18:13
4    again. It's hard to go into an individual claims   01:18:16
5    file and be able to prove that something should    01:18:20
6    have been done differently. So much is a matter of  01:18:26
7    judgment. But recision is clearly allowed as a    01:18:28
8    remedy for material breach.              01:18:31
9         For the last five years, if we date from   01:18:33
10   the collaboration agreement, and for the entire   01:18:36
11   treaty term, if we date from the oral prefunding   01:18:39
12   agreement, claims were handled and resolved in a  01:18:44
13   manner directly contrary to how the treaty       01:18:48
14   provided.                       01:18:51
15        NICO says that to measure our damages we  01:18:53
16   must prove individual situations when NICO either  01:18:56
17   delayed a settlement or otherwise caused the actual  01:19:02
18   loss to be greater than it should have been.     01:19:04
19        As I said, we acknowledge that's a very,   01:19:06
20   very hard burden to meet.              01:19:09
21        We don't think it's the right burden,     01:19:11
22   but we do have some examples and I'm going to be  01:19:14
23   very brief in talking about them.          01:19:17
24        The Equitas settlement whereby NICO     01:19:24
25   traded Stonewall dollars for dollars to go to    01:19:28
```

Page 2859

```
1         -Summation - By Respondent-
2    Commercial Union. Mr. Ryan said he had to do it   01:19:32
3    because there was an arbitration pending in London  01:19:37
4    and Equitas wouldn't honor his offset claim. But   01:19:40
5    nobody checked the treaties to see whether they   01:19:44
6    provided for offset.                 01:19:47
7         Mr. Jain testified yesterday, offset      01:19:48
8    closure is standard in a treaty.            01:19:50
9         And nobody even spoke to a U.K. lawyer   01:19:53
10   asking even in the absence of an offset clause what  01:19:56
11   are the odds of a U.K. Panel accepting an offset.   01:19:58
12        NICO just traded the dollars, and        01:20:01
13   Mr. Ryan admitted he never told Mr. Barclay that he  01:20:05
14   traded the dollars.                  01:20:07
15        He admitted he told Barclay — he never    01:20:08
16   told Barclay that at page 1227 of the transcript,  01:20:12
17   and Mr. Barclay said the same thing. The notion   01:20:15
18   that Equitas wouldn't offset Stonewall claims but  01:20:22
19   they would in effect offset Commercial Union claims  01:20:28
20   makes you wonder why.                01:20:32
21        Then there's Gerling. This is a Seaton    01:20:35
22   one — so you know what? I'll skip it.          01:20:39
23        Let's talk about Fuffer Austin for a      01:20:42
24   minute.                 01:20:44
25        Was there an $18 million offer? I don't  01:20:44
```

Page 2860

```
1         -Summation - By Respondent-
2    know. Burns and Ryan clearly disagree on it.     01:20:47
3    Vernes swears there was. And I keep wondering, why  01:20:52
4    would he be. Admittedly, he didn't like Ryan. So  01:20:55
5    what? As best I can tell, that was not an        01:20:59
6    exclusive club. You remember Ms. Hoelsken's      01:21:02
7    e-mail: You guys aren't on very many people's     01:21:06
8    Christmas card list.                  01:21:11
9         As I told Mr. Snover at the time, they     01:21:13
10   were on my Christmas card list at the time. No    01:21:15
11   more.                        01:21:18
12        But is that enough to make him commit     01:21:19
13   perjury? I mean, he's not even in the industry    01:21:22
14   anymore. He wouldn't come here voluntarily. He   01:21:24
15   insisted on a subpoena. I don't know. You'll     01:21:27
16   decide.                        01:21:30
17        His testimony was unequivocal. There     01:21:30
18   was an $18 million offer. That's page 1489 to 90   01:21:33
19   of the transcript. He made notes that were put in  01:21:37
20   the file. That's page 1497 to 1499 in the       01:21:39
21   transcript. And the typed memo that is in the file  01:21:43
22   isn't his. That's at page 1500 to 1502 of the     01:21:46
23   transcript.                      01:21:50
24        Now, one thing I think is interesting is  01:21:50
25   that our friends say that at some point NICO did a  01:21:53
```

45 (Pages 2857 to 2860)

Page 2861

-Summation - By Respondent-

1  complete investigation to determine whether an $18   01:21:58
2  million offer had ever been made. But Mr. Ryan   01:22:01
3  admitted that they never asked Mr. Vermes. That's   01:22:04
4  at page 1259 of the transcript.   01:22:07
5      And I find that a little odd. If you're   01:22:09
6  looking to investigate whether an offer had been   01:22:12
7  made, I would think you would talk to the guy who   01:22:15
8  was there.   01:22:18
9      Anyhow, I don't know, but I'll tell you   01:22:19
10  one thing. We wouldn't have this disagreement on   01:22:28
11  Fuller Austin if Stonewall's lawyer had attended   01:22:31
12  the mediation session. And one thing that   01:22:35
13  Mr. Vermes says that nobody has disagreed with is   01:22:38
14  that the lawyer refused to attend because his bills   01:22:42
15  weren't being paid. And that's at page 475, lines   01:22:46
16  14 to 21 of the transcript.   01:22:51
17      Can you imagine that? This is the   01:22:55
18  biggest case in their office. There's a chance to   01:22:57
19  settle it. There's a mediation session taking   01:23:02
20  place and Mr. Ryan is stiffing the lawyers to such   01:23:06
21  an extent that they refuse to even go.   01:23:10
22      Now, I got to tell you, a lawyer doesn't   01:23:14
23  turn his back on his client if his bills are 60   01:23:18
24  days overdue, 120 days overdue, 180 days overdue.   01:23:22

Page 2862

-Summation - By Respondent-

1  A year overdue. Trust me. I know from personal   01:23:27
2  experience.   01:23:31
3      18 months before you throw them out.   01:23:31
4      How long were these guy's bills overdue   01:23:34
5  that he refused to show up at the mediation?   01:23:40
6      Strange management technique.   01:23:43
7      DuPont. We know that Mr. Ryan three   01:23:48
8  times denied settlement authority of $750,000 or   01:23:53
9  less, even though its coverage counsel recommended   01:23:57
10  it at a time when the demand was 2 million.   01:24:00
11      Now the demand is 5.9 million. Coverage   01:24:03
12  counsel says pay 4. But he won't authorize more   01:24:07
13  than 1.6 million.   01:24:12
14      People who don't learn from their   01:24:13
15  mistakes are condemned to repeat them.   01:24:16
16      The fact that we only have a few clear   01:24:20
17  examples does not suggest that the rest of NICO's   01:24:24
18  claims handling was unobjectionable or not a breach   01:24:29
19  of the treaty, as they suggest.   01:24:32
20      In fact, there's something a bit   01:24:35
21  arrogant and a bit off-putting about the party who   01:24:38
22  knowingly and callously breached the treaty   01:24:42
23  dictating that the injured party gets no relief   01:24:45
24  except as respects those examples of misconduct   01:24:48

Page 2863

-Summation - By Respondent-

1  that leap off the page at you. That's not how the   01:24:53
2  law works.   01:24:56
3      That's why the law gives the   01:24:57
4  nonbreaching party the option to choose recision or   01:25:00
5  damages. And Stonewall chooses recision.   01:25:02
6      But if compelled to present a damages   01:25:07
7  claim, it's most certainly not limited to proving   01:25:13
8  actual out-of-pocket loss, as NICO wrongly   01:25:16
9  suggests.   01:25:20
10      In our briefs we cited to you the case   01:25:21
11  law that once the fact of damage has been   01:25:23
12  established, you have enormous latitude in   01:25:27
13  calculating the amount of damage. And that is   01:25:30
14  especially true where the difficulty in calculating   01:25:34
15  the exact amount of damage is caused by the   01:25:39
16  breaching party, which is exactly the case here.   01:25:43
17      I haven't seen NICO in its entire   01:25:48
18  even in its closing argument this morning dispute   01:25:51
19  that that's what the law allows.   01:25:55
20      We submit that the fact of damage is   01:26:00
21  clear. In fact, it's undisputed that from the   01:26:02
22  moment or practically the moment Mr. Ryan arrived   01:26:06
23  on the scene to control settlements for NICO an   01:26:09
24  annual net claims payment target was set under   01:26:15

Page 2864

-Summation - By Respondent-

1  which NICO would attempt to not pay more than it   01:26:19
2  earned in investment income assuming a modest 6   01:26:23
3  percent return.   01:26:27
4      This is from Exhibit 15. Its form had   01:26:28
5  been in effect before Mr. Ryan got there. But at   01:26:32
6  his direction, Mr. Krishnamurthy was instructed to   01:26:36
7  add a line.   01:26:41
8      Mr. Krishnamurthy says those are his   01:26:50
9  words: "Allowable annual payment at 6 percent."   01:26:53
10      But do you think he just made it up out   01:26:56
11  of the blue? Do you think Mr. Ryan didn't give him   01:26:59
12  an idea what he wanted to capture in this line?   01:27:03
13      The fact that Mr. Krishnamurthy calls it   01:27:06
14  "Allowable annual payment at 6 percent" suggests to   01:27:09
15  me that that's what he understood Mr. Ryan was   01:27:14
16  looking for. You'll decide.   01:27:17
17      By the way, that exhibit, Exhibit 15, or   01:27:19
18  documents like it, Mr. Krishnamurthy testified went   01:27:30
19  to Mr. Jain along with requests for payment.   01:27:33
20      This document, let's disregard the   01:27:36
21  handwriting. I don't want to get into that.   01:27:42
22  That's Burns' handwriting. I don't know whether   01:27:45
23  he's telling the truth. You'll decide. It's   01:27:48
24  irrelevant as far as I'm concerned.   01:27:51

46 (Pages 2861 to 2864)

Page 2865

-Summation - By Respondent-

1
2     The document very clearly says that     01:27:54
3     there's a target. And for Stonewall that target is     01:27:58
4     7.68 million, which is 6 percent of the original     01:28:03
5     premium.     01:28:07
6     Mr. Ryan -- not Mr. Burns -- Mr. Ryan     01:28:12
7     told you that this document was distributed at his     01:28:16
8     regular claims staff meetings. That's pages 1119     01:28:21
9     to 1121 of the transcript.     01:28:26
10     Do you think that anyone dealing with     01:28:28
11     claims under Mr. Ryan's direction didn't know what     01:28:34
12     the target was?     01:28:40
13     Now, they had no control over whether     01:28:42
14     the target was actually met because they had no     01:28:45
15     authority to settle it. Only Mr. Ryan did.     01:28:47
16     But do you think maybe this had some     01:28:50
17     effect on what they recommended to him? Do you     01:28:54
18     think maybe it had some effect on how aggressive     01:28:57
19     they were? If you're being told week after week in     01:29:01
20     writing that we've got a target, don't you think     01:29:06
21     it's going to have some effect?     01:29:13
22     Mr. Ryan almost comically denied this     01:29:19
23     was a target, even though that's the word that was     01:29:22
24     used. Instead, he called it a benchmark. That's     01:29:25
25     1101 of the transcript.     01:29:29

Page 2866

-Summation - By Respondent-

1
2     I don't know what the difference is     01:29:31
3     between a target and a benchmark. To me they are     01:29:32
4     the same. It's what you're shooting for. It     01:29:35
5     doesn't mean you're always going to make it. We     01:29:38
6     understand that.     01:29:41
7     We understand, as Mr. Krishnamurthy     01:29:41
8     testified yesterday, sometimes it is going to be     01:29:44
9     higher, sometimes it's going to be lower. But you     01:29:48
10     can see over time where they came out.     01:29:52
11     But I am getting ahead of myself.     01:29:52
12     Because first Mr. Ryan claimed in his     01:29:54
13     testimony, just as Mr. Knoerzer had said in his     01:29:57
14     opening: We never met the benchmark because you     01:29:59
15     have to look at our gross annual payments, not our     01:30:02
16     net.     01:30:05
17     It's hard to believe that he believed     01:30:07
18     that in light of the fact that the documents that     01:30:12
19     he prepared to determine whether they were meeting     01:30:17
20     the benchmarks only look at the net.     01:30:21
21     I shouldn't say "only." They look at     01:30:25
22     the net. They have the gross, they have the     01:30:28
23     collected, and then they have the net.     01:30:30
24     And then they compare the benchmark to     01:30:31
25     the net, not the gross.     01:30:34

Page 2867

-Summation - By Respondent-

1
2     And Mr. Krishnamurthy told us the same     01:30:35
3     thing. He was asked about the column "Annual     01:30:38
4     Allowable Payment." And then I'm not going to read     01:30:42
5     the whole thing, but over on page 1420 on the     01:30:45
6     right-hand side: "When you said paid during the     01:30:49
7     coming year you mean paid on a net basis, correct?     01:30:51
8     "Exactly, paid on a net basis."     01:30:54
9     Because cash is cash, as I said in my     01:30:57
10     opening.     01:30:59
11     If ever a company knew cash, it's     01:30:59
12     Berkshire.     01:31:03
13     Let's look at the form that Mr. Ryan     01:31:05
14     designed to track performance. This is the most     01:31:08
15     recent one we have. Exhibit 582. It's as of April     01:31:14
16     1. And look what it shows. Interest at 6 percent,     01:31:19
17     per year.     01:31:24
18     And I mentioned this in my opening. The     01:31:24
19     fact that it's the same per-year number means it's     01:31:26
20     their expectation that this is not being calculated     01:31:30
21     on a declining balance. It's being calculated on     01:31:32
22     the original premium they received, with the     01:31:35
23     expectation that they are not going to go below     01:31:38
24     that even though you're in runoff.     01:31:40
25     And then look -- and the to date     01:31:43

Page 2868

-Summation - By Respondent-

1
2     interest, 53.12 million, payments to date, 54     01:31:47
3     million, and if you look, that's the net column.     01:31:54
4     Mr. Jain told us yesterday it was just     01:32:05
5     dumb luck. Maybe. But it strikes us as a little     01:32:09
6     suspicious that an organization so attuned to     01:32:19
7     investment return and float and no cost float and     01:32:22
8     float at a cost of less than zero, an organization     01:32:29
9     living on numbers like that, preparing charts like     01:32:34
10     this, with targets and allowable annual amounts,     01:32:38
11     could just by dumb luck have managed to hit its     01:32:45
12     target over the seven-year period this treaty has     01:32:49
13     been in force.     01:32:53
14     NICO was playing the float game like     01:32:54
15     Berkshire always does. And it was able to play it     01:32:56
16     well, because under the collaboration agreement it     01:32:59
17     had complete control over the claims and could     01:33:03
18     control the pace at which they were paid and the     01:33:09
19     amounts in which they were paid.     01:33:13
20     And while NICO was making itself a nifty     01:33:15
21     little profit, $126 million profit today, assuming     01:33:18
22     a 6 percent return, 155 million, assuming a 9     01:33:24
23     percent return, and 191 million, assuming an 11.7     01:33:28
24     percent return, you notice NICO hasn't put in what     01:33:34
25     it thinks the return is. It never took issue with     01:33:39

47 (Pages 2865 to 2868)

Page 2869

```
 1     -Summation - By Respondent-
 2   the original 11.7.                      01:33:43
 3        Now, Mr. Carlson found an error in his  01:33:46
 4   calculations that would lower it to 9. But we also  01:33:55
 5   found the Best report that says NICO makes 12.  01:33:58
 6        Mr. Jain testified these were     01:34:03
 7   policyholder funds so they were kept in safer  01:34:06
 8   investments.                          01:34:09
 9        But they were not policyholder funds.  01:34:10
10   He's got no relationship with policyholders.  01:34:13
11        And he says he treats Seaton's funds the  01:34:18
12   same. I cannot disprove that, but I do not believe  01:34:21
13   it. Not for a second.                  01:34:23
14        But they haven't offered a calculation,  01:34:25
15   and that's because they know even the 12 percent is  01:34:27
16   probably conservative.                 01:34:30
17        In his last annual report Mr. Buffett  01:34:31
18   said that in the 30 years he's run the company  01:34:37
19   they've had a return on investment of 120,000  01:34:40
20   percent. 12 percent a year doesn't sound out of  01:34:45
21   line.                                 01:34:49
22        Look at what happened to Stonewall while  01:34:52
23   NICO has been making this money over the last seven  01:34:55
24   years. At the inception of the deal they had $110  01:34:58
25   million of reserves and 61 million of surplus.  01:35:00
```

Page 2870

```
 1     -Summation - By Respondent-
 2        Now, after seven years of NICO control,  01:35:05
 3   its surplus is 56 million and its reserves are  01:35:08
 4   either 95 or 142 million depending on who you want  01:35:11
 5   to believe.                          01:35:15
 6        According to Stonewall itself its net  01:35:16
 7   reserve should be 95.2 million. But Mr. Ryan  01:35:20
 8   doesn't believe that. He says the net reserve  01:35:24
 9   should be 142 million. He says that Stonewall is  01:35:27
10   under-reserved.                       01:35:30
11        Now, let's assume he's right for a  01:35:31
12   minute. The company that started with $110 million  01:35:42
13   in reserves has had approximately half that amount,  01:35:47
14   54 million, paid out in losses over the last seven  01:35:50
15   years, and now has 142 million in reserves.  01:35:53
16        That would make this, I submit, the  01:35:57
17   least successful runoff in industry history, except  01:35:59
18   for Seaton, which is even worse, thanks again, we  01:36:03
19   believe, to the management of NICO.   01:36:07
20        And NICO cannot blame these disastrous  01:36:10
21   results just on adverse changes in the law which  01:36:16
22   had the effect of increasing liabilities.  01:36:19
23        This is from Mr. Knoerzer's   01:36:22
24   cross-examination of Mr. Wall.         01:36:27
25        "Question: Do you know anything about  01:36:28
```

Page 2871

```
 1     -Summation - By Respondent-
 2   trends in the case law, in the asbestos law in the  01:36:32
 3   United States?                        01:36:35
 4        "Answer: I hear some good news coming  01:36:36
 5   out of it. I hear some bad news coming out of it  01:36:39
 6   in the case I cited this morning.     01:36:43
 7        "Question: This morning you only talked  01:36:45
 8   about bad news, right?                 01:36:46
 9        "Answer: Yes.                    01:36:48
10        "Question: And the testimony was   01:36:49
11   there's only been bad news coming out?  01:36:51
12        "Answer: That's been my experience.  01:36:53
13        "Question: But would you agree on cross  01:36:55
14   that there's been some good news?     01:36:57
15        "Answer: For the time being."     01:36:59
16        There's been some good news. So you  01:37:00
17   can't just blame case law developments on the  01:37:03
18   adverse development of a book in runoff on which  01:37:10
19   you're supposed to be, in theory, handling the  01:37:15
20   claims aggressively to limit the development and  01:37:19
21   conclude the runoff.                  01:37:24
22        Mr. Kaufman testified that if    01:37:28
23   Stonewall's -- strike that.           01:37:30
24        As both Mr. Barclay and Mr. Wall  01:37:32
25   testified, most successful runoffs show a 60 to 80  01:37:36
```

Page 2872

```
 1     -Summation - By Respondent-
 2   percent reduction in reserves in the first seven  01:37:39
 3   years. This includes a couple of runoffs done by  01:37:42
 4   Mr. Randall's companies not in partnership with  01:37:47
 5   NICO, as Mr. Barclay talked about.   01:37:50
 6        This is a page from American Centennial,  01:37:54
 7   which my friends cannot say is a U.S. company and  01:38:02
 8   cannot say did not have significant asbestos and  01:38:06
 9   environmental exposures.              01:38:10
10        Mr. Wall was there, and it pursued an  01:38:12
11   aggressive runoff. You can see in the first four  01:38:18
12   years reserves went from 995 million to 354  01:38:20
13   million. And five years later to 50 million.  01:38:24
14        Compare that to the pattern we're seeing  01:38:30
15   here.                                 01:38:32
16        Mr. Kaufman testified that if    01:38:35
17   Stonewall's reserves had followed the pattern you  01:38:38
18   would expect them to follow, and we're today in the  01:38:40
19   20 to $30 million range, which is 60 to 70 percent  01:38:47
20   less than when we started, its owners likely could  01:38:51
21   sell it for a full surplus value rather than half  01:38:57
22   of it.                                01:39:00
23        And that's an approximately $30 million  01:39:00
24   loss. And we think if you don't rescind, you  01:39:03
25   should award that 30 million.         01:39:07
```

48 (Pages 2869 to 2872)

Page 2873

-Summation - By Respondent-
1
2    We also think you should award Stonewall 01:39:09
3    additional damages of $15 million representing the 01:39:12
4    $11 million in fees it paid to Randall for doing 01:39:16
5    next to nothing as a result of the collaboration 01:39:19
6    agreement, plus interest on those fees.    01:39:21
7        Finally, we believe that since NICO's    01:39:24
8    handling of the claims has stalled the settlement 01:39:31
9    of them and increased the likelihood of the limits 01:39:36
10   of the treaty being blown, you should rule that 01:39:40
11   NICO is liable to reimburse Stonewall dollar for 01:39:43
12   dollar for any losses incurred by Stonewall in 01:39:47
13   excess of the treaty limits.    01:39:50
14       That's all if you don't rescind.    01:39:52
15       We believe the proper remedy is recision 01:39:56
16   and return of the premium paid, plus the investment 01:40:01
17   income made on it by NICO, because that's the only 01:40:05
18   way NICO doesn't profit from its material breach of 01:40:08
19   the treaties.    01:40:11
20       Final issue: Who's the claim servicer 01:40:13
21   if you don't rescind.    01:40:16
22       There's only one possible answer, and 01:40:18
23   it's Stonewall. Only one possible answer    01:40:19
24   consistent with the treaty. And it's Stonewall. 01:40:22
25       Article 11(d) expressly says that    01:40:25

Page 2874

-Summation - By Respondent-
1
2    Stonewall can become the claims servicer. No 01:40:30
3    person may serve as claims servicer other than the 01:40:33
4    reinsured or Eastgate Group Limited, et cetera. 01:40:37
5        Reinsured can serve as the claim    01:40:40
6    servicer. No reason not to. Stonewall's capable 01:40:42
7    of performing the function. It employs a seasoned 01:40:47
8    runoff manager, Castlewood, and claims    01:40:50
9    professionals like Mr. Rizzi, and it has access to 01:40:53
10   other claims professional like Mr. Follis through 01:40:57
11   Castlewood.    01:41:00
12       The notion that Stonewall shouldn't be 01:41:01
13   allowed to be claims servicer because it might rely 01:41:03
14   on Castlewood is comical coming from NICO, which 01:41:06
15   says appoint its claims servicer but let it rely on 01:41:09
16   Resolute. What's the difference?    01:41:13
17       There's nothing in the treaty that    01:41:15
18   prohibits Stonewall from using an outside provider 01:41:20
19   to assist it as long as it personally undertakes 01:41:25
20   the duties and responsibilities of claim servicer, 01:41:29
21   which it is prepared to do.    01:41:34
22       Mr. Wall is the president of the    01:41:35
23   company. He is a seasoned runoff executive. 01:41:37
24       In your draft order, Mr. Knoerrer --    01:41:41
25   Mr. Nonna referred to it as an interim order. I 01:41:44

Page 2875

-Summation - By Respondent-
1
2    didn't read it that way. I read it as a draft 01:41:47
3    order. Perhaps I was wrong.    01:41:50
4        On the claim servicer motion, should not 01:41:51
5    influence how you decide that issue now, because 01:41:53
6    there were a number of misrepresentations -- strike 01:41:57
7    that -- there were a number of misconceptions you 01:41:59
8    were operating under at the time you decided that 01:42:02
9    claim servicer motion.    01:42:04
10       The first -- this is from page 72 of the 01:42:06
11   transcript of the argument on that motion.    01:42:09
12       Mr. Nonna tells you certainly at this 01:42:12
13   point Cavell personnel are not -- Cavell is not 01:42:14
14   involved in the claims handling.    01:42:17
15       Well, that just was not accurate.    01:42:19
16   Claims handling was being done by the exact same 01:42:22
17   people who had done it before Stonewall fired them. 01:42:24
18   And Mr. Ryan had written a contemporaneous document 01:42:31
19   admitting it.    01:42:35
20       On June 27th, 2006, Ryan writes this 01:42:36
21   e-mail: "As you know from prior correspondence, 01:42:40
22   NICO is the proper entity to service the Stonewall 01:42:42
23   claims. NICO, through its agent, Cavell, is 01:42:45
24   servicing the NICO claims."    01:42:49
25       You were not told that. You were told 01:42:53

Page 2876

-Summation - By Respondent-
1
2    exactly the opposite.    01:42:55
3        Now, Stonewall had fired Cavell as its 01:42:56
4    claim servicer because Cavell had been completely 01:43:00
5    dishonest with it about the collaboration agreement 01:43:04
6    and because it didn't trust Cavell anymore.    01:43:07
7        Stonewall was more than justified in not 01:43:10
8    wanting the organization it had just fired to 01:43:14
9    continue as claims servicer. Or be involved at 01:43:18
10   all.    01:43:23
11       NICO clearly recognized that that was a 01:43:23
12   legitimate concern. That's why Mr. Nonna addressed 01:43:26
13   it and said what he did.    01:43:29
14       And Mr. Nonna I'm sure did not know what 01:43:30
15   he said was false. But NICO knew what he said was 01:43:34
16   false.    01:43:37
17       And that wasn't the only misconception 01:43:38
18   that we believe you were operating under. As I 01:43:44
19   said in my opening, and I haven't heard a response 01:43:48
20   to since, on the claim servicer motion you were 01:43:52
21   told that NICO had been unaware of the Section 338 01:43:58
22   election as part of the Stonewall transaction and 01:44:04
23   that as a result Dukes Place Limited Partnership 01:44:08
24   could not be the purchaser and instead had to form 01:44:12
25   a corporate affiliate to be the purchaser.    01:44:15

49 (Pages 2873 to 2876)

Page 2877

-Summation - By Respondent-

1
2  Now, again, NICO – I won't say that   01:44:17
3  LeBoeuf knew it, but certainly NICO knew that that   01:44:26
4  wasn't so.   01:44:29
5  First of all, there's no dispute, I   01:44:30
6  don't believe, that for a Section 338 election to   01:44:32
7  be made it can only be done by a corporation, not a   01:44:36
8  limited partnership like Dukes Place.   01:44:39
9  And NICO knew Dukes Place was a limited   01:44:41
10  partnership, not a corporation. And it also knew   01:44:45
11  that an essential component of the transaction was   01:44:48
12  a Section 338 election.   01:44:51
13  Mr. Snover admitted it. I took him   01:44:52
14  through Exhibits 136, 138, 139 and 140. They all   01:44:55
15  clearly disclose a Section 338 election.   01:45:00
16  Mr. Snover said, I had no idea what this   01:45:02
17  meant   01:45:05
18  I'm sure he didn't. He's not a tax   01:45:05
19  lawyer. But that doesn't mean it wasn't disclosed.   01:45:08
20  It was there.   01:45:11
21  He admitted all this at pages 640 to 643   01:45:12
22  of the transcript.   01:45:16
23  Now, the only way you can appoint NICO   01:45:17
24  claims manager is under Amendment 1. This is the   01:45:20
25  only provision that allows NICO to be claim   01:45:24

Page 2878

-Summation - By Respondent-

1
2  servicer.   01:45:27
3  It was interesting, because in the two   01:45:28
4  hours that my friends took this morning telling you   01:45:29
5  that you should allow NICO to be claim servicer   01:45:32
6  they never once pointed to any provision of the   01:45:35
7  treaty that allowed that. Because there is none.   01:45:37
8  Except this.   01:45:40
9  And it talks about Dukes Place Holdings   01:45:41
10  selling 50 percent or more of the voting   01:45:47
11  securities.   01:45:52
12  Now, since they knew of the 338   01:45:52
13  election, and that a corporate entity had been   01:45:55
14  formed, this should be reformed to read Dukes Place   01:45:57
15  corporate entity. I think it's called Stonewall   01:46:04
16  Acquisition Corporation, actually. But I might be   01:46:08
17  wrong. There might be another entity.   01:46:10
18  But if there's a sale from the Dukes   01:46:12
19  Place family, we accept, a 50 percent or greater   01:46:15
20  sale, this gets triggered. But there hasn't been   01:46:20
21  one. There hasn't been a sale to Castlewood of   01:46:23
22  even one percent, let alone 44. It hasn't been   01:46:29
23  approved by the Rhode Island Department. NICO has   01:46:34
24  intervened in that proceeding to object. We don't   01:46:38
25  know if it will ever be approved.   01:46:42

Page 2879

-Summation - By Respondent-

1
2  But as of today, and I have no doubt as   01:46:45
3  of the day you render your award, there will not   01:46:47
4  have been a sale of 50 percent of the voting   01:46:49
5  securities.   01:46:51
6  So the only basis on which NICO can be   01:46:52
7  appointed hasn't been met.   01:46:55
8  But we know NICO. They don't care about   01:46:59
9  contract terms. They are NICO. They are   01:47:03
10  Berkshire. They get what they want.   01:47:05
11  Just real quickly, a couple other   01:47:12
12  things.   01:47:14
13  They also say there were no problems   01:47:14
14  until Castlewood appeared on the scene. We don't   01:47:16
15  think that's accurate. I want to blow up once   01:47:19
16  again a portion of Ryan's e-mail from Exhibit 266.   01:47:22
17  The Equitas deal.   01:47:24
18  This is Ryan writing in December of   01:47:26
19  2004, long before Castlewood came on the scene.   01:47:31
20  "When Robert" -- referring to Barclay --   01:47:34
21  "and I last spoke, he raised concerns about NICO's   01:47:36
22  withholding of approved claims. He stated that any   01:47:40
23  cost arising from withholding approved claims   01:47:43
24  should be borne by NICO outside the treaty limits."   01:47:48
25  Clearly Barclay was already raising a   01:47:52

Page 2880

-Summation - By Respondent-

1
2  complaint about the slowness of NICO's actions.   01:47:55
3  And NICO's story about the building a   01:47:58
4  case. You've heard testimony from Mr. Kaufman and   01:48:02
5  Mr. Patel. They learned of the Castlewood – they   01:48:05
6  learn of the collaboration agreement, they feel   01:48:08
7  they've been done wrong, they investigate. They   01:48:11
8  want to get Cavell out of there. Cavell they can   01:48:15
9  fire and they want to get the remedy they think   01:48:19
10  they're entitled to from NICO.   01:48:23
11  When you feel that way, that's what   01:48:25
12  you do, is try to build a case. I don't think   01:48:27
13  there's anything particularly wrong or   01:48:30
14  inappropriate about it.   01:48:32
15  Now, they tell you that there was an   01:48:33
16  interview with Mr. Ryan in which he didn't know   01:48:35
17  that Castlewood was trying to build a case. An   01:48:39
18  interview with Mr. Kelly and Mr. O'Shea of   01:48:42
19  Castlewood. And that Mr. Ryan was ignorant of what   01:48:45
20  was going on.   01:48:48
21  And Mr. Ryan did say that on both   01:48:49
22  direct, at pages 995 to 96, and redirect, at pages   01:48:51
23  1280 to 1281.   01:48:57
24  But he seemed to say something very   01:48:58
25  different on cross. Let me have you take a look at   01:49:01

50 (Pages 2877 to 2880)

Page 2881

-Summation - By Respondent-

```
1                                          01:49:04
2    it.                                   01:49:04
3       "Obviously I was very concerned that   01:49:04
4    Castlewood was coming in and they were attempting   01:49:08
5    to build a case against us, and their questions   01:49:10
6    were directed at trying specific attacks at me and   01:49:13
7    my professionalism, and I wanted to be a part of it   01:49:16
8    to make sure they got the complete story."   01:49:20
9       Mr. Ryan doesn't tell us when he learned   01:49:23
10   they were trying to build a case against him. But   01:49:25
11   apparently he knew they were trying to build a case   01:49:27
12   against him.                           01:49:31
13      Anyhow, like I said, NICO can only   01:49:31
14   become the claim servicer if there's a sale of 50   01:49:38
15   percent or more of the stock, and there hasn't   01:49:44
16   been.                                  01:49:46
17      If the treaty isn't rescinded you should   01:49:47
18   appoint Stonewall the claims servicer because   01:49:50
19   that's what the treaty provides.        01:49:52
20      You should also affirm its rights under   01:49:54
21   Article 4(a) to be the sole judge of its   01:49:57
22   liabilities.                           01:49:59
23      You should rule that NICO is absolutely   01:50:00
24   bound by all settlements made by Stonewall below   01:50:02
25   the Article 11(b) thresholds.          01:50:05
```

Page 2882

-Summation - By Respondent-

```
1
2       You should rule that when presented with   01:50:08
3    proposed settlement or buybacks above the   01:50:11
4    thresholds, NICO must give its consent or its   01:50:14
5    reason for withholding consent within two business   01:50:18
6    days, and if it refuses to consent this Panel will   01:50:21
7    determine on an expedited basis whether that   01:50:24
8    refusal was reasonable.                01:50:26
9       If you don't rescind, we would like you   01:50:28
10   to keep continuing jurisdiction to look at those   01:50:30
11   issues.                                01:50:33
12      And, finally, you should order NICO   01:50:33
13   immediately to advance to Stonewall for deposit   01:50:36
14   into a claims account administered by Stonewall   01:50:40
15   pursuant to Article 20 of the treaty the sum of   01:50:43
16   either $95 million or $142 million. NICO says the   01:50:47
17   reserves on this treaty should be $142 million. It   01:50:56
18   expects to pay out on this treaty $142 million.   01:51:01
19   Stonewall says the reserves are 95.    01:51:04
20      We know what it's like dealing with   01:51:08
21   NICO, trying to get money out of them. It's like   01:51:10
22   getting blood from a stone.            01:51:12
23      There is a provision in the treaty that   01:51:15
24   expressly says they are to fund an account for the   01:51:18
25   payment of claims. And they should be ordered to   01:51:20
```

Page 2883

-Summation - By Respondent-

```
1                                          01:51:23
2    do so.                                 01:51:23
3       The interest on those funds will belong   01:51:24
4    to them.                               01:51:27
5       You want to laugh again?            01:51:27
6       MR. NONNA: No. I'm laughing at the   01:51:28
7    first thing you said.                  01:51:30
8       MR. BRANDES: The interest on those   01:51:31
9    funds will belong to them, as the treaty provides,   01:51:33
10   but Stonewall shouldn't have to go through what   01:51:35
11   Mr. Jain threatened yesterday: Oh, no. Even   01:51:38
12   though they are the sole judge, when we get a claim   01:51:42
13   we have a right to look at it de novo to decide   01:51:46
14   whether there's coverage, to decide whether it   01:51:49
15   should be paid.                        01:51:51
16      That is a prescription for more and more   01:51:52
17   arbitrations. He made it clear, the president of   01:51:55
18   the reinsurance division, the ultimate   01:51:58
19   decision-maker, other than Buffett, on these   01:52:01
20   treaties.                              01:52:04
21      In sum, there's no dispute in our -- no   01:52:10
22   basis for dispute, in our opinion, that NICO   01:52:14
23   materially breached the treaty. The only real   01:52:17
24   question is what do you do about it.   01:52:20
25      We say rescind, but if you won't rescind   01:52:22
```

Page 2884

-Rebuttal Summation - by Petitioner-

```
1
2    then you should make them pay us our damages,   01:52:25
3    appoint us as claim servicer and enforce the   01:52:27
4    provisions of the treaty as written, including   01:52:31
5    Article 20. There's no basis for not doing that if   01:52:34
6    you don't rescind.                     01:52:39
7       I thank you for your patience, and I am   01:52:40
8    happy to answer any questions you guys might have   01:52:43
9    of me.                                 01:52:46
10      THE UMPIRE: Thank you, Mr. Brandes.   01:52:46
11      Let's take a break. Why don't we take a   01:52:55
12   break until 2 o'clock.                 01:53:05
13      We're going to start at 2, whether   01:53:06
14   anybody's here or not.                 01:53:08
15      (A recess was taken.)               02:01:32
16      MR. NONNA: I said in my closing this   02:01:34
17   was a tale of two cases. Now we see one of the   02:01:36
18   cases has virtually disappeared. That's the claim   02:01:39
19   case.                                  02:01:42
20      Do you remember how we were told at the   02:01:43
21   outset of this case at the organizational meeting   02:01:45
22   that Mr. Burns was going to prove up his e-mails   02:01:47
23   and the Berkshire Boys e-mail was going to be   02:01:51
24   proven? That's all abandoned. A year and a half   02:01:54
25   has gone by since they found out about the Burns   02:01:57
```

51 (Pages 2881 to 2884)

# EXHIBIT 18

Page 1

1                    Proceedings
2    IN THE MATTER OF THE ARBITRATION BETWEEN
3    ----------------------------------------x
4    NATIONAL INDEMNITY COMPANY,           :
                                           :
5         Petitioner,                      :
                                           :
6              vs.                         :
                                           :
7    SEATON INSURANCE COMPANY,             :
                                           :
8         Respondent and Counter-Claimant. :
     ----------------------------------------x
9
10   ARBITRATION PANEL:
11        N. David Thompson, Chairman
12        Caleb L. Fowler, Arbitrator
13        W. Mark Wigmore, Arbitrator
14
15             New York, New York
16             August 6, 2007
17             9:10 A.M.
18
19   Reported by:
20   Kathy S. Klepfer, CSR, RPR, CMR, CRR, CLR
21   &
22   MAYLEEN CINTRON, RMR, CRR
23   Job No.:  12696
24
25

Page 54

1  Opening Statement - Mr. Brandes
2  violation of some sort of agreement or Panel
3  order.
4      As I mentioned in my Stonewall
5  opening, and maybe you remember it, all the
6  Panel ordered was that we tell the parties
7  what issues were to be tried, not what
8  relief anybody was seeking. Here's your
9  order. Read it.
10     It's signed by Mr. Thompson on behalf
11 of the Panel. Paragraph 1. "The Panel is
12 aware that there is an apparent disagreement
13 between the parties as to the issues that
14 are to be heard by the Panel at the
15 scheduled hearing. We require the parties
16 to meet and confer on this issue by May 2.
17 If, following the meet and confer session
18 there remain disagreements, both parties
19 should submit simultaneous statements to the
20 Panel by May 4, with simultaneous replies
21 due May 9."
22     And then later on, talking about the
23 scope of the depositions of Jain, Krutter
24 and Snover -- and this motion all came about
25 because those three people were refusing to

TSG Reporting - Worldwide     877-702-9580

Page 55

1  Opening Statement - Mr. Brandes
2  appear for deposition -- this was the ruling
3  on that motion. And you say, "The scope of
4  said depositions shall be limited to the
5  issues agreed by the parties."
6      The issues. There's nothing about
7  telling you the relief the parties are
8  seeking. And then the parties tell you the
9  issues raised by Seaton. The companies',
10 Seaton and Stonewall, causes of action in
11 these arbitrations. Nowhere is it mentioned
12 what issues NICO's raising.
13     Now, your order applied to both
14 parties, but all you're being told is issues
15 raised by us, not by them. There is
16 absolute silence in this document on what
17 relief NICO is seeking. So if this document
18 limits the relief that any party can get in
19 this arbitration, NICO can't get any because
20 there is nothing about NICO's issues or
21 NICO's relief. It's so typical of NICO.
22 It's so arrogant and condescending not just
23 to us, but to you.
24     You made an order that applies to both
25 parties, but NICO interprets it as only

TSG Reporting - Worldwide     877-702-9580

Page 56

1  Opening Statement - Mr. Brandes
2  applying to Seaton. Only Seaton has to tell
3  you what issues are being raised. And even
4  though you don't ask for relief, Seaton's
5  got to tell you before it deposes the three
6  main witnesses in the case, Seaton's got to
7  tell you what relief Seaton's looking for,
8  but we, NICO, we don't have to tell you our
9  issues or our relief. That's their
10 position.
11     We've completely complied with your
12 order. The issues we have raised in this
13 case are identical to the ones that are
14 mentioned in that document, in that
15 response: Breach of contract and
16 interference with contractual relationships.
17     You asked us for the issues. We told
18 you the issues and those are the issues.
19 You didn't ask us to set forth before
20 discovery was over, before the three main
21 witnesses were deposed, what relief we were
22 seeking. And again, if that's a
23 prerequisite, then this entire hearing is
24 limited to relief that we can get under that
25 letter agreement because NICO doesn't set

TSG Reporting - Worldwide     877-702-9580

Page 57

1  Opening Statement - Mr. Brandes
2  forth any relief it's asking for.
3      Last thing I want to show you in my
4  opening is some testimony by Mr. Jain. And
5  Mr. Thompson, you weren't there when
6  Mr. Jain testified. Please, please, please,
7  I know you will read his transcript
8  carefully. I urge you to. It's quite
9  interesting.
10     What I have blown up here is
11 absolutely astounding testimony, not the
12 only astounding testimony, but probably the
13 most astounding. I want to read it to you.
14 "Q  Why did you need checks and
15 balances," and this is checks and balances in
16 the treaty wording itself, "Why did you need
17 checks and balances to make sure that the right
18 claims and expenses were being paid at the
19 right time?
20 "A   Well, the way the reinsurance
21 transaction had been structured," the deal had
22 already been structured, "the way it had been
23 structured, one of the structural flaws in my
24 mind was the way it was set up, we as the
25 reinsurer could end up losing money." Gee,

TSG Reporting - Worldwide     877-702-9580

Page 282

```
1        T. Ryan - direct
2   make mistakes you apologize and move on. So
3   hopefully that's what we will do.
4   MO      MR. KELLY: I move to strike that
5   last statement from the record.        17:30:56
6        MR. BRANDES: I would have no
7   problem doing that, but I think you
8   mischaracterized what I said.
9        MR. NONNA: The record will reflect
10  it.                17:31:05
11       MR. KNOERZER: The record will
12  reflect it.
13       MR. BRANDES: It will.
14   Q.  Was this the first time that you
15  had ever received -- on the day the wire    17:31:11
16  transfer came in, was this the first time that
17  you had ever received Girling's allocation?
18   A.  This is the first time. It was
19  attached -- it's an e-mail that was sent from
20  someone in the Gerling Accounting Department  17:31:26
21  to their CFO, who is Mr. Finkelstein. And
22  Mr. Finkelstein forwarded it on to me and I
23  forwarded it on to Robert.
24   Q.  Did you keep any information from
25  Mr. Barclay whatsoever about this?       17:31:38
    TSG Reporting - Worldwide    877-702-9580
```

Page 283

```
1        T. Ryan - direct
2   A.  Nothing.
3    Q.  Did Mr. Barclay ever come back to
4   you and say, Oh, no, Oh, no, I've been
5   hoodwinked, defrauded, fooled, cheated?    17:31:45
6   Anything?
7    A.  No. The only thing Mr. Barclay ever
8   did was thank me for a good result.
9    Q.  Did he have any evidence of that?
10   A.  He knew how hard it was to get this   17:32:02
11  deal done.
12       MR. KNOERZER: I pass the witness.
13       CHAIRMAN THOMPSON: You may step
14  down at this point, but we will ask
15  everybody to stay in place for a        17:32:18
16  minute. We thank you.
17       Let me speak to the Panel for just
18  one second.
19       (Executive session.)
20  RLG      CHAIRMAN THOMPSON: This morning we  17:33:32
21  got distracted for a few minutes by our
22  technological problems and so on.
23       We did not advise counsel that the
24  Panel does deny the motion NICO made
25  this morning to strike certain actions,    17:33:47
    TSG Reporting - Worldwide    877-702-9580
```

Page 284

```
1        T. Ryan - direct
2   with leave to renew that motion at the
3   close of this hearing.
4        I'm sorry we did not respond
5   promptly, just diverting.             17:34:00
6        I think I heard a motion just a
7   moment ago. I'm sorry we went by it,
8   Mr. Brandes. Is it a matter --
9        MR. BRANDES: I was not making a
10  motion. The witness said that what I     17:34:10
11  said in my opening was wrong and if you
12  make a mistake, you apologize for it.
13  He hoped I would apologize.
14       And all I'm saying is that if I'm
15  wrong, I would apologize. But I think    17:34:32
16  he was mischaracterizing what I said in
17  my opening. I'm sure it will all be
18  addressed in closing.
19       CHAIRMAN THOMPSON: Fair enough.
20  We thank you. There is no motion        17:34:41
21  before us now?
22       MR. BRANDES: No motion.
23       MR. KNOERZER: I just want to go
24  back to the ruling the Panel advised us
25  a moment ago.                     17:34:51
    TSG Reporting - Worldwide    877-702-9580
```

Page 285

```
1        T. Ryan - direct
2        CHAIRMAN THOMPSON: Yes.
3        MR. KNOERZER: I'm sure the Panel
4   understands why we are doing what we
5   are about to say. But we are going to    17:34:56
6   take exception to the ruling on the
7   grounds that we don't believe the Panel
8   has the authority to hear matters that
9   are outside the scope of the parties'
10  agreement on what is properly before     17:35:08
11  the Panel. We do that to preserve our
12  rights.
13       CHAIRMAN THOMPSON: We do
14  understand that, and it is appropriate
15  that it appear in the record --         17:35:13
16       MR. KNOERZER: Thank you.
17       CHAIRMAN THOMPSON: -- or set forth
18  in the pleadings. We are aware of your
19  view on that.
20       There is leave to renew the motion    17:35:20
21  at later point.
22       MR. KNOERZER: Thank you, sir.
23       MR. NONNA: So tomorrow morning we
24  will have Mr. Calpen (phonetic), he has
25  to go early.                      17:35:33
    TSG Reporting - Worldwide    877-702-9580
```

Page 1069

1          ARBITRATION PROCEEDINGS

2

  In the Matter of the        )
3 Arbitration between          )
                               )
4 NATIONAL INDEMNITY COMPANY,  ) VOLUME IV
                               )
5          Petitioner,         )
                               ) CLOSING
6          -and-               ) STATEMENTS
                               )
7 SEATON INSURANCE COMPANY,    )
                               )
8          Respondent/         )
           Counter-Claimant    )
9 --------------------------)

10

                  One World Financial Plaza
11                New York, New York

12

                  August 9, 2007
13                9:33 a.m.

14

15 B E F O R E:

16      N. David Thompson, Chairman

17      Caleb L. Fowler, Arbitrator

18      W. Mark Wigmore, Arbitrator

19

20

21

22

23 Reported by:

24 MAYLEEN CINTRON, RMR, CRR

25 JOB NO. 12699

Page 1178

```
1        Closing - Petitioner
2    cover because of adverse development,
3    some of which was expected and some of
4    which was, as Mr. Barclay testified.
5        Castlewood, too, knew what it was    11:21:35
6    buying. In Exhibit 730, an e-mail that
7    it sent to Mr. Patel, Castlewood knew
8    it was buying a company, Seaton, that
9    was under-reserved and that NICO cover
10   was likely to be used. But it wanted    11:21:51
11   to buy those companies because
12   Stonewall had value, and they wanted
13   claims servicing fees and the
14   management fees. And NICO is an
15   obstacle to that objective. Just like    11:22:01
16   they recognized it was an obstacle back
17   in 2005.
18       NICO has a right to become the
19   claims servicer, and it is protected by
20   the contract and by Dukes Place's own    11:22:14
21   promises, and Dukes Place's own
22   acknowledgment that the acceleration of
23   liabilities cannot happen.
24       This arbitration is simply an
25   attempt to gain a windfall and achieve    11:22:27
```
TSG Reporting - Worldwide     877-702-9580

Page 1179

```
1        Closing - Petitioner
2    what the contract does not allow them
3    to receive.
4        We have seen that they have
5    resorted to making to the Panel    11:22:36
6    representations contrary to those made
7    to auditors and regulators.
8        Now, they tried to back away from
9    the representations that they made to
10   the Panel in Stonewall, that the    11:22:45
11   contract, Stonewall, was not risk-
12   bearing because they represented to
13   their auditors and the regulators that
14   it was risk-bearing. So now they're
15   dancing a very fine line.    11:22:54
16       But they told the Rhode Island
17   Insurance Department back in late
18   October, I believe, 2006 about
19   $19 million or so remaining as incurred
20   in the NICO cover. And Mr. Carlson    11:23:06
21   admitted today that's false, and they
22   have not told the Department that.
23       There's a consequence, as I stated
24   to the arbitrators in the Stonewall
25   case, for misrepresenting facts to    11:23:16
```
TSG Reporting - Worldwide     877-702-9580

Page 1180

```
1        Closing - Petitioner
2    auditors and regulators. Sometimes
3    people believe they can get away with
4    making myths to arbitration panels
5    because there is no consequence. We    11:23:27
6    are a bunch of friends, we see each
7    other at AREAS conferences, and we know
8    each other for years.
9        But you have to divorce that from
10   the facts of the case and the parties    11:23:35
11   who are before you. And you have to
12   have the courage to say that they
13   cannot take advantage of the
14   friendship. They can't disparage
15   honorable people like Ajit Jain, and    11:23:45
16   they can't abuse the arbitration
17   process.
18       You are the gatekeeper, and we
19   trust you will reach the right
20   decision. Thank you.    11:23:53
21       CHAIRMAN THOMPSON: Thank you. I
22   think we will take just a few minutes.
23       (Whereupon, a recess was taken
24   from 11:24 a.m. to 11:32 a.m.)
25       CHAIRMAN THOMPSON: We go back on    11:32:3
```
TSG Reporting - Worldwide     877-702-9580

Page 1181

```
1        Closing - Respondent
2    the record and recognize Mr. Brandes.
3        CLOSING STATEMENTS - RESPONDENT
4        (MR. BRANDES)
5        MR. BRANDES: Thank you. Like my    11:32:38
6    friends, I want to thank the members of
7    the Panel for their time and attention.
8        Like John said towards the end of
9    his closing, we are all friends and
10   that's nice. But we don't ask for any    11:32:52
11   quarter because of it.
12       If you find that I or my co-counsel
13   or our clients have misbehaved in any
14   way, shape or form, you should take us
15   to task for it.    11:33:03
16       The same is true for my colleagues
17   on the other side of the table, though.
18   If you find that they misbehaved in any
19   way, you should take them to task for
20   it. And I'm talking party, not counsel    11:33:18
21   here. I think you should take them to
22   task for it because I think they have
23   misbehaved.
24       [Messrs. Krutter, Snover and Lewis
25   entering the room.]    11:33:27
```
TSG Reporting - Worldwide     877-702-9580

Page 1182

```
 1      Closing - Respondent
 2        MR. BRANDES: Before I get into the
 3      guts of my remarks -- I'm glad
 4      Mr. Krutter came back, and Mr. Snover.
 5      I wanted to welcome my old friends.        11:33:34
 6        We heard in John's case that our
 7      case is frivolous and, I know that
 8      Mr. Krutter and Mr. Snover and
 9      Mr. Lewis spend a great deal of their
10      time devoting their time and attention    11:33:48
11      to cases they consider frivolous. So
12      welcome to my frivolous remarks.
13        A few points -- not in any
14      particular order -- that troubled me
15      about what I heard from my friends.       11:34:01
16        First, about Mr. Hamwee. We showed
17      you, there was a very first slide in my
18      opening, a quote from their reply brief
19      where they said -- I don't have their
20      exact words. It was something like,        11:34:19
21      Mr. Hamwee refused to appear. But we
22      took them to task for that because we
23      said nobody asked him to appear. We
24      didn't ask him to appear. They didn't
25      ask him to appear. So how could they      11:34:28
```
TSG Reporting - Worldwide    877-702-9580

Page 1183

```
 1      Closing - Respondent
 2      tell you he refused to appear. That
 3      was misleading.
 4        They don't deny that. What John
 5      talks about is that Hamwee now had        11:34:39
 6      relevant evidence to give. We don't
 7      think so. Hamwee was in no way
 8      involved in the negotiation of the
 9      reinsurance contract; that was
10      Mr. Barclay and Mr. Jain. And I'm         11:34:50
11      going to take you through that in some
12      detail.
13        But if my friends thought
14      Mr. Hamwee had relevant testimony to
15      give, they should have called him, and    11:34:59
16      he would have testified.
17        John said that if he knew what our
18      claims were going to be, he definitely
19      -- or he maybe would have wanted to
20      question Hamwee. But they got our         11:35:10
21      Stonewall brief a long, long time ago,
22      and never asked to depose Hamwee after
23      that. After they got our initial
24      Stonewall brief, they did ask and did
25      depose Mr. Wall and Mr. Kaufman. But      11:35:21
```
TSG Reporting - Worldwide    877-702-9580

Page 1184

```
 1      Closing - Respondent
 2      they didn't ask for Hamwee.
 3        And they didn't ask for Hamwee at
 4      the Stonewall hearing. And they didn't
 5      ask to depose him between that hearing    11:35:28
 6      and this one. And they didn't ask for
 7      him to appear at this one.
 8        So, for them to say that he refused
 9      to appear was, in our view, very
10      misleading and they should be taken to    11:35:37
11      task for it.
12        Next thing, the Dukes Place
13      packages. We don't deny that these
14      packages were sent to Dukes Place by
15      Cavell. What will you have to             11:35:50
16      understand is that nobody at Dukes
17      Place was an insurance professional.
18      When they got these packages, they
19      thought they were being prepared by
20      their trusted agent, Cavell. They        11:36:01
21      didn't know that Cavell had handed the
22      keys of the kingdom to NICO.
23        So, when Dukes Place gets one of
24      these packages, they're viewing it with
25      the mindset that, This is our agent      11:36:19
```
TSG Reporting - Worldwide    877-702-9580

Page 1185

```
 1      Closing - Respondent
 2      telling us, this is the best we can do.
 3      That's a fair way for them to react to
 4      those packages.
 5        And without knowledge that the         11:36:34
 6      claims are really being run and
 7      controlled, not by their trusted agent
 8      Cavell, but by NICO, they would have no
 9      cause to question what they're being
10      told.                                     11:36:47
11        Next, they disparage our attempts
12      to compare this runoff to others. NICO
13      tells you that none of the others had
14      retroactive retrocession contracts like
15      here. They've said that countless        11:37:10
16      times throughout this case, and it is
17      not accurate.
18        Mr. Wall talked about the General
19      Accident Puerto Rico runoff which had a
20      retroactive retrocession cover with      11:37:22
21      Swiss Re. Swiss Re didn't demand
22      control of claims or interfere with
23      their cedent's handling of claims.
24        Riverstone had a billion dollars
25      retroactive retrocession contract with   11:37:35
```
TSG Reporting - Worldwide    877-702-9580

Page 1186

```
 1        Closing - Respondent
 2    Swiss Re.  Both Mr. Follis and Mr. Ryan
 3    worked at Riverstone, and neither even
 4    knew about the cover with Swiss Re.
 5    What does that tell you?          11:37:48
 6        Obviously, Swiss Re wasn't
 7    interfering or controlling the way
 8    Riverstone handled claims.
 9        Only, NICO insists not just on
10    interfering, but controlling the      11:38:02
11    handling of claims because it's given a
12    retroactive retrocession contract.  And
13    as I will show you after the lunch
14    break, NICO negotiated away the right
15    to control claims in the contract and    11:38:19
16    stole it back after the contract was in
17    force.
18        Next thing, this whole issue of
19    Seaton's financials and whether these
20    contracts contain real risk transfers.    11:38:36
21    First of all, there is no dispute that
22    on the face of the contract they
23    contain real risk transfer.  They were
24    expressly negotiated by Mr. Barclay on
25    behalf of Seaton to do so, because that    11:38:50
```

Page 1187

```
 1        Closing - Respondent
 2    was the deal.
 3        We believe, we assert and I
 4    personally am 100 percent certain that
 5    NICO breached that, and we are here to    11:39:05
 6    get relief from you for that breach.
 7        But NICO tells you that before you
 8    decide the issue, before you decide
 9    whether there was a breach, and if
10    there was what relief we get, we have    11:39:18
11    to, on our financials, say there's no
12    risk transfer, stop taking credit for
13    the reinsurance, and put ourselves into
14    liquidation.  That's their argument.
15        Because if we say there is no risk    11:39:31
16    transfer on our financials, we can no
17    longer take credit for the remaining
18    $200 million incurred limit on the
19    contract, and we're insolvent by
20    $152 million.  That's what they say we    11:39:46
21    have to do.
22        We are not misleading anyone.
23    Ernst & Young knows all about the
24    accusations we've made, and the relief
25    we seek.  The Rhode Island regulators    11:39:55
```

Page 1188

```
 1        Closing - Respondent
 2    have the brief.  They know exactly what
 3    is going on.
 4        But to suggest that we have to put
 5    ourselves into liquidation as a        11:40:07
 6    condition of having our arguments
 7    heard, well, I've been doing these
 8    cases for 30 years now, I've heard so
 9    many arguments that are so absurd, I
10    will never again say that something is    11:40:19
11    the most absurd thing I've ever heard,
12    but this one has got to be in the top
13    five.
14        You will rule on these contracts,
15    and we expect you will enforce them    11:40:37
16    according to their terms and there will
17    be risk transfer.  If you do not and
18    there is no risk transfer, we will have
19    to take that position with the
20    Department.  At that point, it will not    11:40:54
21    matter.  Because if you don't enforce
22    these contracts with risk transfer, we
23    are going to be in liquidation anyway.
24        Next issue, dedicated IBNR.  It's a
25    diversion.  Mr. Nonna admitted in his    11:41:09
```

Page 1189

```
 1        Closing - Respondent
 2    questioning of Mr. Carlson that many
 3    companies do not carry individual claim
 4    reserves on asbestos and pollution, and
 5    that Commercial Union is one of them.    11:41:21
 6        Now, Mr. Knoerzer in his remarks
 7    said they carry -- I forget what he
 8    called it -- a bulk claim reserve.
 9        Not the companies I know.  The
10    companies I know don't have a bulk    11:41:34
11    claim reserve.  They reserve these
12    claims in their bulk IBNR, and I know
13    for a fact that's what Commercial Union
14    did.  And that's what Mr. Kirshnamurthy
15    told Mr. Carlson.  That testimony is    11:41:44
16    undisputed.
17        Now, Mr. Kirshnamurthy works for
18    Mr. Ryan, and they are running off
19    Commercial Union.  So think about it.
20        If Commercial Union isn't claims    11:41:59
21    reserving for asbestos and
22    environmental, how is it that Mr. Ryan
23    and his team are able to settle cases
24    for Commercial Union and still collect
25    their reinsurance?  Yet for Seaton they    11:42:12
```

31

Page 1190

1    Closing - Respondent
2    tell you, unless Seaton puts up a claim
3    reserve, they can't settle. Do you
4    believe that?
5        Then they say, this was in response    11:42:26
6    to your question, Mr. Thompson. You
7    said on the dedicated IBNR, if you look
8    at the financials, you won't see it as
9    dedicated to an individual
10   policyholder. But if you look at the    11:42:39
11   financials, you won't see claims
12   reserve dedicated to individual
13   policyholders either. If it was, then
14   you wouldn't have to worry about claims
15   reserve being discoverable in    11:42:52
16   litigation; they would all be in your
17   financial statements. They're not.
18       The reason why Commercial Union and
19   many, many other companies in the
20   industry do not put claims reserves on    11:43:03
21   asbestos and environmental is because
22   some courts have ruled they're
23   discoverable and some courts have
24   actually ruled their admission, not
25   just of liability but of the amount    11:43:15
TSG Reporting - Worldwide     877-702-9580

Page 1191

1    Closing - Respondent
2    owing. And that's why you don't do it.
3        And to suggest, for any one in this
4    industry to suggest that a reinsurer
5    objects to that, well, it either shows    11:43:28
6    an unbelievable ignorance of our
7    industry or a lack of candor.
8        Commercial Union for years never
9    had case reserves on asbestos and
10   pollution. They settled case after    11:43:49
11   case. There is not a bit of evidence
12   that any reinsurer ever refused to pay
13   a settlement because they didn't have a
14   case reserve. None.
15       They've been running off the    11:44:05
16   Commercial Union book since 2001. If
17   there were any evidence, you would have
18   seen it. But there is none. Because
19   it doesn't happen.
20       What companies like Commercial    11:44:15
21   Union do is keep their reinsurers
22   advised. They send out what they label
23   "precautionary notices." It actually
24   gets pretty funny. Because a case can
25   be in litigation for ten years and a    11:44:29
TSG Reporting - Worldwide     877-702-9580

Page 1192

1    Closing - Respondent
2    reinsurer is getting Precautionary
3    Notice No. 57, and it is still
4    "precautionary." And it still doesn't
5    have any reserve on it, even ten years    11:44:38
6    into the case because they don't want
7    it discoverable.
8        But reinsurers read these notices,
9    and get a pretty good feel for what the
10   liability is and they put up their own    11:44:49
11   reserves.
12       And Swiss Re was Commercial Union's
13   biggest reinsurer, and they had gone to
14   Commercial Union's office every other
15   week, Pete Marone and Pete Ciraney    11:45:00
16   (phonetic) were up there talking with
17   the claims staff of CU.
18       And how do the reserves for these
19   get into the bulk IBNR? Somebody
20   doesn't just pluck a number out of the    11:45:14
21   air. At the end of each year, in a
22   privileged series of communications,
23   counsel in the company ask the claims
24   handler for an evaluation of the case.
25   And in that communication is where they    11:45:30
TSG Reporting - Worldwide     877-702-9580

Page 1193

1    Closing - Respondent
2    get what we think our ultimate exposure
3    is and what we think we can settle for.
4    And from that they pick a reserve.
5    They don't post it as a reserve; it's
6    effectively a dedicated IBNR. I don't
7    know if anybody else calls it that, to
8    tell you the truth. Commercial Union
9    didn't.
10       But they get that and add those all    11:45:55
11   up. And then they add that to what the
12   actuaries tell them the IBNR in the
13   rest of the book of business should be,
14   and in their financial statement they
15   put a bulk IBNR. There is nothing    11:46:04
16   untoward or deceitful about it.
17       Mr. Ryan's testimony to the
18   contrary that it is somehow double
19   dipping, again, either it speaks of his
20   ignorance of what goes on, or his lack    11:46:20
21   of candor. I don't know which.
22       Again, the contention that the
23   failure to carry individual case
24   reserves will affect your reinsurance
25   collection, if that were true, every    11:46:34
TSG Reporting - Worldwide     877-702-9580

Page 1194

```
1        Closing - Respondent
2    single company that doesn't carry
3    individual reserve on asbestos and
4    pollution would be impairing their
5    ability to collect their reinsurance.    11:46:42
6    Do you really think every company is
7    doing that? You know better.
8        Mr. Ryan's testimony of his refusal
9    to authorize settlements of Seaton
10   cases because of inadequate case        11:47:10
11   reserves and a fear of uncollectable
12   reinsurance simply begs believe.
13       And to hear Mr. Knoerzer say this
14   morning that Seaton was under-reserved,
15   my goodness, what company in our        11:47:27
16   business, the property and casualty
17   business has not been under-reserved
18   for most of the last 30 years? Cigna
19   is putting another billion two. CNA is
20   putting another 3.4 billion. AIG,        11:47:38
21   another 29.6 billion. Travelers in the
22   billions. St. Paul in the billions.
23   Everybody has been under-reserved.
24       Is there a reason for nonpayment by
25   reinsurers? Come on.                    11:47:52
```
TSG Reporting - Worldwide      877-702-9580

Page 1195

```
1        Closing - Respondent
2        Mr. Follis told you, the only
3    problem that Tom Ryan has with Seaton
4    reinsurers is that he failed to keep
5    them advised. Companies are saying, I    11:48:01
6    haven't had notification of this claim
7    for ten years. Reinsurers don't like
8    that; they don't like being taken by
9    surprise. But if you keep them
10   advised, they completely understand and  11:48:15
11   accept the fact that there is no
12   individual case reserve.
13       Let's talk about this charade that
14   NICO put us through with regard to the
15   access to Seaton Re files.               11:48:32
16       Mr. Knoerzer on July 31st, sent us
17   an e-mail incorrectly claiming that we
18   moved these files to Florida,
19   incorrectly claiming that NICO has been
20   denied access to them, and demanding     11:48:45
21   immediate access before this hearing.
22       Why? Have you heard one
23   substantive word of testimony about
24   what was in the Seaton Re files? One
25   word? Did Mr. Kirshnamurthy, the man     11:49:00
```
TSG Reporting - Worldwide      877-702-9580

Page 1196

```
1        Closing - Respondent
2    who review them, even show up to
3    testify? No. What was the need for
4    this rush access?
5        Well, we gave them everything we
6    had. There is no dispute on that. We
7    gave them all the electronic files.
8    They have had time to review them. And
9    have you heard a word about them, about
10   their content or their substance? No.
11   Not one word.
12       What did you hear? You heard Tom
13   Ryan righteously and indignantly say we
14   failed to produce the green folders.
15   Well, it turns out, as Mr. Carlson told
16   you in unrebutted testimony, that
17   before NICO shipped anything to us,
18   they embedded the green Seaton Re
19   folders into their claims files. We
20   had these green folders but not labeled  11:50:08
21   "Seaton Re." They were in the claim
22   files.
23       You heard Mr. Carlson tell you that
24   people from Castlewood sat for weeks
25   with Ryan and his people to make a       11:50:20
```
TSG Reporting - Worldwide      877-702-9580

Page 1197

```
1        Closing - Respondent
2    smooth transition, and nobody told us
3    that they had embedded these green
4    folders into the claim files. Ryan
5    knew it, but we didn't.                  11:50:33
6        And then we get this phony demand
7    for immediate access, in our view, for
8    one purpose only: so Tom Ryan can sit
9    here and say, "They denied my people
10   access." Because that's the only thing   11:50:47
11   you've heard about those Seaton Re
12   files. We think it was a set-up. We
13   think it speaks volumes about Mr. Ryan
14   and NICO.
15       Final preliminary point, on the      11:51:05
16   claims servicer fees. You heard
17   Mr. Carlson and you saw the documents.
18   NICO has been charging us $76,000 a
19   month as an unallocated loss adjustment
20   claims servicer fee for 16 months now.   11:51:26
21       Mr. Carlson, in unrebutted
22   testimony, said their methodology for
23   calculating that is wrong. But even
24   using their methodology, you don't get
25   anywhere near 76,000 a month.            11:51:41
```
TSG Reporting - Worldwide      877-702-9580

Page 1198

1   Closing - Respondent
2   Unrebutted.
3       You ordered the parties to try to
4   work this out. That's your Order.
5   That's this Panel's Order. And we      11:51:50
6   tried. You heard Mr. Carlson, you saw
7   the e-mails he sent. Several of them.
8   "Please get together with us. Let's
9   work this out." We didn't even get the
10  courtesy of a response.         11:52:08
11      NICO simply disregarded your Order,
12  and kept right on deducting the 76,000
13  that it couldn't justify. They have
14  failed to submit any evidence to you
15  justifying $76,000 a month. In fact,    11:52:24
16  they failed to submit any evidence to
17  you justifying one penny a month.
18  You've heard nothing. Zero.
19      Apparently, NICO believes that it
20  can simply pick and choose which of     11:52:44
21  your Orders it must comply with, and it
22  apparently believes that you will
23  simply rubber-stamp its reduction
24  because, Hey, we're part of
25  Berkshire-Hathaway and the rules don't  11:52:53

TSG Reporting - Worldwide      877-702-9580

Page 1199

1   Closing - Respondent
2   apply to us.
3       We ask you to order that NICO
4   immediately, upon issuance of your
5   Order, reimburse us for the million and  11:53:04
6   a quarter that they have deducted in
7   claims-handler fees because, A, they
8   have not proved even one penny of it
9   and, B, they failed to comply with your
10  Order to try to reach a negotiated       11:53:20
11  settlement with us. We think you also
12  ought to double that as a notation to
13  NICO that when you issue an Order, you
14  expect it to be complied with.
15      With that, I suggest we get into     11:53:32
16  the lunch break, and I will get into my
17  prepared remarks.
18      CHAIRMAN THOMPSON: Very good.
19  (Luncheon recess taken at 11:53 p.m.)
20
21
22
23
24
25

TSG Reporting - Worldwide      877-702-9580

Page 1200

1   Closing - Respondent
2   A F T E R N O O N   S E S S I O N
3       (Time noted: 12:46 p.m.)
4   CHAIRMAN THOMPSON: I think we are
5   all present. If we may return to       12:46:52
6   Mr. Brandes.
7       MR. BRANDES: Thank you.
8   Let me begin by apologizing to
9   Caleb and Mark because, you know, a
10  fair chunk of what I've got to go       12:47:08
11  through, you already heard in the
12  Stonewall case. If I notice you dosing
13  off, I understand.
14      ARBITRATOR WIGMORE: But we don't
15  have the option of just reading the     12:47:17
16  transcript.
17      MR. BRANDES: But David, if I
18  notice you dosing off, that's not a
19  good thing.
20      Anyway, there are three issues for  12:47:27
21  you to decide. The first is, did NICO
22  materially breach the treaty?
23      It is interesting, in listening to
24  the 80 or 90 minutes of Mike and John
25  this morning, neither one of them       12:47:41

TSG Reporting - Worldwide      877-702-9580

Page 1201

1   Closing - Respondent
2   pointed you to the treaty. And since
3   the main issue is whether NICO breached
4   it, I'm going to take a fair amount of
5   time taking you through the negotiation  12:47:49
6   and wording of the treaty.
7       The next issue is: If it did breach
8   it, to what remedy is Seaton entitled?
9       And the third issue is: Who acts as
10  claims servicer through the remainder    12:48:04
11  of the runoff, and on what conditions?
12  I'm going to take these in order.
13      First, we submit that NICO
14  materially breached the treaty and that
15  it did so most deliberately and         12:48:18
16  consciously.
17      I want to show you a piece of
18  Mr. Jain's testimony where I asked him:
19  "Question: Why did you need checks
20  and balances to make sure that the      12:49:06
21  right claims and expenses were being
22  made at the right time?
23  "Answer: Well, the way the
24  reinsurance transaction had been
25  structured, one of the structural flaws  12:49:06

TSG Reporting - Worldwide      877-702-9580

34

Page 1202

1      Closing - Respondent
2  in my mind was that the way it was set
3  up, we, as the reinsurer, could end up
4  losing money but the cedent could end
5  up making money. The converse was not          12:49:06
6  true."
7      I'm not going to comment further on
8  that part of the testimony.
9      What I want to do, for present
10  purposes, is focus on the next question          12:49:18
11  beginning on Line 24.
12      "Question: So you understood that
13  the cedents in this case, Seaton and
14  Stonewall, did not have the same
15  economic interests as NICO did,          12:49:28
16  correct?
17      And his answer was: "That is
18  correct."
19      You have been told this morning
20  that I'm going to be criticizing          12:49:42
21  Mr. Jain and casting dispersions on
22  him. Not in this instance, I'm not. I
23  completely agree with him. The parties
24  did not have the same economic
25  interests.

Page 1203

1      Closing - Respondent
2      Interestingly, in this instance, it
3  is Mr. Ryan who criticizes Mr. Jain.
4  Because Mr. Ryan testified he disagrees
5  with Mr. Jain. He believes that NICO's          12:50:02
6  interests and Seaton were the same.
7      I don't have a blow up of that, but
8  I have a page cite. It's the
9  transcript of this hearing, page 994,
10  Line 9 to 13.          12:50:21
11      Well, of course, Mr. Jain got it
12  right, and Mr. Ryan got it wrong.
13      Like many reinsurance transactions,
14  the parties to this one had very much
15  conflicting interests.          12:50:31
16      "Seaton's economic interest was for
17  every potential liability to be
18  extinguished as soon and as cheaply as
19  possible, even if that ate up NICO's
20  reinsurance coverage before it could          12:50:45
21  earn investment income on it. The
22  quicker the liabilities were
23  extinguished, the more solid Seaton's
24  remaining surplus would become, and the
25  more likely its owners could realize a          12:50:58

Page 1204

1      Closing - Respondent
2  larger portion of that surplus on the
3  sale of the company."
4      That's what Mr. Kaufman testified
5  to at page 421 of the transcript.          12:51:09
6      You will recall, he said that Dukes
7  Place was able to buy Seaton at a
8  significant discount because the
9  reserves were unsure, the surplus was
10  unsure, and their goal, Seaton's goal,          12:51:23
11  was to tighten up the reserves,
12  extinguish as many of the liabilities
13  as they could as prudently and as
14  quickly as possible in order to shore
15  up the surplus and be able to sell the          12:51:35
16  company for a higher percentage of the
17  surplus. That was the business plan.
18      NICO's interests were exactly the
19  opposite. It needed the liabilities to
20  be paid out slowly, because investment          12:51:45
21  income was the only way it could make a
22  profit on this deal. And Mr. Jain
23  admitted that. And I want to show you
24  a little more of his transcript.
25      At page 2576, I asked him:          12:51:58

Page 1205

1      Closing - Respondent
2      "Question: Do you recall today what
3  your [objective] assessment was of
4  Seaton when you did the deal?
5      "Answer: Not exactly, but I          12:52:07
6  think -- I mean, in preparation for
7  this, I was looking -- I think the
8  premium we got was around 190, given
9  change. The limits are 350, given
10  change. Again, I'm just sort of          12:52:19
11  approximating, speculating, whatever
12  the word is. But my guess is our
13  ultimate losses would have been
14  somewhere 250 minus or so.
15      "Question: Did you do any sort of          12:52:28
16  assessment of anticipated investment
17  income?
18      "Answer: No. Say that again,
19  please?
20      "Question: Did you do any sort of          12:52:37
21  assessment of anticipated investment
22  income?
23      "Answer: Yes. Absolutely."
24      Then he testified further.
25      "Answer: If you make the assumption          12:52:50

Page 1206

```
1       Closing - Respondent
2   that I projected ultimate losses of
3   250, and if you make the assumption
4   that the limit was about, say, 350,
5   just to keep the math simple, so that    12:52:58
6   100 million is the risk limit, and I
7   would have wanted a risk premium for
8   taking that risk, and that if I wanted
9   a 20 percent rate on line, that would
10  be about 20 million.            12:53:09
11      "Question: 20 million, I see."
12      Then he says, "Since the total
13  premium was 189, my net present value
14  of losses would be 169..."
15      Okay. What does this mean? Using    12:53:22
16  round numbers, what Mr. Jain told us is
17  that he expects ultimate losses to be
18  around 250. Since he is only being
19  paid a premium of 190, he expected to
20  suffer an underwriting loss, and the    12:53:34
21  only way he could convert that to an
22  economic profit was by means of
23  investment income.
24      No magic there. The more
25  investment income he made, the bigger    12:53:47
```
TSG Reporting - Worldwide     877-702-9580

Page 1207

```
1       Closing - Respondent
2   his economic profit. And the slower
3   the pace at which liabilities were
4   extinguished, the greater the
5   investment income he would earn.    12:53:55
6       I mean, all of this is
7   Investment 101, it does not take a
8   genius to understand it.
9       Just as Seaton's interest was for a
10  quick or speedy extinguishment of    12:54:09
11  liability, even if that increased the
12  amount NICO would have to pay under its
13  cover, NICO's interest was for a slow
14  extinguishment or slow payment of
15  liabilities, even if that meant that    12:54:21
16  the limit of the cover was blown and
17  Seaton's surplus was strengthened.
18      Because if the history of our
19  industry over the last 30 years tells
20  us anything, it's that the slower you    12:54:33
21  take to extinguish liability, the
22  higher they're going to become. That's
23  why everybody's been under-reserved.
24      Mr. Jain knew it. No secret.
25  Nobody's fighting that. And Mr. Jain    12:54:49
```
TSG Reporting - Worldwide     877-702-9580

Page 1208

```
1       Closing - Respondent
2   also acknowledged that Mr. Buffet
3   approved the deal after they discussed
4   the economics of it. That's at the
5   Stonewall transcript, page 2572.    12:54:58
6       In fact, Mr. Buffet did more than
7   approve the deal. According to his
8   2001 shareholder letter, which is
9   quoted in Exhibit 641, Mr. Buffet
10  wrote, "I have known the details of    12:55:15
11  almost every policy that Ajit has
12  written since he came with us in 1986."
13      So, Mr. Buffet knew the details of
14  this deal.
15      And there can't really be any doubt    12:55:30
16  on anyone's part, can there, that
17  Mr. Buffet understood the importance of
18  investment income?
19      The relevant provisions of the
20  treaty were carefully negotiated    12:55:47
21  between principally Mr. Jain, on the
22  one hand, and Mr. Barclay on the other
23  in order to strike a balance between
24  these interests, what Mr. Jain called
25  the "checks and balances."    12:55:58
```
TSG Reporting - Worldwide     877-702-9580

Page 1209

```
1       Closing - Respondent
2       Again, there's no dispute that the
3   contract needed checks and balances,
4   because the parties had contrary
5   interests. Certainly no dispute on    12:56:07
6   Mr. Jain's part.
7       That NICO in this proceeding
8   suggests otherwise is really strange,
9   when the man who negotiated the deal
10  and is the president of their    12:56:19
11  reinsurance division tells you that the
12  treaty needed these checks and balances
13  because we had different economic
14  interests.
15      Again, there is no doubt that NICO    12:56:32
16  knew what Seaton's interests were,
17  because they were laid out in writing.
18      This is a letter to Mr. Jain by
19  Mr. Barclay, part of the negotiations.
20  I'm only going to read the last    12:56:46
21  highlighted sentence.
22      "You should understand that our
23  investment parameters are based upon
24  realization after five years." Quick
25  realization.            12:56:56
```
TSG Reporting - Worldwide     877-702-9580

Page 1210

```
 1        Closing - Respondent
 2        I asked Mr. Jain at his testimony
 3    in Stonewall -- and I apologize, I
 4    don't have the page cite for this --
 5    did he understand what this meant. And    12:57:02
 6    he said, "Yes, like any other
 7    investment banker, they want to get in
 8    and get out in five years, that's their
 9    objective."
10        Again, very contrary to NICO's    12:57:16
11    objective, which is to hold the money
12    as long as possible and avoid an
13    acceleration. There can be no dispute
14    that NICO wanted to avoid an
15    acceleration. You heard it time and    12:57:26
16    time again from their side of the
17    table.
18        In fact, in connection with the
19    redomestication of Seaton to Rhode
20    Island, it insisted and received a    12:57:35
21    commitment that Seaton would not take
22    advantage of Rhode Island's 'solvent
23    scheme of arrangement' provisions in
24    order to accelerate liabilities.
25    That's Exhibit 209.          12:57:48
```
TSG Reporting - Worldwide     877-702-9580

Page 1211

```
 1        Closing - Respondent
 2        Again, different economic
 3    interests, negotiation of a contract
 4    with checks and balances to protect
 5    both.                12:57:58
 6        NICO's initial draft of the slip
 7    that was prepared by Mr. Krutter,
 8    Exhibit 501, gave NICO virtually
 9    complete control over when and on what
10    terms claims would be settled. I would    12:58:08
11    have to blow up the whole document to
12    show it to you. I urge you to read
13    Exhibit 501. But NICO would have had
14    complete control.
15        Both John Hancock, which was the    12:58:20
16    owner of Unigard, which later became
17    Seaton, and Dukes Place -- which was
18    the purchaser of the company --
19    rejected giving NICO that complete
20    control. Instead, they revised the    12:58:32
21    slip to put in this provision.
22        This is from Exhibit 502. The
23    revised provision expressly states that
24    "The Reinsured -- Seaton -- "shall be
25    the sole judge as to what shall    12:58:52
```
TSG Reporting - Worldwide     877-702-9580

Page 1212

```
 1        Closing - Respondent
 2    constitute a covered liability under
 3    the Reinsured's original policy,
 4    contract or binder and as to the
 5    Reinsured's liability thereunder and as    12:59:00
 6    to the amount or amounts which shall be
 7    proper for the Reinsured to pay
 8    thereunder; and the Reinsurer shall be
 9    bound by the judgment of the Reinsured
10    as to the liability and obligation of    12:59:13
11    the Reinsured under its original
12    policies, contracts or binders."
13        Pretty clear. The reinsured
14    decides what it owes under its
15    policies, and the reinsurer is bound by    12:59:28
16    its judgment.
17        That language, with a tiny bit of
18    tweaking, ends up in Article 4.A of the
19    treaty. The tiny bit of tweaking is
20    where they are bound by the "good faith    12:59:43
21    determination" of the reinsured.
22        And to save a little bit of time
23    and to save a little bit of my voice, I
24    will not be reading what's on the
25    screen. We will at the end be handing    12:59:51
```
TSG Reporting - Worldwide     877-702-9580

Page 1213

```
 1        Closing - Respondent
 2    out a booklet of all of these blow-ups,
 3    and you can read it for yourself.
 4        There is Article 2 of the treaty,
 5    which I forgot to mention during the    13:00:02
 6    Stonewall closing. Article 2 expressly
 7    states, "The Reinsured and Reinsurer
 8    confirm that it is their mutual intent
 9    that the Reinsurer's liabilities under
10    this Retrocession follow from and are    13:00:15
11    identical to any and all liabilities of
12    the Reinsured..." etcetera.
13        So, what does this tell us? NICO's
14    liability follow from and are identical
15    to Seaton's, that's Article 2; Seaton    13:00:31
16    is the sole judge of its liabilities
17    and what it should pay, Article 4; and
18    NICO must accept Seaton's good faith
19    determinations, Article 4. Nothing the
20    least bit ambiguous about this.    13:00:52
21        Absolutely no doubt that treaty
22    gives Seaton the control over the
23    claims against it, when and on what
24    terms to settle, subject to the other
25    provisions of the treaty, and there are    13:01:07
```
TSG Reporting - Worldwide     877-702-9580

37

Page 1214

```
1       Closing - Respondent
2    other provisions that impact this.
3       In every draft of this slip that
4    was prepared by NICO, every single
5    draft, NICO gave itself unfettered        13:01:21
6    discretion whether or not to consent to
7    settlements or buybacks above certain
8    thresholds. They didn't have to give
9    any reason or justification. They had
10   unfettered discretion.                    13:01:35
11      Here it is from the last of the
12   slips that NICO submitted. This one is
13   attached to Mr. Jain's letter of, I
14   think, April 8, 1998 to Mr. Studley of
15   Hancock. But here is what it says:        13:01:50
16      "Reinsurer's right-to-associate
17   clause" -- these are conditions NICO
18   insisted on the contract -- "(including
19   Reinsurer's pre-approval of any
20   insurance policy buybacks, commutations   13:02:06
21   or ceded or assumed reinsurance and any
22   other payments not in settlement of a
23   specific claim)."
24      So for buyback and commutations,
25   there is not even a threshold.            13:02:18
     TSG Reporting - Worldwide     877-702-9580
```

Page 1215

```
1       Closing - Respondent
2    Unfettered discretion to preapprove,
3    or not, buybacks and commutations.
4       Then Paragraph 2, "Pre-approval of
5    all gross claim settlements or other      13:02:29
6    payments covered by this reinsurance in
7    excess of $250,000."
8       Again, unfettered discretion. We
9    don't have to tell you why we won't
10   approve it. But if we don't, you can't    13:02:39
11   make the settlement.
12      This is what NICO wants. This is
13   what NICO asks for, but it doesn't get
14   it. Because as Mr. Krutter admitted
15   during his testimony, the lawyer from     13:02:50
16   DeBevoise Plimpton, Mr. Dembeck, who
17   was representing Dukes Place, insisted
18   on a proviso. Here is Mr. Krutter's
19   testimony.
20      "Question: How did the requirement     13:03:05
21   that the approval not be unreasonably
22   withheld or delayed get in [the
23   contract]? Do you recall that?
24      "Answer: My recollection was at
25   Mr. Dembeck's request."                   13:03:17
     TSG Reporting - Worldwide     877-702-9580
```

Page 1216

```
1       Closing - Respondent
2       So just as NICO had accepted Dukes
3    Place's insistence that the ceding
4    company be the sole judge of its
5    liabilities and have sole determination   13:03:32
6    of what it should pay, NICO also agreed
7    that as respects its preapproval
8    rights, they could not be reasonably
9    withheld or delayed. This makes it to
10   Article 11.B of the contract.             13:03:48
11      Here it specifically says, "With
12   respect to items (1) and (2)" -- those
13   are settlements above the threshold.
14   They now added a threshold for buybacks
15   also. For buybacks above the              13:04:04
16   threshold, its "approval shall not be
17   unreasonably withheld or delayed."
18      This is a sea change from
19   unfettered discretion. Because NICO
20   now, if it is going to withhold its       13:04:23
21   approval, it's got to come up with a
22   justification that's not unreasonable.
23      "Reasonable," ceding companies have
24   broad discretion in what's reasonable
25   in terms of settlements. As I pointed     13:04:43
     TSG Reporting - Worldwide     877-702-9580
```

Page 1217

```
1       Closing - Respondent
2    out at the Stonewall hearing and as I'm
3    sure Mark knows, Travelers has been
4    enormously successful in getting courts
5    to say that almost anything a ceding      13:04:53
6    company does in its settlement is
7    reasonable vis-à-vis its reinsurers.
8    You really have to prove deliberate
9    misconduct by the cedent to show that
10   anything is unreasonable.                 13:05:06
11      So, again, sea change in what's
12   required, and NICO accepts it in the
13   contract.
14      NICO also accepted Dukes Place's
15   demand that it set up a claims account    13:05:16
16   to fund these liabilities. Here is the
17   correspondence.
18      This is Exhibit 604. It goes from
19   Mr. Barclay to Mr. Jain. And
20   Mr. Barclay writes -- I want to read      13:05:30
21   the whole thing because it is
22   important.
23      "We are concerned that, although
24   Berkshire-Hathaway has the benefit of
25   the insurance fund to meet the net        13:05:42
     TSG Reporting - Worldwide     877-702-9580
```

38

Page 1218

```
 1        Closing - Respondent
 2     liabilities of Unigard..."  By the
 3     "insurance fund," he means there the
 4     entire reserves that are being turned
 5     over to Berkshire-Hathaway,          13:05:50
 6     $180 million.  We don't have the that
 7     anymore.  Now NICO has that money.  And
 8     he says, Unigard will be carrying on
 9     average "105 days of funding cost."
10        What that refers to is the         13:06:04
11     contract, as proposed by NICO, will
12     have Unigard bill NICO at the end of
13     the quarter, 60 days at the end of the
14     quarter, and then NICO gets 45 days
15     after that to pay.                    13:06:14
16        So, even though Seaton or Unigard
17     will have transferred all of its
18     reserves to NICO, the provision, as
19     drafted by NICO, means that Seaton has
20     got to fund the loss and wait 105 days  13:06:26
21     to get paid, which makes no sense
22     because Seaton has no money to fund the
23     losses anymore because it's turned over
24     the reserves to NICO.  And Mr. Barclay
25     points that out.                       13:06:40
```
TSG Reporting - Worldwide      877-702-9580

Page 1219

```
 1     Closing - Respondent
 2        What does he say, "We believe that
 3     the 'claims revolving fund' proposed by
 4     Hancock is the appropriate funding
 5     mechanism for a reinsurance of this    13:06:50
 6     nature and would ask for that wording
 7     to be reinstated."
 8        What he is saying is, put the money
 9     in an account so that we don't have to
10     go out-of-pocket to pay these claims    13:07:03
11     because we have given you all the money
12     we had to pay the claims.  And Mr. Jain
13     agrees.
14        Let me show you.  First, here is
15     his letter in response.  This is        13:07:17
16     Exhibit 605.  In the first paragraph of
17     the letter, he thanks Mr. Barclay for
18     Mr. Barclay's letter.
19        And in the last sentence of that
20     first paragraph that's blown up, he     13:07:29
21     says, "As you will see, in every
22     instance we have incorporated revisions
23     based upon the points you raised in
24     your April 8 letter."
25        Then on the second page of          13:07:43
```
TSG Reporting - Worldwide      877-702-9580

Page 1220

```
 1        Closing - Respondent
 2     Mr. Jain's letter, "Revolving claims
 3     funds," what does he say?  "The slip
 4     has been revised to provide for the
 5     establishment of a claims account by    13:07:53
 6     the Reinsurer to be managed by you as
 7     the claims servicer."
 8        So NICO is going to set up the
 9     account, NICO is going to fund the
10     account, but it is going to be managed   13:08:05
11     by the claims servicer, Eastgate, the
12     agent of Seaton.
13        And then he says, "We have also
14     provided that interest on the account,
15     if any, should be for our benefit."      13:08:16
16        As it should.  It is NICO's money,
17     they should get the benefit of the
18     interest.  But the money has got to be
19     there in the account because otherwise
20     Seaton can't pay the claims.             13:08:26
21        And the slip attached to Mr. Jain's
22     letter provides exactly that.
23        "Reinsurer shall establish and
24     maintain an account for use by the
25     Reinsured for the payment of claims      13:08:39
```
TSG Reporting - Worldwide      877-702-9580

Page 1221

```
 1        Closing - Respondent
 2     hereunder."
 3        There is no ambiguity there.
 4     Reinsurer will establish an account
 5     that the reinsured can use to pay        13:08:48
 6     claims.
 7        "The amount of funds to be
 8     maintained in the account shall be
 9     agreed between Reinsured and Reinsurer
10     as may be necessary from time to         13:09:00
11     time..."
12        This also finds its way into the
13     treaty with a little different
14     language.  Let's take a look at it.
15     Article 20.                             13:09:11
16        20.C, "The Reinsurer shall
17     establish and maintain an account for
18     use by the Reinsured for the payment of
19     claims hereunder."
20        That language is exactly the same     13:09:20
21     that Mr. Jain put in.  After that it
22     changes a little bit.
23        "The amount of funds to be
24     maintained in the claims account shall
25     be agreed between the Reinsured and the  13:09:31
```
TSG Reporting - Worldwide      877-702-9580

Page 1222

Closing - Respondent

1
2   Reinsurer as may be necessary from time
3   to time" -- these are new words, "in an
4   amount sufficient to fund the payment
5   of claims as they fall due from time to          13:09:39
6   time."
7       There is no provision in this
8   contract for the billing of claims.
9   Claims fall due as soon as Seaton pays
10  them. And therefore, there has to be          13:09:51
11  enough money in the account to
12  reimburse Seaton as it pays the claim.
13      That's the only way that you can
14  read this and have it make sense and
15  have it be consistent with the                13:10:08
16  negotiations and have it be consistent
17  with the intent.
18      So again, let's look at all these
19  provisions together. This is what
20  Mr. Jain negotiated and agreed to.           13:10:21
21      One: NICO's liabilities are
22  identical to those of Seaton.
23      Two: Seaton has sole discretion to
24  determine what its liabilities are and
25  how much it should pay in settlement.         13:10:37

Page 1223

Closing - Respondent

1
2       Three: As respects proposed
3   settlements above the threshold, NICO
4   must consent but it can't withhold
5   their consent unreasonably. Got to          13:10:48
6   give a reason.
7       Four: NICO's has got to fund that
8   account so there is enough money there
9   so Seaton doesn't have to go chase it
10  for the money.                               13:11:02
11      Because for Seaton to pay first and
12  change NICO is a guaranteed
13  prescription for liquidation, because
14  Seaton doesn't have the money to pay
15  first. If it's got to chase NICO and         13:11:10
16  NICO doesn't pay, we're broke.
17      Mr. Jain knew it, Mr. Barclay knew
18  it, everybody knew it. The only time
19  that NICO could withhold consent to a
20  proposed settlement is if it could show      13:11:23
21  that the proposed settlement is
22  objectively unreasonable. It can't
23  withhold its consent or its payment
24  just because it or Tom Ryan disagreed
25  with Seaton's decision, or just because      13:11:36

Page 1224

Closing - Respondent

1
2   it wants to hold on to the money and
3   make more investment income.
4       That's what NICO wanted to put in
5   the contract, we saw that. But that's        13:11:49
6   not what was in the contract, because
7   Mr. Jain agreed to negotiate that away.
8       Now, there is one other provision
9   in the contract we have to look at that
10  NICO says changes the entire deal. It        13:12:03
11  is Article 18. Let's take a look at
12  it.
13      "In undertaking the obligations
14  and responsibilities described herein,
15  the Reinsured and Claims Servicer will       13:12:12
16  have a fiduciary duty to act in utmost
17  good faith to the interests of
18  Reinsurer."
19      This provision also has an
20  interesting negotiation and drafting         13:12:27
21  history: None. None. Never shows up
22  in a single slip or single draft. I'm
23  not sure how it got into the final
24  contract. Not sure whether Mr. Barclay
25  noticed it, but he should be put on          13:12:42

Page 1225

Closing - Respondent

1
2   notice that it's there. It certainly
3   was never called to his attention --
4   that starts a pattern we will deal
5   with.                                        13:12:49
6       NICO says that this provision, this
7   one sentence means that Seaton has to
8   put NICO's interests ahead of Seaton's.
9   But that makes no sense. It's
10  inconsistent with every other thing          13:13:06
11  we've looked at with the entire
12  negotiating history.
13      If Seaton intended to put NICO's
14  interests ahead of its own or believed
15  it was obligated to do so, it would          13:13:16
16  simply have agreed to NICO's drafts
17  giving NICO control of the claims.
18      Why in the world would Seaton fight
19  to have sole discretion to settle, to
20  fight to have NICO's preapproval above       13:13:31
21  the threshold, to have to have a reason
22  for it, and a good one, fight for a
23  claims account so that it can reimburse
24  itself for settlements if it intended
25  to put NICO's interest ahead of its          13:13:47

40

Page 1226

```
1        Closing - Respondent
2    own, which is simply saying to NICO,
3    you make all the calls.  It makes no
4    sense.  And it's certainly not what
5    Mr. Barclay understood or intended.      13:13:59
6        And as you can see, it's not an
7    absolute fiduciary duty that's being
8    imposed -- although my friends never
9    refer to the whole phrase -- it's a
10   fiduciary duty to act in utmost good     13:14:14
11   faith.
12       Now, acting in utmost good faith is
13   a term that's well-understood in our
14   business.  It's been defined.  This is
15   from the strain book on reinsurance.     13:14:29
16   Glossary drafted by Harry Kramer, who I
17   know David knows or knew.  He passed
18   away a while ago.
19       "Uberrima fides, literally, of the
20   utmost good faith.  A defining           13:14:43
21   characterization or quality of some
22   (contractual) relationships, of which
23   reinsurance is universally recognized
24   to be one.  Among other differences
25   from ordinary relationship, the nature   13:14:53
```

TSG Reporting - Worldwide    877-702-9580

Page 1227

```
1        Closing - Respondent
2    of reinsurance transactions is
3    dependent upon a mutual trust and a
4    lively regard for the interests of the
5    other party even if inimical to one's    13:15:01
6    own."
7        Now, if the duty of good faith you
8    are asking Seaton to employ means that
9    it has a lively regard for the
10   interests of the other party even if     13:15:18
11   inimical to one's own, how can you then
12   in the same breath say, in the same
13   sentence, No, it does not have to have
14   a lively regard for NICO's interest, it
15   has to put those interests ahead of its  13:15:28
16   own?  I don't believe that makes sense.
17   It is almost an oxymoron.
18       We believe the fiduciary duty to
19   act in good faith means that Stonewall
20   cannot enter into settlements or         13:15:44
21   extinguish liabilities just because
22   NICO's going to be paying for them.
23       Remember, Seaton's best interest is
24   to extinguish everything on day one if
25   it can.  It can go out and simply pay     13:15:59
```

TSG Reporting - Worldwide    877-702-9580

Page 1228

```
1        Closing - Respondent
2    200 cents on the dollar to buy back all
3    of its exposures and say to NICO,
4    Here's your bill, and now I've got a
5    $48 million surplus, that's fine.  This  13:16:10
6    doesn't allow it.
7        Article 18 requires Seaton not to
8    do anything it wouldn't do if just its
9    own money were at stake.  It doesn't
10   require Seaton to put NICO's interests   13:16:26
11   ahead of its own.  What it requires is
12   that Seaton not put its own interests
13   ahead of NICO, and that's very
14   different.
15       Seaton owes duties to its           13:16:44
16   policyholders.  It could never put the
17   interests of a reinsurer ahead of those
18   obligations.  No regulator would permit
19   that.  And these contracts were
20   specifically conditioned on receiving    13:17:02
21   regulatory approval.  That's in
22   Article 1.
23       "The retrocession shall be subject
24   to receipt of all necessary approvals
25   from state insurance regulatory          13:17:17
```

TSG Reporting - Worldwide    877-702-9580

Page 1229

```
1        Closing - Respondent
2    authorities."
3        We submit that the treaty that the
4    Washington and California regulators
5    approved clearly gave the cedent full    13:17:29
6    control over the settlement of
7    liabilities, requiring only that it not
8    do knowingly excessive settlements at
9    NICO's expense or settlements that it
10   wouldn't do if its own money were at     13:17:42
11   stake; that NICO could withhold its
12   consent and payments on settlements
13   above the threshold only if it could
14   demonstrate that they were objectively
15   unreasonable, and not simply because     13:17:56
16   NICO wanted to hold on to the money
17   longer; and requiring NICO to fund the
18   claims account so that Seaton would
19   have funds readily available to
20   reimburse itself immediately upon its    13:18:09
21   payment of its policyholder's claims
22   because it could not pay its
23   policyholder's claims without such a
24   fund."
25       We submit the drafting history       13:18:20
```

TSG Reporting - Worldwide    877-702-9580

41

Page 1230

```
 1      Closing - Respondent
 2  makes crystal clear that that's exactly
 3  what Mr. Barclay and Mr. Jain
 4  negotiated, that's exactly what the
 5  parties put in their contract, that's        13:18:31
 6  exactly what the regulators approved,
 7  and that's exactly what NICO breached.
 8      Indeed, we believe from Mr. Jain's
 9  testimony that NICO never intended to
10  honor the treaty terms to which             13:18:51
11  Mr. Jain had agreed with Mr. Barclay.
12  This isn't me making it up.  This is
13  Mr. Jain's testimony.  If adverse
14  inferences about Mr. Jain are to be
15  drawn, you can draw them from his           13:19:07
16  words, not mine.
17      First of all, on page 2671, I
18  showed him part of his deposition where
19  he had been asked the question that's
20  on Line 13:                                 13:19:21
21      "Question: So, you were
22  contemplating that -- were you
23  contemplating that Cavell was going to
24  handle the claim under the NICO's
25  direction, supervision and control?        13:19:29
```
TSG Reporting - Worldwide     877-702-9580

Page 1231

```
 1      Closing - Respondent
 2      "Answer: Yes.  What page are you
 3  on?" etcetera.
 4      "Question: Was that truthful
 5  testimony?                                  13:19:45
 6      "Answer: Yes.  Yes, I mean, under
 7  NICO's direction, supervision and
 8  control."
 9      That's what he always intended and
10  expected.  It is totally consistent        13:19:53
11  with the terms of the treaty he
12  negotiated.  "Control" being the
13  keyword.  But it gets worse, in my
14  opinion.
15      I asked him on page 2638, I showed     13:20:08
16  him Article 20.C.  This is after having
17  gone through the whole negotiating
18  history of the article with him and his
19  agreement to the claims account, and
20  Mr. Barclays reasons for it.               13:20:21
21      And I show him Article 20.C.  Then
22  I ask him:
23      "Question: It was your
24  understanding when you did this deal,
25  that NICO would put up money in a fund     13:20:31
```
TSG Reporting - Worldwide     877-702-9580

Page 1232

```
 1      Closing - Respondent
 2  managed by Eastgate so that when a
 3  covered claim was approved by Eastgate
 4  and paid on a Stonewall, or in this
 5  case a Seaton check, Seaton could be       13:20:42
 6  immediately reimbursed out of the funds
 7  in this account, right?"
 8      And his answer floored me.
 9      His answer was: "I had no such
10  understanding that they could pay a        13:20:54
11  claim and we would immediately pay the
12  claim right away without any questions,
13  checks and balances."
14      "Question: Under Article 4.A, as
15  respects claims below the threshold,
16  below $250,000, you're unconditionally
17  bound?
18      "Answer: No.  Absolutely not.  If
19  it's not a covered claim -- they can
20  submit that claim to us, we will           13:21:18
21  investigate.  And if we find that it is
22  not a covered claim, we have absolutely
23  no obligation to pay that claim."
24      We just saw it.  Article 2 says
25  NICO's liabilities are identical to        13:21:35
```
TSG Reporting - Worldwide     877-702-9580

Page 1233

```
 1      Closing - Respondent
 2  Seaton's, and Article 4 says Seaton is
 3  the sole judge of what is a covered
 4  claim.
 5      If what Mr. Jain said is, I had no     13:21:49
 6  intention of complying with this
 7  contract, either Seaton was going to
 8  give me the control that I wanted or
 9  they were going to have to chase me for
10  the money.  And Seaton can't chase for     13:22:10
11  the money.  It is really quite
12  astounding to me.
13      It brings me to NICO and Tom Ryan's
14  mantra, if you heard it once, you heard
15  it a hundred times.  "Seaton can always    13:22:34
16  pay funds of its own funds and come
17  after us for the money.  It didn't have
18  to listen to us, it could always pay
19  first".  I wrote down originally, "the
20  most disingenuous argument I ever          13:22:52
21  recall hearing."  But I couldn't say
22  that and changed it to a "thoroughly
23  disingenuous argument."
24      After the treaty was signed, Seaton
25  had transferred $190 million to NICO,      13:23:03
```
TSG Reporting - Worldwide     877-702-9580

42

Page 1234

```
 1       Closing - Respondent
 2    it had only $48 million in surplus
 3    left.  It had transferred $250 million
 4    in liabilities.  It was a literal
 5    impossibility for Seaton to do what        13:23:13
 6    Mr. Ryan and NICO tells you we could
 7    have done, pay first and chase us for
 8    the money.
 9       Which is exactly why Barclay
10    insisted on a funded claim account as a    13:23:29
11    condition of the deal.  Without one,
12    Seaton was subject to blackmail by
13    NICO.  Without one, Seaton could never
14    have control over its own claims.
15       This is what Mr. Jain wrote to         13:23:50
16    Mr. Barclay.  We saw it before.
17    "The slip has been revised to
18    provide for the establishment of a
19    claims account by the reinsurer to be
20    managed by you as claims servicer."        13:24:01
21       There's got to be money in the
22    account.  And who manages it?  The
23    claims servicer.  Which means the
24    claims servicer decides when money gets
25    taken out of that account, not NICO.       13:24:12
      TSG Reporting - Worldwide    877-702-9580
```

Page 1235

```
 1       Closing - Respondent
 2       And Mr. Jain never, for one
 3    instance, intended to honor that.
 4    Those aren't my words, those are his.
 5    And that's what happened.  It happened    13:24:27
 6    from day one.
 7       Ms. Hoelsken said within two weeks
 8    of the signing of the Seaton
 9    transaction -- the treaty hadn't even
10    been signed yet, the transaction had      13:24:48
11    been approved.  Within two weeks people
12    from NICO were in her office in
13    Seattle -- Seaton had two claim
14    offices; one in Seattle and one in
15    Boston.  People were in the office in     13:24:58
16    Seattle, NICO people, saying that they
17    wouldn't fund anything they didn't
18    approve.
19       I actually have that lingering in
20    the outline, and I will get you the       13:25:08
21    page cite for it when I get there.
22    Within two weeks.
23       Let me deal with the Collaboration
24    Agreement first, because that's how I
25    wrote it, so it's easier.                 13:25:19
      TSG Reporting - Worldwide    877-702-9580
```

Page 1236

```
 1       Closing - Respondent
 2       In that Collaboration Agreement,
 3    NICO and Eastgate/Randall/Cavell -- you
 4    can use the names interchangeably --
 5    formalized the complete destruction of    13:25:33
 6    the careful balance in the treaty that
 7    had been negotiated by Mr. Barclay with
 8    Mr. Jain, and completely obliterated
 9    Seaton's rights that it had bargained
10    for and obtained.                         13:25:46
11       There is no dispute that NICO at
12    all times knew that Eastgate was acting
13    as agent for Dukes Place's in this
14    transaction.  It was set forth.  This
15    is one of many instances.  This is a      13:26:04
16    letter from Mr. Barclay to Mr. Jain,
17    Exhibit 500, in which he talks about
18    "our principals," "Dukes Place," "our
19    principals."
20       There is no dispute that the treaty   13:26:23
21    designates Eastgate as agent for Seaton
22    to be the claims servicer.  And as
23    agent for Seaton, Eastgate had a duty
24    of undivided loyalty to Seaton.
25       So, where the treaty gives Seaton      13:26:36
      TSG Reporting - Worldwide    877-702-9580
```

Page 1237

```
 1       Closing - Respondent
 2    the sole authority to settle claims and
 3    determine its own liability, NICO
 4    clearly understood that such authority
 5    would be exercised by Eastgate as agent   13:26:47
 6    for Seaton.
 7       Eastgate, acting on Seaton's
 8    behalf, would decide whether or on what
 9    terms a claim would be settled or a
10    policy bought back.  It would do so       13:27:00
11    acting as if it were Seaton, but at all
12    times honoring NICO's rights under the
13    contract -- meaning, having to seek
14    approval for claims above the
15    thresholds, but being entitled to         13:27:13
16    getting a response without delay.  And
17    if the answer was no, being given a
18    reason and a good reason why, not just
19    "Tom Ryan doesn't like it."
20       In the Collaboration Agreement,        13:27:25
21    Eastgate purported to delegate to NICO
22    all of its important functions in
23    handling claims for Seaton.
24       You can read this whole thing.  I'm
25    going to read the bottom part,            13:27:48
      TSG Reporting - Worldwide    877-702-9580
```

43

Page 1238

1      Closing - Respondent
2  Article 3.1 of the Collaboration
3  Agreement.
4      Last sentence, "For the avoidance
5  of doubt, NICO retains all authorities    13:27:54
6  to supervise and control claims
7  handling and reinsurance collections as
8  are provided in each of the agreements
9  referenced in recitals (A) through
10 (F)."                                      13:28:06
11     Well, recitals (A) through (F)
12 include the deal, the agency agreement
13 between Seaton and Eastgate, which by
14 this point had been renamed Randall
15 America.                                   13:28:16
16     Remember Mr. Jain testified he
17 always expected Eastgate to operate
18 under his supervision and control?  Now
19 it is memorialized.
20     As Mr. Ryan has admitted, the         13:28:32
21 Collaboration Agreement transferred all
22 of Eastgate's powers to NICO.  That's
23 this case, transcript 480, line 24 to
24 481, line 22.
25     All of the claims control that NICO   13:28:46

Page 1239

1      Closing - Respondent
2  had sought in negotiating the treaty
3  but had given up, Eastgate or Randall
4  now purported to hand to NICO on a
5  silver platter.                           13:28:58
6      Both Mr. Krutter and Mr. Randall
7  who negotiated the Collaboration
8  Agreement had to have known that it
9  completely rewrote the treaty to NICO's
10 enormous advantage and Seaton's equally   13:29:14
11 enormous detriment.
12     Remember, it was Mr. Krutter who
13 had drafted the initial slip which
14 would have given NICO the complete
15 control of claims that he now gets in     13:29:26
16 the Collaboration Agreement.
17     And Mr. Krutter was deeply involved
18 in the negotiation of the treaty
19 language, as I'm sure you recall
20 Mr. Jain telling us.                      13:29:38
21     Do you really believe that
22 Mr. Krutter failed to recognize that
23 the Collaboration Agreement was giving
24 him everything he had originally asked
25 for and been denied?  You'll have to      13:29:51

Page 1240

1      Closing - Respondent
2  answer that question.
3      I believe Mr. Krutter had to have
4  known that to effect the enormous
5  change in contractual rights between      13:30:04
6  Seaton and NICO that the Collaboration
7  Agreement purported to effect, the
8  treaty itself had to be amended.
9  Because the treaty itself says that.
10     Article 8, "The terms of this         13:30:17
11 retrocession shall not be waived,
12 modified or changed except by written
13 amendment executed by a duly authorized
14 officer of the Reinsured and
15 Reinsurer."  Well, the terms are being    13:30:31
16 changed.
17     Eastgate, Seaton's agent, is no
18 longer the claims servicer; NICO is.
19 Eastgate, Seaton's agent, no longer has
20 the rights under Articles 2 and 4 --      13:30:52
21 that I've already talked about several
22 times, and won't repeat -- NICO does.
23     Material changes in the contract
24 that require an amendment, which
25 requires Seaton's signature and           13:31:06

Page 1241

1      Closing - Respondent
2  consent, yet Seaton's signature and
3  consent was never sought.
4      I believe that people who
5  negotiated the Collaboration Agreement    13:31:20
6  knew they could never get Seaton's
7  consent.  You've seen the evidence.
8  Mr. Barclay negotiated for protections
9  in this contract.  Do you honestly
10 believe he would have given them up?      13:31:33
11 Especially in return for a
12 Collaboration Agreement that offered
13 him nothing?  There is no benefit to
14 Seaton in this agreement.
15     Originally in their briefs -- and I   13:31:45
16 think it was in their briefs in
17 Stonewall, in all candor, not their
18 briefs in this case -- NICO claimed
19 that the Collaboration Agreement did
20 give a benefit to Seaton, that it         13:31:55
21 provided for prefunding of claims.  And
22 Mr. Ryan has testified to the same
23 thing.
24     But you know what, there is nothing
25 about prefunding of claims in the         13:32:04

44

Page 1242

1    Closing - Respondent
2    Collaboration Agreement, not a word.
3    And, as we've already seen,
4    Article 20.C requires NICO to, in
5    effect, prefund the claims.          13:32:15
6       Seaton, in the treaty, already had
7    control of claims and prefunding. It
8    certainly didn't have to give control
9    of claims to NICO in order to get
10   prefunding. It already had it.        13:32:30
11      The Collaboration Agreement
12   completely and materially rewrote the
13   treaty. Mr. Ryan recognized it. I
14   already gave you his transcript from
15   this case. He said the same thing in    13:32:43
16   the Stonewall case at pages 1149 to
17   1150 of that transcript, and at
18   page 1155.
19      Seaton never agreed to it; never
20   would have agreed to it. But Randall    13:32:58
21   got a huge benefit out of it. As
22   Mr. Ryan testified, the effect of the
23   Collaboration Agreement was that
24   Randall's U.S. operation, Randall
25   America, got to handle the Commercial    13:33:11

TSG Reporting - Worldwide    877-702-9580

Page 1243

1    Closing - Respondent
2    Union runoff, as well as Seaton and
3    Stonewall.
4       Seaton and Stonewall were tiny.
5    They only had about 30 DJ actions to    13:33:21
6    handle. Commercial Union had more than
7    300 pending. That's at page 918 of the
8    Stonewall transcript.
9       Overnight, Randall grew from almost
10   nothing to a major runoff presence in    13:33:38
11   the U.S. And he also reaped a windfall
12   profit in the bargain. He was being
13   paid four to $5 million a year by
14   Seaton and Stonewall primarily to
15   handle their claims. Some of it was    13:33:54
16   going through administrative functions,
17   but to compare -- I can't give you the
18   breakdown. Nobody has been able to,
19   that I'm aware of.
20      But the notion that administrative    13:34:05
21   functions would have been anymore than
22   a tiny fraction of what he had to pay
23   for claims handling would be absurd.
24      So, he's getting paid this money,
25   more than $16 million dollars overall    13:34:22

TSG Reporting - Worldwide    877-702-9580

Page 1244

1    Closing - Respondent
2    by Seaton.
3       After the Collaboration Agreement
4    is signed, Randall is getting
5    reimbursed by NICO for his claims    13:34:30
6    handling costs. Not for all his costs,
7    not for the administrative costs, but
8    all the claims handling costs, he's
9    getting reimbursed dollar-for-dollar.
10      Before the Collaboration Agreement,    13:34:43
11   he's got those costs and he's got to
12   pay them out of the four to five
13   million he's getting from Seaton and
14   Stonewall. After the Collaboration
15   Agreement, he's got those costs and    13:34:54
16   NICO is reimbursing them. That four to
17   five million, most of it goes right
18   into Randall's pocket.
19      Now, to my utter amazement,
20   Mr. Krutter at page 251 of the    13:35:05
21   Stonewall transcript, Ms. Hoelsken at
22   page 512 and again at page 514 to 515,
23   and Mr. Ryan at pages 1168 and 1171 to
24   1172, all deny that NICO's
25   reimbursement of these costs gave a    13:35:25

TSG Reporting - Worldwide    877-702-9580

Page 1245

1    Closing - Respondent
2    financial benefit to Randall. I found
3    that astounding.
4       The reimbursement itself did not
5    give a benefit, but the fact that it    13:35:36
6    allowed him to pocket all of the money
7    it was getting from Seaton and
8    Stonewall is an inarguable and
9    substantial economic benefit.
10      Mr. Randall deliberately sold out    13:35:49
11   the interests of his principal, Seaton
12   and Stonewall, to line his own pockets
13   and expand his U.S. operations. And
14   Mr. Krutter took advantage of his greed
15   and dishonesty to garner the very    13:36:04
16   control of claims that NICO had sought
17   in the treaty but had been denied.
18      The Collaboration Agreement, in our
19   submission, was unquestionably a
20   material breach of the treaty that    13:36:21
21   irrevocably impaired Seaton's rights
22   under it.
23      And Mr. Snover testified to it.
24   This is in the Stonewall hearing. I
25   asked him, "Isn't it a fact that prior    13:36:42

TSG Reporting - Worldwide    877-702-9580

45

Page 1246

Closing - Respondent

1  to the execution of this Collaboration
2  Agreement, you didn't do any of the
3  things that NICO is authorized to do in
4  Article 3?" And he said, "I believe        13:36:49
5  that's right."
6      Yet, after the Collaboration
7  Agreement, NICO did do all the things
8  they're authorized to do in Article 3.
9      Again, Mr. Ryan said that. I've        13:37:08
10  already given you the page cites.
11      How can NICO contend this was not a
12  material change? I don't get it.
13      The real gut of their case, as
14  presented by Ms. Hoelsken and            13:37:28
15  Mr. Krutter, was the Collaboration
16  Agreement really didn't change anything
17  because we had been operating under
18  this concept all along. This is what I
19  mentioned before.                         13:37:39
20      Ms. Hoelsken said that within two
21  weeks after the sale, Randall already
22  had given complete control of claims to
23  NICO in order to get prefunding. And
24  it's at page 288 to 289 of the            13:37:49

TSG Reporting - Worldwide    877-702-9580

Page 1247

Closing - Respondent

1  transcript.
2      Her testimony was the first time we
3  had heard that, or we believe anyone at
4  NICO -- anyone involved in this           13:37:58
5  proceeding had heard that.
6      Mr. Krutter says it didn't happen
7  that quickly. Mr. Krutter says that he
8  was approached by Randall several
9  months into the deal about the idea of    13:38:11
10  obtaining prefunding in return for
11  preapproval of claims. And that's at
12  page 146 to 147 of the Stonewall
13  transcript.
14      But again, the notion that Seaton     13:38:27
15  or anyone acting on behalf of Seaton
16  would have to give up control of claims
17  to get prefunding makes no sense given
18  the negotiation history and the wording
19  of Article 20.C, unless NICO had          13:38:41
20  already made clear, we're not going to
21  abide by Article 20.C.
22      By the way, there is no documentary
23  evidence of either of these alleged
24  oral prefunding agreements. None.         13:38:55

TSG Reporting - Worldwide    877-702-9580

Page 1248

Closing - Respondent

1      Furthermore, Mr. Jain wrote a
2  letter to the Washington Insurance
3  Department prior to the approval by
4  that department, that was the            13:39:06
5  domiciliary state, in which he promised
6  the regulator, I will just read the
7  second sentence:
8      "First and foremost, I want you to
9  know that no material changes to the     13:39:19
10  reinsurance agreements are
11  contemplated. In addition, we will
12  keep you apprised of any material
13  changes contemplated in the future."
14      Now, in light of Mr. Jain's          13:39:28
15  testimony that he always expected
16  Cavell to be subject to his control,
17  you'll have to decide whether what he
18  wrote to the Washington department was
19  an accurate representation or not.       13:39:44
20      What I would say is that to the
21  extent any deal was made after the
22  contract that shifted control of claims
23  to NICO, it was a material change of
24  the contract which Mr. Jain had          13:40:01

TSG Reporting - Worldwide    877-702-9580

Page 1249

Closing - Respondent

1  promised would be brought to the
2  attention of the regulators. The
3  Washington department was never advised
4  of any such change.                      13:40:08
5      Now may be about a good time to
6  take a short break. I'm about midway
7  into my presentation.
8      CHAIRMAN THOMPSON: Let's make it a
9  real ten minutes.                         13:40:35
10      (Whereupon, a recess was taken
11  from 1:40 p.m. to 1:55 p.m.)
12      CHAIRMAN THOMPSON: Resume,
13  Mr. Brandes.
14      MR. BRANDES: Thank you.              13:55:36
15  NICO will tell you that even if
16  everything I said up to this point is
17  true -- and I think it clearly is --
18  none of it matters because Mr. Barclay
19  and the Seaton Board knew all about and  13:55:48
20  either approved or did not object to
21  the Collaboration Agreement.
22      We don't dispute that Mr. Barclay
23  knew there was a Collaboration
24  Agreement between Randall America and    13:56:01

TSG Reporting - Worldwide    877-702-9580

Page 1250

Closing - Respondent
1   NICO. But the undisputed evidence
2   shows that he was not given a copy of
3   it or otherwise informed that it
4   materially affected Seaton at any time   13:56:12
5   prior to November 29, 2005 is.
6       Now, I want to take a look at all
7   of the evidence that there was prior to
8   that time. Everything where a mention
9   was made to the Collaboration   13:56:29
10  Agreement. There isn't much. That
11  agreement was signed in the summer of
12  2001.
13      Now, I think we can all agree it
14  would have been easy enough for   13:56:40
15  Seaton's agent, Randall, or for its own
16  supposed subagent NICO, to tell
17  Mr. Barclay and the Seaton Board, We've
18  done a deal under which we, Randall,
19  have subdelegated to NICO all of our   13:56:58
20  claims handling authority under our
21  agreement with you. A one-sentence
22  e-mail would have done the trick.
23  There is none. No disclosure. Can you
24  imagine?   13:57:16

Page 1251

Closing - Respondent
1       Here is Paragraph 8.1 of the agency
2   agreement between Randall – I guess it
3   was still called Eastgate at this
4   point, and Seaton. It says, "Subject   13:57:29
5   to the clause 10.2," which I think we
6   all agree is particularly relevant,
7   "Eastgate shall have the authority to
8   delegate to any person such functions
9   as it deems necessary for the   13:57:40
10  performance of its obligations under
11  this Agreement."
12      Mr. Barclay testified that his
13  understanding of this was, sure, they
14  could delegate some of their function,   13:57:54
15  they would have to. You have to
16  delegate functions to claims adjusters.
17  You have to delegate some functions to
18  attorneys.
19      But that the notion that there   13:58:05
20  would be a wholesale abandonment of
21  their entire responsibility for claims
22  handling, and especially a
23  sub-delegation to someone whose
24  interests were directly in conflict   13:58:17

Page 1252

Closing - Respondent
1   with Seatons, were beyond his
2   comprehension. He called it
3   "inconceivable." And it is worth
4   looking at his testimony where he said   13:58:25
5   that.
6       "Question: Did you have any
7   understanding that Cavell could
8   delegate the entire claims handling
9   function to NICO under this clause?   13:58:34
10      "Answer: To me, it is inconceivable
11  that this clause would be used to
12  justify such a delegation.
13      "Question: Why do you say that?
14      "Answer: Well, the management of   13:58:49
15  claims, the gross and net of
16  reinsurance are integral to the
17  function of a runoff manager. They are
18  the functions, along, if you like, with
19  preparing accounts and filing   13:58:59
20  regulatory returns, but they are the
21  very heart of runoff. You wouldn't
22  appoint a manager to do the very thing
23  that you wanted him to do and then find
24  that the very thing that you wanted him   13:59:14

Page 1253

Closing - Respondent
1   to do has been delegated to a
2   third-party. It's not tenable."
3       I find that completely persuasive.
4   You have to decide whether you do.   13:59:29
5       And when you decide, bear in mind,
6   he's not told it's been done. If there
7   had been a notification that says,
8   "We've entered into a Collaboration
9   Agreement under which supervision,   13:59:50
10  direction and control of Seaton's
11  claims has been delegated to NICO," we
12  wouldn't be here today.
13      Not only was Mr. Barclay never told
14  the extent of the delegation of   14:00:06
15  authority to NICO, he and the Seaton
16  Board, in fact, we submit, were
17  repeatedly misled about it.
18      Plausible deniability. Let's take
19  a look.   14:00:20
20      This is the first notification that
21  Mr. Randall saw. It doesn't go to
22  Seaton or Stonewall or their boards.
23  It's to the staff at Randall America.
24  And it was through them that   14:00:35

47

Page 1254

```
 1        Closing - Respondent
 2     Mr. Randall got a copy of it. I'm
 3     sorry. Mr. Barclay got a copy of it.
 4     Look what it says:
 5        "Agreement with National Indemnity      14:00:47
 6     Company. I am delighted to announce
 7     that we have today signed a long-term
 8     agreement whereby the Boston office of
 9     Randall America will be providing
10     assistance to NICO in connection with     14:00:59
11     the reinsurance of various OneBeacon
12     underwriting portfolios.
13        "Under the leadership of Pam
14     Hoelsken, Randall America will be
15     providing the full range of runoff       14:01:16
16     services in connection with the
17     management of the OneBeacon
18     reinsurances...
19        "There may be some realignment of
20     responsibilities within the claims       14:01:28
21     teams designed to achieve economies
22     where Seaton, Stonewall and the
23     reinsured OneBeacon portfolios have
24     involvement in the same claims."
25        What would you believe from this?     14:01:45
```
TSG Reporting - Worldwide     877-702-9580

Page 1255

```
 1        Closing - Respondent
 2     First you believe that the
 3     Collaboration Agreement only involves
 4     OneBeacon. But more importantly, you
 5     would believe that Randall is the one    14:01:57
 6     handling the claims, not NICO.
 7        And that's how Mr. Barclay
 8     understood it, as he testified at
 9     pages 1847 to 1849 of the Stonewall
10     transcript. Would you have understood    14:02:17
11     it any differently? Does this describe
12     the complete delegation to NICO of
13     complete control over Seaton claims?
14        The next mention of the
15     Collaboration Agreement comes five       14:02:34
16     months later. And it's in connection
17     with a January 2002 Seaton and
18     Stonewall Board meeting. Let me show
19     you the agenda for that Board meeting.
20        We haven't highlighted the portion    14:02:48
21     dealing with the Collaboration
22     Agreement because there are none. It's
23     not mentioned.
24        Now, attached to the agenda was a
25     memo from Pam Hoelsken, and it did       14:03:01
```
TSG Reporting - Worldwide     877-702-9580

Page 1256

```
 1        Closing - Respondent
 2     mention the Collaboration Agreement.
 3     Look what it says.
 4        "Tom Ryan has been hired by
 5     Berkshire to oversee the claims of       14:03:15
 6     Seaton/Stonewall and OneBeacon. The
 7     new workflow was memorialized through
 8     the National Indemnity/Randall America
 9     Collaboration Agreement."
10        Now, Barclay and the Board are        14:03:32
11     being told that Randall has been hired
12     by Berkshire to oversee claims. There
13     was nothing at all alarming about that
14     because Randall's runoff agreement,
15     management agreement with Seaton and     14:03:47
16     Stonewall, expressly provided in
17     Section 2.3 for NICO to have a
18     representative at Randall's office to
19     perform NICO's affiliation rights.
20     Here he is supervising, not directing,   14:04:04
21     not controlling.
22        Mr. Barclay believed that that's
23     what he was doing, supervising pursuant
24     to the provision in the runoff
25     agreement between Randall and Seaton     14:04:21
```
TSG Reporting - Worldwide     877-702-9580

Page 1257

```
 1        Closing - Respondent
 2     that says NICO could have someone there
 3     to oversee. And Mr. Barclay testified
 4     to that at pages 1853 to 1854 of the
 5     transcript.                              14:04:34
 6        I'm not going to show you minutes
 7     of that January 2004 Board meeting
 8     because there is nothing in there that
 9     mentions the Collaboration Agreement.
10     It is Exhibit 114. You can see for       14:04:46
11     yourself.
12        Again, I ask you: Is there anything
13     in the agenda for the Board meeting, or
14     Ms. Hoelsken's note, that would put
15     Mr. Barclay or the Board on notice that  14:04:56
16     there had been a complete delegation of .
17     the claims handling function from their
18     agent to their reinsurer whose
19     interests conflicted with theirs?
20        If you see one, I must confess,       14:05:13
21     you've seen more than I do in that
22     document and more than Mr. Barclay did.
23        The next mention chronologically
24     comes another six months later. It's a
25     string of e-mails between Mr. Barclay    14:05:40
```
TSG Reporting - Worldwide     877-702-9580

48

Page 1258

1    Closing - Respondent
2    and Ms. Hoelsken. I apologize it is
3    hard to read. But the bottom one is
4    from Ms. Hoelsken to Mr. Barclay.    One
5    of things it says, the highlighted        14:05:58
6    portion:
7        "At any rate, I need your thoughts
8    on pursuing this -- this is a broker
9    who is now asking to be paid extra
10   money to handle the processing of        14:06:08
11   claims which he was supposed to handle
12   through his original commission.
13       Ms. Hoelsken writes, "...I need
14   your thoughts on pursuing this if at
15   all. The biggest question is who pays    14:06:18
16   for their fee -- Dukes or NICO. I
17   think this needs to be determined
18   especially in light of the
19   Collaboration Agreement."
20       Mr. Randall writes back. And what     14:06:30
21   he says is, "The Collaboration
22   Agreement has nothing to do with Seaton
23   and, from Seaton's perspective, is
24   entirely irrelevant." And he wrote
25   that because that's what he believed,    14:06:44

Page 1259

1    Closing - Respondent
2    that's what he had been led to believe.
3    "The Collaboration Agreement has
4    nothing to do with Seaton."
5        And what does Ms. Hoelsken write in   14:06:58
6    response? Does she say, Oh, no, you're
7    wrong? In the collaboration we
8    subdelegated to NICO full control over
9    Seaton claims? No.
10       Ms. Hoelsken writes back, "I         14:07:12
11   actually knew this would be your
12   answer." She knew he thought the
13   Collaboration Agreement had nothing to
14   do with Seaton and did absolutely
15   nothing to disavow him of that notion.   14:07:26
16       This is Mr. Barclay's mindset when
17   we come to the redomestication more
18   than a few months after this, in the
19   fall of the same year 2000. Was that
20   2003? I'm sorry. This e-mail chain is    14:07:52
21   not six months after the Board meeting,
22   it's a year and six months after the
23   Board meeting.
24       So, we have a year and six months
25   where there was no mention at all of     14:08:05

Page 1260

1    Closing - Respondent
2    the Collaboration Agreement. Then you
3    get to the Board meetings, and now six
4    months after that -- I'm sorry. A year
5    and six months after that you get to     14:08:14
6    this. If I messed that up, I
7    apologize.
8        In all this time, before you get to
9    the redomestication, Mr. Barclay has
10   never been told or even hinted that the   14:08:26
11   Collaboration Agreement involves a
12   delegation of claims handling for
13   Seaton. Hoelsken and Randall time and
14   time again are telling him it's got
15   nothing to do with Seaton. These are     14:08:41
16   his agents. These are his colleagues.
17   He trusts them. He assumes they are
18   fulfilling their contractual
19   obligation.
20       He is not told they have no reason    14:08:56
21   to believe that they have sold out
22   Seaton and Stonewall's interests and
23   delegated their responsibility to NICO
24   while continuing to get paid by Seaton
25   and Stonewall for doing those same       14:09:06

Page 1261

1    Closing - Respondent
2    things.
3        You'll have to decide whether at
4    this point in time you would have felt
5    or believed anything differently than   14:09:14
6    Mr. Barclay did. I would respectfully
7    suggest that you probably wouldn't
8    have. And that gets us to the
9    redomestication in the fall of 2003.
10       Here is a document, a draft of a     14:09:41
11   report by one of the examiners for the
12   Rhode Island Department in connection
13   with the redomestication that was shown
14   to Mr. Barclay, and that he edits.
15       If you look at what it says, the     14:09:55
16   parts I've highlighted again. On the
17   left-hand page:
18       "Pursuant to management agreements
19   entered into between each of the
20   Companies and KRA" -- that's Ken        14:10:05
21   Randall America -- "KRA provides all
22   administrative, accounting, claims
23   handling and other management services
24   for other companies."
25       Mr. Barclay believed that was true.  14:10:19

49

Page 1262

```
1        Closing - Respondent
2    KRA was providing the claims handling
3    services. I'm not going to read the
4    rest of that paragraph. Then you go
5    down to the bottom of that page.        14:10:31
6        "All services required by the
7    Companies in connection with their
8    runoff operations are provided by KRA
9    pursuant to the management agreements
10   between the Companies and KRA."         14:10:43
11   Exactly what Mr. Barclay understood.
12       Then you get down below and it
13   refers to NICO.
14       "In addition, as described below,
15   all claims handling activities,         14:11:00
16   including settlements and final
17   payments, are reviewed by NICO," and
18   this next part is added by Mr. Barclay,
19   "who has the right to associate in
20   claims settlement, although the         14:11:12
21   ultimate claims settlement
22   responsibility remains vested in the
23   Companies..." -- and he crosses out,
24   "...subject to NICO's final approval."
25       Because he doesn't think it is      14:11:23
```

TSG Reporting - Worldwide     877-702-9580

Page 1263

```
1        Closing - Respondent
2    subject to NICO's final approval
3    because it is not in the treaty. And
4    nobody has told him otherwise.
5        "All claims are paid only after the   14:11:37
6    Companies have received the funds to
7    pay such claims from NICO."
8        Because that's what Article 20.C
9    says. This accurately reflects exactly
10   what Mr. Barclay understood; exactly     14:11:50
11   what the treaty provides; exactly
12   what he had been led to believe by Ken
13   Randall and Pam Hoelsken and anyone
14   else who mentioned it.
15       After Mr. Barclay makes the edits    14:12:27
16   we just looked at, he sends it back to
17   Pam Hoelsken. And Ms. Hoelsken writes
18   to the Rhode Island Department on
19   October 17, 2003. Here is what he says
20   to the department. This is to            14:12:41
21   Mr. DeQuatro who was the auditor for
22   the department.
23       "As you and I briefly discussed on
24   the phone, many of the items relating
25   to the Collaboration Agreement are not
```

TSG Reporting - Worldwide     877-702-9580

Page 1264

```
1        Closing - Respondent
2    relevant to the basic agreements
3    between Randall America and Seaton and
4    Stonewall, and as such we deleted
5    them."                                   14:13:08
6        She's telling DeQuatro in an e-mail
7    she copies Barclay, the same thing she
8    has been telling Barclay for two and a
9    half years since the Collaboration
10   Agreement was signed. These things      14:13:27
11   have nothing to do with the
12   relationship between Randall America
13   and Seaton.
14       When Ms. Hoelsken sends that out,
15   she has to know it is not accurate.      14:13:46
16   She has to know she's misleading the
17   department. But Mr. Barclay didn't
18   know it. It was completely consistent
19   with what he believed and had always
20   believed.                               14:14:06
21       And Mr. Barclay clearly continued
22   to believe it after the redomestication
23   was concluded. In January 2004, he
24   agreed to amend the agency agreements
25   between Seaton and Stonewall and         14:14:30
```

TSG Reporting - Worldwide     877-702-9580

Page 1265

```
1        Closing - Respondent
2    Randall America to add several more
3    years to them. That's Exhibit 610.
4        And Mr. Barclay testified at
5    page 1905 of the transcript that he      14:14:45
6    would have never extended those
7    agreements and continue to pay Randall
8    millions of dollars in claims handling
9    fees under them if he had known that
10   Randall had delegated the claims        14:15:02
11   handling to NICO and was getting
12   reimbursed for all of the costs. It
13   would have been insane of him to extend
14   those agreements had he known the
15   truth.                                   14:15:16
16       Nothing could more effectively
17   prove that he did not know the truth
18   than the fact that he agreed to extend
19   those agreements.
20       Now, Mr. Barclay had received a      14:15:36
21   copy of DeQuatro's final report. We
22   don't dispute that. And there are
23   things in that final report that are
24   inconsistent with what he understood.
25   No doubt about it. And when he got it,   14:15:52
```

TSG Reporting - Worldwide     877-702-9580

50

Page 1266

Closing - Respondent

1
2  he should have read it. I don't know
3  if he did, but he should have. And if
4  he did, he should have raised questions
5  about it.                    14:16:01
6      That's probably what I would have,
7  done and I'm sure it's what you would
8  have done. And if you choose to hang
9  him and Seaton because he didn't, so be
10 it.                          14:16:13
11     As I said, there is no question he
12 continued to believe what he had
13 believed all along, and we'll show even
14 more evidence of that later. But if
15 you conclude that he should have known,    14:16:25
16 and because of all of the deceit that
17 had been practiced on him for so many
18 years it no longer matters, so be it.
19     But in considering that, we have to
20 ask you to think about the deceit that    14:16:43
21 had been practiced on him for all those
22 years. Think about the fact that both
23 Randall, as his agent, and NICO, as his
24 subagent, pursuant to the Collaboration
25 Agreement, owed him duties of undivided    14:16:58

TSG Reporting - Worldwide     877-702-9580

Page 1267

Closing - Respondent

1
2  loyalty, owed him the duty to tell him
3  what they had done and how it affected
4  him. And they never did.
5      Basically, what they say is there    14:17:11
6  are snippets of evidence from which he
7  should have sniffed out the truth. And
8  it is exactly like Gerling. And I want
9  to talk about Gerling. Because I
10 disagree with what my friend said about    14:17:26
11 it, and Mr. Ryan's righteous
12 indignation.
13     I showed you this in my opening,
14 the entire e-mail sent by Mr. Ryan.
15 And we highlighted the fact that he    14:17:41
16 said, "As you will see from below,
17 Gerling has allocated the payment
18 differently than we did." We never
19 disputed that he said that.
20     We never disputed that he attached    14:17:50
21 Gerling's e-mail and that Gerling's
22 e-mail showed an allocation of
23 $7.8 million.
24     What we said is, Mr. Ryan did not
25 say in his e-mail, by the way,    14:18:02

TSG Reporting - Worldwide     877-702-9580

Page 1268

Closing - Respondent

1
2  Gerling's allocation happens to be
3  $400,000 more for you than my
4  allocation. That's what we complained
5  about. It would have been easy enough    14:18:16
6  to say it, but he doesn't.
7      In fact, he says, "Gerling has
8  allocated the payment differently than
9  we did." And then he says, "Rest
10 assured, we will fight this allocation    14:18:30
11 [if necessary]." Which Randall, says
12 to me, they allocated less to us.
13     But what's important is, as I said,
14 why didn't Ryan just say, it is
15 $400,000 less. How hard is that to do?    14:18:47
16 He is acting as agent for Seaton, for
17 Barclay, why didn't he just tell him
18 the truth? We asked him that at his
19 deposition. And look at what he said.
20 First he was asked:                14:19:01
21     "Question: Did you notify
22 Mr. Barclay that Global had allocated
23 $400,000 more of the settlement to
24 Seaton than to Commercial Union?"
25     Then he says, "I don't know whether    14:19:11

TSG Reporting - Worldwide     877-702-9580

Page 1269

Closing - Respondent

1
2  I knew that, and if I did know it, I
3  know that I wouldn't have cared."
4      And then on the next page when he's
5  asked:                        14:19:22
6      "Question: "That Gerling allocated
7  about $400,000 more to Seaton than you
8  did."
9      He says, "Well, I forwarded them
10 the whole e-mail so he could figure it    14:19:34
11 out himself."
12     That's the truth. That's what he
13 did. Is that enough? Well, you
14 decide.
15     Mr. Ryan is a lawyer. I know I    14:19:46
16 would never, and I don't believe any
17 lawyer in this room would ever send a
18 letter to their client if this had
19 happened and not say, the other guy's
20 allocation is $400,000 different, less.    14:19:59
21 He may want to point out that's okay,
22 there's no reason it harms us. But
23 don't you have to point that out? I
24 think so. But you'll decide.
25     But it is consistent with what they    14:20:15

TSG Reporting - Worldwide     877-702-9580

51

Page 1270

```
 1        Closing - Respondent
 2   did on the Collaboration Agreement.
 3   Same thing. Let him figure it out
 4   himself. But all they had to do was
 5   tell him the truth.          14:20:28
 6        So, you decide who is more
 7   culpable. Those who know the exact
 8   truth, have an absolute duty to tell it
 9   and don't, or he, who didn't figure it
10   out, even though maybe, by the time of   14:20:45
11   the redomestication, he could have
12   figured it out. You're going to have
13   to decide who's more culpable. I know
14   where I come in on that, but it doesn't
15   matter where I come in on that.         14:20:57
16        Also, consider what happened after
17   the redomestication. Not just the
18   renewal of the management contracts in
19   which you're just giving away money, if
20   you know about the Collaboration        14:21:11
21   Agreement, but more.
22        A dispute arises about another.
23   This happens to be a Stonewall claim,
24   but it is instructive.
25        Mr. Ryan sends an e-mail. He sends  14:21:24
```

TSG Reporting - Worldwide    877-702-9580

Page 1271

```
 1        Closing - Respondent
 2   it to Ms. Hoelsken, Mr. Barclay,
 3   Mr. Krutter, Ms. Mullen, about the
 4   Equitas settlement. Forget the "I'm
 5   lost."                        14:21:39
 6        He says: "The Collaboration
 7   Agreement clearly states that Stonewall
 8   has delegated to NICO 'responsibility
 9   for the management of claims'," and
10   that NICO "retains all authorities to   14:21:48
11   supervise and control claims
12   handling... This situation clearly
13   falls within NICO's responsibility and
14   is not subject to second guessing by
15   Cavell."                       14:22:01
16        Well, Mr. Barclay guessed it, so he
17   knows this is not even close to the
18   truth because Stonewall has never
19   delegated anything. He is Stonewall
20   and he has never signed anything, a     14:22:10
21   Collaboration Agreement or anything
22   else that delegates anything to NICO.
23        And he sends out a heated response,
24   in which he points that out in no
25   uncertain terms.               14:22:25
```

TSG Reporting - Worldwide    877-702-9580

Page 1272

```
 1        Closing - Respondent
 2   He points it out to Mr. Ryan,
 3   Ms. Mullen, Mr. Randall. I don't see
 4   Ms. Hoelsken on this. Oh, I see
 5   Ms. Hoelsken on there. Sorry. He        14:22:41
 6   writes:
 7        "To all concerned, for the
 8   avoidance of doubt, Stonewall has
 9   always had and retains the right to
10   agree claims." And he quotes           14:22:49
11   Article 3.A -- he calls it Article 3.A,
12   but it is Article 4.A of the
13   reinsurance agreement. That NICO has
14   the right to associate and he quotes
15   Article 11.A, "The decisions remain      14:23:02
16   vested in Stonewall."
17        Then he says, "Stonewall has a
18   runoff Management Agreement with
19   Cavell... within which it is recorded
20   that 'Eastgate (now Cavell America)      14:23:17
21   agrees to administer the reinsurance
22   agreement'... Stonewall does not have
23   any management agreement with NICO.
24   The relationship between Cavell America
25   and NICO set out in the Collaboration    14:23:34
```

TSG Reporting - Worldwide    877-702-9580

Page 1273

```
 1        Closing - Respondent
 2   Agreement referred to by Tom Ryan is of
 3   no concern to Stonewall which can only
 4   look to Cavell America to fulfill its
 5   obligations under the Runoff Management  14:23:41
 6   Agreement."
 7        He doesn't know that Cavell has
 8   delegated those obligations to NICO.
 9   He couldn't have written this if he
10   knew that. He is looking to his agent    14:23:54
11   Cavell. Everybody who got this e-mail
12   knew that Barclay had it wrong, knew
13   that Cavell had delegated to NICO the
14   control of claims, and that Barclay
15   could not look to Cavell anymore. Not    14:24:17
16   one of them wrote back to him saying
17   that. Not one.
18        Seven months later, Mr. Barclay is
19   invited to attend the presentation made
20   by Mr. Randall and Ms. Hoelsken to the   14:24:39
21   Pennsylvania Insurance Department where
22   Randall's company, Randall & Queller,
23   is looking to buy, I believe, a
24   reinsurance company, and they make a
25   presentation to the Department.          14:24:56
```

TSG Reporting - Worldwide    877-702-9580

Page 1274

1      Closing - Respondent
2    Mr. Barclay is in the audience, and
3    here is part of the presentation giving
4    Mr. Randall's qualifications.
5        And it says, in 2001, he had a U.S.    14:25:11
6    "Collaboration Agreement with NICO
7    (CGNU)" -- Commercial Union --
8    "/Kemper." Not Seaton. Not Stonewall.
9        Mr. Barclay is sitting in the
10   audience and is having reconfirmed for    14:25:34
11   the umpteenth time that the
12   Collaboration Agreement -- by the way,
13   CGNU, Commercial Union, OneBeacon,
14   they're all the same.
15       It wasn't until November of 2005    14:25:50
16   that they actually learned the truth.
17   That they actually get a copy of the
18   Collaboration Agreement and see what it
19   does.
20       The Board hired Stroock, you heard    14:26:01
21   that, to look into it. And Stroock
22   asked Mr. Barclay what he knew about
23   it. And Mr. Barclay sent an e-mail
24   which is very difficult to read. But
25   let me try to read. This is an    14:26:14

Page 1275

1      Closing - Respondent
2    enlarged. But let me try to read to
3    you the highlighted portions.
4        "Being unaware of the terms of the
5    Collaboration Agreement, my    14:26:29
6    assumption" -- he is talking about the
7    Rhode Island report.
8        "Didn't you know about this through
9    the Rhode Island report?"
10       And he says, "Being unaware of the    14:26:36
11   terms of the Collaboration Agreement,
12   my assumption at the time this report
13   was sent to me would have been that
14   this Collaboration Agreement was the
15   one entered into by Randall America and    14:26:49
16   NICO wherein Randall took on
17   responsibility for the administration
18   of the OneBeacon account in 2001 which,
19   as I understood it, provided for some
20   sharing of Randall and NICO [something]    14:27:03
21   resources to manage claims."
22       Then down in the last paragraph he
23   writes, "Having now seen a copy of the
24   Collaboration Agreement and the extent
25   of the delegation of claims handling    14:27:18

Page 1276

1      Closing - Respondent
2    authority by Randall to NICO, the
3    references to the Collaboration
4    Agreement in the examiner's report take
5    on a greater significance. However, at    14:27:29
6    that time I continued to believe that
7    Randall remained solely responsible for
8    the management of the claims and
9    liabilities of Seaton and Stonewall,
10   subject to NICO's rights in the    14:27:39
11   Reinsurance Contracts."
12       Do you have any doubt that he was
13   telling the truth? I submit to you
14   that every single document you've seen
15   proves he was telling the truth. Every    14:27:55
16   document you've seen, after he got the
17   redomestication documents, proves he
18   was telling the truth. But you'll
19   decide.
20       I'm going to skip the next two    14:28:28
21   because it is redundant.
22       As I've already talked in wide
23   redundance, the Collaboration Agreement
24   obviously was a sea change in the
25   handling of claims. NICO now had all    14:28:48

Page 1277

1      Closing - Respondent
2    authority and control and Seaton's
3    agent, Cavell, did not.
4        And Tom Ryan believed that that
5    meant he had to answer to no one.    14:29:03
6    Actually, I'm going to do those two.
7    Let me just show you.
8        Here is Pam Hoelsken, in connection
9    with the same Equitas deal, now for the
10   first time that we've seen, she puts on    14:29:20
11   her hat as an officer, Treasurer of
12   Seaton and Stonewall, rather than her
13   Cavell hat, and she says, "Under my
14   fiduciary responsibilities as treasurer
15   of Stonewall and Seaton, I cannot    14:29:32
16   understand why a payment should be made
17   to Equitas of $700,000 when they owe
18   Stonewall $800,000 and owe Seaton in
19   excess of one million dollars."
20       This is this ostensible principal,    14:29:45
21   Seaton and Stonewall saying this. And
22   what is Mr. Ryan's response? What we
23   looked at before. Get lost. You don't
24   tell me what to do. You've delegated
25   your rights, and I'm not subject to    14:30:05

Page 1278

```
 1        Closing - Respondent
 2    your second guessing.  And I got to
 3    believe that over the two days that you
 4    saw Mr. Ryan testify, you have to know
 5    that he does not take well to criticism    14:30:19
 6    or direction from others.
 7        Finally, to further prove the
 8    point, you heard him admit that he
 9    refused a direct order from
10    Mr. Barclay, the president of Seaton       14:30:37
11    and Stonewall, to transfer the Seaton
12    and Stonewall claim files to
13    Castlewood's office in Rhode Island.
14        You heard that from him in this
15    transcript at page 537 to 538, and he      14:30:49
16    admitted it in the Stonewall transcript
17    at page 1266 to 69.
18        He refused a direct order from his
19    principal.  And he only gave his
20    companies their own files after he was     14:31:05
21    instructed to do so in writing by the
22    Rhode Island Department.  That's
23    Exhibit 575.
24        Those files got to Seaton in
25    mid-2006 because of Mr. Ryan's delay.      14:31:21
```
TSG Reporting - Worldwide       877-702-9580

Page 1279

```
 1        Closing - Respondent
 2    You heard criticism about Seaton
 3    putting up reserves prior to June of
 4    2006.  That was Mr. Knoerzer's entire
 5    presentation, Seaton didn't put up        14:31:42
 6    reserves.  Try putting up reserves
 7    without the claims file.  Ryan wouldn't
 8    give them up as he admitted.  The
 9    arrogance is astounding.  Who are
10    Seaton and Stonewall to tell me what to    14:32:00
11    do with their files or how to handle
12    their claims?  I kept waiting for him
13    to take off his shirt and see the "S"
14    underneath.
15        The carefully constructed balances     14:32:17
16    in the treaty were tossed aside and
17    ignored.  And in direct breach of them,
18    NICO exercised its dictatorial control
19    over all claim functions.  I find it
20    inconceivable that anyone would not        14:32:37
21    conclude that that was not a material
22    breach of the treaty.
23        Let's talk about remedy.  One
24    proper remedy for NICO's breach is
25    rescission.  Case law is clear that,       14:32:52
```
TSG Reporting - Worldwide       877-702-9580

Page 1280

```
 1        Closing - Respondent
 2    you know, you're allowed to get
 3    rescission for material breach.  And in
 4    fact, it's at the option of the
 5    nonbreaching party; you can pick           14:33:03
 6    rescission or damages.
 7        Stonewall picked rescission.  As we
 8    pointed out in our breach, there is a
 9    problem with Seaton picking rescission.
10    The problem is, if you don't couple        14:33:16
11    rescission with a return of premium
12    plus the full interest earned by NICO
13    at almost 12 percent, Seaton could be
14    rendered insolvent.  If you were to
15    couple a rescission with a return of       14:33:30
16    premium plus six percent interest, for
17    example, Seaton would be insolvent.
18        It would be irresponsible in the
19    extreme for Seaton's management to ask
20    for a remedy that would render it          14:33:44
21    insolvent.
22        And I can't imagine that you as a
23    Panel, if you agree that NICO is guilty
24    of material breach, would want to pick
25    out a remedy that rendered Seaton          14:33:56
```
TSG Reporting - Worldwide       877-702-9580

Page 1281

```
 1        Closing - Respondent
 2    insolvent.  But you do have authority
 3    to fashion pretty much whatever remedy
 4    you want.  The case law on that is
 5    clear.                                     14:34:06
 6        And if you choose to fashion the
 7    remedy of rescission plus a return of
 8    premium at 12 percent, which is
 9    $242 million, you have the authority to
10    do that, it would not render Seaton        14:34:23
11    insolvent, and would in many ways be
12    the most appropriate remedy to pick.
13        If you don't do that, you have to
14    look at damages.
15        Now, for the last five years at        14:34:44
16    least, since the day of the
17    Collaboration Agreement and for the
18    entire term of the treaty, if we
19    believe Ms. Hoelsken or Mr. Krutter,
20    the testimony about the oral prefunding    14:34:53
21    agreement, claims were handled and
22    resolved in a manner directly contrary
23    to how the treaty provided.
24        NICO says that to measure our
25    damages from this, we must prove           14:35:05
```
TSG Reporting - Worldwide       877-702-9580

54

Page 1282

1    Closing - Respondent
2    individual situations where NICO either
3    delayed a settlement payment or
4    otherwise caused the actual loss
5    payment to be greater than it should    14:35:17
6    have been.
7        Now, that's a nifty standard for
8    NICO to propose because it is
9    impossible to meet. Because Tom Ryan
10   and his minions never sought to do    14:35:29
11   policy buybacks, so how can we prove
12   from the files they would have
13   succeeded if they tried? It is
14   impossible. It can't be done. And
15   that's why that's not the correct    14:35:43
16   standard.
17       There is something a bit arrogant
18   about the party that breached the
19   contract telling us, and telling you,
20   that the only damages we can get are    14:35:55
21   for those claims that we can actually
22   prove, because it jumps off the
23   page that they cost us money. It is
24   not the standard.
25       What is the standard? The    14:36:08

Page 1283

1    Closing - Respondent
2    standard, as set forth in the case law
3    in our briefs, which they never refute,
4    is that we must prove the fact of
5    damages. Once we have proved the fact    14:36:20
6    of damages, you are free to speculate
7    all you want about the amount of
8    damage. I'll give you an example.
9        The Philadelphia Re fire case.
10   Philadelphia Re was in One Meridian    14:36:36
11   Plaza. The worst fire in U.S. history.
12   Many of their files burned up in that
13   fire. And they actually hired us to
14   sue Bailif (phonetic) on whose fault
15   the fire starred in the building.    14:36:50
16       How do we prove the amount of
17   damages we suffered by not having our
18   files? Can we prove without our files,
19   without having access to our file? How
20   do we prove that we could have defended    14:37:00
21   claims better if we had our files? We
22   don't have the files. We can't prove
23   it.
24       The Court expressly ruled all you
25   have to do is fact of damage, then I    14:37:10

Page 1284

1    Closing - Respondent
2    can speculate all I want as to amount
3    of damage. The Court found the fact of
4    damage, and we had an enormous
5    settlement on amount, even though not    14:37:18
6    one penny was actually provable.
7        That's the rule. Because it is the
8    party at fault that made the damage
9    unprovable. And that's the same
10   situation here.    14:37:32
11       The fact of damage, in our opinion,
12   is crystal clear. It is clear from
13   Mr. Apple's testimony, that while at
14   Cavell and under Ryan's management,
15   commutations just weren't sought. You    14:37:50
16   heard from Mr. Carlson. In the last
17   month he's done two commutations on
18   ceded reinsurance cases. He got
19   authority a month ago, and in a month
20   he got two of them done.    14:38:07
21       In seven years, Mr. Ryan's team got
22   one done and it was with Philly Re,
23   where the net payment was $87 million
24   to them. They never did a single
25   commutation on an incoming book of    14:38:22

Page 1285

1    Closing - Respondent
2    business where they had to pay money
3    out.
4        You heard Mr. Carlson, and you saw
5    it in my friend's opening and this    14:38:29
6    morning, two-thirds of the development
7    on this book is on assumed reinsurance
8    business, and they made no effort to
9    stem it. They say, Well, that was
10   Hoelsken's responsibility. Give me a    14:38:43
11   break.
12       Hoelsken testified, "I can't cut a
13   check without Tom Ryan's approval. I
14   can't do squat without Tom Ryan's
15   approval." Why in the world would    14:38:55
16   Hoelsken pursue commutations on
17   incoming reinsurance when she knows
18   that NICO wants to hold on to the money
19   and not pay them?
20       Mr. Apple told you, he is at Cavell    14:39:14
21   now, no longer under Ryan's thumb, and
22   they actively pursue commutations on
23   behalf of the companies they run-off.
24   That's at page 137 to 138 of the
25   transcript.    14:39:26

Page 1286

Closing - Respondent

1    Closing - Respondent
2        Ryan also admitted at page 195 of
3    the transcript that on assumed
4    reinsurance, Seaton set the reserve
5    recommended by the cedent. So this        14:39:35
6    under-reserving nonsense that you heard
7    is clearly no impediment to commuting
8    assumed reinsurance. Yet they never
9    even tried.
10        As Mr. Fowler actually pointed out    14:39:52
11    to Mr. Ryan, one of the obligations of
12    Randall America/Cavell/Eastgate under
13    their agreement with Seaton is to
14    present a schedule of targets and
15    commutations status reports. It was a    14:40:10
16    very short commutation status report
17    and target report. There were no
18    targets and no commutations.
19        We think the fact of damage is
20    equally clear on the direct insurance    14:40:30
21    business. I don't want to take the
22    time to take you through Mr. Fowler's
23    testimony. You heard it. You saw the
24    documents. You'll decide whether cases
25    could have been settled at discounted    14:40:46

Page 1287

1    Closing - Respondent
2    amounts off of present value. And
3    that's key. That's all Follis ever
4    said we want to do.
5        Discounted off of present value,    14:40:56
6    not give away the store as our friends
7    would have you believe. And he was
8    able to do it. He finally gets
9    authority and he's available to do it.
10        And I want to blow up their Myth    14:41:10
11    No. 5. This is a myth all right, this
12    page. But it is not a myth of ours.
13        Again, how disingenuous is this
14    document? Of the eight Seaton accounts
15    settled with policy buybacks, two of    14:41:10
16    them, Hercules and Tesoro, were done
17    solely by Mr. Follis of Castlewood,
18    despite Tom Ryan's active objections
19    and interference for a year.
20        And I found a little insincere
21    Mr. Ryan's testimony about how pleased
22    he was that Mr. Follis was able to
23    accomplish this deal.
24        When you read through or revisit
25    Mr. Follis's testimony and the e-mail

Page 1288

1    Closing - Respondent
2    chains and the roadblocks that Ryan put
3    up time after time, perhaps you'll
4    share my insincerity.
5        As concerns Tesoro, the evidence
6    show that it had made a settlement
7    offer to Mr. Ryan in 2001 to which he
8    never even responded. Can you imagine
9    not even responding to a policyholder's
10    policy settlement proposal? That's a    14:42:44
11    good way to develop a relationship with
12    a policyholder that could lead to a
13    later settlement. How discourteous and
14    how foolish.
15        Despite that, Follis attempts to    14:42:55
16    repair the breach because he knows the
17    policyholder, and he knows its lawyer.
18    And he settled with them for other
19    clients, other carriers. And he tries
20    and he tries and he tries. And he    14:43:09
21    finally -- Ryan's prescription for
22    dealing with it, this is in response to
23    Follis, an e-mail from Ryan, his
24    prescription, "We're going to keep
25    monitoring." They have been monitoring    14:43:23

Page 1289

1    Closing - Respondent
2    for five years. They are going to keep
3    monitoring it. That's going to resolve
4    it. That's Exhibit 318.
5        Anyhow, Hercules, NICO's exposure    14:43:31
6    model shows a net present value of
7    9.2 million. And despite that, it
8    recommends a full limit reserve of
9    12.4 million. That's Exhibit 696.
10        After it comes up with its net    14:43:50
11    present value, it negotiates a
12    coverage-in-place deal. And Follis
13    says, Why are you doing that? And he
14    pesters Ryan for doing a discounted
15    lump sum settlement that Ryan refuses,    14:44:03
16    and Follis pesters, and Ryan refuses,
17    and Follis pesters.
18        Finally, Ryan grants authority
19    at 5.1 million, and within a week,
20    Follis does a deal on 2.8 million on a    14:44:19
21    case where Ryan is insisting he should
22    be carrying a $12.4 million reserve,
23    And I'm not going to give you the
24    authority until you do it. Come on.
25        A third one on this myth list, U.S.    14:44:31

56

Page 1290

```
 1        Closing - Respondent
 2     Pipe, was also, by Mr. Ryan's
 3     admission, a deal done at least
 4     largely, largely driven by Castlewood.
 5        Two others on the list, Combustion   14:44:48
 6     Engineering and El Paso aren't policy
 7     buybacks at all, they're partial policy
 8     buybacks, as Mr. Follis testified to.
 9     And you can see it in Exhibit 766 and
10     767.                                    14:45:07
11        The truth is that in eight years,
12     eight years of handling Seaton's
13     claims, Mr. Ryan and his team managed
14     to accomplish three policy buybacks.
15     And of the five in progress, three of   14:45:24
16     them, Borg-Warner, Westinghouse and
17     Unocal -- Unocal is not on there. It
18     should be. I'm sorry. Champion.
19     Those are all Follis deals in which --
20     which Ryan never approved until Follis   14:45:47
21     went over his head to Snover. And this
22     is worth looking at.
23        Ryan refuses and refuses and
24     refuses, and Follis writes this note --
25     I'm not going to read it, but you will   14:46:10
    TSG Reporting - Worldwide    877-702-9580
```

Page 1291

```
 1        Closing - Respondent
 2     see it, it will be in the book. He is
 3     saying, I can't get Ryan to approve
 4     these. I know I can do these for
 5     commercially reasonable amounts, and     14:46:18
 6     all Ryan is doing is stalling. Please,
 7     Mr. Snover, do something.
 8        Now, this is April of 2007, this
 9     year. And after this letter, he
10     doesn't get a response from Snover, but  14:46:38
11     let's than a month later, on May 3rd,
12     he gets the okay from Ryan. My friends
13     will tell you, Oh, that's because they
14     put up reserves.
15        I'll tell you that that's because     14:46:53
16     Brian Snover was managing this
17     arbitration and said, My God, are we
18     really going to go into the hearing
19     with the arbitration panel on this
20     record, not letting the guy pursue       14:47:07
21     discounted buybacks with a company who
22     he's done discounted buybacks with
23     before?
24        I believe if the decision had been
25     Tom Ryan's, we never would have gotten   14:47:20
    TSG Reporting - Worldwide    877-702-9580
```

Page 1292

```
 1        Closing - Respondent
 2     the authority. But you'll decide.
 3        Another thing you'll decide is
 4     whether this Myth No. 5 was an accurate
 5     and honest presentation to you.          14:47:36
 6        And why didn't they pursue
 7     buybacks? Why didn't they pursue
 8     commutations? Well, we know the
 9     answer. Because they wanted investment
10     income. Mr. Jain made that clear, and    14:48:05
11     Mr. Ryan did, too.
12        Indira is the best, I switch
13     around, I move from place to place, and
14     she is still right with me with the
15     blow-ups.
16        This is line 160 of Exhibit 15. It
17     shows a line for "allowable annual
18     payment at six percent."
19        Mr. Kirshnamurthy testified that it
20     was Ryan who added this line to the      14:48:43
21     form. This is a form that had been in
22     place before Ryan got there. And it
23     was Ryan who added this line and told
24     him to use the six percent. That's at
25     page 1417 of the Stonewall transcript.   14:48:53
    TSG Reporting - Worldwide    877-702-9580
```

Page 1293

```
 1        Closing - Respondent
 2        I want you to look at another
 3     document. Exhibit 147. This is a
 4     document created by Mr. Ryan himself.
 5     And in the far right-hand column --      14:49:05
 6     forget the handwriting on it. There
 7     are disputes about the handwriting.
 8     They accuse Mr. Burns of adding it
 9     after the fact. I don't know whether
10     he did or not. It doesn't matter. I      14:49:14
11     don't care about the handwriting.
12        The text prints "target." And for
13     Seaton they've got a target. And the
14     target is essentially the same as the
15     allowable annual limit, it's six         14:49:30
16     percent of the premium.
17        Mr. Ryan testified that this
18     document was distributed at his regular
19     claim staff meetings, and that's
20     page 1119 of the Stonewall transcript.   14:49:43
21        Do you think anyone dealing with
22     claims under Mr. Ryan didn't know what
23     the targets were? Didn't know what the
24     objective was, to try and keep claim
25     payments at less than the interests      14:50:00
    TSG Reporting - Worldwide    877-702-9580
```

Page 1294

1       Closing - Respondent
2   were earning on the premium?
3       Now, unlike Stonewall where they
4   met the target, on Seaton, admittedly,
5   they didn't meet the six percent          14:50:13
6   target. Their net payments well exceed
7   the notional six percent return. They
8   don't exceed NICO's actual 12 percent
9   return. I mean, you saw the Best
10  article, you know the return is 12        14:50:28
11  percent. If it wasn't, don't you think
12  they would have put in proof showing
13  otherwise? Come on.
14      At 12 percent, NICO has earned far
15  more in interest than its paid in         14:50:41
16  claims. In fact, you heard
17  Mr. Carlson. Using an 11.7 percent
18  rate of return, and doing it completely
19  properly -- they didn't object to any
20  part of his methodology. They objected    14:50:57
21  to some of his numbers, but not his
22  methodology -- you come up with a
23  guaranteed profit of $57 million,
24  pre-tax.
25      Even if they had to pay the           14:51:12

Page 1295

1       Closing - Respondent
2   remaining 200-plus-million on the cover
3   today, they walk away with a
4   $57 million profit no matter what
5   happens on this book of business going    14:51:19
6   forward. And if the payout lasts
7   another ten years, that becomes over
8   $400 million.
9       Indira, can you go to the next to
10  the last blowout by any chance? It's      14:51:34
11  from Mr. Ryan's testimony.
12      We say, Mr. Carlson did -- if the
13  runoff lasts another ten years, they
14  get $420 million in investment income.
15  Even assuming their limit is blown.       14:51:55
16  Look what Ryan testified to.
17      He was asked, "Well, it hasn't a very
18  successful runoff, isn't it?
19      He says, "Well, it hasn't happened
20  yet." He is talking about the Seaton      14:52:09
21  runoff. Remember, the Seaton direct
22  book of business had gone into runoff
23  in 1974, and the assumed bucket had
24  gone into runoff in 1984. So by the
25  time Ryan got them, one had been in       14:52:20

Page 1296

1       Closing - Respondent
2   runoff for 25 years and the other for
3   15 years.
4       And look what he says, "It hasn't
5   happened yet. So I don't know whether     14:52:31
6   it's successful. To me it's, you know,
7   I'm in the first quarter of an NBA
8   basketball game. We got a long way to
9   go..."
10      The first quarter? On the direct      14:52:41
11  book it's been in runoff now for 33
12  years; on the assumed book, it's been
13  in runoff now for 23 years. According
14  to Mr. Ryan, we're in the first
15  quarter. My great, great, great-          14:52:55
16  grandchildren will not survive the
17  runoff of this if it's left in
18  Mr. Ryan's hands. And imagine the
19  investment income? My goodness.
20      This is a very telling answer about   14:53:15
21  Mr. Ryan's view about how you do
22  runoffs. Even if we ignore the first
23  25 years, he's had it for eight years.
24  Do you really need 32 years to runoff
25  $200 million of reserves?                 14:53:28

Page 1297

1       Closing - Respondent
2       And while NICO is making its
3   fortune, let's look at what's happened
4   to Seaton.
5       At the inception of this deal,        14:53:40
6   Seaton's reserves were $169 million,
7   and probably should have been 250.
8   That's what Mr. Jain said he was
9   anticipating, 250. And it had a
10  $48 million surplus.                      14:53:54
11      Now, since the deal was done, they
12  paid out $158 million, almost the full
13  amount of reserves on the book at the
14  time. There was 169 on the book, they
15  paid out 159. According to Seaton, it     14:54:14
16  still got 217 million in reserves. Add
17  that to the original 169, and you're
18  pushing forward 400 million on this
19  runoff as opposed to what Mr. Jain
20  admitted. He thought it was going to      14:54:39
21  be the 250. According to NICO, the
22  reserve should be $271 million.
23      Do you honestly believe that if
24  there had been even a modicum of effort
25  to do discounted policy buybacks and      14:54:58

58

Page 1298

```
 1        Closing - Respondent
 2   commutations, rather than just let
 3   everything run and run and grow and
 4   grow, that the numbers would have
 5   turned out this bad?  You'll decide.        14:55:14
 6        I believe, we believe this is the
 7   least successful runoff in insurance
 8   industry history.  And I thought it was
 9   funny, Mr. Jain's testimony that we
10   showed you earlier.  Actually, we          14:55:27
11   didn't show it to you.  I think
12   Mr. Nonna showed it to you.  Where
13   Mr. Jain said how dare we make the
14   accusations we are making.  If he had
15   actually done what we accused him of        14:55:38
16   doing, he could have never been in the
17   runoff business, he could have never
18   done the Equitas deal if he operated
19   that way.
20        I submit to you that if Equitas had    14:55:49
21   a clue about the Seaton deal, he
22   couldn't have done it; if they had a
23   clue about the Stonewall deal, he
24   couldn't have done it.
25        And they can't make the disastrous     14:56:02
```
TSG Reporting - Worldwide     877-702-9580

Page 1299

```
 1        Closing - Respondent
 2   results on just bad developments in the
 3   law.  Because you heard Mr. Ryan tell
 4   you that over the last three years,
 5   developments in the law have been          14:56:16
 6   largely, if not exclusively, positive.
 7   That's at page 576 of his testimony.
 8        The disastrous results experienced
 9   by Seaton under Mr. Ryan's management
10   are attributable, we submit, solely to      14:56:34
11   the refusal to seek out discounted
12   settlement and commutations, and to
13   instead engage in absurdly long and
14   unproductive analysis of exposure and
15   enter into coverage-in-place deals          14:56:52
16   under which you are guaranteed to pay
17   out your maximum limits, but over a
18   long period of time so NICO can make a
19   great deal of investment income.
20        One of my colleagues referred to it    14:57:07
21   as "paralysis by analysis."  Don't be
22   proactive like a Joe Follis; run models
23   indefinitely like a Brooke Green.
24   Which just so happens to let you make a
25   fortune in investment income while          14:57:28
```
TSG Reporting - Worldwide     877-702-9580

Page 1300

```
 1        Closing - Respondent
 2   bankrupting your cedent.  And all of it
 3   made possible only by the material
 4   breaches of the treaty through which
 5   NICO ends up in charge instead of           14:57:40
 6   Seaton.
 7        You saw the evidence of successful
 8   runoffs, what the numbers look like
 9   after five years, after ten years.  I'm
10   not going to revisit it.                    14:57:55
11        We would suggest, allowing NICO to
12   make a profit in the hundreds of
13   millions for having bankrupted Seaton
14   would be a crime.  Because we can't put
15   an actual number -- I'll be the first       14:58:17
16   to admit it.  We can't and will never
17   be able to, and no one ever could, put
18   an exact number on the damage we've
19   suffered because of this, we don't have
20   to.                                         14:58:29
21        And what you should do, if you
22   don't rescind these treaties and give
23   us the premium plus interest, what you
24   should do is rule that our damages and
25   the amount NICO must pay us in damages      14:58:48
```
TSG Reporting - Worldwide     877-702-9580

Page 1301

```
 1        Closing - Respondent
 2   is exactly equal to all amounts that
 3   Seaton has to pay for claims and
 4   expenses in excess of the limit of the
 5   NICO treaty.  That's the only way you       14:59:00
 6   keep Seaton out of liquidation.
 7        You heard Mr. Carlson.  On our own
 8   reserves, we are only a million or two
 9   away from liquidation, away from
10   exhausting this cover and ending up in      14:59:20
11   liquidation.
12        According to Ryan, it is
13   271 million.  We are 63 million over
14   the limit.  According to Ryan, last
15   sentence, "Seaton is $63.6 million over     14:59:33
16   the limit."  This is a company whose
17   surplus is only 40 million.
18        You can rule, and should rule, that
19   we have been damaged by NICO in an
20   amount that equals the full amount that     14:59:54
21   we ultimately are required to pay on
22   claims and expenses in excess of the
23   limits of the reinsurance agreement,
24   and that NICO must reimburse us for
25   those amounts and when they come due.       15:00:12
```
TSG Reporting - Worldwide     877-702-9580

Page 1302

```
1        Closing - Respondent
2    And I would ask that you put 25 percent
3    interest for overdue payments, because
4    that's the only thing that will get
5    NICO's attention.              15:00:29
6        Final issue, who acts as claims
7    servicer. We submit the only
8    reasonable answer is Seaton. And in
9    fact, it is the answer mandated by the
10   contract, contrary to what my friends  15:00:43
11   will tell you.
12       They always tell you, "Under the
13   contract we're the claims servicer,"
14   but they never show you the contract.
15   Let me show you first the negotiation  15:00:53
16   of the provision.
17       This is in Mr. Barclay's letter to
18   Mr. Jain. NICO had put in a provision
19   to the effect that it had to preapprove
20   any sale of Seaton. Mr. Barclay writes  15:01:07
21   back in Exhibit 604:
22       "The purchaser" -- Dukes Place --
23   "must retain the right to realize its
24   investment in the reinsured and cannot
25   be bound to first seek the approval of  15:01:21
```
TSG Reporting - Worldwide    877-702-9580

Page 1303

```
1        Closing - Respondent
2    Berkshire-Hathaway."
3        What does Mr. Jain respond? This
4    is Mr. Jain's letter to Mr. Barclay.
5        "Rather than require the prior   15:01:37
6    approval of the Reinsurer for the sale
7    of the Reinsured, the slip provides
8    that should the Reinsured be sold, the
9    Reinsurer would have the option to
10   assume the administration of the   15:01:45
11   subject claims."
12       And look what he put in the slip.
13   "The Reinsurer has the option to assume
14   handling of claims until this
15   reinsurance cover is exhausted."   15:02:03
16       Look at the treaty, both
17   provisions, where it talks about NICO
18   having the right to become claims
19   servicer. It expressly says, until
20   this reinsurance, or this retrocession  15:02:16
21   is exhausted, what it doesn't say is
22   exhausted on a paid basis.
23       NICO drafted this. As a matter of
24   law, if you find it ambiguous, you must
25   construe that ambiguity against NICO.   15:02:35
```
TSG Reporting - Worldwide    877-702-9580

Page 1304

```
1        Closing - Respondent
2    I submit to you, it's ambiguous.
3        Does it mean until the retrocession
4    is exhausted on a paid basis or on an
5    incurred basis? And I submit you   15:02:50
6    should interpret it to mean on an
7    incurred basis. First of all, because
8    NICO drafted it but, secondly, because
9    that's the only thing that makes any
10   sense.                        15:03:08
11       Mr. Ryan has acknowledged the cover
12   is exhausted on an incurred basis. All
13   that we are playing with now is
14   Seaton's money, not NICO's. All that's
15   at risk now is Seaton's surplus, not   15:03:24
16   NICO's treaty limit.
17       And why in the world should NICO be
18   allowed to handle Seaton's claims when
19   it's no longer's NICO's money at stake?
20   What NICO is telling you, let us keep   15:03:44
21   handing the claims and keep making
22   investment income ad nauseam, even
23   though doing that is going to put
24   Seaton into liquidation.
25       Please, give Seaton a fighting   15:04:00
```
TSG Reporting - Worldwide    877-702-9580

Page 1305

```
1        Closing - Respondent
2    chance to survive. Rule NICO's cover
3    is exhausted and, therefore, it has no
4    right to be claims servicer; Seaton is
5    the claims servicer. Give us a chance   15:04:13
6    to fight for our life instead of
7    letting NICO kill us.
8        And remember, since NICO
9    acknowledges that its limit is going to
10   be exhausted, its only incentive right   15:04:27
11   now is to stall, stall, stall, stall,
12   keep the cash, keep the cash, keep the
13   cash, no matter how badly it buries
14   Seaton.
15       And if you're not going to rescind   15:05:03
16   and you're going to enforce the
17   contract as written, and you declare
18   Seaton the claims servicer and award
19   the damages I talked about, you also
20   have to rule that NICO must comply with   15:05:19
21   its obligations under the treaty going
22   forward.
23       You must affirm that under
24   Article 4.A, Seaton is the sole judge
25   of its liabilities and NICO is bound by   15:05:33
```
TSG Reporting - Worldwide    877-702-9580

Page 1306

1      Closing - Respondent
2    its good faith decisions. You must
3    rule that NICO is absolutely bound by
4    any good faith settlements or buybacks
5    made by Seaton below the thresholds.      15:05:48
6      You must rule that when presented
7    with a proposed settlement or buyback
8    above the threshold, NICO must give its
9    position, consent to a no, without
10   delay. We ask for 48 hours. No more.      15:06:04
11   And that if it refuses to consent, it
12   must set forth in writing its reasons
13   for doing so.
14      And that you, this Panel, will
15   retain jurisdiction to adjudicate on an      15:06:27
16   expedited basis any claim where NICO
17   refuses to give its consent.
18      And finally and absolutely most
19   importantly, you must order NICO to put
20   into a claims account to be      15:06:52
21   administered by Seaton, the remaining
22   limit left on the treaty, which I
23   believe is $191 million. Because if
24   you don't enforce Article 20.C and
25   order them to put that money into a      15:07:13

Page 1307

1      Closing - Respondent
2    claims account, you are, again,
3    condemning Seaton to insolvency.
4      Because without that money there,
5    Seaton can't settle and pay claims.      15:07:26
6    Mr. Barclay and Mr. Jain knew it at the
7    outset of the deal, that's exactly why
8    Article 20.C is there. Mr. Ryan has
9    acknowledged, we're going to have to
10   pay out this full amount, there's no      15:07:44
11   dispute about that. Make them put it
12   into an account.
13      The interest belongs to them --
14   although I would suggest that you
15   should rule that the interest      15:07:54
16   accumulates in order to pay, in part,
17   our damages. And when we have to pay
18   claims after their limit has been
19   exhausted on a paid basis, we can use
20   the interest to pay our damages.      15:08:11
21      Anything short of that is rewarding
22   a material breach of contract, it's
23   allowing NICO to put hundreds of
24   millions of dollars in its pocket for
25   having breached a contract and      15:08:33

Page 1308

1      Closing - Respondent
2    bankrupted Seaton.
3      I don't think you can, in good
4    conscious, do that. I hope you can't.
5    And I thank you very much for      15:08:48
6    listening.
7      CHAIRMAN THOMPSON: Thank you. Do
8    you want to take a brief break at this
9    point?
10      MR. NONNA: It is up to the Panel.      15:08:59
11      ARBITRATOR WIGMORE: Yes.
12      ARBITRATOR FOWLER: How much time
13   do you think you're going to take?
14      MR. NONNA: That's a very good
15   question. Mr. Brandes went on for      15:09:08
16   about two and a half or total --
17      CHAIRMAN THOMPSON: Approximately.
18      MR. NONNA: Counting before lunch,
19   two and a half hours.
20      MR. BRANDES: A little bit less if      15:09:21
21   you reduce it by the break, which was
22   15 minutes. But I don't care, whatever
23   time John feels he needs.
24      MR. NONNA: We will try to do this
25   quickly. Why don't we come back in ten      15:09:32

Page 1309

1      Rebuttal - Petitioner
2    minutes? In 45 minutes, we will try to
3    wrap it up, 40 minutes. As fast as we
4    can. I will explain what I want to do
5    when we get back.      15:09:42
6      CHAIRMAN THOMPSON: That is
7    understood. I will remind everybody
8    ten minutes. Which would be 20 minutes
9    past 3:00.
10      (Whereupon, a recess was taken      15:09:55
11   from 3:09 p.m. to 3:21 p.m.)
12      REBUTTAL STATEMENTS - PETITIONER
13      (MR. KNOERZER)
14      MR. KNOERZER: It is now twice that
15   I have been treated to Mr. Brandes's      15:21:34
16   imaginary closings. I enjoyed the
17   second one as much as I enjoyed the
18   first one.
19      But I notice that, again, many
20   times there are things missing. One of      15:21:47
21   them is causation. I will talk about
22   that in a moment. Again, as he admits,
23   there is no prove of damage.
24      The first thing I want to talk
25   about, and I think what transcends      15:21:59

# EXHIBIT 19



**RIKER**
**DANZIG**
**SCHERER**
**HYLAND**
**PERRETTI** LLP

A T T O R N E Y S   A T   L A W

Shawn L. Kelly
Partner

Direct:
t: 973.451.8555
f: 973.451.8670
skelly@riker.com
Reply to: Morristown

March 20, 2008

<u>Via Telecopy</u> (402-536-3265)

National Indemnity Company
3024 Harney Street
Omaha, NE 68131
Attn: General Counsel

Re:  Demand for Arbitration by Stonewall Insurance Company against
     National Indemnity Company

Dear Sir/Madam:

Along with Cadwalader, Wickersham & Taft LLP, this firm represents Stonewall
Insurance Company ("Stonewall"). By and through this letter, Stonewall hereby
demands arbitration against National Indemnity Company ("NICO") pursuant to
Article 14 of the Aggregate Reinsurance Agreement between NICO and
Stonewall more fully identified as Contract No. RA 1385 (the "Treaty"). In this
arbitration, Stonewall shall seek a panel order rescinding the Treaty on the
ground that it was induced by fraud by NICO, and an award of such other and
further relief that the arbitration panel deems equitable and appropriate.

Stonewall names as its arbitrator Richard L. Voelbel, whose curriculum vitae is
available on the ARIAS US web site. Stonewall demands that NICO appoint its
arbitrator within thirty (30) days of receipt of this arbitration demand, as
required by the Treaty. Should NICO fail to appoint its arbitrator within the
specified time period, Stonewall intends to appoint NICO's arbitrator.

Headquarters Plaza  One Speedwell Avenue, Morristown  NJ 07962-1981 • t. 973.538.0800 f. 973.538.1984
50 West State Street, Suite 1010  Trenton, NJ 08608-1220 • t. 609.396.2121 f. 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t. 212.302.6574 f. 212.302.6628
London Affiliate: 33 Cornhill  London EC3V 3ND, England • t. +44 (0) 20.7877.3270 f. +44 (0) 20.7877.3271
www.riker.com

National Indemnity Company
March 20, 2008
Page 2


All responses to this arbitration demand should be directed to the undersigned
co-counsel for Stonewall.


Very truly yours,

*Shawn L. Kelly /JKV*

Shawn L. Kelly


CADWALADER WICKERSHAM & TAFT LLP


By: *Lawrence I. Brandes /JKV*

Lawrence I. Brandes, Esq.
Co-Counsel for Seaton


cc: Brian G. Snover, Esq. (via E-mail)
    Richard L. Voelbel (via E-mail)


3834466.3

# EXHIBIT 20



**RIKER**
**DANZIG**
**SCHERER**
**HYLAND**
**PERRETTI** LLP

A T T O R N E Y S   A T   L A W

Shawn L. Kelly
Partner

Direct:
t. 973.451.8555
f. 973.451.8670
skelly@riker.com
Reply to: Morristown

March 20, 2008

**Via Telecopy (402-536-3265)**

National Indemnity Company
3024 Harney Street
Omaha, NE 68131
Attn: General Counsel

Re:    **Demand for Arbitration by Seaton Insurance Company against
National Indemnity Company**

Dear Sir/Madam:

Along with Cadwalader, Wickersham & Taft LLP, this firm represents Seaton
Insurance Company, formerly known as Unigard Security Insurance Company
(hereinafter, "Seaton").  By and through this letter, Seaton hereby demands
arbitration against National Indemnity Company ("NICO") pursuant to Article 14
of the Aggregate Retrocession of Loss Portfolio Agreement between Seaton and
NICO more fully identified as Contract No. RA 1321, and Article 15 of the First
Aggregate Excess Retrocession of Loss Portfolio Agreement between NICO and
Seaton more fully identified as Contract No. RA 1322.  In this arbitration, Seaton
shall seek a panel order rescinding each of the above referenced Retrocession of
Loss Portfolio Agreements (collectively, the "Treaties") on the ground that they
were induced by fraud by NICO, and an award of such other and further relief
that the arbitration panel deems equitable and appropriate.

Seaton names as its arbitrator Jonathan Rosen, whose curriculum vitae is available
on the ARIAS US web site.  Seaton demands that NICO appoint its arbitrator
within thirty (30) days of receipt of this arbitration demand, as required by the
Treaties.  Should NICO fail to appoint its arbitrator within the specified time
period, Seaton intends to appoint NICO's arbitrator.

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t. 973.538.0800 f. 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t. 609.396.2121 f. 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t. 212.302.6574 f. 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t. +44 (0) 20.7877.3270 f. +44 (0) 20.7877.3271
www.riker.com

National Indemnity Company
March 20, 2008
Page 2


All responses to this arbitration demand should be directed to the undersigned
co-counsel for Seaton.


Very truly yours,

*Shawn L. Kelly /JRV*

Shawn L. Kelly


CADWALADER WICKERSHAM & TAFT LLP


By: *Lawrence I. Brandes /JRV*

Lawrence I. Brandes, Esq.
Co-Counsel for Seaton


cc:  Brian G. Snover, Esq. (via E-mail)
     Jonathan Rosen, Esq. (via E-mail)


3834538.3